1

LATHAM & WATKINS LLP
    Belinda S Lee (Cal. Bar No. 199635)
    *belinda.lee@lw.com*
    Sarah M. Ray (Cal. Bar No. 229670)
    *sarah.ray@lw.com*
    Aaron T. Chiu (Cal. Bar No. 287788)
    *aaron.chiu@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600

2

3

4

5

6

7 *Attorneys for Defendant Apple Inc.*

8

9

UNITED STATES DISTRICT COURT

10

NORTHERN DISTRICT OF CALIFORNIA

11

OAKLAND DIVISION

12

13 | AFFINITY CREDIT UNION,

14 | Plaintiff,

15 | v.

16 | APPLE INC.

17 | Defendant.

18

CASE NO. 4:22-cv-04174-JSW

**DEFENDANT APPLE INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT**

Date:   January 6, 2023
Time:   9:00 a.m.
Place:  Courtroom 5, 2nd Floor, Oakland
Judge:  The Honorable Jeffrey S. White

19

20

21

22

23

24

25

26

27

28

1    **NOTICE OF MOTION AND MOTION**

2    TO THIS HONORABLE COURT, THE PARTIES, AND THEIR ATTORNEYS OF

3    RECORD, PLEASE TAKE NOTICE THAT on January 6, 2023 at 9:00 a.m. in Courtroom 5 of

4    the United States District Court for the Northern District of California, Oakland Division, located

5    at 1301 Clay Street, Oakland, California, Defendant Apple Inc. ("Apple") will and hereby does

6    move to dismiss with prejudice all claims brought by Plaintiff Affinity Credit Union ("Affinity")

7    in the Class Action Complaint ("Complaint").

8    Apple respectfully makes this Motion under Federal Rules of Civil Procedure 8(a) and

9    12(b)(6) on the ground that Plaintiff does not allege sufficient facts to state a claim for any cause

10   of action:

11   1.    Affinity fails to plead claims for monopolization and attempted monopolization

12   under Section 2 of the Sherman Act, 15 U.S.C. § 2, because those claims are premised on

13   implausibly pled single-brand markets.  *See Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1107–08

14   (N.D. Cal. 2022); *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198–200 (N.D. Cal. 2008).

15   2.    Affinity lacks standing to pursue a tying claim under Sections 1 and 3 of the

16   Sherman Act, 15 U.S.C. §§ 1, 3, and otherwise fails to plead the existence of an unlawful tying

17   arrangement.  *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199–200 (9th Cir. 2012);

18   *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 974–75 (9th Cir. 2008); *United States*

19   *v. Microsoft*, 147 F.3d 935, 949–50 (D.C. Cir. 1998).

20   3.    Affinity fails to plead any anticompetitive effects as required to state claims for

21   monopolization and tying under the rule of reason.  *See Ohio v. Am. Express Co.* (*Amex*), 138 S.

22   Ct. 2274, 2284–85 (2018).

23   4.    Affinity fundamentally complains of a refusal to deal, the elements of which it fails

24   to allege.  *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407–

25   08 (2004); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020).

26   This Motion is based on this Notice of Motion and Motion to Dismiss, the attached

27   Memorandum of Points and Authorities, all pleadings and papers filed herein, oral argument of

28   counsel, and any other matter that may be considered by this Court on this Motion.

1

**TABLE OF CONTENTS**

2

**Page**

3    I.     INTRODUCTION ................................................................................................... 1

4    II.    STATEMENT OF ISSUES TO BE DECIDED ...................................................... 3

5    III.   STATEMENT OF RELEVANT ALLEGATIONS................................................. 3

6    IV.   ARGUMENT .......................................................................................................... 6

7         A.    Affinity's Monopolization Claims Fail Because They Are
Premised upon an Implausible Single-Brand Market Limited to

8              Apple Pay................................................................................................... 6

9              1.    Single-Brand Relevant Markets Are "Extremely Rare" and
"Disfavored" .................................................................................. 6

10

11              2.    Affinity's Single-Brand Market Limited to Apple Pay Fails ................... 7

12              3.    Affinity Does Not and Cannot Plead an Aftermarket Claim ................... 9

13         B.    Affinity Does Not and Cannot Allege a Tying Arrangement ............................. 10

14              1.    As a Card Issuer, Affinity Lacks Antitrust Standing to
Complain of Tying.................................................................................. 10

15              2.    Apple Pay Is an Integrated Component Part of Apple's
Devices.................................................................................................. 11

16

17              3.    Users Are Not Required to Use Apple Pay, So There Is No
Unlawful Tie ......................................................................................... 12

18              4.    Affinity Fails to Allege Market Power in a Tying Product
Market ................................................................................................... 12

19

20         C.    Affinity Fails to Plead Anticompetitive Harm ................................................... 14

21         D.    Affinity Fundamentally Complains of a Refusal to Deal, the
Prerequisites of Which It Cannot Allege ........................................................... 14

22     V.    CONCLUSION..................................................................................................... 15

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**CASES**

4
*Alivecor, Inc. v. Apple Inc.*,
   No. 21-cv-03958, 2022 WL 833628 (N.D. Cal. March 21, 2022).................................. 8, 13

5

*Apple, Inc. v. Psystar Corp.*,
   586 F. Supp. 2d 1190 (N.D. Cal. 2008) ........................................................... 6, 7, 9

6

7
*Aurora Enterprises v. National Broadcasting Co.*,
   688 F.2d 689 (9th Cir. 1982) ............................................................................... 5

8

*Blix Inc. v. Apple, Inc.*,
   No. CV 19-1869-LPS, 2021 WL 2895654 (D. Del. July 9, 2021) ........................... 12

9

10
*Brantley v. NBC Universal, Inc.*,
   675 F.3d 1192 (9th Cir. 2012) ........................................................................ 12, 14

