Steve W. Berman (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Ben M. Harrington (SBN 313877)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
benh@hbsslaw.com

Eamon P. Kelly (*pro hac vice*)
Joseph M. Vanek (*pro hac vice*)apple
**SPERLING & SLATER, P.C.**
55 W. Monroe Street, 32nd Floor
Chicago, IL 60603
Telephone: (312) 676-5845
Facsimile: (312) 641-6492
ekelly@sperling-law.com
jvanek@sperling-law.com

*Attorneys for Plaintiff and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| AFFINITY CREDIT UNION, GREENSTATE CREDIT UNION, AND CONSUMERS CO-OP CREDIT UNION,<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., a California corporation,<br><br>Defendant. | Case No. 4:22-cv-04174-JSW<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANT APPLE INC.'S MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**<br><br>Date:     February 24, 2023<br>Time:    9:00 a.m.<br>Place:    Courtroom 5, 2nd Floor, Oakland<br>Judge:    The Honorable Jeffrey S. White |

**TABLE OF CONTENTS**

Page

I.    PRELIMINARY STATEMENT ........................................................................................1

II.   ARGUMENT ...............................................................................................................2

    A.    Plaintiffs Have Alleged a Relevant Market Supporting Their
        Monopolization Claims. .....................................................................................2

        1.    The "Tap-and-Pay iOS Wallets" Market Is Not a Single-Brand
                Market.......................................................................................................2

        2.    Plaintiffs Plausibly Allege all Elements of an Aftermarket. ...........3

        3.    Plaintiffs' Relevant Market Does Not Exclude Reasonable
                Substitutes...............................................................................................7

    B.    Plaintiffs Allege a Plausible Tying Claim .........................................................9

        1.    Plaintiffs Have Standing to Challenge Apple's Tying
                Arrangement. .........................................................................................10

        2.    Apple's Product-Integration Argument Does Not Support
                Dismissal. ..............................................................................................11

        3.    It Is No Defense That Some Apple Device Holders Do Not Use
                Apple Pay. .............................................................................................12

    C.    Plaintiffs Have Alleged Anticompetitive Effects. ...........................................13

    D.    Apple Cannot Avoid Liability by Recharacterizing Its Conduct As a
        "Refusal to Deal."............................................................................................15

III.  CONCLUSION ..........................................................................................................15

1

**TABLE OF AUTHORITIES**

2

<u>Page(s)</u>

3

C<small>ASES</small>

4

*AliveCor, Inc. v. Apple Inc.*,
5 592 F. Supp. 3d 904 (N.D. Cal. 2022).................................................................3, 4, 5, 9

6 *In re Am. Express Anti-Steering Rules Antitrust Litig.*,
361 F. Supp. 3d 324 (E.D.N.Y. 2019) ......................................................................... 8
7

8 *Apple, Inc. v. Pepper*,
139 S.Ct. 1514 (2019) ................................................................................................ 11

9

*Associated Gen. Contractors v. California State Council of Carpenters*,
10 459 U.S. 519 (1983) ............................................................................................ 10, 11

11 *Bhan v. NME Hospitals, Inc.*,
929 F.2d 1404 (9th Cir. 1991) .................................................................................... 9
12

13 *Blix Inc. v. Apple, Inc.*,
2021 WL 2895654 (D. Del. July 9, 2021) ................................................................ 13

14

*Blue Shield of Virginia v. McCready*,
15 457 U.S. 465 (1982) ................................................................................................. 10

16 *Cyntegra, Inc. v. Idexx Labs, Inc.*,
520 F. Supp. 2d 1199 (C.D. Cal. 2007) .................................................................... 11
17

18 *Dang v. San Francisco Forty Niners*,
964 F. Supp. 2d 1097 (N.D. Cal. 2013)...................................................................... 3

19

*Datel Holding Ltd. V. Microsoft Corp.*,
20 712 F. Supp. 2d 974 (N.D. Cal. 2010)........................................................................ 6

21 *Dream Big Media Inc. v. Alphabet Inc.*,
2022 WL 16579322 (N.D. Cal. Nov. 1, 2022) .................................................... 13, 14
22

23 *Eagle v. Star-Kist Foods, Inc.*,
812 F.2d 538 (9th Cir. 1987) .............................................................................. 10, 11

24

*Eastman Kodak Co. v. Image Technical Services*,
25 504 U.S. 451 (1992) .......................................................................................... 5, 13, 15

26 *Ellis v. Salt River Project Agric. Improvement & Power Dist.*,
24 F.4th 1262 (9th Cir. 2022).................................................................................... 15
27

28 *Epic Games, Inc. v. Apple Inc.*,
559 F. Supp. 3d 898 (N.D. Cal. 2021)....................................................................... 14

*Giacalone Elec. Servs., Inc. v. Wesco Distribution Inc.*,
    2004 WL 7324092 (N.D. Cal. Mar. 26, 2004) ........................................................ 6

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ............................................................................... 9

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ............................................................................................. 11

*Image Tech. Servs. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ............................................................................... 2

*In Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
    532 F.3d 963 (9th Cir. 2008) ............................................................................... 12

*Innovative Health LLC v. Biosense Webster, Inc.*,
    2022 WL 1599713 (C.D. Cal. Mar. 22, 2022) ....................................................... 6

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ........................................................................................... 11, 12

*Kamakahi v. Am. Soc. for Reprod. Med.*,
    2013 WL 1768706 (N.D. Cal. Mar. 29, 2013) ....................................................... 2

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988, 1012 (9th Cir. 2018) ....................................................................... 2

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ............................................................................................. 10

*Newcal Industries, Inc. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) ....................................................................... *passim*

*Northern Pac. Ry. Co. v. United States*,
    356 U.S. 1 (1958) ................................................................................................. 13

