1    LATHAM & WATKINS LLP
         Belinda S Lee (Cal. Bar No. 199635)
2          *belinda.lee@lw.com*
         Sarah M. Ray (Cal. Bar No. 229670)
3          *sarah.ray@lw.com*
         Aaron T. Chiu (Cal. Bar No. 287788)
4          *aaron.chiu@lw.com*
     505 Montgomery Street, Suite 2000
5    San Francisco, California 94111-6538
     Telephone: +1.415.391.0600
6

7    *Attorneys for Defendant Apple Inc.*

8

9                        UNITED STATES DISTRICT COURT

10                      NORTHERN DISTRICT OF CALIFORNIA

11                              OAKLAND DIVISION

12

13   AFFINITY CREDIT UNION,                    CASE NO. 4:22-cv-04174-JSW
     GREENSTATE CREDIT UNION, AND
14   CONSUMERS CO-OP CREDIT UNION,             **DEFENDANT APPLE INC.'S REPLY
                                               IN SUPPORT OF MOTION TO
15                      Plaintiffs,            DISMISS PLAINTIFFS' AMENDED
                                               CLASS ACTION COMPLAINT**
16          v.
                                               Date:   February 24, 2023
17   APPLE INC.                                Time:   9:00 a.m.
                                               Place:  Courtroom 5, 2nd Floor, Oakland
18                      Defendant.             Judge:  The Honorable Jeffrey S. White

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

APPLE INC.'S REPLY ISO
MOT. TO DISMISS AM. COMPL.
CASE NO. 4:22-cv-04174-JSW

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.    ARGUMENT ....................................................................................................... 2

    A.    Plaintiffs' Monopolization Claims Fail Because They Are Premised upon an Implausible Relevant Market ..................................... 2

        1.    Plaintiffs' Market Definition Implausibly Excludes Numerous Alternative Payment Methods That Compete with Apple Pay ................................................................. 3

        2.    Plaintiffs' Alleged "Tap-and-Pay iOS Mobile Wallets Market" Is a Single-Brand Market Limited to Apple Pay ......................... 4

        3.    Plaintiffs' Single-Brand Market Is Undermined by Their Allegations that Many Card-Issuers Choose Not to Offer Apple Pay and That Some Apple Device Users Do Not Use Apple Pay .................................................................................. 5

        4.    Plaintiffs Fail to and Cannot Plead an Aftermarket .................................. 7

    B.    The Court Should Dismiss Plaintiffs' Tying Claim ............................................. 10

        1.    Apple Device Users Are Not Required to Use Apple Pay and Are Not Precluded from Using Competing Payment Methods ...................................................................................... 10

        2.    Plaintiffs Do Not Allege Distinct Demand for Apple Pay ....................... 11

        3.    Plaintiffs Lack Antitrust Standing to Assert a Tying Claim ................... 13

    C.    Plaintiffs Fail to Plead Anticompetitive Harm .................................................... 13

    D.    Plaintiffs Cannot Deny They Are Complaining of a Refusal to Deal ................. 15

III.    CONCLUSION .................................................................................................. 15

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

APPLE INC.'S REPLY ISO
MOT. TO DISMISS AM. COMPL.
CASE NO. 4:22-cv-04174-JSW

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Apple, Inc. v. Psystar Corp.*,
   586 F. Supp. 2d 1190 (N.D. Cal. 2008) ........................................................................ *passim*

*Athos Overseas, Ltd. v. Youtube, Inc.*,
   No. 1:21-CV-21698, 2022 WL 910272 (S.D. Fla. Mar. 29, 2022) .................................... 11

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ......................................................................................................... 7

*Brown v. Visa U.S.A., Inc.*,
   674 F. Supp. 249 (N.D. Ill. 1987) ..................................................................................... 14

*Cyntegra, Inc. v. Idexx Laboratories, Inc.*,
   520 F. Supp. 2d 1199 (C.D. Cal. 2007), *aff'd*, 322 F. App'x 569 (9th Cir.
   2009) ................................................................................................................................. 13

*Dang v. San Francisco Forty Niners*,
   964 F. Supp. 2d 1097 (N.D. Cal. 2013) ............................................................................. 2

*Digital Equipment Corp. v. Uniq Digital Technologies, Inc.*,
   73 F.3d 756 (7th Cir. 1996) ............................................................................................... 8

*Dream Big Media Inc. v. Alphabet Inc.*,
   No. 22-cv-02314-JSW, 2022 WL 16579322 (N.D. Cal. Nov. 1, 2022) ...................... *passim*

*Eastman Kodak Co. v. Image Technology Services, Inc.*,
   504 U.S. 451 (1992)............................................................................................. 7, 9, 11, 15

*Epic Games, Inc. v. Apple Inc.*,
   559 F. Supp. 3d 898 (N.D. Cal. 2022) ............................................................................... 9

*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018) ........................................................................................ 1, 2

*In re American Express Anti-Steering Antitrust Litigation*,
   361 F. Supp. 3d 324 (E.D.N.Y. 2019) ............................................................................... 5

*In re ATM Fee Litigation*,
   768 F. Supp. 2d. 984 (N.D. Cal. 2009) .................................................................... 7, 8, 10

*Innovative Health LLC v. Biosense Webster, Inc.*,
   8:19-cv-1984-JVS (KESx), 2022 WL 1599713 (C.D. Cal. Mar. 22, 2022) ................... 5, 9

*Ireland v. Bend Neurological Associates. LLC*,
   No. 6:16-CV-02054-JR, 2017 WL 6329561 (D. Or. Nov. 6, 2017)................................... 14

*Jefferson Parish Hospital District No. 2 v. Hyde*,
   466 U.S. 2 (1984)................................................................................................... 10, 12, 13

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

*Kaplan v. Burroughs Corp.*,
    611 F.2d 286 (9th Cir. 1979) ................................................................................ 4

*Newcal Industries, Inc. v. Ikon Office Solution*,
    513 F.3d 1038, 1045 (9th Cir 2008) ................................................................... 2, 9

*Northern Pacific Railway Co. v. United States*,
    356 U.S. 1 (1958) ......................................................................................... 11

*Ohio v. American Express Co. ("Amex")*,
    138 S. Ct. 2274 (2018) ................................................................................... 13

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
    555 U.S. 438 (2009) ...................................................................................... 15

*Packaging System, Inc. v. PRC-Desoto International, Inc.*,
    268 F. Supp. 3d 1071 (C.D. Cal. 2017) ............................................................... 10

