Steve W. Berman (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Ave., Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Ben M. Harrington (SBN 313877)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
benh@hbsslaw.com

Eamon P. Kelly (*pro hac vice*)
Joseph M. Vanek (*pro hac vice*)
Jeffrey H. Bergman (*pro hac vice*)
**SPERLING KENNY NACHWALTER, LLC**
321 N. Clark St., 25th Floor
Chicago, IL 60654
Telephone: (312) 641-3200
Facsimile: (312) 641-6492
ekelly@sperlingkenny.com
jvanek@ sperlingkenny.com
jbergman@ sperlingkenny.com

Phillip F. Cramer (*pro hac vice*)
**SPERLING KENNY NACHWALTER, LLC**
1221 Broadway, Suite 2140
Nashville, TN 37203
Telephone: (312) 641-3200
Facsimile: (312) 641-6492
pcramer@ sperlingkenny.com

*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

AFFINITY CREDIT UNION, et al.,

Plaintiffs,

v.

APPLE INC.,

Defendant.

Case No. 22-cv-04174-JSW

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**[PUBLIC REDACTED VERSION]**

Hrg. Date: August 8, 2025
Hrg. Time: 9:00 a.m.
Location: Zoom Videoconference
Judge: Hon. Jeffrey S. White

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on August 8, 2025, at 9:00 am PT, or as soon thereafter as the matter may be heard before the Honorable Jeffrey S. White of the United States District Court for the Northern District of California, Oakland Division, located at Courtroom 1, 2nd Floor, 1301 Clay Street, Oakland, CA 94612, Plaintiffs will and hereby do move for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.

This motion is based on this Notice of Motion and Motion for Class Certification, the accompanying memorandum of points of authorities, and all accompanying declarations and exhibits, the pleadings and papers on file in this action, oral argument and such other matters as the Court may consider in hearing this motion.

**TABLE OF CONTENTS**

**Page**

I. PRELIMINARY STATEMENT .......... 1

II. BACKGROUND .......... 2

A. Apple Has Stifled Competition From Other Mobile Wallets. .......... 2

B. Undisciplined by Competition, Apple Charges Issuers [redacted] Apple Pay Fees that Generate [redacted] for Apple. .......... 4

C. Apple Pay Is the Only Mobile Wallet to Charge Issuer Fees. .......... 5

D. Facing Mounting Antitrust Scrutiny, Apple Lifted its NFC Restraint Mid-Litigation, But It Has Not Undone The Harm to the Class or the Market. .......... 5

III. ARGUMENT .......... 6

A. The Proposed Class Satisfies the Four Requirements of Rule 23(a). .......... 6

B. The Class is Ascertainable. .......... 8

C. Common Questions Predominate Under Rule 23(b)(3). .......... 8

1. Market Definition Is a Common Question. .......... 9

2. Whether Apple Has Monopoly Power Is a Common Question. .......... 10

3. Whether Apple Engaged in Anticompetitive Conduct Is a Common Question. .......... 10

4. Whether Plaintiffs and the Class Were Impacted Is a Common Question. .......... 11

5. Damages Can Be Estimated Classwide with Common Proof. .......... 13

D. A Class Action is Superior to Individual Adjudication. .......... 14

E. Class Certification Is Also Appropriate Under Rule 23(b)(2). .......... 14

F. The Court Should Appoint Class Counsel. .......... 15

IV. CONCLUSION .......... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ........ 6, 8

*In re Apple iPod iTunes Antitrust Litig.*,
2008 WL 5574487 (N.D. Cal. Dec. 22, 2008) ........ 9, 10

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ........ 8, 14

*Castro v. Sanofi Pasteur Inc.*,
134 F. Supp. 3d 820 (D.N.J. 2015) ........ 9, 10, 11, 12

*In re College Athlete Nil Litig.*,
2023 WL 8372787 (N.D. Cal. Nov. 3, 2023) ........ 11

*Davy v. Paragon Coin, Inc.*,
2020 WL 4460446 (N.D. Cal. June 24, 2020) ........ 8

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ........ 9, 10, 11

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) ........ 10

*Gilbert v. MoneyMutual, LLC*,
318 F.R.D. 614 (N.D. Cal. 2016) ........ 8, 14

*Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*,
723 F.3d 1019 (9th Cir. 2013) ........ 11

*Hatamian v. Advanced Micro Devices, Inc.*,
2016 WL 1042502 (N.D. Cal. Mar. 16, 2016) ........ 14