11

*Cyntegra, Inc. v. Idexx Laboratories, Inc.*,
   520 F. Supp. 2d 1199 (C.D. Cal. 2007) ............................................................... 10

12

13
*Digital Equipment Corp. v. Uniq Digital Technologies, Inc.*,
   73 F.3d 756 (7th Cir. 1996) ............................................................................... 10

14

*Eagle v. Star-Kist Foods, Inc.*,
   812 F.2d 538 (9th Cir. 1987) ............................................................................... 10

15

16
*Eichman v. Fotomat Corp.*,
   880 F.2d 149 (9th Cir. 1989) ............................................................................... 5

17

*Federal Trade Commission v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ........................................................................... 6, 15

18

19
*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018) ....................................................................... 6, 8, 9

20

*Illinois Tool Works Inc. v. Independent Ink, Inc.*,
   547 U.S. 28 (2006) ............................................................................................ 12

21

22
*In re American Express Anti-Steering Rules Antitrust Litigation*,
   361 F. Supp. 3d 324 (E.D.N.Y. 2019) ................................................................... 7

23

*In re German Automobile Manufacturers Antitrust Litigation*,
   No. 391, 2020 WL 1542373 (N.D. Cal. Mar. 31, 2020)........................................... 13

24

25
*Jefferson Parish Hospital District No. 2 v. Hyde*,
   466 U.S. 2 (1984)......................................................................................... 11, 12

26

*MetroNet Service Corp. v. Quest Corp.*,
   383 F.3d 1124 (9th Cir. 2004) ............................................................................. 15

27

28

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

APPLE INC.'S MOT. TO DISMISS
CASE NO. 4:22-cv-04174-JSW

*Newcal Industries, Inc. v. Ikon Office Solution*,
513 F.3d 1038 (9th Cir. 2008) ............................................................................ 6, 9, 10

*Oahu Gas Services, Inc. v. Pacific Resources, Inc.*,
838 F.2d 360 (9th Cir. 1988) .................................................................................. 13

*Ohio v. American Express Co.*,
138 S. Ct. 2274 (2018) ........................................................................................ 3, 14

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
555 U.S. 438 (2009) ............................................................................................. 3, 15

*PSI Repair Services, Inc. v. Honeywell, Inc.*,
104 F.3d 811 (6th Cir. 1997) .................................................................................. 10

*Rebel Oil Inc. v. Atlantic Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .................................................................................. 13

*Reilly v. Apple Inc.*,
578 F. Supp. 3d 1098 (N.D. Cal. 2022) ............................................................ 6, 9, 10

*Response of Carolina, Inc. v. Leasco Response, Inc.*,
537 F.2d 1307 (5th Cir. 1976) ................................................................................ 11

*Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*,
532 F.3d 963 (9th Cir. 2008) .................................................................................. 11

*Saint Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd.*,
778 F.3d 775 (9th Cir. 2015) .................................................................................... 9

*Streamcast Networks Inc. v. Skype Technologies, S.A.*,
547 F. Supp. 2d 1086 (C.D. Cal. 2007) .................................................................... 8

*Sumotext Corp. v. Zoove, Inc.*,
No. 16-CV-01370, 2016 WL 6524409 (N.D. Cal. Nov. 3, 2016) ............................ 12

*United States v. E.I. duPont de Nemours*,
351 U.S. 377 (1956) ................................................................................................ 13

*United States v. Microsoft*,
147 F.3d 935 (D.C. Cir. 1998) ................................................................................ 11

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ................................................................................................ 15

## STATUTES

15 U.S.C. § 15b ............................................................................................................ 5

# I.    __INTRODUCTION__

Apple designed Apple Pay to provide a seamless, secure, and private way for consumers to present a digital version of their existing payment cards in-store and online on iPhone, Apple Watch, iPad, and Mac.  Apple achieved this by creating a unique and differentiated technical architecture for Apple Pay—one that protects personal information, provides consumers an easy way to choose the card they want to use, and most importantly, uses the highest level of security.

Since Apple introduced Apple Pay in 2014, it has benefitted consumers, merchants, and banks alike—by facilitating more transactions with an option that has proven to be safe and secure. Apple's entry into this already highly competitive market gave banks of all sizes the ability to offer easy digital payment options for their customers.  Apple Pay is free for merchants and consumers, and accessible to all card-issuing banks.  Apple charges all card issuers in the same country the same nominal fees for credit and debit transactions on Apple Pay, regardless of the issuer's size or transaction volume.  This allows smaller card-issuing banks, like Plaintiff Affinity Credit Union, to present their credit and debit cards in Apple Wallet for use with Apple Pay alongside cards issued by banks with substantially more resources to reach customers.  Apple Pay's technical architecture provides consumers, merchants, and software developers with greater choice by supporting cards and use cases from thousands of issuers.

Affinity's Complaint says nothing of these benefits, or the innovation and increased competition that Apple Pay brings to the payments space.  Instead, the Complaint invokes the antitrust laws to question how Apple designed, structures, and offers Apple Pay.  Consumers, merchants, and card issuers like Affinity have countless options when it comes to payment methods—including alternatives to Apple Pay that can also be used on Apple devices.  Yet Affinity claims that Apple violates the antitrust laws because Apple Pay is the only digital wallet that can use the near-field communication ("NFC") controller on an Apple device.[1]  According to Affinity, this aspect of Apple Pay has allowed Apple to monopolize a "Tap and Pay iOS Mobile Wallet" market—i.e., a market limited exclusively to Apple Pay.  Affinity also claims that Apple unlawfully ties Apple Pay to Apple's devices, even though Apple Pay is integrated with the

---

[1] This is inaccurate.  For purposes of this Motion, however, Apple accepts Affinity's allegations.

operating system ("OS")[2] and Apple device owners are not required to use Apple Pay at all.