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) (*Amex*) ....................................................................... 8, 14

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    20 F.4th 466 (9th Cir. 2021) .................................................................................. 8

*Surf City, Inc. v. Int'l Longshore & Warehouse Union*,
    123 F. Supp. 3d 1219 (C.D. Cal. 2015) ............................................................... 10

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
    546 F.3d 991 (9th Cir. 2008) .......................................................................... 9, 10

*United Shoe Mach. Corp. v. United States*,
   258 U.S. 451 (1922) ............................................................................................................ 13

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) .............................................................................................. 3

*In re Webkinz Antitrust Litig.*,
   695 F. Supp. 2d 987 (N.D. Cal. 2010) ................................................................................ 7

*Westlake Servs., LLC v. Credit Acceptance Corp.*,
   2016 WL 3919487 (C.D. Cal. Apr. 6, 2016) ...................................................................... 9

1

## I.      PRELIMINARY STATEMENT

Apple has market power in three relevant markets for mobile devices—smart phones, smart watches, and tablets. AC ¶¶ 21–34. Apple's mobile devices (*i.e.*, iPhones, iPads, and Apple Watches) use an Apple operating system ("iOS") and, as of 2015, come preloaded with Apple Pay, Apple's payments platform. *Id.* ¶¶ 46, 82. Apple Pay utilizes Near Field Communication ("NFC"), a decades-old technology that Apple did not develop. *Id.* ¶¶ 21, 35-37, 46. When a device with an NFC chip taps a reading pad, the device and the pad can communicate. *Id.* ¶¶ 1, 38-39. Thus, a device with an NFC chip can be loaded with the owner's credit or debit card and when the device taps the reading pad, a multi-sided transaction between the bank that issued the payment card, the consumer and a merchant can be executed. *Id.*

Third-party tap-and-pay platforms could also be used on iOS devices and provide competitive alternatives to Apple Pay, but Apple bars such competition by preventing all would-be competitors from using the NFC chip on iOS devices. *Id.* ¶¶ 46-52. Google, on the other hand, does not restrict NFC technology on Android devices and several tap-and-pay platforms compete against its own Google Pay. *Id.* ¶¶ 42-44. As a result, the price charged by payment platforms to card issuers (as well as consumers and merchants) on Android devices has been competed away to zero. *Id.* ¶ 45. Facing no such competitive threat on iOS devices, Apple is able to charge card-issuing banks a monopolistic price up to 15 basis points per transaction. *Id.* ¶ 5.

App developers may access the NFC chip on a consumer's iOS device for numerous purposes. *Id.* ¶¶ 48-50. This is in keeping with Apple's practice of allowing apps to interface with iOS device hardware and software—*e.g.*, camera, microphone, and navigation features—to enhance device functionality. *Id.* ¶ 48. It is *only payment apps* that would compete with Apple Pay that are barred from accessing NFC technology. *Id.* ¶¶ 49-50. Apple accomplishes this by forcing app developers to accept guidelines authorizing NFC access only for apps lacking "payment-related" functions. *Id.* ¶ 50. As a result, consumers are coerced to use Apple Pay if they use any iOS tap-and-pay platform at all. Likewise for card issuers, Apple Pay is the only iOS tap-and-pay platform on which their cards can be enabled for use.

Based on these facts, Plaintiffs allege that Apple has (a) monopolized (AC ¶¶ 150-60) or

attempted to monopolize (*id*. ¶¶ 161-171) the relevant market for Tap-and-Pay iOS Mobile Wallets and (b) tied tap-and-pay transaction services to its sale of iOS mobile devices (*id*. ¶¶ 150-60). Apple moves to dismiss the monopolization claims on the ground that Tap-and-Pay iOS Mobile Wallets cannot constitute a relevant market. Apple moves to dismiss the tying claim by asserting a litany of incorrect propositions, including that its conduct does not reduce output or injure competition.

As explained below, Apple's arguments have no merit and should be rejected.

## II.     ARGUMENT

In deciding motions to dismiss, courts are limited to the factual allegations of the complaint and must disregard purported facts from outside the pleadings. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1012 (9th Cir. 2018). Despite that, Apple asserts facts from outside the Amended Complaint, claiming that its conduct provides procompetitive benefits, encourages innovation, and increases competition. MTD at 1, 4. These assertions must be disregarded because they have no basis in the Amended Complaint and are contrary to the alleged facts. AC ¶¶ 105-111.[1]

### A.     Plaintiffs Have Alleged a Relevant Market Supporting Their Monopolization Claims.

Market definition "is a factual determination for the jury." *Image Tech. Servs. v. Eastman Kodak Co.,* 125 F.3d 1195, 1203 (9th Cir. 1997). Courts therefore "hesitate to grant motions to dismiss for failure to plead [a] relevant product market." *Kamakahi v. Am. Soc. for Reprod. Med.*, 2013 WL 1768706, at *10 (N.D. Cal. Mar. 29, 2013); *Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1051 (9th Cir. 2008) ("The actual existence of an aftermarket . . . is a factual question").  !