*Paladin Associates, Inc. v. Montana Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) ..................................................................... 10, 11

*Perry v. Rado*,
    504 F. Supp. 2d 1043 (E.D. Wash. 2007), *aff'd*, 343 F. App'x. 240 (9th Cir.
    2009) ..................................................................................................... 14

*Power Analytics Corp. v. Operation Technology, Inc.*,
    820 F. App'x 1005 (Fed. Cir. 2020) .................................................................. 14

*Reilly v. Apple Inc.*,
    578 F. Supp. 3d 1098 (N.D. Cal. 2022) ............................................................ 5, 14

*Response of Carolina, Inc. v. Leasco Response, Inc.*,
    537 F.2d 1307 (5th Cir. 1976) .......................................................................... 12

*Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*,
    532 F.3d 963 (9th Cir. 2008) ........................................................................... 12

*Sidibe v. Sutter Health*,
    4 F. Supp. 3d 1160 (N.D. Cal. 2013) .................................................................. 10

*SMS System Maintenance Services v. Digital Equipment Corp.*,
    188 F.3d 11 (1st Cir. 1999) .............................................................................. 9

*Streamcast Networks, Inc. v. Skype Technologies, S.A.*,
    547 F. Supp. 2d 1086 (C.D. Cal. 2007) ............................................................. 3, 4

*United Shoe Machinery Corporation v. United States*,
    258 U.S. 451 (1922) ...................................................................................... 11

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko*,
    540 U.S. 398 (2004) ...................................................................................... 15

*Wolfire Games, LLC v. Valve Corp.*,
    No. C21-0563-JCC, 2022 WL 1443744 (W.D. Wash. May 6, 2022) ........................... 6

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

iv

APPLE INC.'S REPLY ISO
MOT. TO DISMISS AM. COMPL.
CASE NO. 4:22-cv-04174-JSW

1

### TREATISES

2

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (Sept. 2021 update)....................... 8, 10

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

v

APPLE INC.'S REPLY ISO
MOT. TO DISMISS AM. COMPL.
CASE NO. 4:22-cv-04174-JSW

## I.       INTRODUCTION

Plaintiffs' antitrust claims rest entirely upon the fiction that Apple Pay, a payment method that presents a digital version of an existing physical payment card, is somehow *not* an alternative to numerous other payment methods—like credit cards, cash, and other digital solutions—that consumers use every day to make purchases.  The viability of their fictitious relevant market, centered entirely around Apple Pay, is not a factual issue.  It is a market definition so contrary to common sense and Plaintiffs' own allegations that it is facially unsustainable.

Plaintiffs begin with the illogical contention that their "Tap-and-Pay iOS Mobile Wallets" market is not a single-brand market, despite the fact that it is artificially defined around one product (Apple Pay) from one brand (Apple).  Next, Plaintiffs offer conclusory recitations that everything from physical credit cards to other digital payment methods available on Apple's devices like PayPal, Venmo, and Amazon Pay are somehow not substitutes for Apple Pay.  But Plaintiffs' arguments are contradicted by their own allegations that:  (1) numerous consumers with Apple devices *do not* use Apple Pay and (2) many issuers *do not* offer Apple Pay to their card customers (AC ¶ 64)—both of which confirm that consumers and card-issuers like Plaintiffs frequently use and offer payment methods *other* than Apple Pay.  Finally, Plaintiffs argue, inconsistently, that Apple Pay constitutes an aftermarket even though they admit many users do not activate and therefore do not use Apple Pay on their Apple devices (which is a concession that these users can and do use myriad other payment methods) (*id.*)—meaning there is no lock-in giving rise to a viable aftermarket. No antitrust plaintiff with facts sufficient to allege a plausible relevant market would resort to making such conclusory and contradictory assertions.  That is the ultimate tell that Plaintiffs' alleged market is "not natural, artificial, and contorted to meet their litigation needs." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018) (simplified).

The same problems underlie Plaintiffs' remaining arguments as to their tying claim and failure to plead anticompetitive effects.  The tying claim fails because Plaintiffs' facially implausible Apple Pay-only market also serves as the allegedly tied product market.  Plaintiffs' own allegations that Apple device users may choose not to use Apple Pay also confirm that there is no tie.  And as for competitive effects, Plaintiffs offer nothing more than the conclusory and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

APPLE INC.'S REPLY ISO
MOT. TO DISMISS AM. COMPL.
CASE NO. 4:22-cv-04174-JSW

1   speculative assertion that there would be more innovation and output if NFC accessibility on Apple
2   devices were not limited to Apple Pay.  Here, too, Plaintiffs' assertions are contradicted by their
3   own allegations that Apple Pay has indeed led to increased adoption and output (AC ¶¶ 64, 68, 88)
4   and that Apple continues to improve Apple Pay (*id.* ¶¶ 54–55, 100 n.60, 106).

5   The Amended Complaint should be dismissed with prejudice.

6   **II.   ARGUMENT**

7   **A.   Plaintiffs' Monopolization Claims Fail Because They Are Premised upon an**
8   **Implausible Relevant Market**

9   Plaintiffs cannot hide their failure to plead facts plausibly supporting an Apple-Pay only
10  market by arguing that market definition is inherently "factual."  *See* Opp'n at 2.  The Ninth Circuit
11  has made clear that dismissal on the pleadings is appropriate where "judicial experience and
12  common sense" indicate the alleged relevant market is implausible.  *Hicks*, 897 F.3d at 1121.  And
13  Plaintiffs' own authorities acknowledge that "antitrust claims may be dismissed under rule
14  12(b)(6) if the plaintiff's 'relevant market' definition is facially unsustainable."  *Dang v. San*
15  *Francisco Forty Niners*, 964 F. Supp. 2d 1097, 1104 (N.D. Cal. 2013) (quoting *Newcal Industries,*
16  *Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir 2008)).