*In re HIV Antitrust Litig.*,
2022 WL 22609107 (N.D. Cal. Sept. 27, 2022) ........ 13, 15

*Howard v. Aetna Life Ins. Co.*,
2024 WL 1098789 (C.D. Cal. Feb. 27, 2024) ........ 8

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*,
451 U.S. 557 (1981) ........ 13

*Kleen Prod. LLC v. Int'l Pape*r,
306 F.R.D. 585 (N.D. Ill. 2015) ........ 12

*In re Live Concert Antitrust Litig.*, 247 F.R.D. 98 (C.D. Cal. 2007) .......... 9

*Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011 (9th Cir. 2024) .......... 6, 13

*In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.*, 311 F.R.D. 532 (N.D. Cal. 2015) .......... 11

*In re NCAA Student-Athlete NIL Litig.*, 2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) .......... 11

*Ohio v. Am. Express*, 585 U.S. 529 (2018) .......... 11, 13

*Olean Wholesale Grocery Coop, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) .......... 8, 11, 13

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65 (E.D.N.Y. 2024) .......... 12

*Quezada v. Con-Way Freight, Inc.*, 2012 WL 4901423 (N.D. Cal. Oct. 15, 2012) .......... 6, 7, 13

*Shepard v. Lowe's HIW, Inc.*, 2013 WL 4488802 (N.D. Cal. Aug. 19, 2013) .......... 7

*Tawfilis v. Allergan, Inc.*, 2017 WL 3084275 (C.D. Cal. June 26, 2017) .......... 12, 13

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) .......... 8

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .......... 7

**Statutes**

Sherman Act .......... 9, 10

**Other Authorities**

Fed. R. Civ. P. 23 .......... *passim*

## I. PRELIMINARY STATEMENT

Plaintiffs are financial institutions (i.e., banks and credit unions) that contract with Defendant Apple to enable their payment cards (e.g., credit cards) for use on Apple Pay, Apple's mobile wallet. Plaintiffs contend that Apple has stifled competition to secure an unlawful monopoly for Apple Pay, and charges Plaintiffs and other financial institutions supracompetitive transaction fees. This Court upheld Plaintiffs' monopolization claims at the motion to dismiss stage, and now, with discovery ongoing, Plaintiffs move to certify a class of:

> All U.S. entities that (a) issued any Payment Card enabled for Apple Pay and (b) paid Apple a fee for Apple Pay transactions on that Payment Card.

This case is well suited for class treatment. All of the Rule 23(a) prerequisites are easily established. The Class contains thousands of issuers who are far too numerous to join. Plaintiffs' antitrust claims are entirely typical of the Class, and implicate a range of common questions. Adequacy cannot be legitimately disputed. *See infra* at § III.A.

The Rule 23(b)(3) predominance inquiry is also unusually straightforward in this case. Apple has admitted in written discovery that [redacted] Often, establishing the classwide effect of a restraint involves isolating its impact across individually negotiated prices. Individualized inquiries can creep into the analysis, and defendants typically challenge whether economic modelling can adequately control for individualized pricing considerations. [redacted], the classwide effect of Apple's restraints reduces to one common question—whether [redacted] are supracompetitive. If so, the entire proposed Class was overcharged. *See infra* at § III.C.

Every element of Plaintiffs' claims—from market definition, to monopoly power, to anticompetitive conduct, to damages—will be adjudicated with common proof. Each of these legal issues turns not on individual class members' circumstances, but on *Apple's* conduct, and its effects in the market as a whole. Given the overwhelming predominance of these common

issues, a class action is a superior means of resolving this dispute. The alternative would be thousands of duplicative individual actions that would risk inconsistent adjudication and generate enormous inefficiencies. *See infra* at § III.C. For these reasons, and those that follow, this Court should respectfully certify the Class pursuant to Rules 23(b)(3) and 23(b)(2).

## II. BACKGROUND

### A. Apple Has Stifled Competition From Other Mobile Wallets.

To use Apple Pay, a financial institution must first contract with Apple to enable its cards on the app, and agree to pay Apple fees every time Apple Pay is used. An Apple device owner may then upload their payment card details onto the Apple Pay app and, at the point of sale, they position their device in close proximity to the payments terminal ("tap and pay"). Using basic Near Field Communication ("NFC") technology on the device, Apple Pay then transmits the users' payment card information to the merchant. Apple Pay can also be used to make payments online in eCommerce. *See generally* Counsel Decl. Exs. 1, 2.