None of these are valid antitrust claims; the antitrust laws are not concerned with the design and engineering decisions of a firm regarding its own products. This is especially true where, as here, the design elements at issue are instrumental to Apple Pay's innovative user experience, privacy, and security, and affect only one payment method (Apple's) among many alternatives. The Complaint, however, also fails at more fundamental, threshold levels:

*Affinity's alleged relevant markets are implausible.* Affinity cannot plead a monopolization or tying theory with a properly defined market that recognizes Apple Pay competes with other payment methods. Every day, millions of transactions occur with physical credit cards and debit cards (including tap and pay cards that use NFC technology), cash, and numerous other payment methods like Google Pay, Samsung Pay, and PayPal. Thus, as innovative and popular as Apple Pay is, it is just one of many ways consumers can make payments, and one payment method among many that financial institutions like Affinity can offer their customers.

Given this competitive reality, Affinity contrives single-brand markets limited to Apple Pay, iPhone, iPad, and Watch. But this gambit fails—a properly defined relevant market must cover the area of effective competition, and a plaintiff cannot ignore economic realities by arbitrarily constraining the market to match its antitrust theories. Affinity's conclusory and common-sense-defying allegations that no Apple Pay substitutes exist fail as a matter of law.

*Insurmountable deficiencies plague Affinity's tying claim.* Affinity lacks standing to bring a tying claim because, as a card issuer, it neither purchases Apple devices with Apple Pay nor asserts claims as a competing developer of NFC-based payment apps on OS. The tying claim also fails because Apple Pay is integrated with and "pre-installed" on Apple devices. Compl. ¶ 45.

*Affinity cannot allege anticompetitive effects.* Affinity cannot plausibly suggest that Apple Pay has reduced competition in a properly defined market. Indeed, Affinity admits that output in mobile payment transactions, which includes competing payment methods, has only *increased* since Apple Pay debuted in 2014. *See id.* ¶ 71. And the Complaint alleges only

---

[2] Each Apple product referenced in the Complaint has a separate operating system—iOS for iPhone, iPadOS for iPad, and WatchOS for Watch. In this Motion, the term "OS," unless specified otherwise, refers collectively to these unique operating systems.

economic harm to card issuers and nothing about the effects Apple Pay has on consumers and merchants, which is insufficient to establish harm to competition given that Apple Pay is a multi-sided transactions platform.  *Ohio v. Am. Express Co.* (*Amex*), 138 S. Ct. 2274, 2285–87 (2018).

*Affinity cannot plead an actionable refusal to deal.*  At bottom, this case is an attempt to change the way Apple designed and offers Apple Pay.  But "businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).  The antitrust laws do not require Apple to design, implement, and offer issuers an additional, separate architecture for NFC-based payments on its devices.  Unlike competitors that make payment methods free to card issuers at the expense of consumers' privacy, Apple makes Apple Pay free for consumers and merchants, with privacy and security being paramount.  These design decisions are what make Apple Pay a unique and innovative payment method among the many others in a highly competitive market. They are therefore not something the antitrust laws are concerned with.

Affinity's Complaint should be dismissed with prejudice.

## II.  STATEMENT OF ISSUES TO BE DECIDED

1.      Does the Complaint state claims for monopolization and attempted monopolization where those claims rest on an implausibly pled single-brand market limited to Apple Pay?

2.      Does the Complaint state a claim for tying under Sections 1 and 3 of the Sherman Act, where Affinity, as a card issuer, lacks standing to complain of a tying arrangement and otherwise fails to plead the prerequisites of an unlawful tie?

3.      Does the Complaint plausibly allege market-wide anticompetitive effects?

4.      Does the Complaint adequately plead the elements of an unlawful refusal to deal?

## III.  STATEMENT OF RELEVANT ALLEGATIONS

*Apple Pay.*  Apple Pay is a secure, seamless, and private payment method that allows users to make payments in person, in OS apps, and online.  Compl. ¶¶ 1, 8.  For in-person payments, Apple Pay utilizes the NFC controller on an Apple device for short-range wireless communication between the device and a merchant's payment terminal.  *Id.* ¶¶ 1, 34–35, 38.  An iPhone or Watch user who has activated Apple Pay and wants to use it only needs to hold their device near the

merchant's payment terminal to make a purchase. *Id.* ¶¶ 37–38, 53. Apple Pay is fully integrated with OS and has never been available for download or purchase separately. *Id.* ¶ 45.

Apple Pay comes pre-installed on Apple devices, *id.*, but whether to activate and use it is up to the user. As of September 2020, only about half of iPhone users are alleged to have activated Apple Pay (which involves linking it to a card an issuer has made available on Apple Pay). *Id.* ¶ 62. Consumers who use Apple Pay, and merchants who accept it, do so for free. Unlike competitors whose payment methods are free for the issuers because they monetize their services at the expense of consumers' privacy, Apple charges card issuers a per-transaction fee: 15 basis points (0.15%) on credit and a half a penny ($0.005) on debit. *Id.* ¶ 70. To keep Apple Pay free for consumers, card issuers agree not to pass on these fees to their customers. *Id.* ¶¶ 7, 73. Card issuers may choose not to enable Apple Pay for their cards and avoid these fees altogether.

Though Affinity paints Apple Pay as an exclusive technology, Apple Pay competes with many other payment methods. At physical points-of-sale, these include "tap and pay" payment cards (which also use NFC technology), "chip" or traditional "swipe" payment cards, cash, non-NFC payment methods on Apple and other mobile devices (e.g., QR codes on PayPal), and NFC payment methods on other mobile operating systems (e.g., Google Pay). Apple Wallet—the app where consumers can securely store cards for use with Apple Pay—is the digital equivalent of a physical wallet. For online purchases, which do not use NFC technology, consumers have options like Shop Pay, Amazon Pay, Google Pay, PayPal, credit and debit cards, and countless others.