### 1.     The "Tap-and-Pay iOS Wallets" Market Is Not a Single-Brand Market.

Apple's discussion of market definition assumes that Plaintiffs allege a single-brand product

---

[1] Apple misrepresents the Amended Complaint's allegations in multiple respects. For example, citing paragraph 55 of the Amended Complaint, Apple asserts that Apple Pay has distinct security advantages for consumers (MTD at 4-5), but paragraph 55 alleges only that *mobile wallets* have distinct security advantages, not that Apple Pay offers a unique advantage. Citing paragraph 46 of the Amended Complaint, Apple claims that "Apple Pay is fully integrated with OS," (MTD at 4), but paragraph 46 says the opposite: "Apple Pay is not, however, integrated into Apple's [OS] mobile devices." And citing paragraphs 17 through 19 of the Amended Complaint, Apple claims that "Plaintiffs chose to offer Apple Pay" (MTD at 5), but those paragraphs allege that Plaintiffs were "required to agree to Apple's anticompetitive terms." The Amended Complaint further alleges that "Apple coerces iOS consumers" to use Apple Pay. AC ¶ 154.

market. While Plaintiffs can prevail on a single-brand theory (*see infra* at § II.A.2), the alleged market is not limited to a single brand. The relevant product market—Tap-and-Pay iOS Mobile Wallets—is brand-neutral. Absent Apple's restraints, any company (*i.e.*, "brand") could offer tap-and-pay wallets on iOS devices, and many would be expected to do so. The ability of multiple brands to compete with their own differentiated offerings makes the market multi-branded. *See, e.g., Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097, 1104 (N.D. Cal. 2013) (market for "NFL apparel" not single-brand market because several teams are capable of offering such apparel); *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (upholding market defined as "Intel-compatible PC operating systems" without any suggestion that the market was limited to a single brand).

No one disputes that Apple Pay is currently the only "brand" operating in the relevant market, but that is only because Apple has prevented rivals from offering competing wallets and further eliminated price competition. Apple's monopolization conduct cannot transform the brand-neutral market that Plaintiffs have defined into a single-brand market. If it did, any 100% monopolist could defend itself by claiming to operate in a single-brand market. This would have the perverse effect of protecting the most extreme monopolies (or at least those that are not aftermarkets).

**2.    Plaintiffs Plausibly Allege all Elements of an Aftermarket.**

Even if the relevant market was treated as a "single-brand," Plaintiffs allege all elements of a single-brand aftermarket. *See AliveCor, Inc. v. Apple Inc.,* 592 F. Supp. 3d 904, 916 (N.D. Cal. 2022) (White, J.) (recognizing that single-brand aftermarkets are "legally permissible"). "Under *Newcal*, to plausibly allege a single-brand aftermarket at the pleading stage, a plaintiff must adequately allege that (1) the aftermarket is wholly derivative from the primary market; (2) illegal restraints of trade relate only to the aftermarket; (3) the defendant did not achieve market power in the aftermarket through contractual provisions that it obtains in the initial market; and (4) competition in the initial market does not suffice to discipline anticompetitive practices in the aftermarket." *Id*. (citing *Newcal*, 513 F.3d at 1050). Each element is plausibly alleged here.

***First***, the market for Tap-and-Pay iOS Mobile Wallets is entirely derivative and dependent on the device foremarkets. AC ¶ 75. That is, Tap-and-Pay iOS Mobile Wallets do not function on their own. *Id*. The market for these wallets exists only because there are foremarkets for smartphones,

tablets, and smart watches on which Tap-and-Pay iOS Mobile Wallets can function. *Id.* These "allegations establish a plausible aftermarket for [Tap-and-Pay IOS Mobile Wallets] that is derivative from and dependent on the primary device market." *AliveCor,* 592 F. Supp. 3d at 916.

*Second*, the challenged restraints relate only to the aftermarket, not the foremarket. AC ¶ 76. Plaintiffs allege that "Apple has blocked rivals from accessing the NFC interface for purposes of developing a Tap-and-Pay iOS Mobile Wallet." *Id.* That is not a restriction in the device foremarkets. Rather, as in *Newcal* and *AliveCor*, the restrictions operate as "part of the separate and derivative aftermarket." *Newcal*, 513 F.3d at 1050; *AliveCor,* 592 F. Supp. 3d at 916.

*Third*, Apple's market power in the aftermarket for Tap-and-Pay iOS Mobile Wallets does not derive from contractual provisions it secures in the device foremarkets. AC ¶ 77. When buying Apple's smartphones, tablets, and smart watches, consumers do not agree (contractually or otherwise) that Apple Pay will be the exclusive Tap-and-Pay iOS Mobile Wallet available for their devices. *Id.* ¶¶ 47, 77, 83-84. Issuers likewise do not agree to this restriction, nor do they even participate in the foremarkets at issue. Thus, as in *Newcal* and *AliveCor*, the aftermarket restrictions are not knowingly accepted—much less contractually—in the foremarkets. *See Newcal*, 513 F.3d at 1050; *AliveCor*, 592 F. Supp. 3d at 916. Rather, Apple's "market power allegedly flows from its relationship with its consumers." *Newcal*, 513 F.3d at 1050.

*Fourth*, competition in the device foremarkets does not constrain Apple's market power in the Tap-and-Pay iOS Mobile Wallets Market. AC ¶ 78. Apple has structured Apple Pay to ensure as much. The side of the market that pays Apple's aftermarket fees (card issuers) does not transact in the foremarket and thus "cannot drive substitution in the foremarket in response to aftermarket restraints." *Id.* Consumers do participate in the foremarkets, but because they do not pay Apple's fees, they "have no incentive to substitute devices" because of them. *See id.* Apple also prevents issuers from passing on Apple Pay fees (*i.e.*, charging consumers more for Apple Pay) to influence consumers' foremarket behavior. In this way, Apple has insulated its aftermarket practices from foremarket competition.

Even if consumers paid Apple's aftermarket fees, foremarket competition would not discipline Apple's aftermarket conduct due to the difficulty and high-cost of switching foremarket operating systems (known as "lock-in"). *Id.* ¶¶ 79-82. As the Amended Complaint alleges:

- switching would require iOS consumers to purchase new non-Apple devices, which is "a costly and unrealistic option," *id.* ¶¶ 53, 61–66;

- relearning an operating system takes substantial time and effort, and users are disinclined to switch and "face the same learning curve anew," *id.* ¶ 79;

- consumers lose apps and content when switching and tend to stick with their operating system to avoid these "sunk costs," *id.* ¶ 80; and

- data confirm the absence of switching, showing that "more than 90% of new iPhone purchase are made by consumers whose previous smartphone was likewise an iPhone," *id.* ¶ 82.