17  Like the Amended Complaint, Plaintiffs' Opposition is replete with conclusory statements
18  and antitrust buzzwords.  But Plaintiffs fail to plead any factual allegations to support the notion
19  that Apple Pay exists in a market of its own, despite obvious alternatives such as physical payments
20  cards, other digital payment methods on Apple's devices, and those on other platforms and devices.
21  The Ninth Circuit has held that courts should not suspend common sense when evaluating the
22  plausibility of an alleged relevant market.  *See Hicks*, 897 F.3d at 1117, 1121.  Indeed, Plaintiffs'
23  factual allegations fatally undermine their single-brand market and confirm that Apple Pay is just
24  one of a number of payment methods available to consumers, merchants, and card-issuers.  For
25  example, Plaintiffs allege that:  (1) numerous consumers with Apple devices *do not* use Apple Pay
26  to make payments; and (2) many issuers *do not* offer Apple Pay to their credit card customers
27  given its cost.  *See* AC ¶ 64.  These allegations contradict and, thus, are fatal to Plaintiffs'
28  artificially narrow market definition.  *See Dream Big Media Inc. v. Alphabet Inc.*, No. 22-cv-

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

APPLE INC.'S REPLY ISO
MOT. TO DISMISS AM. COMPL.
CASE NO. 4:22-cv-04174-JSW

02314-JSW, 2022 WL 16579322, at *5 (N.D. Cal. Nov. 1, 2022) (White, J.) (dismissing complaint "fail[ing] to allege facts showing the absence of economic substitutes for the products").

### 1. **Plaintiffs' Market Definition Implausibly Excludes Numerous Alternative Payment Methods That Compete with Apple Pay**

Plaintiffs do not really dispute that they failed to allege how physical payment cards, other mobile wallets, and QR codes are not substitutes for Apple Pay. Plaintiffs' only response is one footnote of conclusory statements that Apple Pay lacks alternatives. *See* Opp'n at 7 n.5.

***Physical Payment Cards***. Plaintiffs cannot sidestep the most obvious substitute to Apple Pay: the underlying physical payment cards that one utilizes to sign up for and use Apple Pay. Plaintiffs ask this Court to accept the nonsensical claim that a physical payment card connected to the same bank or credit account as Apple Pay and that uses the same chip-enabled technology is not a substitute for making point of sale payments. But, when one can tap to make a payment using either a physical payment card or Apple Pay, the two are by definition interchangeable.

Plaintiffs' only argument for excluding physical payment cards as substitutes is that they "lack the security functionality of a mobile wallet." Opp'n at 8 n.5. First, Plaintiffs' complaint contains allegations claiming the opposite: that Apple Pay purportedly has a "fraud rate . . . that exceeded traditional cards." AC ¶ 109. Second, whether Apple Pay has or lacks security advantages relative to physical payment cards is not a basis for excluding those cards from the market. "[U]nique attributes" that make a product "more attractive and efficient" do not distinguish it from others that "permit users to accomplish the same basic task." *Streamcast Networks, Inc. v. Skype Techs., S.A.*, 547 F. Supp. 2d 1086, 1095 (C.D. Cal. 2007). If that were so, single-brand markets would be the rule rather than the exception, as one could always point to differences between products used for the same function to claim that they somehow do not compete. But that is not the law. Plaintiffs' market definition cannot withstand the reality that physical tap-and-pay cards are alternatives.

***Other Mobile Wallets***. Here, too, Plaintiffs' only argument is contradicted by their own complaint. Plaintiffs contend other mobile wallets are not reasonable substitutes because they are "Android wallets that do not function on iOS devices," and switching devices is "costly, difficult

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

APPLE INC.'S REPLY ISO
MOT. TO DISMISS AM. COMPL.
CASE NO. 4:22-cv-04174-JSW

and rare" for consumers.  Opp'n at 7 n.5.  This is contradicted by their admissions that Apple Pay and other mobile wallets are "mostly indistinguishable."  AC ¶¶ 4, 46.  Such allegations about brand loyalty also fail to support a single-brand market.  For "[e]ven where brand loyalty is intense, courts reject the argument that a single branded product constitutes a relevant market."  *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) (citation omitted).

In any event, arguments about the substitutability of other mobile wallets from the perspective of *consumers* are irrelevant because Plaintiffs are card-issuers.  Plaintiffs allege that *more* card-issuers would offer Apple Pay if Apple reduced its fees (AC ¶¶ 12, 103, 104), meaning that those fees cause some issuers to forgo Apple Pay for alternatives, including "tap-and-pay mobile wallet services offered to Google Android device owners" that Plaintiffs acknowledge are "alternative[s]" (*id.* ¶ 137). These allegations preclude any inference that, for card-issuers, other mobile wallets are not substitutes for Apple Pay.  *See Psystar*, 586 F. Supp. 2d at 1199 (a price differential "does not necessarily mean that a product is unconstrained by competition").

**QR-based payment methods.**  Plaintiffs' Opposition reiterates the allegation that QR-based payment methods, which they admit are used at some of the largest merchants like Starbucks and Walmart (AC ¶ 72), are not reasonable alternatives to Apple Pay because they are supposedly more "cumbersome" to operate.  Opp'n at 8 n.5.  But, as Apple previously articulated (Mot. at 8), such differences do not establish that a competing product is not interchangeable.  Where two payment methods accomplish the "same basic task"—i.e., facilitate transactions—"unique attributes and components" do not separate them into distinct markets.  *Streamcast*, 547 F. Supp. 2d at 1095.

Plaintiffs' refrain that only "a limited number of merchants accept" QR-based payments is also of no help.  Opp'n at 8 n.5.  A properly defined market must include producers—even "eager potential entrants to the market"—that can take business away from each other given the similarity of their products. *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292 (9th Cir. 1979) (citation omitted).

## 2.   Plaintiffs' Alleged "Tap-and-Pay iOS Mobile Wallets Market" Is a Single-Brand Market Limited to Apple Pay

Plaintiffs' contention that a "Tap-and-Pay iOS Mobile Wallets" is not a single-brand market but rather "brand-neutral" (Opp'n at 3) is no more than wordplay.  A relevant market

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

APPLE INC.'S REPLY ISO
MOT. TO DISMISS AM. COMPL.
CASE NO. 4:22-cv-04174-JSW

defined around a product to give one brand 100% market share (*see* AC ¶ 129) is—by definition—a single-brand market.  *See Innovative Health LLC v. Biosense Webster, Inc.*, 8:19-cv-1984-JVS (KESx), 2022 WL 1599713, at *5 (C.D. Cal. Mar. 22, 2022) ("Each of the three catheter markets that [plaintiff] purports to define includes only one product from one brand. . . . This is precisely the definition of a single-brand market." (simplified)).  Omitting the words "Apple Pay" from the market definition does not change the fact that a "Tap-and-Pay iOS Mobile Wallets" market is limited to a single brand (Apple) and product (Apple Pay).