Apple did not develop NFC; its underlying technology has been around since World War II and is used in a variety of applications, from hotel key cards to automobile infotainment systems. *See id.* Exs. 3 at 2-3, 4 at '04, 5. Apple also did not invent the mobile wallet. Nokia phones were using NFC technology for payments as early as 2007, [redacted]. *See id.* Exs. 6, 7 at '142-'144, 8 at 6, 9 at '52-'55.

However, Apple Pay is the only "tap and pay" mobile wallet available on iOS devices. This is because, for over a decade and until very recently (as addressed below), Apple leveraged its control of the operating system to contractually restrict third-party mobile wallet app developers from accessing the NFC capability needed to offer tap-and-pay payments. Apple's restriction on mobile wallet app developers' access to NFC was a sharp break from standard practice. As with other functionality on its devices (e.g., the camera, speakers, microphone), Apple generally [redacted] *See id.* Exs. 10 at '66, 11. This benefits Apple by enhancing app functionality, and thus the utility and value of its devices. [redacted]

[redacted] But to shield Apple Pay from competition, [redacted]. *See id.* Exs. 16 at '83-'84; 17 at '83; 18 at '64; 19 at '94; 20 at 3, Attachment A p. 59; 21 at '16; 22 at '46. This restraint (hereafter "NFC Restraint") ensured that, on Apple's devices, only Apple Pay could be used in stores. In short, Apple rigged its app developer agreements so that its own product—Apple Pay—would enjoy a complete monopoly.

Apple has also reinforced and extended its monopoly power through two additional contractual restraints. *First*, while Apple charges card issuers substantial Apple Pay transaction fees when their cardholders make a payment using Apple Pay (*see infra*), [redacted]. The [redacted] prevents this from happening, insulating Apple Pay from normal price competition. *See* Vellturo Rep. ¶ 243.

*Second*, Apple contractually requires that issuers who enable their cards for Apple Pay "tap and pay" payments [redacted] *See, e.g.*, Counsel Decl. Ex. 23 at '21, '24. [redacted] *See* Vellturo Rep. ¶ 240. Apple has forcefully resisted efforts [redacted]." Counsel Decl. Ex. 27 at '58; *see also id.* Ex. 28 at '19.

### B. Undisciplined by Competition, Apple Charges Issuers [redacted] Apple Pay Fees that Generate [redacted].

Having foreclosed meaningful competition, Apple charges Plaintiffs and other issuers significant fees whenever their cards are used to complete an Apple Pay transaction. [redacted]. *See id.* Ex. 29 at 2-4. [redacted], and Apple has confirmed this in written discovery:

> [redacted]

> [redacted]

*Id.*; *see also id.* at 4-5. In addition to charging these [redacted] across the proposed Class, Apple acknowledges that it does not provide [redacted].” *Id.* In short, all Class members pay Apple [redacted]. This is part of Apple’s overarching strategy to impose [redacted] Counsel Decl. Ex. 30 at ‘47; *see also id.* Exs. 31 at ‘88-‘90; 32 at ‘66; 33 at ‘56; 34 at ‘58.

Apple’s data productions to date indicate that, from the start of the Class Period, Apple has imposed more than [redacted]. *See* Vellturo Rep. ¶ 297.

[redacted]

Apple's [redacted]. *See* Vellturo Rep. ¶¶ 176-77, 256-262, 297. Internal Apple studies show that Apple has [redacted]. *See id* ¶ 175. Thus, every dollar in issuer fees is [redacted]. *See id.* ¶ 176. [redacted].

**C. Apple Pay Is the Only Mobile Wallet to Charge Issuer Fees.**

[redacted]. *See* Counsel Decl. Exs. 35 at '75; 36 at PDF pp. 2, 7. [redacted] *See id.* Exs. 37 at '35; 38 at '41; 36 at PDF p. 7. [redacted]. *See id.* Ex. 39 at '26-'29.