Any card issuer that wants to offer its customers the ability to make NFC-based payments using Apple devices can do so either with Apple Pay in the Apple Wallet or from a digital card accessed in their own banking app. Apple does not, however, have or offer an additional NFC interface for other NFC-enabled payment methods for use on Apple devices. *See id.* ¶¶ 4, 46–50. Since its debut in 2014, Apple Pay has been the only "tap and pay" OS payment method with access to the NFC chip on Apple's devices. *See id.* ¶ 68. This is reflected in the publicly available Apple Developer Program License Agreement and known to all card issuers. *See id.* ¶¶ 48–49.

Apple Pay provides numerous benefits for consumers, card issuers, merchants, and payment networks. It has "distinct security advantages" for consumers via the card number

tokenization process, which protects their data. *Id.* ¶ 54. For card issuers, Apple Pay reduces fraud and offers smaller financial institutions like Affinity the same payment method, on the same terms, to compete against larger banks. Since Apple Pay debuted, output in mobile payments transactions has "more than quintupled"—growing the pie for everyone. *Id.* ¶ 71.

**Plaintiff Affinity Credit Union.** Affinity is an Iowa-chartered credit union that issues payment cards. *Id.* ¶ 18. Affinity chose to offer Apple Pay to its customers and therefore pays Apple a transaction fee each time its customers opt to use Apple Pay with an Affinity-issued payment card. *Id.* Affinity seeks to represent a nationwide class of card issuers that "(a) issued any Payment Card enabled for Apple Pay and (b) paid Apple a fee for any Apple Pay transaction on that Payment Card."[3] *Id.* ¶ 115.

**Affinity's Claims.** Affinity asserts two claims under Section 2 of the Sherman Act on the theory that Apple monopolizes and attempts to monopolize "the market for tap and pay mobile wallets on iOS," *id.* ¶ 11—a market limited to Apple Pay in which Apple's "market share is 100 percent," *id.* ¶ 112; *see also id.* ¶¶ 52–67, 108–12, 137–57. Despite widespread use of physical payment cards, QR-based payments, Google Pay, and other alternatives (including cash), Affinity claims Apple Pay is its own relevant market. *Id.* ¶¶ 11, 62–63, 65–66. Affinity posits that, if Apple's "would-be . . . competitors" were not "barr[ed] . . . from accessing the NFC interface needed to compete," *id.* ¶ 4, Apple would "reduce its fees to issuers," *id.* ¶ 86, and "even more issuers would enroll in Tap and Pay iOS Mobile Wallets," *id.* ¶ 12, "thereby increasing output," *id.* ¶ 86.

Affinity also asserts a tying claim under Sections 1 and 3 of the Sherman Act, alleging that Apple "has unlawfully 'tied' two of its products together—namely, its mobile devices and its mobile wallet—by compelling iOS users to use its mobile wallet product exclusively." *Id.* ¶ 10; *see also id.* ¶¶ 126–36. Affinity claims (wrongly) that when a consumer purchases an iPhone or

---

[3] Affinity's Complaint is silent as to its time period. If Affinity seeks to represent card issuers that executed contracts for Apple Pay before July 18, 2018, such claims are time-barred by the Clayton Act's four-year statute of limitations, regardless of whether such card issuers continue to pay Apple fees pursuant to their contracts. *See* 15 U.S.C. § 15b; *Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989) ("[T]he passive receipt of profits from an illegal contract by an antitrust defendant is not an overt act of enforcement which will restart the statute of limitations."); *Aurora Enters. v. Nat'l Broad. Co.*, 688 F.2d 689, 694 (9th Cir. 1982) (similar).

Watch, she must use Apple Pay, although Affinity alleges elsewhere that only "51%" of Apple iPhone users actually activate Apple Pay. *Compare id.* ¶¶ 10, 141, *with id.* ¶ 62. Affinity variously defines the tying product markets as markets limited to certain Apple devices (iPhone, iPad, Watch), or markets for smartphones, tablets, and smartwatches. *Compare id.* ¶ 113, *with id.* ¶ 101.

## IV.   ARGUMENT

### A.   Affinity's Monopolization Claims Fail Because They Are Premised upon an Implausible Single-Brand Market Limited to Apple Pay

#### 1.   Single-Brand Relevant Markets Are "Extremely Rare" and "Disfavored"

Affinity's monopolization claims fail at the threshold as Affinity fails to plead any well-defined relevant antitrust markets. Market definition, which is "the area of effective competition," is a "threshold step in any antitrust case." *F.T.C. v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (simplified). Without it, "there is no way to measure [the defendant's] ability to lessen or destroy competition." *Amex*, 138 S. Ct. at 2285 (alteration in original). A relevant market must "encompass the product at issue as well as all economic substitutes." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). Economic substitutes are reasonably interchangeable products with sufficient cross-elasticity of demand—i.e., those with similar uses "gauged by . . . considering the price, characteristics and adaptability of the competing commodities." *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1106 (N.D. Cal. 2022) (citation omitted). A properly pled relevant market must reference economic substitutes; it cannot "ignore economic reality and 'arbitrarily choose the product market relevant to [the plaintiff's] claims.'" *Id.* (citation omitted). Dismissal is appropriate where "judicial experience and common sense" indicate the alleged market is "'not natural,' 'artificial,' and 'contorted to meet [the plaintiff's] litigation needs.'" *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1117, 1121 (9th Cir. 2018) (citation omitted).