By satisfying all four *Newcal* requirements, Plaintiffs' allegations are "sufficient to pursue a claim based on the alleged aftermarket." *AliveCor,* 592 F. Supp. 3d at 917. This should end the inquiry. The primary cases Apple relies upon—*Reilly v. Apple Inc.* and *Apple, Inc. v. Psystar Corp.*—did not involve alleged aftermarkets[2] and all of Apple's market definition arguments can be dispatched by straightforward application of the *Newcal* and *AliveCor* framework.

Apple nevertheless contends that there can be no aftermarket here because consumers supposedly purchase the aftermarket product (Apple Pay) simultaneously with the foremarket product (Apple mobile device). MTD at 10. Apple distorts the facts. Apple hides pricing from consumers and if they elect to use the service, they cannot do so until they take deliberate steps to enable it after device acquisition. AC ¶ 46. Facts aside, what matters legally (and economically) is not the timing of foremarket and aftermarket purchases, *per se,* but whether consumers can accurately price the aftermarket restraints into their foremarket purchase. *See Eastman Kodak Co. v. Image Technical Services,* 504 U.S. 451, 473-74 (1992) (noting this requires "accurate lifecycle pricing" of aftermarket restraints). Apple's device consumers cannot do this. The price of Apple Pay is governed by issuer contracts to which consumers are not privy, and even if they were, consumers are shielded from Apple Pay fees and thus have no reason to price in their lifecycle effects. AC ¶¶ 78, 83.

Citing a Third Circuit decision, Apple next asserts that satisfying *Newcal's* fourth factor

---

[2] *See Reilly*, 578 F. Supp. 3d 1098, 1107 (N.D. Cal. 2022) ("Plaintiff does not allege that the 'iOS App Distribution Market' is an aftermarket."); *Psystar*, 586 F. Supp. 2d 1190, 1197 (N.D. Cal. 2008) ("Psystar alleges not a single-brand aftermarket dependent on and derivative of a specific company's primary product.").

1   requires a change in policy, which supposedly is absent here. MTD at 11. In the Ninth Circuit, however,

2   aftermarkets do not "necessarily require a post-purchase policy change." *Innovative Health LLC v.*

3   *Biosense Webster, Inc.*, 2022 WL 1599713, at *7 (C.D. Cal. Mar. 22, 2022) (collecting cases). *Newcal*

4   itself contains no such requirement. As to the fourth factor, it requires only that competition in the

5   foremarket not "discipline anticompetitive practices in the aftermarket," *Newcal*, 513 F.3d at 1050,

6   and as already addressed, Plaintiffs can make that showing. Even if a policy change were necessary,

7   Plaintiffs allege one. As the Complaint explains, Apple's aftermarket restraints were a change in policy

8   because they did not roll out until 2015, by which point the Apple device markets had matured and

9   consumers were already "locked into the iOS ecosystem and unable to readily switch operating

10  systems." AC ¶ 82.

11       Relying on *Queen City Pizza*, Apple further asserts that there can be no aftermarket because

12  Apple has contracts with consumers, issuers, and developers. MTD at 12. Apple misconstrues *Queen*

13  *City Pizza*. As the Ninth Circuit has explained, *Queen City Pizza* rejected an alleged aftermarket not

14  simply because market participants had contracts with the defendant, as Apple implies, but rather

15  because the specific contracts were (a) "obtain[ed] in the initial" or foremarket and (b) gave the

16  defendant "market power in the aftermarket." *Newcal*, 513 F.3d at 1050. None of the contracts Apple

17  points to satisfy these essential criteria. Consumers must accept terms and conditions governing Apple

18  Pay, but those terms contain no agreement to make Apple Pay the exclusive provider of iOS tap-and-

19  pay solutions. AC ¶¶ 46-47. Issuers likewise have contracts with Apple, but there is no allegation that

20  they contain any requirement to enable cards only for Apple Pay. *Cf. id.* ¶¶ 6, 100. Developers are the

21  *only* party with contracts that reference Apple's restrictions (*see id.* ¶ 50), but critically, developers

22  (like issuers) do not participate in the relevant foremarkets (*i.e.*, they do not buy or sell iOS devices)

23  and thus any contractual rights Apple secures from developers are not rights secured in the foremarkets.

24  This case is thus nothing like *Queen City Pizza*.[3]

25

26       [3] Courts do not hesitate to distinguish *Queen City* where, as here, it is factually inapposite. *See,*
    *e.g., Newcal*, 513 F.3d at 1050 ("[W]e find that Newcal's allegations are more like the allegations at
27  issue in *Eastman Kodak* than those at issue in *Queen City Pizza*."); *Datel Holding Ltd. V. Microsoft
    Corp.*, 712 F. Supp. 2d 974, 990 (N.D. Cal. 2010) ("[H]ere, as in *Newcal* and *Kodak*, and unlike in
28  *Queen City Pizza*, the Aftermarket is wholly derivative and dependent on the primary market."); *Giacalone Elec. Servs., Inc. v. Wesco Distribution Inc.*, 2004 WL 7324092, at *4 (N.D. Cal. Mar. 26,

Finally, Apple contends that consumers' supposed visibility of its restraints allows foremarket competition to discipline the aftermarket. MTD at 12. At best this is a factual issue, *see Newcal*, 513 F.3d at 1051, and one that (ultimately) should be resolved in Plaintiffs' favor. The Amended Complaint plausibly alleges that consumers do *not* have visibility of the restraints when contracting in the foremarkets. AC ¶¶ 83-84. It may be, as Apple asserts, that some consumers know Apple Pay is "free" to them, and which issuers participate, but this does not equate to knowledge that Apple Pay is the *only* tap-and-pay solution available on iOS. Even if consumers were aware of the restraints when transacting in the foremarket, their incentive to discipline Apple's aftermarket conduct is limited because consumers are shielded from Apple's aftermarket fees. Issuers have stronger incentives but, as noted, they do not participate in the foremarkets and Apple ensures that they cannot spur competition in the foremarkets to influence the aftermarkets.