The court in *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1107 (N.D. Cal. 2022), rejected precisely this kind of wordplay by plaintiffs also seeking to avoid the difficulty of pleading a viable single-brand market.  There, the alleged market was one "for distribution of apps compatible with iOS to users of iOS devices" and consisted entirely of Apple's App Store.  *Id.* at 1105, 1107.  The court recognized this was "essentially . . . a *single-brand* market *defined* as Apple's App Store." *Id.* at 1107 (emphasis in original).  Because the plaintiff did not plead an aftermarket and failed to justify "limiting the relevant market to a *single-brand market* defined around *Apple's distribution of iOS apps*," the court dismissed the complaint.  *Id.* at 1107–08, 1111 (emphasis in original).[1]

The same defects plague Plaintiffs' "Tap-and-Pay iOS Mobile Wallets" market.  It is a single-brand market, drawn around Apple Pay and Apple Pay alone.  Plaintiffs are advancing a highly disfavored market definition that arises only in the kind of "rare and unforeseen circumstances" that they fail to and cannot allege here.  *Psystar*, 586 F. Supp 2d at 1198; *see also In re Am. Express Anti-Steering Antitrust Litig.*, 361 F. Supp. 3d 324, 343 (E.D.N.Y. 2019) ("It is an understatement to say that single-brand markets are disfavored.").

### 3.  <u>Plaintiffs' Single-Brand Market Is Undermined by Their Allegations that Many Card-Issuers Choose Not to Offer Apple Pay and That Some Apple Device Users Do Not Use Apple Pay</u>

Plaintiffs' single-brand "Tap-and-Pay iOS Mobile Wallet" market is facially unsustainable

---

[1] Plaintiffs' attempt to distinguish *Reilly* and *Psystar* on the ground that the plaintiffs in both cases did not explicitly allege an aftermarket, Opp'n at 5, is unavailing.  Both courts dismissed the complaints after assessing whether the plaintiffs' allegations could alternatively support a single-brand aftermarket.  *See id.* at 1108 n.2; *Psystar*, 586 F. Supp. 2d at 1203.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

APPLE INC.'S REPLY ISO
MOT. TO DISMISS AM. COMPL.
CASE NO. 4:22-cv-04174-JSW

1    given the contradictory allegations that: (1) "[a]s of September 2020, approximately 51% of

2    iPhone users had activated Apple Pay" (AC ¶ 64; *see also id.* ¶ 53); and (2) "the number of Apple

3    Pay issuers has increased steadily since Apple Pay's launch" (*id.* ¶ 64).  First, Plaintiffs' admission

4    that nearly half of iPhone users had not activated Apple Pay as of September 2020 confirms that

5    those customers use a payment method *other* than Apple Pay—e.g., their physical credit or debit

6    card, cash, or some other digital method like Venmo or Paypal—to make purchases.   This

7    admission defeats any plausible inference that Apple Pay exists in a market of its own.[2]

8            Second, Plaintiffs' acknowledgment that more card-issuers are opting to offer Apple Pay

9    to their card customers (*id.* ¶ 64) means that issuers *do* switch and offer additional payment

10   methods.  These admissions undermine the assertion that there is no "substantial issuer (or issuer-

11   induced) substitution."  Opp'n at 8.  That even more issuers would participate in Apple Pay if

12   Apple reduced its fees (AC ¶¶ 12, 103, 104) means that issuers are choosing alternative payment

13   methods.  Contrary to the suggestion that "[l]ittle imagination is needed to confirm the absence of

14   issuer-side substitution," Opp'n at 8, Plaintiffs themselves allege that such substitution exists.

15                                    *        *        *

16           Plaintiffs' contrived "Tap-and-Pay iOS mobile wallet" market is implausibly narrow and

17   contradicted by their own allegations that both consumers and card-issuers switch between Apple

18   Pay and other payment methods.  Because this market construct fails, the Court can and should

19   dismiss the Amended Complaint on this basis alone.  *See Psystar*, 586 F. Supp. 2d at 1200

20   (dismissing complaint that failed to plausibly allege a relevant market given internally

21   contradictory allegations); *Wolfire Games, LLC v. Valve Corp.*, No. C21-0563-JCC, 2022 WL

22   1443744, at *2 (W.D. Wash. May 6, 2022) (dismissing complaint where "the commercial realities

23   alleged . . . undercut Plaintiffs' separate market theory").

24

25

26   [2] Plaintiffs have not alleged a "real-world SSNIP" test to support an Apple Pay-only market.
     Opp'n at 8–9.  *First*, their "real-world SSNIP" test is belied by their own theory of harm—that
27   Apple's fees cause issuers choose alternative payment methods.  *See* AC ¶¶ 12, 103, 104.  *Second*,
     Apple has never charged consumers fees for Apple Pay, so consumers cannot have been subjected
28   to a "real-world SSNIP" test.  And just restating legal elements (*id.* ¶ 60) is not enough to plead
     that Apple Pay lacks any substitutes.  *See Dream Big Media*, 2022 WL 16579322, at *2.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

APPLE INC.'S REPLY ISO
MOT. TO DISMISS AM. COMPL.
CASE NO. 4:22-cv-04174-JSW

### 4.    Plaintiffs Fail to and Cannot Plead an Aftermarket

Plaintiffs' Opposition largely recycles the conclusory allegations from the Amended Complaint that parrot aspects of the *Newcal* decision.  *See generally* Opp'n at 3–4.  Such bare recitations, however, are not enough to plead an aftermarket.  *See Dream Big Media*, 2022 WL 16579322, at *2 ("Labels and conclusions [] and formulaic recitation of the elements of a cause of action will not do.") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Beyond that, Plaintiffs engage contradictory arguments to fit Apple Pay into the highly specific and disfavored aftermarket paradigm.  But, stepping back and focusing on the context in which such aftermarkets arise, Plaintiffs clearly have failed to—and cannot—allege that Apple Pay is an aftermarket.