**D. Facing Mounting Antitrust Scrutiny, Apple Lifted its NFC Restraint Mid-Litigation, But It Has Not Undone The Harm to the Class or the Market.**

Plaintiffs are not the first to allege that Apple has stifled competition to prop up Apple Pay. Following a two-year investigation, the European Commission issued a statement of objections in May 2022 preliminarily finding that Apple has "a dominant position on the in-store mobile wallet market on iOS" and that Apple had "abused its dominant position" by denying other digital wallets access to "NFC hardware and software." *See* Counsel Decl. Ex. 40. To resolve this investigation, Apple committed to lift its NFC restraint in the EU. *See id.* The European Commission accepted this commitment in July 2024 as a means to "open up competition in mobile payments on iPhone." *Id.*



In August 2024, on the heels of its EU commitments, Apple agreed to open NFC access in the United States and other regions with the launch of iOS 18.1 in October 2024. *See id.* Ex. 41. While Apple has now lifted its NFC Restraint, it has not lifted the other restraints Plaintiffs challenge, including its [redacted]. Nor has Apple undone the harm caused by its NFC Restraint. By foreclosing rival NFC wallets for more than a decade, Apple succeeded in cementing Apple Pay's dominance. And while competitors are now ostensibly permitted to offer NFC-enabled mobile wallets on Apple's devices, and many have expressed an interest in doing so,[1] they have forever been deprived of the ability to compete on a level playing field. Instead, they will enter a market dominated by an absolute monopolist—Apple Pay—that has a decade head start forging commercial partnerships and gaining Apple users' acceptance. As an entrenched monopolist, Apple continues to charge Plaintiffs and issuers the same supracompetitive transaction fees. *See* Vellturo Rep. ¶ 236.

## III. ARGUMENT

To obtain class certification, plaintiffs must establish the four Rule 23(a) prerequisites—numerosity, commonality, typicality, and adequacy—and satisfy one or more provisions of Rule 23(b). Courts must conduct a "rigorous analysis" at class certification, but it is "different from summary judgment" where the merits are tested. *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1023 (9th Cir. 2024). Class certification instead presents a procedural question—"whether a class action is a suitable method of adjudicating the case." *Id.* This can entail passing on merits issues necessary to determine whether class treatment is appropriate, but Rule 23 grants no "license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

### A. The Proposed Class Satisfies the Four Requirements of Rule 23(a).

All four Rule 23(a) prerequisites are easily satisfied in this case.

**The Class is Sufficiently Numerous.** As this Court has recognized, "classes consisting of more than 75 members usually satisfy the numerosity requirement." *Quezada v. Con-Way*

[1] PayPal's CEO, for example, has confirmed that PayPal will act "quickly" to take advantage of Apple's opening of NFC access for mobile wallets. *See* Counsel Decl. Ex. 42.

*Freight, Inc.*, 2012 WL 4901423, at *3 (N.D. Cal. Oct. 15, 2012) (White, J.). There are thousands of class members in this case, as Apple's own records demonstrate. *See* Counsel Decl. Ex. 43. The numerosity requirement is met.

**Common Questions of Law and Fact Exist.** To satisfy the commonality requirement, "[e]ven a single [common] question will do," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011), and there are many here. Common questions include, for example, whether Plaintiffs have identified a relevant market, whether Apple has monopoly power, whether Apple has engaged in anticompetitive conduct, and whether the Class has been impacted. The presence of these common questions, and more, satisfy the commonality requirement.

**The Class Representatives' Claims Are Typical**. The typicality requirement "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Quezada*, 2012 WL 4901423, at *3 (White, J.). "As with the commonality requirement, the typicality requirement is applied permissively." *Id*. Named Plaintiffs here are issuers subject to each of the Restraints. *See* Counsel Decl. Exs. 22-25. They assert the same theory of injury as all members of the Class (overcharges), arising from the same course of allegedly unlawful conduct, under precisely the same legal theories. Their claims are highly typical.

**The Class Is Adequately and Ably Represented.** The test for adequacy turns on two questions: "(1) [d]o the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Shepard v. Lowe's HIW, Inc.*, 2013 WL 4488802, at *5 (N.D. Cal. Aug. 19, 2013) (White, J.). Neither the named Plaintiffs nor proposed Class Counsel have any conflicts. Plaintiffs have also demonstrated that they will prosecute this action vigorously; each has produced documents, consulted with counsel about the facts of the case and strategy, and remained abreast of litigation developments. *See* Counsel Decl. ¶ 15. Class Counsel has likewise pursued this action diligently since 2022 to advance the Class's interests, and will continue to do so. *See id.* ¶¶ 10-13.