Single-brand markets are "extremely rare . . . [e]ven where brand loyalty is intense." *Reilly*, 578 F. Supp. 3d at 1107 (alteration in original) (citation omitted); *see also Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) (same). "It is an understatement to say that single-brand markets are disfavored." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361

1    F. Supp. 3d 324, 343 (E.D.N.Y. 2019).

2                    **2.    Affinity's Single-Brand Market Limited to Apple Pay Fails**

3         Affinity's monopolization claims fail under the weight of a contrived market for "Tap and

4    Pay iOS Mobile Wallets," in which "Apple Pay's market share is 100 percent."  Compl. ¶ 112.

5    That is an implausible market artificially limited to one product—Apple Pay.  *Id.* ¶¶ 52–56.

6         Seeking to avoid the common-sense reality that Apple Pay is one of many payment

7    methods available to consumers and card issuers, the Complaint makes conclusory assertions that

8    obvious alternatives—including physical payment cards, QR-based payment methods, and other

9    mobile wallets like Google Pay and Samsung Pay—are not reasonable substitutes.  *See, e.g.*,

10   Compl. ¶¶ 56, 57, 64.  But merely repeating that there are no "reasonably close substitutes" is not

11   the same as pleading, with facts, that consumers and issuers lack alternatives to Apple Pay.  *See*

12   *Psystar*, 586 F. Supp. 2d at 1198 ("merely restat[ing] a commonly used test for market definition

13   without providing any factual basis for the claim" fails *Twombly*).

14        Indeed, most of Affinity's *factual* allegations undermine Affinity's single-brand market.

15   Start with Affinity's allegation that "[a]s of September 2020," only "51% of iPhone users had

16   activated Apple Pay."  Compl. ¶ 62.  Of course, activating Apple Pay does not limit a consumer to

17   using only Apple Pay to make payments.  But the allegation itself demonstrates that, at the very

18   least, *half* of consumers with an iPhone and Apple Pay at their fingertips use an alternative payment

19   method.  This belies any single-brand market limited to Apple Pay.  And, even looking solely at

20   tap and pay options, Affinity's attempts to carve off (1) physical payment cards; (2) QR-based

21   payment methods; and (3) other mobile wallets as alternatives to Apple Pay are similarly flawed:

22        ***Physical payment cards.***  It defies common sense and marketplace reality to suggest that

23   physical payment cards are not alternatives to Apple Pay.  A consumer who uses Apple Pay is

24   merely using an Apple device to present the same physical payment card that they have in their

25   physical wallet.  Affinity ignores this all to support an Apple-Pay-only market.  Its argument for

26   doing so is that card issuers continue to offer Apple Pay to their customers despite being charged

27   inflated fees.  *See* Compl. ¶¶ 65–66.  But that is just a conclusory assertion that card issuers offer

28   Apple Pay only to appease cardholders, rather than to benefit from increased transactions and

1    profit. *See Hicks*, 897 F.3d at 1122–23. Affinity's other attempts to distinguish physical payment

2    cards fail. It avers Apple Pay has unique security advantages, *see* Compl. ¶¶ 53–54, 67, but

3    contradicts itself by alleging that Apple Pay is not more secure than credit cards, *id.* ¶ 92.

4        ***QR-based payment methods.*** Though QR technology is an increasingly popular method

5    for making mobile payments—and is available for use on Apple devices alongside Apple Pay—

6    the Complaint does not even attempt to allege why QR-based solutions are not substitutes. Indeed,

7    the "Payments Security White Paper" the Complaint incorporates by reference (at ¶ 83 n.43)

8    identifies QR technology as an alternative to the NFC technology used by Apple Pay. *White Paper*

9    at 9 (2015). Affinity's own allegations defeat the notion that a relevant market includes Apple Pay

10   but excludes QR-based payment methods. *See Hicks*, 897 F.3d at 1123 ("[P]roposed product

11   markets are facially unsustainable because they fail to include many reasonably interchangeable

12   products") (simplified); *Alivecor, Inc. v. Apple Inc.*, No. 21-cv-03958, 2022 WL 833628, at *6–7

13   (N.D. Cal. March 21, 2022) (White, J.) (plaintiff's hardware-based markets failed because it "ha[d]

14   not alleged why seemingly similar products . . . [were] not reasonable substitutes").

15       ***Other mobile wallets.*** Affinity fails to plausibly allege that mobile wallets on competing

16   operating systems (e.g., Android) are not reasonably interchangeable with Apple Pay. First,

17   allegations about the difference in transaction fees on Apple Pay and other mobile wallets do not

18   establish that Apple Pay is in a market of its own. *See* Compl. ¶¶ 44, 81. "The mere existence of

19   a price differential . . . does not necessarily mean that a product is unconstrained by competition."

20   *Psystar*, 586 F. Supp. 2d at 1199. Second, it is not enough to allege that Apple Pay is available

21   for NFC transactions on iOS while Google Pay and Samsung Pay are not. *See* Compl. ¶ 57. Card

22   issuers can and do participate in other mobile wallets on Android, *id.* ¶ 3, which are "mostly

23   indistinguishable," *id.* ¶ 4, from Apple Pay "from a functionality standpoint," *id.* ¶ 45. And simply

24   because Apple Pay uses NFC technology on iOS does not establish that it lacks comparable

25   substitutes such that it exists in a market of its own. *See Streamcast Networks Inc. v. Skype Techs.,*

26   *S.A.*, 547 F. Supp. 2d 1086, 1095 (C.D. Cal. 2007) (rejecting alleged single-brand market because

27   the defendant's product's "unique attributes" that made it "more attractive and efficient" would

28   not preclude users from patronizing other networks if nominal fees were charged).

The conclusory statement (at ¶ 58) that a small but significant increase in the price ("SSNIP") of an OS mobile wallet transaction would not make Apple Pay "users" switch to Android mobile wallets does not move the needle.  *See Hicks*, 897 F.3d at 1122 (allegation that economic studies would show purchasers would not switch products in response to SSNIP was "legal conclusion veiled as a factual allegation"); *Psystar*, 586 F. Supp. 2d at 1198 (allegations that SSNIP "would not result in a change in demand for Mac OS" were "conclusory").  The impact of a SSNIP on users is irrelevant because Affinity is not a user, but a card issuer complaining of an allegedly supra-competitive fee it pays.  *See Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015) (proper application of SSNIP would look to response of healthcare insurers given that they are direct purchasers of health care, not consumers).