### 3. Plaintiffs' Relevant Market Does Not Exclude Reasonable Substitutes.

An alleged relevant market can be rejected on the pleadings only when it is "facially unsustainable." *In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 995 (N.D. Cal. 2010) (White, J.). In conducting this limited inquiry, it is "not appropriate to delve into a factual inquiry on effective substitutes." *Id.*[4] Factual inquiry, however, is exactly what Apple invites here, asserting that various payment modes (payment cards, QR-based payment methods, and other mobile wallets) are reasonably interchangeable with Apple Pay. *See* MTD at 7-9. At a minimum, these factual contentions should be rejected as premature. They also are without merit.

Apple focuses on asserted substitution by consumers between various payment modes, but all of Apple's arguments require disregarding the Amended Complaint. As Plaintiffs plausibly allege, consumers do *not* regard Tap-and-Pay wallets as being reasonably interchangeable with the payment modes Apple identifies.[5] Even if Apple were correct as to *consumers*, this is a multi-sided market and

---

2004) ("[F]ranchise cases, such as . . . *Queen City Pizza*, are not applicable to this dispute because franchises involve exclusive markets that are defined by contract.").

[4] Internal quotation marks omitted here and throughout.

[5] The only "other mobile wallets" Apple identifies are Android wallets that do not function on iOS devices. These are not reasonable substitutes because, to access them, consumers would need to buy a new mobile device and switch operating systems. This is costly, difficult and rare. AC ¶¶ 79-82.

the Supreme Court instructs us to evaluate "both sides." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2286 (2018) (*Amex*). It is particularly "misguided" to define a two-sided market based on substitution occurring on just one side, as Apple proposes. *See In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 345 (E.D.N.Y. 2019). The factfinder must also assess whether other sides of the platform have the same ability to substitute such that the "product at issue—the transactions— is actually interchangeable." *Id.*

Here, even if Apple were correct that consumers readily substitute between payment modes, issuers on the other side of the platform do not substitute to the same modes and cannot induce consumer substitution because Apple bars them from passing on Apple Pay fees. Without substantial issuer (or issuer-induced) substitution, it would be erroneous to include these other payment modes in the same relevant antitrust market. Ignoring issuers, as Apple does, is particularly indefensible because a profit-maximizing platform is expected to levy fees on the less elastic side of the market, here the issuing side.

Little imagination is needed to confirm the absence of issuer-side substitution. Apple has been charging issuers supracompetitive Apple Pay fees since inception, yet issuers demonstrably are not substituting away from Apple Pay to the alternatives Apple identifies. Rather, issuer participation in Apple Pay is increasing every year. AC ¶ 64. This real-world SSNIP,[6] pleaded with particularity, forcefully supports Plaintiffs' market definition. In the final analysis, the relevant market can only include products that "have the actual or potential ability to deprive each other of significant levels of

---

Payment cards are not reasonably close substitutes for consumers because cards lack the security functionality of a mobile wallet, which "tokenizes" payment card numbers without disclosing them to merchants. *Id.* ¶¶ 55, 69. QR-code payments are more cumbersome and require multiple steps: opening an app, clicking through menus, and scanning a code. *Id.* ¶ 71. More fundamentally, consumers cannot substitute to QR-code apps because nearly all of them are specific to a particular merchant, and the few general purpose QR-code apps have not been well received and only a limited number of merchants accept them. *Id.* ¶ 72.

[6] SSNIP stands for "small but significant non-transitory increase in price" and SSNIP tests are a "common methodology for defining a relevant antitrust market." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 482 n.1 (9th Cir. 2021). If buyers would not respond to a SSNIP "by making purchases outside the proposed market definition, thereby rending the SSNIP unprofitable," the market is properly defined and should not be expanded to include asserted substitutes. *See id.*

business." *AliveCor*, 592 F. Supp. 3d at 914. Because supracompetitive prices for Tap-and-Pay iOS Mobile Wallets transactions do not trigger switching to the payment modes Apple identifies, there is no cross-elasticity of demand between the wallets and these alternatives. *See AliveCor*, 592 F. Supp. 3d at 914 (boundaries of relevant product market are set by "whether there is cross-elasticity of demand between the product and its [purported] substitutes").

Here again, Apple gets no assistance from *Reilly* and *Psystar*. Plaintiffs allege numerous facts explaining why other payment platforms are not reasonable substitutes for Apple Pay. AC ¶¶ 53-73. By contrast, the complaint in *Reilly* "lack[ed] any discussion of cross-elasticity of demand," *Reilly,* 578 F. Supp. 3d at 1108, and the complaint in *Psystar* "contained only conclusory allegations … without providing any factual basis." *Westlake Servs., LLC v. Credit Acceptance Corp.*, 2016 WL 3919487, at *8 (C.D. Cal. Apr. 6, 2016). Apple likewise misconstrues *Hicks*, as the complaint there simply alleged "economic studies will demonstrate" the results of some future SSNIP test, whereas Plaintiffs here allege the results of an actual SSNIP test by which Apple successfully inflated transaction prices by 15 basis points without causing issuers or consumers to switch to other platforms. *Compare Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018) *with* AC ¶¶ 65-69.[7]