Cognizable single-brand aftermarkets arise in situations like *Eastman Kodak Co. v. Image Technology Services, Inc.*, 504 U.S. 451 (1992), and *Newcal*, where "once a consumer buys . . . a good, like a photocopier, [the consumer] is 'locked in' to purchasing compatible parts and service for a considerable length of time, given the expense and difficulty of buying a new photocopier." *In re ATM Fee Litig.*, 768 F. Supp. 2d 984, 997 (N.D. Cal. 2009).  "In those circumstances, market imperfections prevent consumers from imposing market discipline in the derivative market because of the difficulty of switching among competitors in the primary market." *Id.*

That is nothing like what Plaintiffs allege, or can allege, with respect to Apple Pay. Consumers who buy an iPhone, iPad, or Apple Watch are not locked into using Apple Pay as their sole payment method.  The opposite is true.  As Plaintiffs' themselves allege (at AC ¶ 64), nearly half of iPhone users *do not even activate Apple Pay*—meaning those Apple device owners are free to and do use other methods to make payments.  Because the purchase of the supposed "foremarket product" (here, an Apple device) does not—as Plaintiffs admit—lock the buyer into using the "aftermarket product" (here, Apple Pay), this is not an aftermarket situation.[3]

Plaintiffs' attempt to shoehorn Apple Pay into its own aftermarket is like the failed attempt by the plaintiffs to plead an aftermarket in *ATM Fee*.  There, the plaintiffs sought to allege an aftermarket limited to "the provision of Foreign ATM Transactions routed over [the] Star

---

[3] Because there is no lock-in, Plaintiffs' arguments and allegations about the purported switching costs of moving from Apple to non-Apple devices are irrelevant.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

7

APPLE INC.'S REPLY ISO
MOT. TO DISMISS AM. COMPL.
CASE NO. 4:22-cv-04174-JSW

[network]" that they alleged was "wholly derivative from and dependent on the market for deposit accounts." 768 F. Supp. 2d at 994–95.  This was not a cognizable aftermarket theory, because the plaintiffs "fail[ed] to plead a viable theory suggesting that once a customer signs up for a bank account, he is 'locked in' to that bank's services.  There are numerous banks that offer deposit accounts and ATM services, and customers may presumably switch to a new bank if they are unhappy with the services offered by their current institution."  *Id.* at 997.  Plaintiffs' failure to "allege that they are effectively limited to the Star network as a result of their present banking relationships" meant they "failed to plead that they are 'locked in' to the derivative aftermarket." *Id.*  Here, Plaintiffs *outright acknowledge* that Apple device owners are *not* locked into using only Apple Pay.  *See* AC ¶ 64.  That defeats any plausible claim that Apple Pay constitutes its own, single-brand aftermarket.

Plaintiffs' remaining arguments to contort Apple Pay into an aftermarket fail for the following additional reasons:

*First*, Plaintiffs cannot avoid the reality that Apple Pay always comes preloaded on Apple's devices.  Apple did not "distort[] the facts" on this issue.  Opp'n 5.  Rather, Plaintiffs themselves allege that "[i]f a consumer purchases an iOS device in any of these markets, that consumer also receives the Apple Pay service."  *See* AC ¶ 10; *see also id* ¶ 46 ("Consumers cannot purchase one of these devices without also acquiring Apple Pay").  That is dispositive of whether they can plead an aftermarket, as one only arises where a consumer must purchase the aftermarket product due to being locked-in by having first purchased the foremarket product.  *See Phillip* E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 564b (Sept. 2021 update) ("[W]hen the primary good and the 'aftermarket' good are sold at the same time, such as a computer together with its bundled software, there is no lock-in."); *see also Psystar*, 586 F. Supp. 2d at 1201 n.4; *Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996).

*Second*, Plaintiffs' contention that consumers cannot price the alleged aftermarket constraint, Opp'n at 5, is wrong, and—again—contrary to their own allegations.  Plaintiffs admit that Apple device owners are not locked in to Apple Pay.  *See* AC ¶ 64.  Apple Pay is also free for consumers.  AC ¶ 7, 90, 78 n.46.  Thus, there is neither an "aftermarket restraint," nor anything to

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

8

APPLE INC.'S REPLY ISO
MOT. TO DISMISS AM. COMPL.
CASE NO. 4:22-cv-04174-JSW

1  "accurately price" from the perspective of Apple's device consumers with respect to Apple Pay.

2  Plaintiffs also plead that consumers are aware: (1) that Apple Pay is free to them; (2) which card-

3  issuers participate in Apple Pay; and (3) where it can be used.  *See* AC ¶ 78 n.46; Mot. at 12.  This

4  defeats any aftermarket claim, which requires consumers to be locked into an aftermarket product

5  *and* lack the information to assess the lifecycle cost of being locked-in.  *See Kodak*, 504 U.S. at

6  473–75; *Innovative*, 2022 WL 1599713, at *10 (plaintiff "has not shown that they are 'locked in'

7  because of high information costs that prevent them from accurately assessing lifecycle pricing"

8  (citing *SMS Sys. Maint. Servs. v. Digital Equip. Corp.*, 188 F.3d 11, 23 (1st Cir. 1999))).

9      In any event, whether Plaintiffs can frame Apple Pay as an aftermarket from the perspective

10  of Apple device customers is irrelevant.  Plaintiffs are card-issuers; they do not purchase Apple

11  devices (the supposed "foremarket" products) and therefore cannot be locked-in to any

12  "aftermarket" consisting of Apple Pay by virtue of having purchased the "foremarket" product.

13  As card-issuers, the restraint Plaintiffs complain of does not arise from anything to do with an

14  aftermarket, but rather stems from contracts they willingly entered into with Apple governing their

15  participation in Apple Pay and the associated fees.[4]  AC ¶¶ 17–19, 131.  Because their claim

16  "rest[s] on market *power* that arises solely from contractual rights that [they] knowingly and

17  voluntarily gave to the defendant," there can be no aftermarket.  *Newcal*, 513 F.3d at 1048.[5]

18      *Finally*, Plaintiffs' arguments that the Ninth Circuit does not require a post-lock-in change

19  in policy and Apple Pay's debut in 2014 was a policy change (Opp'n at 5–6) are irrelevant given

20  their admission that consumers are not locked-in to Apple Pay.[6]  AC ¶¶ 46, 64.  Plaintiffs cannot

21  establish the "precondition to market power [in an aftermarket] as a result of 'lock-in', *i.e.*,

---

[4] Contrary to what they argue (*see* Opp'n at 2 n.1), Plaintiffs allege only that "[a]s a participating financial institution, [each issuer] is required to agree to Apple's anticompetitive terms."  AC ¶¶ 17–19.  Agreeing to Apple's terms in order to offer payment cards on Apple Pay is not coercion.