**B. The Class is Ascertainable.**

Plaintiffs seek to certify a Class of "All U.S. entities that (a) issued any Payment Card enabled for Apple Pay and (b) paid Apple a fee for Apple Pay transactions on that Payment Card." For purposes of class certification, Plaintiffs define "Payment Card" to include general purpose (*i.e.*, accepted at numerous, unrelated merchants) credit cards, debit cards, and prepaid cards.[2] Plaintiffs' proposed class definition turns on entirely objective criteria and thus satisfies the implied Rule 23 requirement of "ascertainability." *See Gilbert v. MoneyMutual, LLC*, 318 F.R.D. 614, 623 (N.D. Cal. 2016) (White, J.). Indeed, Apple publicly identifies all U.S. issuers who have enabled cards for Apple Pay and paid Apple's fees. *See* Counsel Decl. Ex. 43; *see also* Vellturo Rep. ¶ 48 n.26. Accordingly, although not required, *see Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017), there is also an administratively feasible means of identifying Class members in this case.

**C. Common Questions Predominate Under Rule 23(b)(3).**

Predominance "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). The focus must be on "the method or methods by which plaintiffs propose to use [class-wide] evidence to prove" their case. *Olean Wholesale Grocery Coop, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666 (9th Cir. 2022). Courts are "limited to resolving whether the evidence establishes that a common question is capable of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Id.* at 666-67. Predominance also does not require that *each* element of the plaintiffs' claims be "susceptible to class-wide proof," provided common questions predominate overall. *See Amgen*, 568 U.S. at 469; *accord Tyson Food*, 577 U.S. at 453.

---

[2] This class definition is identical to the class pleaded in the operative Second Amended Complaint, *see* ECF No. 40 ¶ 140-42, with the exception that it excludes (a) "transit cards" and (b) any non-general purpose cards (e.g., private label cards that can only be used at one merchant). Courts readily permit class plaintiffs to modify their class definition at the class certification stage, particularly where, as here, the modifications *narrow* the proposed class. *See Davy v. Paragon Coin, Inc.*, 2020 WL 4460446, at *2 (N.D. Cal. June 24, 2020) (White, J.); *Howard v. Aetna Life Ins. Co.*, 2024 WL 1098789, at *5 (C.D. Cal. Feb. 27, 2024).

**1. Market Definition Is a Common Question.**

To prevail on their Sherman Act claims, Plaintiffs must first define a relevant antitrust market. This is inherently a common question that, however answered, binds the entire Class. *See, e.g., In re Apple iPod iTunes Antitrust Litig.*, 2008 WL 5574487, at *4 (N.D. Cal. Dec. 22, 2008) ("[W]hether an 'online music market exists'" is "complex factually inquir[y] that do[es] not depend in any way upon individualized proof"); *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 846 (D.N.J. 2015) ("Defining the relevant market focuses on common data, expert analysis, and economic tests; such proof generally does not vary by class member."); *Glumetza Antitrust Litig.*, 336 F.R.D. 468, 475 (N.D. Cal. 2020) ("Section 2 monopolization claims readily lend themselves to common evidence," including "(1) the possession of monopoly power in the relevant market."); *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 131 (C.D. Cal. 2007) ("defining the product market will be predominated by common questions").

Although Plaintiffs are not required to establish a relevant market at this stage, using proof entirely common to the Class, Dr. Vellturo concludes that there is a relevant antitrust aftermarket for Tap-and-Pay iOS Mobile Wallets. *See* Vellturo ¶¶ 108-111, 147-169. In particular, the timeline of Apple Pay's rollout provides a natural SSNIP test, the standard methodology for defining antitrust markets. *See id.* ¶ 108. The chronology shows that no conceivable alternative to Apple Pay constrained Apple Pay's pricing. *See id.* ¶¶ 108-110, 147-169. In particular, at Apple Pay's launch in 2014, Google Pay was already offered at a price of $0 for issuers. That Apple Pay [redacted] that Google Pay is not in the same antitrust market. *See id.* ¶¶ 108-111, 150. Similarly, after Apple Pay launched, Samsung Pay, contactless cards and PayPal's QR-code wallet rolled out, but [redacted] likewise do not place significant competitive constraints on Apple Pay. *See id.* ¶¶ 108-09, 151-169. Dr. Vellturo further demonstrates that Tap-and-Pay iOS Mobile Wallets bear all the hallmarks of an "aftermarket" and that competition in the foremarket for Apple's devices does not constrain its pricing of Tap-and-Pay iOS Mobile Wallets in the aftermarket. *See id.* ¶¶ 114-140. All of this proof is common to the proposed

Class.