Affinity may claim that a SSNIP analysis as to card issuers is implied by the allegation that card issuers continue to offer Apple Pay because they do not expect disabling it would cause customers to switch to Android.  Compl. ¶ 62.  But Affinity cannot ignore its admission that card issuers can and do enable Apple Pay substitutes.  *See id.* ¶¶ 3–4.  The allegation that the Apple Pay fee is inflated "because even more issuers would enroll in Tap and Pay iOS Mobile Wallets if the cost of doing so were lower," *id.* ¶ 12, *see id.* ¶ 86 (similar), underscores two fundamental flaws in Affinity's theory.  First, the same is true of almost every product—if a firm lowers its prices, more people would buy it.  Allegations to this effect therefore say nothing about whether the product itself lacks any reasonably interchangeable substitutes.  Second, the fact that many card issuers do *not* participate in Apple Pay, and use alternatives based on their own cost/benefit calculus, demonstrates that the market is in fact highly competitive.

### 3.   Affinity Does Not and Cannot Plead an Aftermarket Claim

Affinity's single-brand market limited to Apple Pay also fails because the Complaint does not advance an aftermarket claim—the only situation in which single-brand markets are viable.  "The Supreme Court and Ninth Circuit have only found single-brand markets plausible in the context of *aftermarkets* which are 'wholly derivative from and dependent on the primary market.'"  *Reilly*, 578 F. Supp. 3d at 1107 (emphasis in original) (quoting *Newcal*, 513 F.3d at 1049).  To plead a single-brand aftermarket, Affinity must allege "(1) the aftermarket is wholly derivative

from the primary market, (2) the illegal restraints of trade relate only to the aftermarket, (3) the defendant did not achieve market power in the aftermarket through contractual provisions that it obtains in the initial market, and (4) competition in the initial market does not suffice to discipline anticompetitive practices in the aftermarket." *Id.* at 1108 n.2 (citing *Newcal*, 513 F.3d at 1048–50). There is no aftermarket if: (1) a consumer purchases the foremarket product with the aftermarket product, *see Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996); (2) the claim "rest[s] on market *power* that arises solely from contractual rights that consumers knowingly and voluntarily gave to the defendant," *Newcal*, 513 F.3d at 1048 (emphasis in original); or (3) there is no *unforeseeable* policy change to the aftermarket product after consumers have bought the foremarket product and are locked in, *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997). Here, Affinity does not plead an aftermarket, so its single-brand market monopolization claims fail. *See Reilly*, 578 F. Supp. 3d at 1107–08.

### B. Affinity Does Not and Cannot Allege a Tying Arrangement

Affinity's tying claim rests on the notion that Apple "ties" its devices and Apple Pay together by compelling users to use Apple Pay exclusively. Compl. ¶¶ 10, 126–36. The claim fails because: (1) Affinity lacks antitrust standing to complain of tying; (2) Apple Pay is integrated with Apple devices; (3) Apple device owners are free to not use Apple Pay (as Affinity admits); and (4) Affinity fails to allege that Apple has market power in a well-defined tying product market.

#### 1. As a Card Issuer, Affinity Lacks Antitrust Standing to Complain of Tying

Affinity lacks antitrust standing to bring a tying claim because it is neither a consumer of the alleged "tying" and "tied" products—Apple devices and Apple Pay—nor asserts claims as a competing developer of an NFC-based payment app on OS. Only two kinds of plaintiffs have standing to bring tying claims: (1) consumers forced to buy the tied and tying products; and (2) competitors restrained from entering the market for the tied product. *See Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 540 (9th Cir. 1987); *see also, e.g.*, *Cyntegra, Inc. v. Idexx Labs., Inc.*, 520 F. Supp. 2d 1199, 1210 (C.D. Cal. 2007). Affinity complains of injury in the form of allegedly supracompetitive fees that it pays as a card issuer to Apple. Compl. ¶ 135. That is not an injury to either a consumer of the supposed tying and tied products or a competing supplier of the tied

product. It therefore is not enough to establish antitrust standing to assert a tying claim.

### 2.   Apple Pay Is an Integrated Component Part of Apple's Devices

Affinity's tying claim fails because Apple Pay is—and has been since inception—a fully integrated component of Apple devices. There can be no actionable tying arrangement if the tying and tied products are "'bundled' and related products or services." *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 974 (9th Cir. 2008). Here, Affinity recognizes that Apple Pay: (1) is an integrated payment solution that has been intrinsic to Apple devices since it launched in 2014; (2) "comes preinstalled on Apple's iPhones, iPads, and Watches"; and (3) has never been offered as a separate product. Compl. ¶¶ 45, 53 n.32. That precludes a tying claim.

Moreover, Affinity's acknowledgment that the integration of Apple Pay with Apple devices provides technical benefits such as privacy, security, and user experience enhancements (Compl. ¶¶ 52–56) is fatal.[4] Where the "tying" and "tied" products are two technologically integrated components, attempts to cast them as separate, tied products fail. *See Resp. of Carolina, Inc. v. Leasco Resp., Inc.*, 537 F.2d 1307, 1330 (5th Cir. 1976) (antitrust violations are "limited to . . . where the technological factor tying the hardware to the software has been designed . . . [to tie] the products, rather than to achieve some technologically beneficial result"); *United States v. Microsoft*, 147 F.3d 935, 949 (D.C. Cir. 1998) ("[I]ntegration may be considered genuine if it is beneficial when compared to a purchaser combination. . . . [C]ourts have recognized the limits of their institutional competence and have . . . rejected theories of 'technological tying.'").