**B.    Plaintiffs Allege a Plausible Tying Claim**

Plaintiffs allege that Apple has tied Apple Pay to its mobile devices by foreclosing all rival iOS tap-and-pay solutions. AC ¶¶ 46-52. Plaintiffs can prevail on this claim upon showing "(1) a tying of two distinct products or services, (2) sufficient economic power in the tying product market to affect the tied market, and (3) an effect on a substantial amount of commerce in the tied market." *Bhan v. NME Hospitals, Inc*., 929 F.2d 1404, 1411 (9th Cir. 1991). Apple does not challenge Plaintiffs allegations as to the latter two elements. Apple contests only Plaintiffs' standing and the existence of a tie between two separate products.[8]

---

[7] In addressing SSNIP tests, *Hicks* relied on *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008), which deemed SSNIP evidence comparable to Plaintiffs' sufficient to sustain a *jury verdict*. *See id.* (upholding market definition limited to coupon inserts because when price of inserts increased, "the percentage of inserts in the coupon market also rose" rather than fell).

[8] It bears emphasis that Plaintiffs' tying claim does not depend on Tap-and-Pay iOS Mobile Wallets being a relevant antitrust market. Even if that market includes payment alternatives, as Apple

1

### 1.     Plaintiffs Have Standing to Challenge Apple's Tying Arrangement.

2

"[P]laintiffs whose injuries [are] proximately caused by a defendant's antitrust violation" have

3

standing to sue. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126, 132 (2014)

4

(citing *Associated Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983))

5

("*AGC*"). Only a plaintiff whose injury "is 'too remote'" is denied standing, *id.* at 133, and the "infinite

6

variety of claims that may arise make it virtually impossible to announce a black-letter rule." *AGC*, 459

7

U.S. at 536. Standing must therefore be "evaluated on a case-by-case basis." *Eagle v. Star-Kist Foods,*

8

*Inc.*, 812 F.2d 538, 540 (9th Cir. 1987) (citing *AGC*, 459 U.S. at 537–45). Relevant factors include:

9

(1) whether the plaintiff's injury is of the type the antitrust laws were meant to prevent; (2) the directness

10

of the plaintiff's injury; (3) whether the harm is speculative; (4) whether there is a risk of double

11

recovery; and (5) the complexity of the apportionment of damages, if any. *Id*; *AGC*, 459 U.S. at 538-45.

12

The *AGC* factors confirm Plaintiffs' standing to challenge Apple's tying arrangement. Apple's

13

conduct excludes competing tap-and-pay products from operating on iOS devices, thus depriving card

14

issuers of any price competition for tap-and-pay transaction services on iOS devices. AC ¶¶ 131, 133-

15

38. That is precisely the kind of injury the antitrust laws are meant to prevent (factor 1), and Plaintiffs

16

are directly injured (factor 2) because they contract with Apple and pay an anticompetitive overcharge

17

directly to Apple. *Id.* ¶¶ 131, 134, 136. Moreover, Plaintiffs' injuries are not speculative (factor 3); to

18

the contrary, the injuries have already occurred, are specifically intended by Apple, and are the

19

foreseeable result of excluding competition on iOS devices. *Id.* ¶¶ 133, 137.[9] And there is no risk of

20

double recovery (factor 4) or chance of complex apportionment of damages (factor 5), because

21

Plaintiffs are contractually barred from passing on the overcharges they incur. *Id.* ¶¶ 90-92.[10] Plaintiffs

22

---

23

improperly contends, Apple does not dispute that the challenged restraints affect a "substantial amount of commerce," which is all tying requires.  *See id.*; *see also* AC ¶¶ 88-89.

24

[9] *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 479 (1982) (Where plaintiff's injury is "foreseeable" and is "a necessary step" in achieving the intended anticompetitive effects, plaintiff has standing to sue.); *Surf City, Inc. v. Int'l Longshore & Warehouse Union*, 123 F. Supp. 3d 1219, 1231-32 (C.D. Cal. 2015) (Even indirect victims have standing to sue when the harm was 'clearly foreseeable.").

25

26

[10] Indeed, as direct purchasers, card issuers may be the *only* parties with standing to sue for the overcharges extracted by Apple. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745-46 (1977); *see AGC* at 594; *Apple, Inc. v. Pepper*, 139 S.Ct. 1514, 1521 (2019) (holding that those who purchased directly from Apple are "proper plaintiffs to maintain this antitrust suit").

27

28

1    absorb the overcharge in full.

2        Failing to apply the *AGC* factors, Apple advocates for the type "black letter" rule *AGC* cautions

3    against—specifically, a rule that would limit standing to (a) consumers who purchase both the tied and

4    tying products and (b) competitors excluded from the tied product market. MTD at 12. None of Apple's

5    cases endorse such a rule. The *Eagle* decision was decided long before *American Express* addressed

6    multisided platforms and is not even a tying case. Rather, it is a price-fixing case in which the plaintiffs

7    were employees of the directly overcharged victim, not (as here) the directly charged victims

8    themselves. And *Eagle* reiterates what Apple ignores—that standing is determined by analysis of the

9    *AGC* factors and that plaintiffs have standing if (as here) they participate "in the same market as the

10    alleged malefactor[.]" *Eagle*, 812 F.2d at 540. Similarly, the court in *Cyntegra* stated that, in a tying

11    case, "standing rests on whether the plaintiff has been adversely affected by an anticompetitive aspect

12    of the defendants' conduct." *Cyntegra, Inc. v. Idexx Labs, Inc.*, 520 F. Supp. 2d 1199, 1210 (C.D. Cal.

13    2007). Here, Plaintiffs are alleged to be adversely affected by the elimination of price competition in

14    the tied product market.