[5] Plaintiffs also cannot ignore their own allegation that the restriction complained of—the limiting of NFC accessibility to Apple Pay—is contractually obtained from Apple device users and developers.  *See* AC ¶ 46 (users must agree to the "terms and conditions governing their use of Apple Pay"); *id.* ¶ 50 (the restriction "is implemented through Apple's developer guidelines").

[6] The suggestion that Apple Pay was a policy change that occurred after consumers were locked into Apple's ecosystem, Opp'n at 6, is nonsensical.  That would mean consumers were locked into an Apple Pay-only aftermarket *before Apple Pay even existed*.  *See Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1021 (N.D. Cal. 2022) ("Without a product, there is no market for the non-product.").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

APPLE INC.'S REPLY ISO
MOT. TO DISMISS AM. COMPL.
CASE NO. 4:22-cv-04174-JSW

1   customers who are actually locked in."  Areeda ¶ 564b; *see also ATM Fee*, 768 F. Supp. 2d at 997.

2       **B.**    <u>**The Court Should Dismiss Plaintiffs' Tying Claim**</u>

3       Plaintiffs' failure to plead a relevant market is also fatal to their tying claim.  "An antitrust

4   complaint must define the relevant market for both the tying product and the tied product."

5   *Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071, 1083–84 (C.D. Cal. 2017)

6   (collecting cases).  The allegedly tied product here is Apple Pay, which is the sole "product in the

7   Tap-and-Pay iOS Mobile Wallet Market."  AC ¶¶ 151–52.  Plaintiffs have failed to adequately

8   plead the existence of this single-brand market limited to Apple Pay, which also serves as their

9   tied product market, so their tying claim likewise fails.  *See Packaging Sys.*, 268 F. Supp. 3d at

10   1084 (dismissing tying claim where "Plaintiff has failed to adequately define the tied product

11   market"); *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1177 (N.D. Cal. 2013) ("[I]f Plaintiffs want

12   to assert tying and monopolization claims, they must identify the relevant markets and support

13   their allegations with some facts to show that they are plausible.").

14       The tying claim fails for additional reasons, none of which Plaintiffs reasonably dispute:

15       **1.**    <u>**Apple Device Users Are Not Required to Use Apple Pay and Are Not**</u>

16       <u>**Precluded from Using Competing Payment Methods**</u>

17       Plaintiffs' tying claim cannot survive given their own admissions that Apple device users

18   "may choose not to use Apple Pay" (Opp'n at 13) and that "Apple Pay is, and always has been,

19   free of charge" (AC ¶ 61).  *See also* Opp'n at 5 (consumers can "elect to use the [Apple Pay]

20   service"); AC ¶ 78 ("Apple Pay is entirely free to use.").  "[A]n invalid tying arrangement" requires

21   "the seller's exploitation of its control over the tying product to force the buyer into the purchase

22   of a tied product that the buyer either did not want at all, or might have preferred to purchase

23   elsewhere on different terms."  *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984).

24   When a seller does not "coerce" the customer to "buy the tied product in order to obtain the tying

25   product," there is no illegal tie.  *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159

26   (9th Cir. 2003); *see also Dream Big Media*, 2022 WL 16579322, at *4 ("Because [Plaintiffs] fail

27   to allege they purchased any Google mapping services, [they] fail to allege coercion," which "is

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

APPLE INC.'S REPLY ISO
MOT. TO DISMISS AM. COMPL.
CASE NO. 4:22-cv-04174-JSW

fatal to [the] tying claim.") (citation omitted);[7] *Athos Overseas, Ltd. v. Youtube, Inc.*, No. 1:21-CV-21698, 2022 WL 910272, at *3 (S.D. Fla. Mar. 29, 2022) ("[A]cceptance of a free service does not constitute an impermissible tie-in.").[8]

Plaintiffs argue that tying may also exist where a consumer "agrees that he will not purchase [the tied] product from any other supplier." Opp'n at 13 (quoting *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958)). That may be true, but it is irrelevant. Plaintiffs do not (and cannot) allege that Apple conditions the use of Apple devices on an agreement not to purchase or use payment methods that compete with Apple Pay. There is no such agreement. And Plaintiffs' reliance on *Kodak* and *United Shoe Machinery Corporation v. United States*, 258 U.S. 451 (1922), for their "negative" tying theory is misplaced. *See* Opp'n at 13. In *Kodak*, the only alternative to the tied product (i.e., service for the machine) was self-service, which was not realistic for many consumers. *Kodak*, 504 U.S. at 463. In *United Shoe*, the only alternative to the tied product (i.e., additional machinery) was not to purchase additional machinery at all. *United Shoe*, 258 U.S. at 456–58. In both cases, there were certain products or functions that consumers *could not buy or perform* without the tied product. That is not the case here. As Plaintiffs allege, many Apple device owners use payment methods other than Apple Pay. *See* Section II.A.3; AC ¶ 64.[9] That is fatal to Plaintiffs' tying claim. *Dream Big Media*, 2022 WL 16579322, at *4.

### 2.   Plaintiffs Do Not Allege Distinct Demand for Apple Pay

Plaintiffs acknowledge that they must demonstrate that Apple Pay and Apple devices are distinct products. Opp'n at 11. Despite their allegation that "Apple Pay comes preinstalled" on Apple's devices, AC ¶ 46, Plaintiffs argue that Apple Pay is a distinct product from Apple's

---

[7] Plaintiffs attempt to distinguish *Dream Big Media* on the basis that the tying claim there "failed for many reasons inapplicable here," Opp'n at 13, but this Court held the "lack of sufficient allegations of coercion [was] fatal to Plaintiffs' tying claim." 2022 WL 16579322, at *4.

[8] Plaintiffs' conclusory allegations of "coercion" (at AC ¶ 154) do not help. Their complaint acknowledges that Apple neither forces nor coerces consumers to use Apple Pay at all—let alone exclusively. Their tying claim therefore fails, regardless of whether others can "access[] the NFC interface" on Apple's devices. *See Paladin*, 328 F.3d at 1159 ("Essential to the second element of a tying claim is proof that the seller coerced a buyer to purchase the tied product.").