**2. Whether Apple Has Monopoly Power Is a Common Question.**

Plaintiffs must also establish that Apple possesses monopoly power. *See In re Apple iPod iTunes Antitrust Litig.*, 2008 WL 5574487, at *4. Either Apple has monopoly power, or it does not. The answer will not differ for individual members of the proposed Class. *Castro*, 134 F. Supp. 3d at 845 ("Evidence concerning market power is common to the class."). Dr. Vellturo's report demonstrates that Apple possesses monopoly power, again with proof entirely common to the Class. Apple's monopoly power is demonstrated, by definition, in its ability to control price and limit competition. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023). In fact, Apple is able to charge issuer fees that generate [redacted]. *See* Vellturo Rep. ¶¶ 171-77. This indicates, in conjunction with Dr. Vellturo's Lerner index calculation, [redacted] *Id.* ¶ 176. Apple has also foreclosed entry by competitors for more than a decade. Not surprisingly, Apple's share of the Tap-and-Pay iOS Mobile Wallets Market is 100%. *See id.* ¶ 110. Even if the market were expanded (unjustifiably) to include Android Tap-and-Pay wallets, Apple Pay's share would [redacted] and Apple still possesses the power to control price and limit competition. *See id.* ¶¶ 178-183.

**3. Whether Apple Engaged in Anticompetitive Conduct Is a Common Question.**

Monopoly power is not unlawful unless "accompanied by an element of anticompetitive conduct." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020). The presence of anticompetitive conduct distinguishes natural monopolies from the "willful acquisition or maintenance of [monopoly] power" that the Sherman Act condemns. *Id.* Whether conduct is anticompetitive is generally assessed under the "Rule of Reason: a multi-step, burden-shifting framework that requires courts to conduct a fact-specific assessment to determine a restraint's actual effect on competition." *Epic Games,* 67 F.4th at 974. Because the Rule of Reason focuses not on individual class members, but on the effect of the challenged restraint, it implicates a host of common issues that can be resolved classwide. This can be seen in each step of the inquiry.

*First*, Plaintiffs will show that Apple's conduct "harm[ed] the competitive process." *Qualcomm, Inc.*, 969 at 990. This analysis is by definition classwide, as Plaintiffs show "injury

to competition in the market *as a whole*.'" *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1024-25 (9th Cir. 2013) (emphasis added).

*Second*, if Plaintiffs demonstrate harm to competition, the burden shifts to Apple "to show a procompetitive rationale for the restraint." *Ohio v. Am. Express*, 585 U.S. 529, 541 (2018). Whatever procompetitive justification Apple may attempt to muster here, by definition it must focus on the rationale for Apple's classwide restraint, which is likewise a common issue. *See Castro*, 134 F. Supp. 3d at 844-45 ("procompetitive justifications" are "common issues"); *In re NCAA Student-Athlete NIL Litig.*, 2013 WL 5979327, at *4 (N.D. Cal. Nov. 8, 2013) (same).

*Third*, if Apple can muster a credible procompetitive rationale, the burden will shift back to Plaintiffs to "demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Epic Games.*, 67 F.4th at 974. This too is a common issue. *In re College Athlete Nil Litig.*, 2023 WL 8372787, at *5 (N.D. Cal. Nov. 3, 2023) ("less restrictive alternatives" a common issue); *see also In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.*, 311 F.R.D. 532, 539 (N.D. Cal. 2015) ("whether the NCAA's procompetitive justifications for its conduct are legitimate" a common issue).

**4. Whether Plaintiffs and the Class Were Impacted Is a Common Question.**

Plaintiffs must establish "antitrust injury" or "impact." *Olean*, 31 F.4th at 666. In antitrust class actions, most liability issues are invariably common to the class, and defendants focus their arguments on whether antitrust impact can be established classwide—a showing often referred to as "common impact." *See, e.g., id.* at 677.