A tying claim also requires "sufficient demand for the purchase of [the tied product] separate from [the tying product] to identify a distinct product market in which it is efficient to offer [the tied product] separately from [the tying product]." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21–22 (1984). The allegedly "tied" product here is Apple Pay. Compl. ¶ 127. Constrained by this restrictive definition of the tied product *market*, Affinity fails to plead that there is any discrete demand, let alone "sufficient demand," for Apple Pay such that it would be

---

[4] Apple Pay uses security features built-in to the hardware and software of the device to protect consumers transactions. *See* Compl. ¶ 54; Apple Pay Security and Privacy Overview, Apple (last accessed Aug. 22, 2022), https://support.apple.com/en-us/HT203027 (incorporated by reference at Compl. ¶ 54 n.34).

efficient for Apple to offer it as a standalone product apart from Apple's own devices.

### 3.   Users Are Not Required to Use Apple Pay, So There Is No Unlawful Tie

Affinity's tying claim also fails because Apple device users (the supposed purchasers of the allegedly tied products) do not pay for Apple Pay and are not required to use it.  Tying occurs when "a supplier agrees to sell a buyer a product (the tying product), but 'only on the condition that the buyer also purchases a different (or tied) product.'"  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199 (9th Cir. 2012).  "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."  *Jefferson Par.*, 466 U.S. at 12.  Even if a consumer activates it, there is no cost to use Apple Pay.  Compl. ¶¶ 7, 59.  And, those "who purchase Apple mobile devices do not need to use a tap and pay wallet."  *Id.* ¶ 50.  This defeats a tying claim.  *See Blix Inc. v. Apple, Inc.*, No. CV 19-1869-LPS, 2021 WL 2895654, at *5 (D. Del. July 9, 2021) (finding no tie because the "tied" product, Sign In With Apple, need not be used with iOS).

### 4.   Affinity Fails to Allege Market Power in a Tying Product Market

Affinity's tying claim also fails because Apple lacks market power in any properly defined tying market.  Tying requires proof "that the defendant has market power in the tying product." *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 46 (2006); *see also Psystar*, 586 F. Supp. 2d at 1195 (a tying claim "requires plaintiff to establish market power in a 'relevant market'").[5]

Affinity confusingly shifts between alleged tying markets limited to Apple's own devices (iPhone, iPad, and Watch)—each of which is a single-brand market—and tying markets consisting of smartphones, tablets, and smart watches.  *Compare* Compl. ¶ 113, *with id.* ¶¶ 101–07.  This lack of clarity alone is enough to dismiss Affinity's tying claim.  *See Psystar*, 586 F. Supp. 2d at 1200 (dismissing claims where relevant market allegations were "internally contradictory"); *Sumotext Corp. v. Zoove, Inc.*, No. 16-CV-01370, 2016 WL 6524409, at *3 (N.D. Cal. Nov. 3, 2016)

---

[5] Affinity alleges a *per se* tying claim and one under the rule of reason.  Compl. ¶¶ 10, 132–33. *Per se* tying claims are exceedingly rare after *Illinois Tool Works.  See* 547 U.S. at 35–37 (noting the Supreme Court's "strong disapproval of tying arrangements has substantially diminished"). Regardless, there must still be plausible allegations that Apple has market power in a well-defined tying product market.  Those are absent here.

1    (dismissing claims where "allegations of the relevant market" were "unclear").

2           Regardless, neither of these alleged markets can sustain Affinity's tying claim.  If the tying

3    markets are limited to iPhone, iPad, and Watch, they are all implausible single-brand markets.  *See*

4    *supra* Section IV.A.  It would defy common sense to claim, for example, that Apple's iPhone,

5    iPad, and Watch are not plausible substitutes with the Samsung Galaxy, Galaxy Tab, and Galaxy

6    Watch, or with Google's Pixel phone, Amazon's Fire tablet, and Garmin's vívoactive watch.

7           The tying claim fares no better if the alleged tying market extends beyond Apple's

8    products.  Affinity has not alleged that Apple has market power in any smartphone, tablet, or

9    smartwatch markets.  Merely asserting that "Apple exercises market power in the mobile device

10   markets for smartphones, tablets[,] and smart watches," Compl. ¶ 129, is not enough.  And the

11   only *factual* allegations relate to Apple's market share: Apple allegedly has 57% of "the

12   smartphone market," 54% of "the tablet market," and 46% of "the smart watch market."  *Id.* ¶¶ 24,

13   29, 33.[6]  Most of these figures are from page views of select websites rather than an appropriate

14   measure of devices sold.[7]  And regardless, "market share is just the starting point for assessing

15   market power."  *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 366 (9th Cir. 1988).  Market

16   power must be defined with reference to an ability to control prices or exclude competition.  *United*

17   *States v. E.I. duPont de Nemours*, 351 U.S. 377, 391 (1956).  While Affinity acknowledges that

18   competitors exist in its proposed device markets,[8] it fails to allege those competitors cannot

19   increase output in the short run.  *See Rebel Oil Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th

20   Cir. 1995).  It just repeats the conclusory mantra that entry barriers exist for newcomers.  Compl.

21   ¶¶ 25, 29, 33.  That is not enough to plausibly allege such barriers.  *See Hicks*, 897 F.3d at 1122.

22

23   ──────────────

     [6] Those shares fall below the threshold required to plead a plausible antitrust claim.  *See AliveCor*,
24   2022 WL 833628, at *8 ("[A] market share of sixty-five percent is sufficient for a monopolization
     claim."); *In re German Auto. Mfrs. Antitrust Litig.*, No. 391, 2020 WL 1542373, at *7 (N.D. Cal.
     Mar. 31, 2020) (same), *aff'd*, No. 20-17139, 2021 WL 4958987 (9th Cir. Oct. 26, 2021).
25
     [7] *See* Compl. ¶¶ 24 n.5, 29 n.10 (citing Statcounter Global Stats); Statcounter, *Frequently Asked*
26   *Questions*,  https://gs.statcounter.com/faq#methodology (describing Statcounter methodology).