15          **2.**    **Apple's Product-Integration Argument Does Not Support Dismissal.**

16        Apple contends that Apple Pay and iOS devices are not distinct products—a requirement for

17    tying—because Apple Pay supposedly is integrated with the devices and comes preinstalled. MTD at

18    13. But as the Supreme Court has explained, "whether one or two products are involved turns not on

19    the functional relation between them, but rather on the character of the demand for the two items." *See*

20    *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984). Separate products exist when "there

21    is a sufficient demand for the purchase of [the tied product] separate from [the tying product]" such

22    that it would be efficient to offer the tied product on a standalone basis. *See id.*

23        Plaintiffs have more than adequately alleged separate demand for Tap-and-Pay iOS Mobile

24    Wallets. Digital wallets are typically offered as standalone products. On Android devices, where

25    Apple's challenged restraints do not operate, Google Pay, Samsung Pay and other tap-and-pay

26    solutions are standalone products sold separately. AC ¶¶ 42-44. Google Pay and PayPal are also

27    available as freestanding apps for iOS devices, albeit without the tap-and-pay technology they need to

28    compete with Apple Pay. *Id.* ¶ 59. Apple pockets at least $1 billion annually in Apple Pay fees, making

it more than efficient for competitors to offer competing wallets (if they could). *See id.* ¶ 88.[11]

Apple contends that Apple Pay *itself* has not been sold as a standalone product, which is untrue since that is exactly how it is sold to card issuers and merchants. As for iOS device owners, because of the tie, Apple does not need to market Apple Pay separately and compete on the merits. That is the point. The product market also is not "Apple Pay," as Apple contends (MTD at 13), but rather Tap-and-Pay iOS Mobile Wallets. Accordingly, even if Apple did not offer Apple Pay as a standalone product in the but-for-world, there would still be demand for rival standalone offerings, and thus two distinct products for tying purposes.

Apple further overreaches in asserting that Apple Pay and iOS devices are technically "integrated components" incapable of being tied. MTD at 13 & n.10 (citing *Microsoft*, 147 F.3d at 949). The degree to which Apple Pay is technologically integrated into Apple's devices is a factual question that, to the extent relevant, cannot be resolved on the pleadings. Nor should Apple's "integration" arguments be accepted uncritically. Apple iOS devices existed for nearly a decade before Apple Pay was introduced, and Android devices show that multiple Tap-and-Pay wallets can coexist on a single device. Accordingly, there is no basis to presume (much less at this stage) that Apple's tie arises from technological necessity and not, as the Amended Complaint alleges, Apple's desire to stymie competitors.[12]

### 3.   It Is No Defense That Some Apple Device Holders Do Not Use Apple Pay.

Next Apple contends that while iOS device holders are foreclosed from accessing competing tap-and-pay wallets, this is not a "tie" because some consumers do not use digital wallets at all. MTD at 13-14. Apple is wrong. The Supreme Court has long held that "a tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases

---

[11] Apple relies on *In Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 974 (9th Cir. 2008), but the plaintiff there (unlike here) neglected to plead *any* facts suggesting distinct demand for the tied product. *See id.* at 975.

[12] Plaintiffs nowhere concede, as Apple contends, that "the integration of Apple Pay with Apple devices provides technological benefits." MTD at 13. The sections of the Amended Complaint Apple points to merely note that tap-and-pay wallets (which in the but-for world many rivals could provide) offer advantages over contactless cards. *See* AC ¶¶ 54-56.

a different (or tied) product, *or at least agrees that he will not purchase that product from any other supplier.*" *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958) (emphasis added); *accord Eastman Kodak*, 504 U.S. at 461. That is exactly what Apple does here: by hoarding NFC technology, it prohibits iOS consumers from accessing a tap-and-pay mobile wallet from any other supplier.

Apple is correct that some consumers of iOS devices ultimately may choose not to use Apple Pay, but this does not make the tie any less pernicious. Take *Eastman Kodak*, a seminal tying decision. There, Kodak sold replacement parts to purchasers "only if they agreed not to buy service" from companies competing with Kodak's own service business. *See id.* 504 U.S. at 463. The Supreme Court acknowledged that some purchasers of the tying product (parts) may not require the tied product (service), because, for example, they might just install the replacement parts themselves. *See id.* at 463. But the Court had little difficulty deeming this a "tying arrangement" under § 1. *See id.* Similarly in *United Shoe Mach. Corp. v. United States*, 258 U.S. 451, 456–57 (1922), another seminal tying decision, the Court condemned contracts that required lessees of shoe-making equipment to purchase any "additional machinery" of certain types from the lessor. *Id.* The lessees were not obligated to purchase the additional machinery, but there was still a tie because any such purchase (if made) had to be made from the lessor. *See id.* at 457-58.

Apple does not confront, let alone acknowledge, this century of Supreme Court precedent, and the cases it cites are wildly off point.[13] Plaintiffs' tying claim should be upheld.

**C.      Plaintiffs Have Alleged Anticompetitive Effects.**

Anticompetitive effects are established with proof of "reduced output, increased prices, or decreased quality in the relevant market." *Amex*, 138 S. Ct. at 2284. Plaintiffs plausibly allege each form of anticompetitive harm.  Specifically, having foreclosed rivals, Apple charges supracompetitive

---

[13] In *Blix Inc. v. Apple, Inc.*, 2021 WL 2895654, at *5 (D. Del. July 9, 2021), Apple gave users the option to select between the allegedly "tied" product—Apple's sign-in service—and competing sign-in services. Thus, unlike here, there was no tie at all. In *Dream Big Media Inc. v. Alphabet Inc.*, 2022 WL 16579322, at *3-5 (N.D. Cal. Nov. 1, 2022), this Court held that Google had the right to control how its mapping services are displayed, and the plaintiffs' tying claim failed for many reasons inapplicable here, including because the plaintiff had not alleged any relevant product markets in which Google had market power. *See id.* *2-5.