[9] Plaintiffs admit that nearly half of iPhone users had not activated Apple Pay as of September 2020. AC ¶ 64. Plaintiffs have not and cannot allege that these iPhone users do not use alternative payment methods—digital or otherwise—for the same function as Apple Pay: to pay for goods and services.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

APPLE INC.'S REPLY ISO
MOT. TO DISMISS AM. COMPL.
CASE NO. 4:22-cv-04174-JSW

1   devices because there is "separate demand for Tap-and-Pay iOS Mobile Wallets." Opp'n at 11;

2   *see also Jefferson Par.*, 466 U.S. at 21–22 (tying claim requires "sufficient demand for the

3   purchase of [the tied product] separate from [the tying product] to identify a distinct product market

4   in which it is efficient to offer [the tied product] separately from [the tying product]"). But again,

5   those are just conclusory statements restating the legal test under *Jefferson Parish*.

6          Plaintiffs' allegations regarding other digital wallets, which they try to claim exist outside

7   their allegedly tied product market limited to Apple Pay, are also insufficient. That "Google Pay,

8   Samsung Pay and other tap-and-pay solutions" may be "offered as standalone products," Opp'n at

9   11, says nothing about whether there is "sufficient demand" for Apple Pay—separate and apart

10  from Apple's devices. Moreover, the specifics of these "other tap-and-pay solutions" would still

11  fail to satisfy the *Jefferson Parish* test. Plaintiffs now argue they are "standalone products sold

12  separately," *id.*, but this contradicts their own allegations that "[n]one of these tap-and-pay

13  solutions charges transaction fees" to consumers or issuers. AC ¶ 45. Given that Google Pay and

14  Samsung Pay are also free to use, there is no basis to infer any distinct consumer demand for the

15  "purchase" of these products separate from the devices themselves. *See Jefferson Par.*, 466 U.S.

16  at 21–22. In all events, the lack of any well-pled facts about discrete demand for Apple Pay defeats

17  Plaintiffs' tying claim.[10]   *See Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 975

18  (9th Cir. 2008) (tied product was not a "separate and distinct product" from the tying product

19  because "[t]here are no facts pled indicating the existence of a separate market").

20         There is also no support for Plaintiffs' contention that the "degree to which Apple Pay is

21  technologically integrated into Apple's devices is a factual question that . . . cannot be resolved on

22  the pleadings." Opp'n at 12. Tying is "limited to those instances where the technological factor

23  tying the hardware to the software has been designed for the purpose of tying the products, rather

24  than to achieve some technologically beneficial result." *Resp. of Carolina, Inc. v. Leasco Resp.,*

25  *Inc.*, 537 F.2d 1307, 1330 (5th Cir. 1976). The allegations that the integration between Apple

---

26
27  [10] Plaintiffs argue Apple Pay has been "sold as a standalone product" because "that is exactly how
    it is sold to card issuers and merchants." Opp'n at 12. But how Apple Pay is "sold" to card issuers
    is irrelevant because Plaintiffs' tying claim is based on Apple's alleged conduct with respect to
28  *consumers*. *See* AC ¶ 154 ("Apple conditions *consumers'* use of their iOS devices on their
    agreement to its Apple Pay terms and conditions.") (emphasis added).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

APPLE INC.'S REPLY ISO
MOT. TO DISMISS AM. COMPL.
CASE NO. 4:22-cv-04174-JSW

1    devices and Apple Pay are technologically beneficial (*see* AC ¶ 54) doom Plaintiffs' tying claim.

2                    **3.      Plaintiffs Lack Antitrust Standing to Assert a Tying Claim**

3            Even if Plaintiffs plausibly alleged a tying arrangement, they still lack standing to assert

4    one.  The Opposition parrots generalized antitrust standing principles, *see* Opp'n at 10–11, but

5    offers no explanation for how Plaintiffs have standing to sue for the *tying arrangement* alleged.

6    To have standing for tying claims, a plaintiff must be either: (1) a purchaser who is "forced to buy

7    the tied product to obtain the tying product"; or (2) a competitor who is "restrained from entering

8    the market for the tied product." *Cyntegra, Inc. v. Idexx Lab'ys, Inc.*, 520 F. Supp. 2d 1199, 1210

9    (C.D. Cal. 2007), *aff'd*, 322 F. App'x 569 (9th Cir. 2009).  These standing requirements reflect the

10   contemplated antitrust injury that can result from tying—either harm to consumers (in the form of

11   reduced choice) or harm to competitors (in the form of restricted competition and increased barriers

12   to entry).  *See Jefferson Par.*, 466 U.S. at 14.  There are no allegations that Plaintiffs are either

13   consumers of Apple Pay or competing suppliers.  Rather, Plaintiffs are card-issuers who contracted

14   with Apple for a service, but now complain of the fee they agreed to pay.  That is not the subject

15   of any tying arrangement, and Plaintiffs thus lack standing to assert such a claim.

16                  **C.      Plaintiffs Fail to Plead Anticompetitive Harm**

17           Plaintiffs' allegations regarding anticompetitive effects are conclusory and contradicted by

18   both common sense and allegations elsewhere in the Amended Complaint.  Courts "will not infer

19   competitive injury from price and output data absent some evidence that tends to prove that output

20   was restricted or prices were above a competitive level." *Ohio v. Am. Express Co. ("Amex")*, 138

21   S. Ct. 2274, 2288 (2018) (quotation marks omitted).

22           *First*, Plaintiffs have not plausibly alleged that Apple Pay fees are "above the competitive

23   level." *See* Opp'n at 14.  Apple Pay's per-transaction charges are a fee for a service, which Apple

24   charges card issuers instead of monetizing consumer data like Google Pay or Samsung Pay.  Mot.

25   at 4.  Plaintiffs do not allege that the fees charged by Apple have ever increased since Apple Pay

26   debuted in 2014 nor "increased the overall cost of the platform's services." *Amex*, 138 S. Ct. at

27   2286.  To the contrary, Apple Pay is and has always been free for consumers and merchants.  *See*