Common impact is straightforward, however, in cases involving standardized prices paid by all (or nearly all) members of the proposed class. *See, e.g.*, Newberg and Rubenstein on Class Actions § 20:28 (6th ed.) ("Courts have routinely certified classes alleging that a monopolist's conduct caused a direct and uniform overcharge"). If the defendant charges standardized prices across the class, proof that those prices are supracompetitive will, by definition, demonstrate antitrust impact classwide. That is the type of common question that class actions are designed to address. *See, e.g.*, *High-Tech*, 985 F. Supp. 2d at 1221-22 (finding that "rigid compensation structures" indicated that adjustments in employee compensation in but-for world "would have

had classwide effect and would have impacted all or nearly all [Class] members"); *Castro*, 134 F. Supp. 3d at 848 (finding common impact where defendant maintained "a rigid price structure with little price variance between customers" such that competition could be expected to "reduce price across the board"); *see also Tawfilis v. Allergan, Inc.*, 2017 WL 3084275, at *14 (C.D. Cal. June 26, 2017) ("[B]ecause this case involves a large group of direct purchasers who paid one list price…it is particularly well suited for resolution on a classwide basis."); *Kleen Prod. LLC v. Int'l Paper*, 306 F.R.D. 585, 595 (N.D. Ill. 2015) ("a plaintiff can demonstrate impact by showing that the conspiracy caused an increase to the standard market price of the product").

Here, [redacted]. *See* Counsel Decl. Ex. 29 at 2-5. Accordingly, this is not a case where [redacted]. If so, all Class members were impacted.

Not only is this a common question, it is one that, when the time comes, will readily be answered in in favor of the Class. As addressed in Dr. Vellturo's report, multiple forms of common proof demonstrate that Apple's issuer fees, paid by all members of the proposed Class, are supracompetitive. *First*, no other mobile wallet charges issuer fees. This is true generally, and specifically is true in the Android operating system, where NFC access is not restricted and multiple mobile wallets compete. *See* Vellturo Rep. ¶¶ 266-272. *Second,* in a competitive market Apple would have faced competition from Apple's Pay's inception from mobile wallets charging $0 issuer fees, restraining Apple's ability to impose and sustain fees above that competitive baseline. *See id.* ¶¶ 253-55, 263-293. *Third,* absent [redacted]. *See id.* ¶¶ 242-44, 294-96. *Finally*, Apple's issuer fees [redacted] Prices substantially above marginal costs are, by definition, supracompetitive. *See, e.g.,* Areeda & Hovenkamp, Antitrust Law, *supra*, ¶ 502b; Vellturo Rep. ¶¶ 96, 171-77; *In*

*re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 103 (E.D.N.Y. 2024) (recognizing that competitive prices "tend . . . toward marginal cost" (citation omitted)); *see also Am. Express*, 585 U.S. at 548 (acknowledging that proof of high margins could be evidence of supracompetitive prices).

**5. Damages Can Be Estimated Classwide with Common Proof.**

At class certification, plaintiffs need only show that "damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34. There is no requirement to execute a damages model at this stage, *see Lytle*, 114 F.4th at 1029, and while class members' individual damages will differ, this "is insufficient, standing alone, to defeat certification." *Quezada*, 2014 WL 186224, at *3 (White, J.); *Olean*, 31 F.4th at 681-82. Even on the merits, courts accept a "degree of uncertainty" with antitrust damages because"[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981).

Here, damages are straightforward and readily estimable on a classwide basis. Although not required, Dr. Vellturo has preliminarily executed his methodology. *See* Vellturo Rep. ¶¶ 256-298. He uses a yardstick methodology, a widely accepted means of estimating antitrust damages. *See* Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 395; *Tawfilis*, 2017 WL 3084275, at *6 (holding that yardstick methodology "is a reliable methodology for calculating damages"); *In re HIV Antitrust Litig*., 2022 WL 22609107, at *39 (N.D. Cal. Sept. 27, 2022) (same). A yardstick model compares the prices charged by the defendant to prices in a "yardstick" market reasonably unaffected by the challenged restraints.

One need not look far for a comparable yardstick in this case. As Dr. Vellturo explains, Apple's restraints do not operate in the Android ecosystem and, in that ecosystem, mobile wallets compete (particularly Google Wallet and Samsung Pay) and do not charge issuers any fees. *See supra* at III.C.4; Vellturo Rep. ¶¶ 266-272. Using the $0 fees charged by Google and Samsung as a competitive yardstick, Dr. Vellturo has demonstrated how to estimate classwide

damages by summing the fees Apple charged Class members during the class period. Under this yardstick methodology, [redacted]. *See* Vellturo Rep. ¶ 297.[3]