     [8] Samsung, for example, is among Apple's competitors in the alleged U.S. smartphone and tablet
27   markets.  Compl. ¶¶ 25, 29.  In the Smart Watch market, Fitbit—among others—competes
     aggressively with Apple in the U.S.  *See* Katharina Bucholz, "Apple Watch Leads U.S. Market,"
28   STATISTIA (Oct. 15, 2021), https://www.statista.com/chart/25982/smartwatch-market-by-brand-
     us/ (incorporated by reference at Compl. n.15).

### C.   Affinity Fails to Plead Anticompetitive Harm

Affinity's claims should also be dismissed because it fails to allege adverse competitive effects.  *See Brantley*, 675 F.3d at 1200.  Affinity acknowledges that its "iOS Mobile Wallet" market is a multi-sided market consisting of mobile wallets users, payment card issuers, and merchants who enable their terminals to accept the NFC payments.  Compl. ¶ 55.  In multi-sided markets, "competition cannot be accurately assessed by looking at only one side of the platform in isolation." *Amex*, 138 S. Ct. at 2287.  "Price increases on one side of the platform likewise do not suggest anticompetitive effects without some evidence that they have increased the overall cost of the platform's services."  *Id.* at 2286.  The competitive effects of Apple's conduct therefore cannot be judged by looking to effects on card issuers alone.

Here, Affinity concedes that payment methods like Apple Pay have increased output in the transactions market:  "[s]ince 2015"—a few months after Apple Pay launched—"mobile wallet transactions have more than quintupled."  Compl. ¶ 71.  Beyond conclusory statements that output *might* further increase absent the alleged restraint (*id.* ¶¶ 12, 87), there are no factual allegations that Apple Pay and its alleged limitations caused anticompetitive effects throughout this multi-sided market.  Indeed, Affinity recognizes that more issuers are choosing to participate in Apple Pay, which coincides with more transactions.  *See id.* ¶ 11 ("[I]ssuer acceptance of Apple Pay increases every year.").  Allegations limited to effects on issuers fail to plead market-wide anticompetitive effects.  *See Amex*, 138 S. Ct. at 2287 (finding plaintiffs' argument "unpersuasive" where they "stake their entire case on proving that Amex's agreements increase merchant fees").

Affinity also has not and cannot plausibly claim that Apple's alleged restrictions on Apple's *own* payment method cause any meaningful reduction in financial transactions overall.  Even accepting Affinity's assumptions about a world without Apple's alleged restrictions, the result would be a greater share of transactions occurring on OS-based NFC methods—*not* necessarily more credit and debit transactions overall.

### D.   Affinity Fundamentally Complains of a Refusal to Deal, the Prerequisites of Which It Cannot Allege

Beyond offering card issuers NFC access on Apple devices through Apple Pay, Affinity

1    claims the antitrust laws require Apple to provide a separate way for issuers to offer NFC-based

2    payments on Apple devices to avoid the "substantial tax" Apple charges for Apple Pay.  Compl.

3    ¶ 73; *see also id.* ¶ 4 (Apple prevents "would-be and free competitors from accessing the NFC

4    interface [on Apple devices] needed to compete.").  This is a claim of a refusal to deal, and it fails.

5            "[T]he Sherman Act does not restrict the long-recognized right of [a] trader or

6    manufacturer engaged in an entirely private business, freely to exercise his own independent

7    discretion as to parties with whom he will deal." *Verizon Commc'ns Inc. v. Law Offices of Curtis

8    V. Trinko*, 540 U.S. 398, 408 (2004) (citation omitted) (alteration in original).  The sole exception

9    requires that a defendant:  (1) unilaterally terminate a voluntary and profitable course of dealing;

10   (2) the only conceivable rationale of which is to sacrifice short term benefits to obtain higher profits

11   in the long run from the exclusion of competition; and (3) the refusal to deal involves products that

12   the defendant already sells in the existing market. *Qualcomm*, 969 F.3d at 993–94.  This exception

13   is "at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409.

14           Affinity cannot plead such a claim.  Since incorporating NFC technology into its devices,

15   Apple has always integrated it with Wallet for payments and no other payment solutions.  Compl.

16   ¶¶ 48–50.  There is thus no prior course of dealing, which is dispositive. *Trinko*, 540 U.S. at 408.

17           Nor could Affinity plausibly allege that Apple's conduct amounts to a constructive refusal

18   to deal.  Firms have "no duty to deal under the terms and conditions preferred by [their] rivals."

19   *Pac. Bell Tel. Co.*, 555 U.S. at 457.  A constructive refusal to deal is viable only when the defendant

20   offers terms that would leave a rival unable to compete profitably. *MetroNet Serv. Corp. v. Quest

21   Corp.*, 383 F.3d 1124, 1132 (9th Cir. 2004).  Affinity has not alleged that participation in Apple

22   Pay is not a profitable endeavor for Affinity or other payment card issuers.  Nor could it.

23           The Sherman Act "does not give judges *carte blanche* to insist that a monopolist alter its

24   way of doing business whenever some other approach might yield greater competition." *Trinko*,

25   540 U.S. at 415–16.  Yet that is what Affinity urges here.  The Court should reject it.

26   **V.    CONCLUSION**

27           For all the reasons set forth above, the Complaint should be dismissed with prejudice.

28

1   Dated: October 7, 2022                     LATHAM & WATKINS LLP
2                                              By:   /s/  Belinda S Lee
                                                     Belinda S Lee
3
                                               Belinda S Lee (Cal. Bar No. 199635)
4                                               belinda.lee@lw.com
                                               Sarah M. Ray (Cal. Bar No. 229670)
5                                               sarah.ray@lw.com
                                               Aaron T. Chiu (Cal. Bar No. 287788)
6                                               aaron.chiu@lw.com
                                               505 Montgomery Street, Suite 2000
7                                              San Francisco, California 94111-6538
                                               Telephone: +1.415.391.0600
8
9                                              *Attorneys for Defendant Apple Inc.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28