1   issuer fees exceeding $1 billion annually. AC ¶¶ 97-98. In a competitive market with lower fees, more

2   issuers would enable their cards for Apple Pay and rival wallets, thereby increasing output. *Id.* ¶¶ 103-

3   04. And competition among rival iOS wallets would spark innovation and product differentiation, as

4   has occurred in the Android market. *Id.* ¶¶ 99-102.

5       Apple does not dispute (for purposes of this motion) that its restraints have increased prices

6   above the competitive level, and supracompetitive prices alone are an anticompetitive effect sufficient

7   to uphold Plaintiffs' claims. *See Amex,* 238 S. Ct. 2284. As to output, Apple's position is that Plaintiffs

8   "concede" an output increase. MTD at 14. But Plaintiffs allege the opposite, AC ¶¶ 103-04, and the

9   snippets of the Amended Complaint Apple references merely note that mobile-wallet transactions, and

10  Apple Pay acceptance, are increasing. *Id.* ¶¶ 11, 88. That does not mean output is increasing. The

11  relevant question is not whether Apple Pay is gaining in popularity but, instead, whether the *restraints*

12  reduced output relative to a counterfactual world without them.[14] As Plaintiffs explain, absent the

13  restraints, more iOS wallets and lower prices would generate additional output in the relevant market.

14      Plaintiffs' allegations about decreased innovation are likewise not conclusory. As addressed in

15  the Amended Complaint, the analogous Android market provides real-world confirmation of the types

16  of innovation that would be expected to emerge if multiple iOS wallets had to compete for issuer and

17  user acceptance. AC ¶¶ 99-102. Apple ignores those allegations.

18      Apple also contends that Plaintiffs focus only on issuers and ignore the multi-sided nature of

19  the relevant market, yet an entire section of the Amended Complaint addresses how "Apple's conduct

20  harms not only card issuers, but also consumers and competition as a whole." AC § IV.G (altered

21  capitalization); *see also id.* ¶¶ 109-110. Although consumers do not pay Apple's transaction fees,

22  Apple's monopolization and tying conduct nonetheless deprive consumers of "innovation and

23  differentiated choice among market alternatives." AC ¶ 12, 99-102. That is clear anticompetitive harm

24  on the consumer-side of the platform. *See Ellis v. Salt River Project Agric. Improvement & Power*

25  *Dist.*, 24 F.4th 1262, 1274 (9th Cir. 2022) ("Coercive activity that prevents its victims from making

26

27      [14] *See Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 998 (N.D. Cal. 2021) (to assess
    anticompetitive effects, "what is needed is a comparison of output in a 'but-for' world without the
28  challenged restrictions").

1   free choices between market alternatives gives rise to antitrust injury."). ‼

2   **D.    Apple Cannot Avoid Liability by Recharacterizing Its Conduct As a "Refusal to Deal."**

3   Apple contends that its conduct is really a unilateral refusal to deal and that Plaintiffs cannot

4   satisfy the elements of a refusal-to-deal claim. MTD at 15. As a factual matter, there is no basis for

5   such contentions. Apple does not refuse to deal with banks, developers or consumers; it allows all to

6   access and use NFC technology for virtually all purposes—except to facilitate competing tap-and-pay

7   wallets. Nor is Apple's conduct a unilateral refusal to deal as it effectuates its NFC restraints through

8   guidelines developers must accept to offer iOS apps. AC ¶ 50. And Apple's contractual restraint

9   barring issuers from passing on Apple Pay fees is certainly not a refusal to deal.

10   Moreover, as a matter of law, a tying arrangement cannot be recast and analyzed as an

11   exclusive-dealing arrangement. In *Eastman Kodak*, Kodak had refused to sell parts to its customers

12   "unless they agreed not to buy services from [competing service providers]." 504 U.S. at 463–64. Like

13   Apple in this case, Kodak tried to frame its conduct as a "unilateral refusal to deal." *Id*. n.8. But the

14   Supreme Court rejected Kodak's argument, holding that the sale of parts on the condition that

15   customers not purchase services from competitors is not a unilateral refusal to deal. *Id*. The same

16   conclusion applies here. Apple ties Apple Pay to its devices by preventing consumers from accessing

17   competing tap-and-pay mobile wallets. That tie cannot be repackaged as a unilateral refusal to deal.

18   **III.    CONCLUSION**

19   For all the reasons above, Apple's Motion to Dismiss should be denied in full.

20

21   DATED: January 11, 2023                     Respectfully submitted,

22                                               **HAGENS BERMAN SOBOL SHAPIRO LLP**

23                                               By */s/ Steve W. Berman*

24                                                  Steve W. Berman (*pro hac vice*)
                                                 1301 Second Avenue, Suite 2000
25                                               Seattle, WA 98101
                                                 Telephone: (206) 623-7292
26                                               Facsimile: (206) 623-0594
                                                 steve@hbsslaw.com
27

28

1

2    Ben M. Harrington (SBN 313877)
     715 Hearst Avenue, Suite 202
3    Berkeley, CA 94710
     Telephone: (510) 725-3000
4    Facsimile: (510) 725-3001
     benh@hbsslaw.com
5

6    **SPERLING & SLATER, P.C.**
     Eamon P. Kelly (*pro hac vice*)
7    Joseph M. Vanek (*pro hac vice*)
     Jeffrey Bergman (*pro hac vice*)
8    55 W. Monroe Street, 32nd Floor
     Chicago, IL 60603
9    Telephone: (312) 676-5845
     Facsimile: (312) 641-6492
10   ekelly@sperling-law.com
     jvanek@sperling-law.com
11   jbergman@sperling-law.com

12
     *Attorneys for Plaintiff and the Proposed Class*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RESPONSE TO MOTION TO DISMISS - 16
Case No.: 4:22-cv-04174-JSW