28   AC ¶ 78.  Plaintiffs thus fail to allege increased prices.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

APPLE INC.'S REPLY ISO
MOT. TO DISMISS AM. COMPL.
CASE NO. 4:22-cv-04174-JSW

*Second*, Plaintiffs' allegations regarding output reduction are hypothetical and conclusory. *See* Opp'n at 14.  Plaintiffs cite to two paragraphs of their Amended Complaint, which postulate that absent the alleged restraints, "more issuers would enable their cards for a Tap-and-Pay iOS Mobile Wallet, thereby increasing output." *Id.* (citing AC ¶¶ 103–04).  But merely surmising an unsupported counterfactual in which output *might* increase more than it admittedly has is insufficient to plead anticompetitive effects.  *See Ireland v. Bend Neurological Assocs. LLC*, No. 6:16-CV-02054-JR, 2017 WL 6329561, at *5 (D. Or. Nov. 6, 2017) ("[T]he FAC's assertion relating to increased prices remains hypothetical and therefore cannot serve as the basis of a Sherman Act claim." (citing *Perry v. Rado*, 504 F. Supp. 2d 1043, 1048–49 (E.D. Wash. 2007), *aff'd*, 343 F. App'x. 240 (9th Cir. 2009)); *see also Brown v. Visa U.S.A., Inc.*, 674 F. Supp. 249, 252 (N.D. Ill. 1987) ("Allegations as to a hypothetical anticompetitive effect are not enough to sustain this complaint.").  Moreover, Plaintiffs' factual allegations evidence *increased* output: user transactions have increased (AC ¶ 88); issuer acceptance has increased (*id*. ¶¶ 64, 68); and merchant acceptance has increased.[11]  These allegations warrant dismissal.  *See Psystar*, 586 F. Supp. 2d at 1198–200 (dismissing claim where allegations were "internally contradictory").

*Third*, Plaintiffs' allegations about Apple "stifl[ing] innovation" (AC ¶¶ 99–102) are similarly conclusory and contradictory.  *See Reilly*, 578 F. Supp. 3d at 1110 (allegation that Apple's conduct "reduced innovation" was "wholly conclusory"); *Power Analytics Corp. v. Operation Tech., Inc.*, 820 F. App'x 1005, 1019 (Fed. Cir. 2020) (same).  And allegations about innovation on Android (AC ¶¶ 99–102) do not show a lack of innovation with Apple Pay.  Indeed, the *facts* in the Amended Complaint confirm otherwise.  Plaintiffs allege that as recently as February 2022, Apple introduced a new functionality for merchants to accept Apple Pay on their iPhones, which will "provide businesses with a secure, private, and easy way to accept contactless

---

[11] *Compare* Gene Munster, David Stokman, "Apple Pay Availability Growing 20% Plus," LOUP (Nov. 5, 2020), https://loupfunds.com/apple-pay-availability-growing-20-plus/ (incorporated at AC ¶¶ 53 n.36, 64 n.43, 85 n.56, 92, n.57) ("[I]n January 2019 Apple announced that Apple Pay was accepted at 74 of the top 100 US retailers and available at 65% of all US retail locations"), *with* "Apple empowers businesses to accept contactless payments through Tap to Pay on iPhone" (Feb. 8, 2022), https://www.apple.com/newsroom/2022/02/apple-unveils-contactlesspayments-via-tap-to-pay-on-iphone/ (incorporated at AC ¶¶ 49 n.32, 106, n.61 & n.62 (as of 2022, Apple Pay was "accepted at more than 90 percent of US retailers," and "virtually every business, big or small, will be able to allow their customers to Tap to Pay on iPhone at checkout").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

APPLE INC.'S REPLY ISO
MOT. TO DISMISS AM. COMPL.
CASE NO. 4:22-cv-04174-JSW

1  payments and unlock new checkout experiences using the power, security, and convenience of

2  iPhone." AC ¶ 106; *see also id.* ¶¶ 54–55. And the Payment Security White Paper incorporated

3  by reference in the Amended Complaint (at AC ¶ 100 n.60) explains that Apple was a first mover

4  on biometric authentication and an early adopter of tokenization.[12] Plaintiffs have not pled any

5  anticompetitive effects through decreased innovation and consumer choice.

6  ### D.   Plaintiffs Cannot Deny They Are Complaining of a Refusal to Deal

7  Plaintiffs cannot dispute that what they fail to adequately plead as an aftermarket

8  monopolization and tying case is, at its core, a complaint of a refusal to deal. Citing a footnote in

9  *Kodak*, Plaintiffs argue that a tying arrangement cannot be recast as an exclusive-dealing

10  arrangement. Opp'n at 15. That may be true, but it is irrelevant. *Kodak*'s discussion is focused

11  on a conditional tying arrangement in which Kodak sold parts to third parties on the condition that

12  they buy service from Kodak. 504 U.S. at 463 n.8. That arrangement could not be reframed as a

13  refusal to deal. *Id.* Here, by contrast, Plaintiffs are not buyers of the alleged tying and tied

14  products, and therefore are not subject to any conditional tying arrangement that could be

15  improperly recast as a refusal to deal. This is nothing like the condemned situation in *Kodak*.

16  Plaintiffs' claims are undeniably aimed at urging the Court to force Apple to provide an

17  additional, separate way for issuers to offer NFC-based payments on Apple's own devices aside

18  from Apple Pay. *See* AC ¶ 90. That is an attempt to use the antitrust laws to dictate the terms and

19  conditions on which Apple offers a service on its own products. It is fundamentally a claim of a

20  refusal to deal. *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009). And

21  because Apple has always integrated the NFC controller on its devices with Apple Pay for

22  payments and nothing else, Plaintiffs cannot even begin to allege the prerequisites of such a claim.

23  *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004).

24  ### III.   CONCLUSION

25  For all the reasons above, the Amended Complaint should be dismissed with prejudice.

26

27  [12]   "Payments Security White Paper," (July 13, 2015), at 25, https://cba.ca/Assets/CBA/Documents/Files/Article%20Category/PDF/misc-2015

28  paymentssecuritywhitepaper-en.pdf ("Apple Pay leverages the iPhone Touch ID capability to authenticate each payment transaction; Samsung Pay is expected to leverage the fingerprint in a similar way.").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

APPLE INC.'S REPLY ISO
MOT. TO DISMISS AM. COMPL.
CASE NO. 4:22-cv-04174-JSW

1    Dated: February 6, 2023                LATHAM & WATKINS LLP

2                                           By:   /s/  Belinda S Lee
                                                  Belinda S Lee
3

4                                           Belinda S Lee (Cal. Bar No. 199635)
                                             belinda.lee@lw.com
5                                           Sarah M. Ray (Cal. Bar No. 229670)
                                             sarah.ray@lw.com
6                                           Aaron T. Chiu (Cal. Bar No. 287788)
                                             aaron.chiu@lw.com
7                                           505 Montgomery Street, Suite 2000
                                            San Francisco, California 94111-6538
8                                           Telephone: +1.415.391.0600

9                                           *Attorneys for Defendant Apple Inc.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

APPLE INC.'S REPLY ISO
MOT. TO DISMISS AM. COMPL.
CASE NO. 4:22-cv-04174-JSW