**D. A Class Action is Superior to Individual Adjudication.**

The superiority element is met where "class-wide litigation of common issues will reduce litigation costs and promote greater efficiency." *Gilbert*, 318 F.R.D. at 626 (White, J.). Courts assess: "[1] the interest of members of the class in individually controlling the prosecution or defense of separate actions; [2] the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; [3] the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [4] the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

All four factors favor certification here. Given the high degree of class cohesion, *see supra* at § III.C, this case can most efficiently be prosecuted through class representatives. No individual Class member has shown any interest in pursuing individual litigation, and no individual action by any member of the Class has been initiated in any forum. Concentration in this forum is also advantageous because Apple is headquartered here. *See Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *10 (N.D. Cal. Mar. 16, 2016). Finally, with common issues predominating, case management considerations favor certification. Any case management challenges also need to be measured against the alternative means of litigating the Class's claims—*i.e.*, thousands of duplicative lawsuits. *Briseno*, 844 F.3d at 1128 (superiority element involves "comparative assessment"). A class action plainly is the most efficient means of litigating the Class's claims here.

**E. Class Certification Is Also Appropriate Under Rule 23(b)(2).**

Certification of an injunctive relief class under Rule 23(b)(2) is appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class,

[3] This estimate is based on Apple's data productions to date, which appear incomplete in several respects. Plaintiffs reserve all rights to modify their overcharge estimate based on further discovery. Notably, even if the competitive price were a non-zero amount, Dr. Vellturo could readily calculate damages classwide by netting the competitive fee amount from the supracompetitive fees Apple charged during the Class Period. *See id.* ¶ 37.

so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ .P. 23(b)(2). Here, Apple's Restraints apply classwide without exception, such that an injunction lifting them would bring relief to all Class members. Certification under Rule 23(b)(2) is thus appropriate. *See, e.g., In re HIV*, 2022 WL 22609107, at *33 (appropriate to certify both Rule 23(b)(2) and 23(b)(3) classes in "antitrust suits where defendants' conduct was market wide and not specific to individual consumers") (internal quotation marks omitted).

### F. The Court Should Appoint Class Counsel.

Plaintiffs respectfully request that the Court appoint (a) Hagens Berman Sobol Shapiro LLP and (b) Sperling Kenny Nachwalter, LLC as Class Counsel. All 23(g) factors support counsel's appointment. *See* Counsel Decl. ¶¶ 4-13. Hagens Berman and Sperling Kenny have vigorously prosecuted this action since inception in 2022, leveraging a wealth of applicable antitrust class action experience If appointed, Hagens Berman and Sperling Kenny will continue to zealously pursue this action to advance the proposed Class's interests.

## IV. CONCLUSION

Pursuant to Rules 23(b)(3) and 23(b)(2), Plaintiffs respectfully ask the Court to certify a class of: "all U.S. entities that (a) issued any Payment Card enabled for Apple Pay and (b) paid Apple a fee for Apple Pay transactions on that Payment Card." The Court should also appoint the undersigned counsel as Class Counsel. All of the Rule 23(a) prerequisites are easily established. The Class is readily ascertainable but contains thousands of issuers who are far too numerous to join. Plaintiffs' antitrust claims are entirely typical of the Class and implicate a range of common questions, all of which predominate this action. This case is well suited for class treatment.

Dated: February 7, 2025

Respectfully submitted,

By */s/ Ben M. Harrington*

Ben M. Harrington (SBN 313877)
**HAGENS BERMAN SOBOL SHAPIRE LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
benh@hbsslaw.com

Eamon P. Kelly (*pro hac vice*)
Joseph M. Vanek (*pro hac vice*)
Jeffrey H. Bergman (*pro hac vice*)
**SPERLING KENNY NACHWALTER, LLC**
321 N. Clark St., 25th Floor
Chicago, IL 60654
Telephone: (312) 641-3200
Facsimile: (312) 641-6492
ekelly@sperlingkenny.com
jvanek@ sperlingkenny.com
jbergman@ sperlingkenny.com

Phillip F. Cramer (*pro hac vice*)
**SPERLING KENNY NACHWALTER, LLC**
1221 Broadway, Suite 2140
Nashville, TN 37203
Telephone: (312) 641-3200
Facsimile: (312) 641-6492
pcramer@sperlingkenny.com

Steve W. Berman (*pro hac vice*)
**BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Counsel for Plaintiffs and the Proposed Class*

**E-FILING ATTESTATION**

I, Ben M. Harrington, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in this filing.

*/s/ Ben M. Harrington*
Ben M. Harrington