# ATTACHMENT 2

# REDACTED VERSION

FILED UNDER SEAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| AFFINITY CREDIT UNION, GREENSTATE CREDIT UNION, and CONSUMERS CO-OP CREDIT UNION,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>APPLE INC.<br><br>　　　　　Defendant. | CASE NO. 4:22-cv-04174-JSW |

**Expert Report of Christopher Vellturo, PhD**

**In Support of Class Certification**

**February 7, 2025**

1

FILED UNDER SEAL

# Table of Contents

1.  Qualifications and Compensation ...................................................................... 6

2.  Introduction and Assignment ......................................................................... 6

    2.1  Class Definition ......................................................................................... 6

    2.2  Summary of the Alleged Conduct ............................................................. 7

    2.3  Assignment ................................................................................................. 9

3.  Summary of Conclusions ................................................................................ 9

    3.1  Relevant market ........................................................................................ 10

    3.2  Market Power/Anticompetitive conduct ................................................. 12

    3.3  Antitrust Impact ....................................................................................... 12

    3.4  Damages .................................................................................................... 13

4.  Background on Mobile & Digital Wallets ..................................................... 15

    4.1  Mobile & Digital Wallet Funding ........................................................... 16

    4.2  Mobile Wallet Technology ....................................................................... 17

        4.2.1  Near-Field Communication ("NFC") "Pay" Wallets ..................... 17

        4.2.2  Merchant or Financial Institution QR Code Closed Wallets ............. 18

    4.3  Transaction Flow ...................................................................................... 18

    4.4  History of NFC and Contactless Payments .............................................. 21

        4.4.1  Evolution of NFC .............................................................................. 22

        4.4.2  History of Contactless Payments in the United States ...................... 23

    4.5  Apple Pay's Role in Contactless Transactions and Innovation ................ 27

        4.5.1  Tokenization ...................................................................................... 27

        4.5.2  Secure Element Versus Host Card Emulation .................................. 28

        4.5.3  Fees ................................................................................................... 29

5.  Economic Principles of Market Definition and Power .................................. 31

    5.1  General Economic Framework for Defining the Relevant Market ........... 31

    5.2  Price Setting and Market Definition in Multisided Platforms.................. 32

    5.3  General Framework for Identifying and Measuring Market Power.......... 36

    5.4  Market Definition and Power in Aftermarkets ........................................ 37

6.  Tap-and-Pay iOS Mobile Wallets is a Relevant Antitrust Market ................ 39

    6.1  The Geographic Market is Specific to the U.S.......................................... 40

    6.2  The Aftermarket for Tap-and-Pay iOS Mobile Wallets Satisfies the *Epic* Factors ...41

        6.2.1  The Challenged Aftermarket Restrictions Are not Generally Known When Consumers Make their Foremarket Purchase ................................................. 43

FILED UNDER SEAL

6.2.2    Significant Information Costs Prevent Accurate Lifecycle Pricing..................45

6.2.3    Significant Monetary or Non-Monetary Switching Costs Exist.......................46

6.2.4    General Market-Definition Principles Regarding Cross-Elasticity of Demand Do not Undermine the Proposed Aftermarket ..................................................48

6.3    A SSNIP Test Must be Applied to Card Issuers ........................................48

6.4    Card Issuers Must List on the Apple Pay Platform ....................................49

6.5    Card Issuers Decision to Continue to Acquiesce to Apple Pay's Terms Was Unaffected by the Entry of Contactless Cards ....................................................50

6.6    Card Issuers Decision to Acquiesce to Apple Pay's Terms was Unaffected by the Entry of QR-code Wallets ....................................................................55

7.    Through Apple Pay, Apple Possesses Market Power........................................58

7.1    Apple Pay Was (and Is) Essentially ███████████ ................................58

7.2    Android Tap-and-Pay Mobile Wallets Do Not Constrain Apple Pay's Market Power – Even if They Are Included in the Relevant Market ........................................60

7.3    Apple Pay's Dominance Is not a Result of Superior Product Offering....................62

7.4    iOS Users Account for a Supermajority of Tap-and-Pay Mobile Wallet Spending ..65

8.    The Challenged Conduct Excluded Competitors and Inflated Apple Pay's Fees............68

8.1    Apple Denies NFC Access to Would-be Competitors................................69

8.1.1    Apple Only Denies NFC Access to Competitive Threats to Apple Pay ............69

8.1.2    Apple's NFC Restraint Excluded Mobile Wallet Competition.........................71

8.1.3    PayPal Is (and Was) A Credible Competitive Threat to Apple Pay Which Apple Demonstrably Excluded From The Relevant Market ....................................73

8.2    Apple Pay is ████████████████████ ....................................77

8.3    Apple Imposes Pricing Restraints on Issuers that Distort Competitive Incentives...79

8.4    The Challenged Conduct is Also Capable of Harming Competition in an Android Inclusive Market ....................................................................80

9.    Apple Pay Would Charge No (or the Same Lower) Fees in the But-for World to all Members of the Proposed Issuer Class ..................................................82

9.1    All Members of the Proposed Issuer Class Are Impacted..........................82

9.2    Yardstick Analysis is a Method Common to the Proposed Issuer Class That Can Estimate Counterfactual Fees ....................................................................84

9.3    Android Tap-and-Pay Mobile Wallets Are a Competitive Yardstick ......................85

9.4    Payment Network Tokenization Frameworks Lowered Barriers to Entry and Expansion, Facilitating Fee Reducing Competition ..........................................87

9.4.1    Unlike Google and Samsung, Apple Did Not Participate in the Networks' Tokenization Frameworks..................................................................88

9.4.2    Like Google and Samsung, PayPal Also Participated in the Networks' Tokenization Frameworks ........................................................................ 90

9.5    Apple Pay Fees After Opening NFC Access are not a Reliable Indicator of the But-for World .................................................................................................... 92

9.6    Assessment of Aggregate Class Wide Damages ...................................... 94

Appendices ........................................................................................................ 96

A.    Payment Industry Participants .................................................................. 96

A.1.    Key Players in the Payment Industry ..................................................... 96

A.2.    Fees in Standard Card Payments ............................................................ 97

**A.2.1.**    Merchant Discount Rate ................................................................ 97

**A.2.2.**    Multilateral Interchange Fees ....................................................... 97

**A.2.3.**    Network Fee ................................................................................... 98

**A.2.4.**    Acquirer Fee .................................................................................. 98

**A.2.5.**    Processing Fees ............................................................................. 98

B.    EEA NFC Requests .................................................................................. 101

C.    Summary of Datasets Relied Upon .......................................................... 103

C.1.    Apple Pay Data ....................................................................................... 103

**C.1.1.**    Invoice Data ................................................................................ 103

**C.1.2.**    Volume Data ................................................................................ 107

C.2.    PayPal Data ............................................................................................. 110

C.3.    Visa Data ................................................................................................. 113

**C.3.1.**    Visa Invoice Data ........................................................................ 113

**C.3.2.**    Visa Transaction Data ................................................................. 121

C.4.    Mastercard Data ..................................................................................... 166

**C.4.1.**    Mastercard Transaction Data ..................................................... 166

**C.4.2.**    Mastercard Invoice Data ............................................................ 174

D.    Materials Cited ......................................................................................... 182

D.1.    Academic Articles ................................................................................... 182

D.2.    Public Documents ................................................................................... 184

D.3.    Bates Documents ..................................................................................... 194

D.4.    Requests For Admission & Interrogatories ........................................... 196

D.5.    Cases ........................................................................................................ 197

E.    Curriculum Vitae ...................................................................................... 198

FILED UNDER SEAL

**Table of Figures**

Figure 1: Aggregate Class-Wide Damages ........................................................................14
Figure 2: Transaction Flow for Pass-Through Wallets .....................................................17
Figure 3: Four-Party Network Transaction Flow ..............................................................20
Figure 4: Three-Party Network Transaction Flow ............................................................21
Figure 5: Timeline of POS & Contactless Payments ........................................................27
Figure 6: Apple Pay Fees in Transaction Process .............................................................30
Figure 7: Share of U.S. iPhone Users by Number of Years in the iOS Ecosystem as of Q4
2020....................................................................................................................................44
Figure 8: Repeat iPhone Owners Stated Reason for Staying in the iOS Ecosystem .............47
Figure 9: Number of Contactless Cards Issued by Visa in the U.S., 2019-2024 ..................53
Figure 10: Apple Pay's Revenue and Volumes During Contactless Rollout ..........................54
Figure 11: Comparison of PayPal QR app and Apple Pay's Volumes ....................................56
Figure 12: Apple Pay, Google Pay, and Samsung Pay Net Spending......................................60
Figure 13: Apple Pay Share of Tap-and-Pay iOS and Android Mobile Wallet Spending........61
Figure 14: Samsung's Analysis of User Satisfaction Rates Between Samsung Pay and Apple
Pay......................................................................................................................................62
Figure 15: PayPal QR POS Spend, iOS vs Android ..........................................................64
Figure 16: User Demographics for Apple Pay, Samsung Pay, and Google Pay, 2018 ...........67
Figure 17: PayPal ███████████████████████, 2022-2023 ..........................75
Figure 18: Apple Pay ██████████████████ 2023 ................................................75
Figure 19: PayPal ████████████████████████████ 2023 ..........................76
Figure 20: Aggregate Class-Wide Damages .....................................................................94

**Table of Tables**

Table 1: Apple's Response to Interrogatory No. 4 – NFC Requests in the EEA Post
Commitments to the European Commission ......................................................................101
Table 2: Summary of Apple Invoice Data.........................................................................104
Table 3: Summary of Apple Volume Data ........................................................................108
Table 4: Summary of PayPal Data ................................................................................... 111
Table 5: Summary of VisaAffinityCU-00004062 ............................................................. 114
Table 6: Summary of VisaAffinityCU-00004054 .............................................................122
Table 7: Summary of VisaAffinityCU-00004055 .............................................................128
Table 8: Summary of VisaAffinityCU-00004056 .............................................................134
Table 9: Summary of VisaAffinityCU-00004057 .............................................................139
Table 10: Summary of VisaAffinityCU-00004058 ...........................................................145
Table 11: Summary of VisaAffinityCU-00004059 ...........................................................150
Table 12: Summary of VisaAffinityCU-00004060 ...........................................................155
Table 13: Summary of VisaAffinityCU-00004061 ...........................................................161
Table 14: Summary of "2567325523 Digital Wallet report 1" ..........................................167
Table 15: Summary of "Apple - Billing History 2015 to present" .......................................174

FILED UNDER SEAL

# 1. Qualifications and Compensation

1.   I am the founder and president of Quantitative Economic Solutions, LLC, a microeconomic consulting firm.  I received a Doctor of Philosophy degree (Ph.D.) in Economics from the Massachusetts Institute of Technology, where my primary fields of specialization were industrial organization and econometrics.  I have published in the field of industrial organization with an emphasis on issues relating to antitrust and competition policy.  I have also taught economics at the Graduate School of Management at Boston University.  My curriculum vitae, which lists my testimony for the last ten years and my publications, is attached as Appendix E.

2.   One of my fields of specialization within economics (as noted) is industrial organization, and a subspecialty of mine within this discipline is antitrust.  I have published numerous scholarly papers in this field, including in leading journals such as The Antitrust Law Journal and Antitrust.  I have conducted extensive analyses relating to antitrust/competition policy issues, including those in the context of private antitrust actions and reviews before antitrust enforcement agencies around the world.  I have appeared before the U.S. Congress on antitrust related matters, as well as the U.S Department of Justice ("DOJ"), the Federal Trade Commission, the Federal Reserve Board of Governors, and numerous other federal agencies.  I have also appeared before many states' Attorneys General.  Internationally, I have appeared before the European Commission, the Australian and New Zealand competition authorities, and the Canadian Competition Bureau.

3.   I have extensive experience in the banking/financial services industry including antitrust/regulatory matters relating to payment cards.  In the 1990s and 2000s I had a major role in economic issues related to the development of super-regional and national ATM networks and related services, where I appeared before the Federal Reserve Board of Governors on numerous occasions.

4.   I am being compensated for my time in this matter at an hourly rate of $1,250 and am supported by staff at Fideres Partners LLP and Quantitative Economic Solutions LLC.

# 2. Introduction and Assignment

## 2.1  Class Definition

5.   I understand plaintiffs seek to certify a class (i.e., the "Proposed Issuer Class") comprised of:

> All U.S. entities that (a) issued any Payment Card enabled for Apple Pay and (b) paid Apple a fee for any Apple Pay transaction on that Payment Card.

6.     Counsel instructs me that the Proposed Issuer Class only includes General Purpose credit, debit, and prepaid cards.[1] It therefore does not include transit cards, such as the Clipper Card, or private label cards for use at specific retailers.

7.     Plaintiff's First Amended Complaint ("FAC") in this action does not specify a class period, but counsel instructs me that they intend to seek damages commencing 4 years before the claim was filed on July 18, 2022 – putting the Proposed Issuer Class start date on July 18, 2018.

## 2.2  Summary of the Alleged Conduct

8.     The Plaintiffs in this action are three credit unions, Consumers Credit Union, Affinity Credit Union, and GreenState Credit Union.  Plaintiffs allege that they pay the Defendant, Apple Inc., supracompetitive prices on Apple Pay debit and credit card transactions.  Plaintiffs allege that Apple is able to collect monopolistic prices because Apple has precluded would-be competitors from offering mobile wallets that can effectively compete with Apple Pay in the iOS ecosystem by denying them access to the Near-Field Communication ("NFC") chip in Apple's iOS devices and imposing other contractual restraints on competition.[2]

9.     Apple Pay is a payment product that allows iOS device holders to make digital payments with mobile devices using credit and debit cards that have been issued by card-issuing institutions (such as Plaintiffs).  Apple Pay (and other tap-and-pay mobile wallets) works by storing credit and debit cards in a mobile wallet.  Apple devices contain an NFC chip or controller, which can communicate using wireless signals with an NFC-enabled payment terminal.  At the point of purchase, iOS device holders place their Apple mobile device in close proximity to an NFC-enabled payment terminal, and Apple Pay sends a signal containing debit or credit card information to the merchant.  These are called tap-and-pay mobile wallet transactions.  Apple Pay can also be used to make purchases online from e-commerce merchants that accept Apple Pay as a means of payment.

10.    To provide tap-and-pay function, mobile wallet apps on Apple iOS devices therefore require access to the NFC chips embedded in those devices.  Plaintiffs allege, however, that Apple historically has prevented any competing mobile wallet providers from accessing the NFC chip on Apple devices, which has precluded the emergence of any iOS mobile wallets that are alternatives to Apply Pay.  Throughout this report, I refer to this as the "NFC Restraint." As a result of this restriction, Plaintiffs allege that Apple, through Apple Pay, currently controls 100% of the market for tap-and-pay mobile wallets on iOS devices.  Plaintiffs further allege that Apple imposes these NFC restrictions to prevent competition with Apple Pay from other mobile wallets on Apple

---

[1] ████████████████████████████████████████████████████████████████████

[2] Throughout this report, I will use "iOS" to refer to iPhone, iPad, and Apple Watch devices and their corresponding operating systems.

FILED UNDER SEAL

devices—indeed, Apple has granted NFC access on its devices to developers that offer products that do not compete with Apple Pay.

11.   By blocking access to the NFC interface, Plaintiffs allege that Apple has prevented would-be mobile wallet providers from offering mobile wallets for iOS devices that can effectively compete with Apple Pay.   Plaintiffs further allege that this market dominance has enabled Apple to charge card-issuing banks and credit unions ("issuing institutions," members of the proposed class) supracompetitive prices for Apple Pay transactions.   Whenever an Apple Pay transaction is completed on a U.S. issuer's payment card, the issuer must pay Apple a fee— ██████████████ on credit transactions and a flat ████████████ on debit transactions.

12.   In contrast to the restrictions that Apple has imposed in the iOS ecosystem, Plaintiffs point out that mobile device manufacturers whose devices run on the Android operating system do not restrict access to NFC chips.   As a result, there are multiple mobile wallet providers in the Android ecosystem.   Plaintiffs explain that competition, absent from Apple's devices that run on the iOS system, has yielded lower fees for mobile wallet transactions on non-Apple devices—unlike Apple Pay, mobile wallets in the Android ecosystem do not charge card-issuing institutions any fees for mobile wallet transactions.

13.   In addition to locking mobile wallet competitors out of the iOS ecosystem, Plaintiffs allege that Apple has imposed contractual restraints ██████████████████ ████████████████████████████████████████████████ ██████   I refer to this as the "Pricing Restraint" throughout this report.   By imposing this restraint, Plaintiffs allege that Apple has further insulated itself from price competition because card issuers are unable to direct card holders to payment methods that do not charge the issuers fees.   Plaintiffs further allege that this restraint— ████████████████████—removes economic incentives for card holders to switch to $0 fee alternatives.

14.   Finally, Plaintiffs allege that Apple has combined its point of sale ("POS") and e-commerce services into a multiproduct wallet, which has allowed Apple to extract more monopolistic fees from card-issuing institutions.   E-commerce transactions do not use NFC technology.   Nevertheless, ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████   And for all e-commerce transactions that use Apple Pay, Apple imposes the same fees that it imposes on tap-and-pay mobile wallet transactions.   Plaintiffs allege that this has allowed Apple to extract supracompetitive prices on e-commerce transactions in addition to tap-and-pay transactions.

FILED UNDER SEAL

## 2.3  Assignment

15.  For the purpose of this report, counsel for the Proposed Issuer Class has instructed me to:

- Evaluate whether common evidence can establish that the challenged conduct has enabled Apple to achieve or maintain monopoly power in a relevant market.

- Evaluate whether common evidence can establish that all or nearly all members of the Proposed Issuer Class paid supracompetitive fees to Apple as a result of its challenged conduct.

- Demonstrate how common methods can ascertain the aggregate quantum of overcharge paid by members of the Proposed Issuer Class to Apple stemming from its alleged monopolization, during the relevant period.[3]

16.  My present conclusions on this assignment, summarized below, are based on the record evidence available to me at the time of writing, as detailed in Appendices C and D.[4] Should the Proposed Issuer Class be certified, I anticipate expanding my analysis. Should Apple (or third parties) produce further relevant information, I reserve the right to amend my analysis and conclusions.

## 3. Summary of Conclusions

17.  It is undisputed that all members of the Proposed Issuer Class pay the exact same credit and debit fees on a per transaction basis – as I explain in Section 9.1.  It is also undisputed that multiple digital wallet apps (such as Google Pay and Samsung Pay) are available to Android customers where the fees to card issuers for such transactions are zero, including for all members of the Proposed Issuer Class that participate in Google Android-based digital wallet service – discussed further in Section 9.3.

---

[3] For the avoidance of doubt, the damages analysis in this report should not be construed as my final estimate of class wide harm. Should the proposed class be certified, such an analysis would be forthcoming at merits. The purpose of my present analysis is to demonstrate the applicability of class wide methods and evidence to estimate harm.

[4] Apple has not answered several of plaintiffs' questions about the amount of revenue it generates from Apple Pay - given apparent contradictions in different files it has produced, see Appendix C.1.  Apple has also stated that it could not find underlying data it received after plaintiffs filed their first complaint.  Despite this representation, Apple later produced additional data (which it had a deadline to produce by the end of November 2024) three days before this report was due along with promises of producing yet additional data files the same day this report was due for filing. I have not had an opportunity to review this production. Apple has similarly failed to provide ██████████████████████████████████████████████████ In addition, ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ , see APL-ACU_01084939.

18. Apple has created and maintained this supracompetitive price through restrictions that create barriers to entry by denying other digital wallet app developers the ability to access the NFC technology – access which is necessary to effect digital wallet-based payments at the point of retail sale – discussed in Section 8.1. Further, ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ I discuss this Pricing Restraint in Section 8.3.

19. Finally, Apple, through its Apple Pay digital wallet, allows card holders to use their digital wallets for purchases online, thus expanding the feature set available through its digital wallet. Apple places other potential digital wallet suppliers at a material disadvantage, as they cannot offer their card-issuing customers the same product range. I discuss this ███████████████ in Section 8.2.

20. These restrictions apply to and affect all members of the Proposed Issuer Class similarly in both retail and online contexts. The result has been a restriction of competition that applies across the Proposed Issuer Class in common ways – to wit, an inability to credibly turn to alternative iOS-based digital wallets to rein in Apple's pricing, or to alter card holder behavior in the direction of less-costly payment options through pricing-based mechanisms. The result is a sustained supracompetitive pricing regime that applies across the Proposed Issuer Class and adversely impacts every member of the Proposed Issuer Class.

21. With actual Android tap-and-pay mobile wallets and excluded wallet-providers as suitable competitive yardsticks, the amount of damages associated with this conduct is readily ascertainable on a class-wide basis, using class-wide data.

## 3.1  Relevant market

22. As in standard market definition analytics, the study of a relevant market begins by studying a set of candidate product(s) that represent a candidate relevant market and then performing the standard Hypothetical Monopolist test. For the candidate market, the test posits whether the price on the candidate market product(s) can be raised above competitive levels profitably (as reflected in a Small but Significant Non-transitory Increase in Price, or SSNIP); if so, then the market is defined; if not, then the market is expanded until this condition is met. I explain the economic principles of market definition in Section 5.

23. I begin by explaining that the candidate aftermarket for tap-and-pay iOS mobile wallets satisfies each of the four elements laid out in *Epic v Apple* in Section 6.2. To summarize, ████████████████████████████████████████████████████████████ ███████████████████████████████ Even if they were aware, a supermajority of iOS users were locked into the iOS ecosystem before Apple engaged in the challenged conduct, and the Pricing Restraint ███████████████████████████████

FILED UNDER SEAL

███████████████.[5]  In addition to these information costs, iOS users who were already in Apple's ecosystem faced substantial switching costs in the form of a new smartphone, repurchasing digital content, and learning a new operating system.  As a result, a SSNIP test shows that Apple was able to profitably raise fees above the pre-established competitive level set by Android tap-and-pay mobile wallets when it first launched Apple Pay, as I explain further below.

24.    My analysis of the *Epic* factors focuses on iOS device holders, as only they transact with Apple in the foremarket.  However, an important point of this case is that Apple Pay's fee-paying customers are exclusively card issuers.  Only the card issuers pay Apple Pay's fees, and ████████████████████████████████ ████████████████████████████  Given these facts (and as I explain in Section 6.3), a SSNIP test in this case must be applied to card issuers.

25.    In the present matter there is a special circumstance, where the actual pricing history of Apple Pay performs this exercise for us.  Prior to Apple Pay, Google Pay had already launched on the Android operating system, at a price of zero (providing expanded fee-free access to a digital wallet is consistent with how many pre-loaded apps are provided as it enhances the quality of the Android ecosystem to device holders).  In its launch, Apple introduced its digital wallet at a price above this competitive level ████████ ████████████████████████████████████  This implies as a matter of economics that Apple has sufficient market power to raise prices to supracompetitive levels in the market for digital wallets broadly, or in the alternative, that iOS digital wallets are their own relevant market.

26.    Moreover, contactless physical credit and debit cards do not and did not serve as a competitive constraint on Apple Pay's pricing and should not be included in the relevant market.  We know this because as contactless card technologies have been rolled out to include virtually all credit and debit cards held in the U.S., Apple ████████████ – thus demonstrating that there is insufficient cross-elasticity of demand between Apple Pay and these contactless cards for the physical cards to residing in the same relevant market with Apple Pay.  I discuss my application of this SSNIP test in Sections 6.4-6.6.

27.    Note that this consideration of the relevant market applies in a common form across the Proposed Issuer Class and can be established using common class wide evidence using the analytic framework outlined above.

---

[5] Lifecycle pricing refers to the total cost a purchaser incurs in both the foremarket and the aftermarket across the lifespan of a durable good. It differs from upfront pricing in the foremarket depending on the extent of user participation in the aftermarket.

## 3.2  Market Power/Anticompetitive conduct

28.   Apple's share in the iOS tap-and-pay mobile wallet market is 100%.  Further, even
within a broader market including all smartphone-based digital wallets, Apple's share
in the U.S is dominant at 93% of transactions by value.[6]  Importantly, this dominance
even in a broader market arises because iOS users are, on average, younger and
wealthier than Android users - meaning they account for more than 90% of mobile
wallet spend and are a must-have group of customers for card issuers, as I explain in
Section 7.4.

29.   Consistent with the import of Apple's restrictions, no one has entered the relevant
market for tap-and-pay iOS mobile wallets in the United States since Apple did in 2014.
The artificial barriers Apple has erected mean that competitors cannot offer digital
wallet products that serve both retail and e-commerce demands that card issuers seek
to provide to their card holders. Only after Apple lifted the NFC restraint in the
European Economic Area (EEA) did the first competing tap-and-pay mobile wallet
launch in Norway in December 2024.   Contactless cards have not represented
meaningful competitive entry/expansion, as is clearly demonstrated by ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as the proliferation of credit and debit cards capable of
contactless transactions has risen from virtually zero to near universal availability.

## 3.3  Antitrust Impact



30.   Despite ongoing innovation in digital wallets and contactless payments, ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Card Issuers' inability to drive
Apple's price down reflects economic conditions and restrictions that are common
across the Proposed Issuer Class.  All issuers face similar competitive options (or, more
precisely, a lack of competitive options), that leave them with no ability to credibly
threaten to lower transaction volumes as a way to prompt pricing reductions from
Apple.  First, there are no competing iOS-based digital wallets to serve as alternatives
for issuing institutions.  Further, issuing institutions cannot credibly move (or threaten
to move) volume to Google Pay by terminating their cards' Apple Pay capabilities for
their card holders, as this would require their card holders to shift from their established
use of the iOS ecosystem to the Android ecosystem – a switch that imposes significant
switching costs that issuers demonstrably believe their card holders will not undertake.

31.   Finally, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮ and also remain a provider of the Apple Pay service, because Apple
enforces the challenged Pricing Restraint ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
Such rules apply to all members of the Proposed Issuer Class in a ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in the agreements between Apple and the issuing institutions.

---

[6] See Section 7.2.

32.     As noted earlier, Google did not have sufficient power to raise its price above $0, which
        provides a useful class-wide yardstick of a competitive price, and also demonstrates
        there is antitrust impact across the entire class that manifested itself similarly for all
        members of the Proposed Issuer Class.

## 3.4 Damages

33.     All members of the Proposed Issuer Class pay the same fees for Apple Pay.
        Specifically, in the United States, Apple charges card issuers (members of the Proposed
        Issuer Class) ████████████ of each credit transaction and ████████ for each debit
        transaction to give their card holders access to the Apple Pay platform.  In response to
        plaintiffs' Request for Admission No. 1 (specific to credit fees), Apple stated:

        ████████████████████████████████████████████████
        ████████████████████████████████████████████████
        ████████████████████████████████████████████████
        ████████████████████████████████████████████████
        ████████████████████████████████████████████ [7]

34.     In response to plaintiffs' Request for Admission No. 2 (specific to debit fees), Apple
        repeated that:

        ████████████████████████████████████████████████
        ████████████████████████████████████████████████
        ████████████████████████████████████████████████
        ███████████████████████████████████ [8]

35.     It is therefore uncontested that Apple charges a perfectly homogenous fee structure
        across all members of the Proposed Issuer Class for both credit and debit transactions,
        ████████████████████████████████████████████████████
        ████

36.     With a common inflated price paid by all card issuers, and a common yardstick service
        that offers a competitive price, the damages question can be addressed and assessed for
        the entire class with a common approach, using class-wide data.  Specifically, using a
        "but for" price more in line with those observed in Google Pay and Samsung Pay,
        damages would be simply the sum of Apple Pay's revenue from card issuers during the
        class period:

---

[7] Apple's Response to Request for Admission No.1.
[8] Apple's Response to Request for Admission No.2.

FILED UNDER SEAL



37.    Even if a subsequent yardstick analysis found that counterfactual fees would have been above $0, there would still be class wide common impact measured by a common yardstick methodology so long as counterfactual fees were at all lower than Apple Pay's actual fees.  This is because Apple, by admission and design, charges a perfectly homogenous fee structure across all members of the Proposed Issuer Class, and there is no reason to think this would change in the but-for world -- particularly because the currently available yardsticks also charge a perfectly homogenous ($0) fee across all members of the Proposed Issuer Class.

38.    In the report that follows, I begin by explaining the relevant industry and economic context for Apple Pay, then proceed to examine candidate competitive constraints on Apple Pay and the effect the challenged conduct had on Apple's ability to extract fees from members of the Proposed Issuer Class.  I conclude by summarizing what presently available competitive yardsticks indicate members of the Proposed Issuer Class would

---

pay Apple but for the challenged conduct, then provide a calculation demonstrating how class-wide damages would be applied.

# 4. Background on Mobile & Digital Wallets

39.     Before proceeding to analyze the competitive context surrounding Apple Pay and how Apple has distorted that competitive process to its own advantage, I begin by reviewing the characteristics and functionality of the core product at issue in this case (a tap-and-pay mobile wallet on iOS devices), how it relates to other participants in the payment industry, and how this technology evolved to its current state. In Appendix A, I provide a more general background on the payment industry not specific to mobile or digital wallets. There, I define several industry terms which I use repeatedly throughout this report.

40.     A digital wallet is an application that securely stores users' payment credentials, such as credit and debit card details, and presents them to merchants either at the point of sale ("POS") or in e-commerce (sometimes also called "remote"). This allows card holders to pay for goods and services directly from their devices without having to use a physical card.[10] Some wallets may be used for both POS and e-commerce (such as Apple Pay and Google Pay), while others are only for e-commerce (such as Amazon Pay). I will use "mobile wallets" to refer to a subset of digital wallets that support POS payments on mobile devices, several of which also support e-commerce transactions. This report will focus on such mobile wallets.

41.     A mobile wallet is usually accessed through a mobile device, such as a smartphone or smartwatch.[11] These wallets may be pre-installed (e.g., Apple Pay, Google Pay, and Samsung Pay), or downloaded from an app store (e.g., PayPal).[12]

42.     I note that PayPal allows users to make online payments, peer-to-peer transfers, and, for a time, allowed Quick Response ("QR") codes payments in-store. While PayPal has sought to introduce NFC-enabled payments for some time, these attempts were hindered by Apple restricting access to iOS devices' NFC interface.[13] However,

---

[10] "Global Payments Report," Worldpay, p. 156, available at https://worldpay.globalpaymentsreport.com/en#download-report (hereinafter, "Worldpay Global Payments Report"). See also "Business Guide to Mobile Wallets," Worldpay, available at https://www.worldpay.com/en/insights/articles/business-guide-to-mobile-wallets (accessed January 14, 2025).
[11] "Digital Wallet vs. Mobile Wallet: What's the Difference?," Capital One, August 15, 2024, available at https://www.capitalone.com/learn-grow/money-management/digital-wallet-vs-mobile-wallet/ (accessed January 14, 2025).
[12] "Payment Trends 2023: Mobile Wallets Are Becoming Universal," Visa, 2023, p. 1, available at https://corporate.visa.com/content/dam/VCOM/regional/na/us/services/documents/vca-mobile-wallets-are-becoming-universal.pdf (accessed January 14, 2025) (hereinafter, "Visa Payments Trends 2023").
[13] "*PayPal can be used at POS and online via the mobile and digital channels and plans to add NFC capability in the future.*" See "Adapting to Mobile Wallets: The Consumer Experience," Federal Reserve Bank of Boston, June 16, 2017, p. 13, available at https://www.bostonfed.org/publications/payment-strategies/choosing-a-mobile-wallet-the-consumer-perspective.aspx (hereinafter, "Adapting to Mobile Wallets: The Consumer Experience") (accessed January 14, 2025).

FILED UNDER SEAL

following Apple's announcement in January 2024 that it would open NFC access, PayPal announced that it will "quickly" take advantage of this by offering an NFC-enabled mobile wallet.[14]  I discuss PayPal's potential entry to NFC payments further in Section 9.4.2 below.

43.     The main tap-and-pay mobile wallets in the United States are Apple Pay, Google Pay, and Samsung Pay.[15]  These wallets use NFC technology and can therefore be used to make contactless payment at the POS.  As I mention in Section 4.4.2, Google introduced Google Wallet in 2011.  In September 2014, Apple announced the release of Apple Pay,[16] and Samsung Pay launched in September 2015.[17]  Android Pay – Google's rebranded version of Google Wallet – was announced in Spring 2015.  In January 2018, the "Android Pay" and "Google Wallet" names were consolidated under the "Google Pay" brand.[18]  In 2024, Google discontinued the U.S. version of the Google Pay app and replaced its functions with the Google Wallet app.[19]  I discuss this timeline further in Section 4.4.2.

## 4.1  Mobile & Digital Wallet Funding

44.     Pass-through wallets facilitate transactions by converting payment credentials into secure tokens.  They do not store any funds.[20]  Apple Pay, Google Pay and Samsung Pay are all pass-through mobile wallets.

45.     The card holder presents their payment method, which communicates tokenized payment credentials to the merchant.  I discuss tokenization in detail later in Section 4.5.1.  The merchant then processes the transaction directly with its acquiring bank in

---

[14] "PayPal CEO sets out vision for 'PayPal everywhere' with NFC," NFCW, September 10, 2024, available at https://www.nfcw.com/2024/09/10/388838/paypal-ceo-sets-out-vision-for-paypal-everywhere-with-nfc/ (accessed January 14, 2025).

[15] "Digital Wallet Statistics," Capital One Shopping, available at https://capitaloneshopping.com/research/digital-wallet-statistics (accessed January 14, 2025). See also Global Payments Report, p. 153. Indeed, the transaction data produced by Visa and Mastercard only identifies Apple Pay, Samsung Pay and Google Pay as tap-and-pay mobile wallets in the U.S.

[16] "Apple Announces Apple Pay," Apple Newsroom, September 9, 2014, available at https://www.apple.com/newsroom/2014/09/09Apple-Announces-Apple-Pay/ (accessed January 14, 2025).

[17] "Samsung Announces Launch Dates for Groundbreaking Mobile Payment Service Samsung Pay," Samsung Newsroom, available at https://news.samsung.com/global/samsung-announces-launch-dates-for-groundbreaking-mobile-payment-service-samsung-pay (accessed January 14, 2025).

[18] "Apple Pay vs. Samsung Pay vs. Android Pay," Worldpay, available at https://www.worldpay.com/en/insights/article/apple-pay-vs-samsung-pay-vs-android-pay (hereinafter, "Apple Pay vs. Samsung Pay vs. Android Pay – Worldpay") (accessed January 14, 2025).

[19] "About Google Pay," Google Pay Help, available at https://support.google.com/googlepay/answer/14555219?hl=en (hereinafter, "Google Pay Help - About Google Pay") (accessed January 14, 2025).

[20] "The FCA and PSR Publish a Joint Call for Information on Digital Wallets," Bird & Bird, 2024, available at https://www.twobirds.com/en/insights/2024/uk/the-fca-and-psr-publish-a-joint-call-for-information-on-digital-wallets (hereinafter, "The FCA and PSR Publish a Joint Call for Information on Digital Wallets") (accessed January 14, 2025). See also "Digital Wallets in Visa's Ecosystem," Visa, October 2024, available at https://usa.visa.com/content/dam/VCOM/global/support-legal/documents/digital-wallet-guide-october-2024.pdf (hereinafter, "Digital Wallets in Visa's Ecosystem") (accessed February 3, 2025), p. 2.

the same way as a typical Visa or Mastercard transaction.[21]  Both Apple Pay and Google Pay transactions are tokenized, meaning that when a customer pays using the device, the digital wallet only provides the token to the merchant and not the actual information on the card.[22]  Apple Pay and Google Pay rely on card networks such as Visa and Mastercard to settle the transaction.[23]

**Figure 2: Transaction Flow for Pass-Through Wallets**



46.    Some mobile wallets are "staged" rather than pass-through wallets.  This means the wallet itself receives funds from the card holder, which it then relays to the merchant, rather than solely transmitting payment credentials.  PayPal's existing wallet is a notable example.[24]

## 4.2  Mobile Wallet Technology

47.    Digital wallets can also be categorized based on the technology that they use, such as NFC or QR codes.[25]

### 4.2.1  Near-Field Communication ("NFC") "Pay" Wallets

48.    NFC pay wallets use NFC technology to facilitate contactless payments at a POS.  They accept credit or debit cards from participating financial institutions and can be used at any NFC-enabled merchant.[26]  NFC pay wallets support the use of tokenization, whereby a "token" is used instead of the primary account number.  NFC pay wallets include Google Pay, Apple Pay, and Samsung Pay.  I provide a brief history on the development of NFC technology below in Section 4.4.

---

[21] Digital Wallets in Visa's Ecosystem, p. 11.

[22] "Digital Wallet Tokenization," Checkout.com, available at https://www.checkout.com/blog/digital-wallet-tokenization (accessed January 14, 2025).

[23] The FCA and PSR Publish a Joint Call for Information on Digital Wallets.

[24] "What is a Staged Digital Wallet?," GoCardless, available at https://gocardless.com/guides/posts/what-is-a-staged-digital-wallet/ (hereinafter, "Staged Digital Wallet - GoCardless") (accessed January 14, 2025).

[25] "What is a Digital Wallet," Checkout.com, available at https://www.checkout.com/blog/what-is-a-digital-wallet (accessed January 14, 2025).

[26] Adapting to Mobile Wallets: The Consumer Experience, p. 5. For a list of Apple Pay participating banks, see "Apple Pay Participating Banks," Apple Support, available at https://support.apple.com/en-us/HT204916 (hereinafter, "Apple Pay Participating Banks") (accessed January 14, 2025).

FILED UNDER SEAL

## 4.2.2  Merchant or Financial Institution QR Code Closed Wallets

49.    Quick Response ("QR") codes are, in the U.S., rarely used in digital wallets.  A QR code contains encoded data that is displayed as a unique combination of small black and white squares.  The code can be read by QR code scanner, usually on a mobile device camera.  In the context of payments, the QR code can represent transaction information including account details and the payment amount.[27]  As a result, businesses can use QR codes to facilitate contactless payments.  A merchant may choose to display a QR code at the POS, which can be scanned by customers with their mobile device to complete the payment.[28]  PayPal and Amazon Pay are also available in select brick-and-mortar stores using QR code payments.[29]  As I show in Section 6.6, QR-code mobile wallet use was extremely limited in the U.S. compared to NFC and, as I discuss *infra*, play a very limited role in assessing the salient competitive issues I detail later. This will be important for my conclusions regarding market definition and power.

## 4.3  Transaction Flow

50.    Any card payment involves the transfer of funds from a card issuer to an acquiring bank to settle payment to the merchant whose goods were purchased and for whom the acquiring bank settles such transactions.  First, the card holder initiates the transaction by presenting their payment credentials to the merchant – one way of doing so is a mobile wallet.[30]  In a traditional card payment transaction, the card holder's primary account number (PAN) is visible to the merchant.[31]  In a tokenized transaction, the card holder's primary account number (PAN) is replaced with a unique "token," which is used instead of the card holder's actual card number.  In this way, the merchant does not see or store the card details.  I discuss tokenization further below in Section 4.5.1.

51.    The merchant then sends the payment details to its financial institution, which is referred to as the acquirer, which in turn relays the payment details to the payment network.[32]  If the payment network is also the issuer, the network decides whether to

---

[27] "QR Code Payments," Stripe, available at https://stripe.com/gb/resources/more/qr-code-payments (hereinafter, "QR Code Payments – Stripe") (accessed January 14, 2025).
[28] QR Code Payments – Stripe.
[29] See "Amazon Pay: An In-Depth Guide," Stripe, available at https://stripe.com/gb/resources/more/amazon-pay-an-in-depth-guide (hereinafter, "Amazon Pay: An In-Depth Guide") (accessed January 14, 2025); and "How QR Codes Work – PayPal," available at https://www.paypal.com/us/brc/article/how-do-qr-codes-work (accessed January 14, 2025).
[30] "Merchant Discount, Interchange, and Other Transaction Fees in the Retail Electronic Payment System," Congressional Research Service, August 6, 2021, available at https://crsreports.congress.gov/product/pdf/IF/IF11893/1 (hereinafter, "CRS report") (accessed January 14, 2025).
[31] Adam J. Levitin, "Pandora's Digital Box: The Promise and Perils of Digital Wallets," University of Pennsylvania Law Review, Vol. 166, No. 2, January 2018, pp. 305-376 (hereinafter, "The Promise and Perils of Digital Wallets"), p.315, , available at https://web.archive.org/web/20190428193040/https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=9607&context=penn_law_review (accessed January 14, 2025).
[32] The Promise and Perils of Digital Wallets, p. 313.

FILED UNDER SEAL

authorize the payment.  If there is a different issuer, the network forwards the transaction details to the issuing institution, which either approves or declines the transaction (based on the customer's account balance, etc.).[33]  The card issuer then relays the decision to the payment network, which in turn forwards the decision to the merchant.  If the transaction is approved, the issuer releases the funds to the acquirer, via the payment network.[34]

52.    In a credit transaction, the issuing institution provides credit to the card holder, and the card holder is billed for the amount at a later date.  In a debit transaction, payment is immediately drawn from funds in the card holder's bank account.[35]  Figure 3 illustrates the flow of payments in a four-party model:

---

[33] "The Payment Industry Ecosystem Explained," Stripe, available at https://stripe.com/gb/resources/more/the-payment-industry-ecosystem-explained (hereinafter, "Stripe – The Payment Industry Ecosystem Explained") (accessed January 14, 2025).

[34] The Promise and Perils of Digital Wallets, p. 313.

[35] See CRS Report. There are two types of debit card networks: signature networks and personal identification number ("PIN") networks. For a discussion of PIN and signature networks, see Pulse Network, L.L.C., v. Visa, Inc., *Appeal from the United States District Court for the Southern District of Texas USDC No. 4:14-CV-3391, 5th Cir., No. 18-20669*, filed April 5, 2022 (hereinafter, "Pulse v. Visa Appeal"), pp. 2-4. See also United States of America v. Visa, Inc., *Complaint*, No. 24-07214 (S.D.N.Y.), filed September 24, 2024, pp. 17-25.

FILED UNDER SEAL

**Figure 3: Four-Party Network Transaction Flow[36]**



53.    Not all payment networks are four-party.  Some are instead three-party, where the "network" acts as both card issuer and acquirer.  I visualize this below in Figure 4:

---

[36] The Four Corner Model for Card Payments, Paiementor, December 15, 2017, available at https://www.paiementor.com/the-four-corner-model-for-card-payments/ (accessed January 29, 2025).

**Figure 4: Three-Party Network Transaction Flow[37]**



54.     Three-party networks include members of the Proposed Issuer Class, including American Express (often abbreviated to "Amex") and Discover.

## 4.4  History of NFC and Contactless Payments

55.     Presently, Apple Pay is the most widely used NFC payment app in the United States measured by users, transaction count, and transaction value (discussed further in Section 7.2).   Apple achieved this position despite playing a limited role in the development of contactless payments.   Indeed, Apple Pay substantially relies on technical infrastructure pioneered by other firms.

56.     Near Field Communication (NFC) is a technology that enables two devices to communicate with each other wirelessly, over a short distance of a few centimeters.[38] One of the devices is usually a mobile phone, smartwatch, or contactless payment card; the other may be a terminal such as a retail point of sale or a public transport entry

---

[37] The Three Corner Model in Card Payments, Paiementor, December 26, 2017, available at https://www.paiementor.com/the-three-corner-model-in-card-payments/ (accessed January 29, 2025).
[38] Hendry M. "What is NFC? In: Near Field Communications Technology and Applications," Cambridge University Press, available at https://www.cambridge.org/core/books/abs/near-field-communications-technology-and-applications/what-is-nfc/D7FBAAD86442DA5362711674061F3078 (hereinafter, "What is NFC? - Cambridge University Press"). The typical range of NFC is up to 2cm, see "What NFC Does," NFC Forum, available at https://nfc-forum.org/learn/what-nfc-does/ (accessed January 14, 2025).

point.[39]   In the payment industry, NFC allows a contactless card or smartphone to communicate with a card reader to process contactless tap-and-pay payments. Contactless payments do not require physical contact between the card (or mobile device) and the POS terminal.  The card holder presents the contactless card or mobile device in close proximity to the terminal.[40]  The transaction, which is often called a "tap," usually lasts less than a second, during which time payment information is communicated wirelessly.    In this way, NFC technology facilitates contactless payments using credit/debit cards and mobile wallets.  Indeed, most smartphones and credit/debit cards now contain NFC technology.[41]

## 4.4.1  Evolution of NFC

57.      NFC is a type of radio frequency identification (RFID).[42]   RFID is a contactless communication technology which dates back to World War II, when it was used to warn of approaching planes.[43]   Since then, RFID has been used in various industries, including agriculture (to track cattle), in supermarkets (to scan items), in hotels (to open room doors) and automotive (anti-theft devices in cars).[44]  In 1983, the first patent for RFID was granted in the United States.[45]

58.      NFC was developed jointly by Sony and NXP Semiconductors (formerly Philips) in 2002.[46]  Since around 2004, the acronym "NFC" has mainly referred to one specific set of standards that utilize near field effects.[47]  In 2004, Sony and Philips together with Nokia, founded the "NFC Forum" to "enable the use of touch-based interactions in

---

[39] What is NFC? - Cambridge University Press.

[40] "Tap to Pay: Will Contactless Cards Pave the Way for NFC Mobile Payments in the U.S.?," Federal Reserve Bank of Boston, April 22, 2019, p.3, available at https://www.bostonfed.org/publications/payment-strategies/tap-to-pay-will-contactless-cards-pave-the-way-for-nfc-mobile-payments-in-the-us.aspx (hereinafter, "Federal Reserve Bank of Boston report") (accessed January 14, 2025).

[41] "*NFC technology is built into the vast majority of today's payment acceptance terminals and other devices.*" See "Apple Pay vs. Samsung Pay vs. Android Pay – Worldpay."

[42] "What Is NFC Technology?," Square, available at https://squareup.com/us/en/the-bottom-line/managing-your-finances/nfc (hereinafter, "What Is NFC Technology? – Square") (accessed January 14, 2025).

[43] "The History of RFID Technology," RFID Journal, available at https://www.rfidjournal.com/expert-views/the-history-of-rfid-technology/76202/ (hereinafter, "History of RFID Technology") (accessed January 14, 2025).

[44] See "The History of RFID Technology;" "What Is NFC Technology? – Square;" and "Hotel Key Cards," SiteMinder, available at https://www.siteminder.com/r/hotel-key-card/ (accessed February 4, 2025).

[45] "Evolution of Touch-free," Mastercard, available at https://www.mastercard.com/content/dam/public/mastercardcom/gateway/payment-solutions/other/digital-disruption.pdf (hereinafter, "Evolution of Touch-free") (accessed January 14, 2025).

[46] "Near Field Communication (NFC) Technology and Measurements White Paper," Rhode & Schwarz, June 2011, p. 3, available at https://cdn.rohde-schwarz.com/pws/dl_downloads/dl_application/application_notes/1ma182/1MA182_5E_NFC_WHITE_PAPER.pdf. See also "History of NFC," NFC Near Field Communication, available at https://nfcnearfieldcommunication.org/history.html: "*Sony and a company called NXP Semiconductors invented the new NFC technology in 2002;*" and "Mobile Phones and the Evolution of NFC," NXP, available at https://www.nxp.com/company/about-nxp/smarter-world-blog/BL-MOBILE-PHONES-EVOLUTION-OF-NFC (accessed January 14, 2025).

[47] What is NFC? - Cambridge University Press.

consumer electronics, mobile devices, PCs, smart objects and for payment purposes."[48] NFC operates in a frequency range of 13.56 MHz.  It was standardized in ISO 18092 in 2004.[49]

## 4.4.2  History of Contactless Payments in the United States

59.    The concept of using NFC to 'tap-and-pay' and communicate payment credentials to a POS system is neither new nor proprietary to Apple.[50]  In 1997, ExxonMobil introduced RFID payments in the U.S. via "Speedpass" – a fob that could be held near a gas pump to allow customers to pay for gas without cash or a physical payment card.[51]  Speedpass reportedly "used Near Field Communication (NFC) to transmit user and payment information to the pump."[52]

60.    In the early 2000s, some card networks began piloting contactless payment programs in select regions in the United States.[53]  For example, in 2002, MasterCard partnered with Chase, Citibank and MBNA to trial MasterCard "PayPass" – a card payment program that allowed consumers to pay by tapping their card on a POS terminal.[54] PayPass cards included both a magnetic strip and a microchip and used RFID technology to transmit payment details wirelessly.[55]  In 2003, American Express began testing its contactless technology, marketed as "Express Pay," in over 400 merchant locations, including CVS.[56]  Express Pay took the form of a key fob and used RFID

---

[48] "NFC Forum Announces First Five Specifications," NFC Forum, available at https://web.archive.org/web/20110628203003/http://www.nfc-forum.org/news/pr/view?item_key=d8968a33b4812e2509e5b74247d1366dc8ef91d8 (hereinafter, "NFC Forum Announces First Five Specifications") (accessed January 14, 2025).
[49] See "NFC Forum Announces First Five Specifications" and "FeliCa and NFC Technology," Sony, available at https://www.sony.net/Products/felica/NFC/ (accessed January 14, 2025). According to the ISO website, "*ISO standards are internationally agreed by experts.*" They are "*a formula that describes the best way of doing something*" such as "*making a product, managing a process, delivering a service or supplying materials*." See "Standards," ISO, available at https://www.iso.org/standards.html (accessed January 14, 2025).
[50] Tom Akana and Wei Ke, Ph.D., "Contactless Payment Cards: Trends and Barriers to Consumer Adoption in the U.S.," Federal Reserve Bank of Philadelphia Discussion Paper, May 2020, p. 3, available at https://www.philadelphiafed.org/-/media/frbp/assets/consumer-finance/discussion-papers/dp20-03.pdf (hereinafter, "Federal Reserve Bank of Philadelphia Discussion Paper") (accessed January 14, 2025).
[51] Evolution of Touch-free.
[52] Federal Reserve Bank of Philadelphia Discussion Paper, p. 3.
[53] Federal Reserve Bank of Boston report, p. 4.
[54] "New MasterCard PayPass Utilizes Contactless Card Payment Technology," SecureIDNews, available at https://www.secureidnews.com/news-item/new-mastercard-paypass-utilizes-contactless-card-payment-technology/ (accessed January 14, 2025).
[55] "Contactless Cards: The Future of Payments," CNN Money, February 2, 2004, available at https://web.archive.org/web/20130408085233/https://money.cnn.com/2004/02/02/news/companies/contactless_cards/ (hereinafter, "CNN Money on Contactless Cards") (accessed January 14, 2025).
[56] The rollout took place mainly in the Phoenix area. See "CNN Money on Contactless Cards."

FILED UNDER SEAL

technology to facilitate contactless payments.[57]  American Express also used Express Pay in some New York ferry terminals.[58]

61.    According to a report by the Consumer Financial Protection Bureau ("CFPB"), 2004 marked the first use of NFC contactless payments in the U.S.[59]  For example, in 2005, MBNA started issuing credit cards that integrated MasterCard PayPass contactless technology to customers in Atlanta.[60]  PayPass cards incorporated an RFID chip and antennae and allowed customers to "tap" their cards to make payment.  The same year, JPMorgan Chase began issuing contactless MasterCard and Visa credit cards known as "Chase Blink," which was embedded with an RFID tag.[61]  Following a pilot program in Florida in 2003, the card was accepted by merchants including 170 7-Eleven stores, and a number of fast-food chains and drug stores.[62]

62.    In 2007, U.S issuers started to provide cards with Visa "PayWave" technology, which allows cardholders to use their cards for contactless tap-and-pay transactions at payment terminals.[63]  In the same year, Visa launched a pilot program with Wells Fargo Bank, involving its employees and a small group of cardholders, to test the use of contactless and NFC technology for payments.[64]  Later, Visa extended the pilot programs to other banks, including Bank of America, JP Morgan Chase, and U.S. Bank.[65]  In 2011, Visa and Google signed a licensing deal to enable Visa account holders

---

[57] "American Express Expands Availability of New Contactless Payment Product," SecureIDNews, July 16, 2003, available at https://www.secureidnews.com/news-item/american-express-expands-availability-of-new-contactless-payment-product/ (accessed January 14, 2025).

[58] CNN Money on Contactless Cards.

[59] "Big Tech's Role in Contactless Payments: Analysis of Mobile Device Operating Systems and Tap-to-Pay Practices," CFPB, September 7, 2023, available at https://www.consumerfinance.gov/data-research/research-reports/big-techs-role-in-contactless-payments-analysis-of-mobile-device-operating-systems-and-tap-to-pay-practices/full-report/ (hereinafter, "CFPB report on Big Tech's Role in Contactless Payments") (accessed January 14, 2025).

[60] "MBNA America Bank Launches Contactless Credit Cards in Atlanta," MerchantService.com, October 17, 2005, available at https://www.merchantservice.com/mbna-america-bank-launches-contactless-credit-cards-in-atlanta/ (accessed January 14, 2025).

[61] Mary Catherine O'Connor, "Chase Offers Contactless Cards in a Blink," RFID Journal, available at https://www.rfidjournal.com/news/chase-offers-contactless-cards-in-a-blink/79149/ (accessed January 14, 2025).

[62] "Contactless Payments in a 'blink'," SecureIDNews, March 23, 2005, available at https://www.secureidnews.com/news-item/contactless-payments-in-a-blink/ (accessed January 14, 2025).

[63] Visa contactless payment and chip innovation was first launched as "Visa Wave" in 2004 in Malaysia and U.S banks started to issue cards with Visa PayWave in 2007. See "Visa Launches Visa Wave for Contactless Card Payments," Secure Technology Alliance, April 27, 2004, available at https://www.securetechalliance.org/visa-launches-visa-wave-for-contactless-card-payments/; and "New Visa PayWave Issuers and Merchants Sign Up for Faster, More Convenient Payments," Secure Technology Alliance, September 20, 2007, available at https://www.securetechalliance.org/new-visa-paywave-issuers-and-merchants-sign-up-for-faster-more-convenient-payments/ (accessed February 3, 2025).

[64] "Wells Fargo, Visa Launch Mobile Payment Pilot," Secure Technology Alliance, June 27, 2007, available at https://www.securetechalliance.org/wells-fargo-visa-launch-mobile-payment-pilot/ (accessed February 3, 2025).

[65] "Wells Fargo Pilots, Visa Formally Launches Mobile Contactless Payments," BankTech, available at https://web.archive.org/web/20240616164002/https://www.banktech.com/payments/wells-fargo-pilots-visa-formally-launches-mobile-contactless-payments/d/d-id/1294365.html (accessed February 4, 2025).

to add their credit, debit, and prepaid accounts to Google Wallet through Visa payWave's "innovative NFC-based payment technology."[66]

63.    NFC technology was integrated into mobile phones years before it was included on an iPhone. The Nokia 6131 (launched in January 2007) was the first NFC-enabled mobile phone. Its first use in the U.S. was in New York, where a pilot program allowed certain Citigroup PayPass card holders to tap their phone to make purchases or pay for transit fares.[67]  On Smartphones, tap-and-pay mobile wallets first became available in 2011:

- In 2011, Google introduced its mobile payment system "Google Wallet"- which stored customers' card details on Google Android smartphones and used NFC technology to allow customers to tap-to-pay with their phone.[68]

- In November 2013, Softcard (formerly "ISIS Pay") launched as a joint venture between AT&T, T-Mobile and Verizon.[69]

- Apple Pay launched in 2014.

- Samsung Pay launched in 2015.[70]

- Google acquired Softcard's intellectual property and introduced a rebranded version of Google Wallet – "Android Pay" – in 2015.[71]

- In 2018, "Android Pay" and "Google Wallet" were consolidated under the "Google Pay" brand.

- In 2024, Google discontinued the U.S. version of the Google Pay app and replaced its functions with the Google Wallet app.[72]

---

[66] "Visa and Google Sign Licensing Deal to Boost Mobile Payment Adoption," Visa Newsroom, available at https://usa.visa.com/about-visa/newsroom/press-releases.releaseId.8936.html (accessed February 3, 2025). See also - Jim McCarthy, Global Head of Product at Visa Inc., stated, "*This agreement builds on Visa's strategy of enabling consumers to make mobile payments with whatever device they choose using the trusted accounts they already have.*" Stephanie Tilenius, Vice President of Commerce and Payments at Google, added, "*This agreement extends Google Wallet to Visa account holders worldwide.*"

[67] See "Nokia's NFC Phone History," Windows Blog, available at https://blogs.windows.com/devices/2012/04/11/nokias-nfc-phone-history/ (accessed February 4, 2025). See also "U.S. Citi Tests Tapping Subway Fares in NYC," NFC Times, available at https://www.nfctimes.com/project/us-citi-tests-tapping-subway-fares-nyc (accessed February 4, 2025).

[68] See "Google Wallet Makes Its Debut," The New York Times, September 19, 2011, available at https://archive.nytimes.com/bits.blogs.nytimes.com/2011/09/19/google-wallet-makes-its-debut/ (accessed February 4, 2025).

[69] "Isis Mobile Wallet Goes Live Nationwide, Offers Freebies," CNET, November 14, 2013, available at https://www.cnet.com/tech/mobile/isis-mobile-wallet-goes-live-nationwide-offers-freebies/ (accessed February 3, 2025).

[70] Federal Reserve Bank of Philadelphia Discussion Paper, pp. 4-5.

[71] "Google Wallet Will Soon Come Pre-Installed on Verizon, AT&T, and T-Mobile Android Phones," The Verge, February 23, 2015, available at https://www.theverge.com/2015/2/23/8091407/google-wallet-softcard-partnership (hereinafter, "Google Wallet Will Soon Come Pre-Installed on Verizon, AT&T, and T-Mobile Android Phones") (accessed February 3, 2025). See also "The History of Google Pay," Dintero, available at https://www.dintero.com/newsroom/blog/the-history-of-google-pay (accessed January 14, 2025).

[72]  Google Pay Help - About Google Pay.

FILED UNDER SEAL

64.    In 2018, financial institutions rolled out NFC functionality to EMV (Europay, Mastercard, and Visa) chip cards in the U.S.[73]  In 2018, some financial institutions – including Chase in partnership with Visa – started issuing EMV dual interface cards.[74] Dual interface cards are designed as standard physical credit cards; they also contain an embedded chip that enables them to be used in both chip-and-pin and contactless transactions.  In 2019, Chase rolled out tap-to-pay functionality to all Chase Visa credit cards.[75]  The same year, Wells Fargo launched contactless credit and debit cards in the U.S.[76]  I visualize the proliferation of contactless card issuance at Visa later in Section 6.5 – as I explain there, by 2024, Visa had issued more than 500 million contactless cards, up 35x from approximately 15 million in 2017.

65.    In summary, Google has been facilitating mobile phone-based NFC payments since 2011, well before Apple Pay launched in 2014.[77]  Contactless cards had existed in small numbers in the U.S. since 2007.  They did not become widely available until several years after Apple Pay launched.  These facts will be important to my analysis of market definition in Section 6.

---

[73] CFPB report on Big Tech's Role in Contactless Payments.

[74] Federal Reserve Bank of Boston Report, p. 4. See also "Chase Announces New Contactless Visa Credit Cards," Crowdfund Insider, November 14, 2018, available at https://www.crowdfundinsider.com/2018/11/141318-chase-announces-new-contactless-visa-credit-cards/ (accessed January 14, 2025).

[75] "Visa Expands Global Footprint with Contactless Payments," Visa, November 14, 2018, available at https://usa.visa.com/about-visa/newsroom/press-releases.releaseId.15971.html (accessed January 14, 2025).

[76] "Wells Fargo Accelerates Customer Checkout Experience with New Tap-to-Pay Contactless Cards," Business Wire, April 2, 2019, available at https://www.businesswire.com/news/home/20190402005214/en/Wells-Fargo-Accelerates-Customer-Checkout-Experience-with-New-Tap-to-Pay-Contactless-Cards (accessed January 14, 2025).

[77] "*Google Wallet was the first major deployment of a mobile phone-based NFC payments system.*" See Ron Amadeo, "How Mobile Payments Really Work," Ars Technica, October 29, 2014, available at https://arstechnica.com/gadgets/2014/10/how-mobile-payments-really-work/ (accessed February 3, 2025).

**Figure 5: Timeline of POS & Contactless Payments[78]**



## 4.5  Apple Pay's Role in Contactless Transactions and Innovation

66.  As the prior section makes clear, Apple did not pioneer or even innovate on NFC payments.  Indeed, Google launched the first NFC enabled mobile wallet 3 years before the launch of Apple Pay.  Instead, Apple adopted technologies which issuers, payment networks, other technology companies, and other smartphone producers developed over more than a decade.  Apple's role in mobile wallet transactions is relegated to storing and transmitting anonymized tokens, which the payment networks originally innovated and continue to operate to this day.

### 4.5.1  Tokenization

67.  Many mobile wallets (including both Apple Pay and Google Pay) offer secured transactions through a process called "tokenization." In simplest terms, tokenization refers to when a user's actual card details are replaced by an anonymous "token" only the payment networks can identify, match to a card, and use to process a payment.  If a thief were to access a card holder's token, they would be unable to make any fraudulent

---

[78] "Big Tech's Role in Contactless Payments: Analysis of Mobile Device Operating Systems and Tap-to-Pay Practices," CFPB, September 7, 2023, available at https://www.consumerfinance.gov/data-research/research-reports/big-techs-role-in-contactless-payments-analysis-of-mobile-device-operating-systems-and-tap-to-pay-practices/full-report/ (accessed January 14, 2025). See also "Commission accepts commitments by Apple opening access to 'tap and go' technology on iPhones," European Commission, July 11, 2024, available at https://ec.europa.eu/commission/presscorner/detail/en/ip_24_3706 (hereinafter, "Commission accepts commitments by Apple opening access to 'tap and go' technology on iPhones") (accessed January 29, 2025).

transactions with it.[79]  As just alluded to, tokenization is neither propriety nor specific to Apple Pay.  This has important implications both for any security justifications Apple may raise, and for understanding the contractual negotiations between mobile wallet providers (like Apple and Google) and the payment networks.  I turn to the latter point in Section 9.4.  I explain the tokenization process in further detail in Appendix A.

### 4.5.2  Secure Element Versus Host Card Emulation

68.  Apple Pay uses a Secure Element ("SE") chip which is embedded in the iPhone.[80]  The SE securely stores the Device Primary Account Number ("DPAN").[81]  The DPAN is kept separate from the phone's operating system and is not stored on Apple servers or backed up to iCloud.[82]

69.  In contrast, Google Pay and Samsung Pay use host card emulation ("HCE") technology instead of SE to transfer tokenized payment details to an NFC-enabled POS terminal.[83]  With HCE, payment credentials are stored in a secure cloud environment, rather than on the phone.[84]  HCE enables transactions to be completed using NFC, without relying on an in-device SE chip.[85]  To process offline payments (e.g., when a device is not connected to the cloud), Google Pay stores the DPAN in a "secure area of the mobile phone OS."[86]  Samsung Pay similarly downloads payment tokens and cryptographic keys from a cloud server and stores them on a mobile phone.[87]

---

[79] "*If someone were to access the token, they wouldn't be able to use it to make fraudulent purchases as it doesn't contain the real payment details. By using tokens instead of actual card information, businesses can provide a secure and seamless payment experience for their customers, while reducing the risk of data breaches and fraud.*" See "Payment Tokenization 101," Stripe, available at https://stripe.com/ie/resources/more/payment-tokenization-101 (accessed February 3, 2025).

[80] I note the distinction between the Secure Element and the Secure Enclave. The Secure Enclave is a "*dedicated secure subsystem*" in the latest versions of Apple devices, including iPhones and iPads. It is "*integrated into Apple systems on chips (SoCs)*" and is "*isolated from the main processor to provide an extra layer of security*." It is "*designed to keep sensitive user data secure even when the Application Processor kernel becomes compromised.*" The Secure Element is a "*certified chip designed to specifically store payment info[r]mation].*" It "*hosts a specially designed applet to manage Apple Pay*." The Secure Element and Secure Enclave both play a role in Apple Pay. For devices with a Secure Enclave, a payment can be made only after it receives authorization from the Secure Enclave (for example, in the form of biometric authentication by the user). The Secure Enclave and Secure Element communicate during the payment process. When a user authorizes a transaction, (which usually involves biometric authentication communicated to the Secure Enclave), the Secure Enclave sends transaction data to the Secure Element. See "Apple Platform Security: Payment Tokenization," Apple Support, available at https://support.apple.com/en-gb/guide/security/seccb53a35f0/web  and "Apple Pay Security," Apple, available at https://learn.applepay.apple/security-us.  See also "Apple Platform Security Overview," Apple Support, available at https://support.apple.com/en-euro/guide/security/secc1f57e189/web (accessed January 14, 2025).

[81] Federal Reserve Bank of Boston, Adapting to Mobile Wallets: The Consumer Experience, p. 4.

[82] Countries and Regions That Support Apple Pay.

[83] Federal Reserve Bank of Boston, Adapting to Mobile Wallets: The Consumer Experience, p. 4.

[84] "What is Host Card Emulation (HCE)?," Thales Group, available at https://cpl.thalesgroup.com/faq/hardware-security-modules/what-host-card-emulation-hce (accessed January 14, 2025).

[85] Commission accepts commitments by Apple opening access to 'tap and go' technology on iPhones.

[86] Federal Reserve Bank of Boston, Adapting to Mobile Wallets: The Consumer Experience, p. 4.

[87] Federal Reserve Bank of Boston, Adapting to Mobile Wallets: The Consumer Experience, p. 4.

70.    ████████████████████████████████████████████[88]  I also
understand that, in its July 2024 decision "relating to proceedings under Article 102 of
the Treaty on the Functioning of the European Union and Article 54 of the Agreement
on the European Economic Area" the European Commission concluded:

> "Following technical investigation and market responses, the
> Commission considers SE and HCE comparable and equally
> effective technologies for the use case of NFC-based payments
> at POS terminals in stores, where comparable security levels and
> comparable user experience can be achieved."[89]

71.    The EC went on to explain that:

> "HCE-based solutions can achieve comparable and equally
> effective levels of security, by utilising tokenisation, limiting
> usage of tokens or making use of specific cryptography.  Like
> SE, HCE can also enable offline card-based payments, for
> example by downloading tokens to a device for offline use."[90]

72.    The efficacy of HCE relative to SE token storage is therefore disputed.  The operative
economic question is whether a mobile wallet's use of SE vs HCE affected card issuers'
willingness to pay for the mobile wallet.  That Apple itself may have believed SE was
superior to HCE does not answer this question.  Indeed, ████████████████████
████████████████████████████.[91]

73.    From a class certification perspective, I note that whether SE and HCE token storage
are reasonably interchangeable is a question common to the Proposed Issuer Class
which can be answered with class wide evidence.  Moreover, that Apple only opened
up access to the NFC chip via HCE storage in the EEA does not necessarily characterize
the but-for world, especially given Apple has announced it will also open SE access in
the U.S.[92]

### 4.5.3  Fees

74.    As discussed in Section 4.3, at every stage of the payment process, intermediaries take
a slice of the purchaser's original payment.  The merchant receives payment from the
purchaser for the good or service.  Out of this, it pays a Merchant Discount Rate
("MDR") to the acquirer, which is then split among the issuer and card network in the

---

[88] APL-ACU_00238804.
[89] Antitrust Case AT.40452 – Apple Mobile Payments, "Commitments Decision (Art. 9) of 11.07.2024,"
European Commission, July 11, 2024, available at
https://ec.europa.eu/competition/antitrust/cases1/202441/AT_40452_10269725_10183_3.pdf (hereinafter, EC
Decision on Apple Mobile Payments) (accessed February 3, 2025), ¶120.
[90] EC Decision on Apple Mobile Payment, ¶122.
[91] APL-ACU_00404483.
[92] "Open NFC Platform," Apple, available at https://www.apple.com/uk/legal/privacy/data/en/open-nfc-platform
(accessed February 3, 2025).

FILED UNDER SEAL

form of interchange and network fees respectively.  If payment is made using a mobile wallet, there may be further revenue sharing with the wallet provider.[93]  For example, Apple Pay charges issuers ▇▇▇▇ for each credit card transaction, and ▇▇▇▇ for each debit transaction.[94]  Other mobile wallet providers do not currently charge fees to issuers and, to my knowledge never have.[95]

**Figure 6: Apple Pay Fees in Transaction Process[96]**



---

[93] "The Consumer Credit Card Market," Consumer Financial Protection Bureau, October 2023, available at https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-report_2023.pdf?mod=article_inline, (hereinafter, "CFPB report") (accessed February 3, 2025), p. 167.

[94] CFPB report on Big Tech's Role in Contactless Payments, fn. 22.

[95] CFPB report, p. 167.

[96] "Electronic Payments Coalition Report ," available at https://www.electronicpaymentscoalition.org/wp-content/uploads/2020/07/July-2020-Overview-of-Interchange.pdf  (hereinafter, "Electronic Payments Coalition report") (accessed January 14, 2025), p. 1.

FILED UNDER SEAL

# 5. Economic Principles of Market Definition and Power

75.   With the above industry background in-hand, I move to explaining the economic theory and principles relevant to my current assignment. This economic background lays the foundation of my later case-specific analysis of market definition and power in Sections 6 and 7 respectively. Other economic foundations may be relevant in a future merits report, but are not necessary for my current assignment at class certification, described in Section 2.3.

## 5.1   General Economic Framework for Defining the Relevant Market

76.   Defining the relevant market is often the starting point of analysis in antitrust cases because it indicates the scope of potentially relevant competitive products. The relevant markets consist of both geographic and product dimensions.[97] In this report, I primarily focus on product market definition, but briefly address geographic market definition in Section 6.1.

77.   Conceptually, product market definition is determined by purchasers' willingness to substitute goods with each other.[98] Two products are part of the same market if a sufficient number of purchasers would substitute between them given small changes in their relative price. When purchasers are unwilling to substitute to a sufficient degree between products in response to price changes, the two products exist in distinct product markets.

78.   Practically, economists and antitrust practitioners define markets using the Hypothetical Monopolist Test. A proposed set of products ("candidate market") is an antitrust market if a hypothetical monopolist of those products could profitably apply a "significant and non-transitory increase in price (SSNIP)" relative to the competitive level. The test essentially asks how willing purchasers are to substitute to other products. If enough purchasers substitute out of the candidate market, then the SSNIP would be unprofitable and the candidate market would fail the Hypothetical Monopolist test.

---

[97] "Operationalizing the Hypothetical Monopolist Test," U.S. Department of Justice, available at https://www.justice.gov/atr/operationalizing-hypothetical-monopolist-test (hereinafter, Operationalizing the Hypothetical Monopolist Test) (accessed February 4, 2025).

[98] "Market Definition: Use and Abuse," U.S. Department of Justice Antitrust Division, available at https://www.justice.gov/atr/operationalizing-hypothetical-monopolist-test (accessed February 5, 2025): "*There are two virtually equivalent ways to define markets. One is to rely on demand substitution to identify products and the geographic areas where they are sold and then separately to consider as market participants all those who would supply the product at the current price plus, say 5%. This is roughly the approach of the Merger Guidelines. A second and virtually equivalent approach is to combine this procedure into one step and define the market to include all those products and areas that constrain prices of the product under analysis from either the demand or supply side. Product A is a demand substitute for Product B if a price increase in B causes purchasers to substitute to A. Product A is a supply substitute for Product B, if a price increase in B causes firms that produce A to shift their capacity to the production of B.*"

FILED UNDER SEAL

79.  The Hypothetical Monopolist test is also called the SSNIP test,[99] in reference to how purchasers react to a small price increase, typically five to ten percent, that is non-transitory, i.e., not a short-term sale.

80.  A conceptual risk in performing a Hypothetical Monopolist Test is the "Cellophane Fallacy." The Cellophane Fallacy refers to when an *actual*, not hypothesized, cartel or monopolist has already increased prices to the monopoly price. At this point, applying a SSNIP test will produce a false negative result.[100] When an observed firm or group of firms is already charging the monopoly price (has already exercised market power), further increasing prices will, by definition, be unprofitable despite the lack of available substitutes - as the monopolist finds it in its unilateral profit maximizing interest to continue to raise prices until an additional increase would no longer be profitable due to sufficient reduction in consumer demand. Intuitively, even a perfect monopolist faces demand constraints that prevent it from raising prices arbitrarily high. Market definition is not concerned with such demand constraints.

81.  The fallacy arises because the SSNIP test is appropriately conducted from the competitive price level. In other words, economists care if a hypothetical monopolist could profitably increase prices above the competitive level, not if it could further increase prices above the monopoly level.

82.  With this general market definition toolkit in mind, I turn to the application of a SSNIP test in multisided platforms.

## 5.2  Price Setting and Market Definition in Multisided Platforms

83.  Multisided platforms are distinct from conventional markets in that they exhibit indirect (or cross-platform) network effects.[101] These occur when the utility of the platform to a given participant depends on other participants' use of the platform on the opposite side. Payment networks are a notable example. These network effects influence how platform operators set optimal prices.

84.  Indirect network effects can also cause "tipping" – which refers to when a platform has gained such a large user base and consequent indirect network effects that even equally

---

[99] Operationalizing the Hypothetical Monopolist Test

[100] "*As a firm raises its price above its costs, its product becomes more interchangeable. This produces the well-known "Cellophane fallacy" of defining a market based on observed interchangeability without considering whether one product (in that case cellophane) was already being sold at monopoly prices. Customers might strongly prefer cellophane if both it and wax paper were being sold at prices close to their cost. But if cellophane is a monopoly with a high markup, its owner will price it into a region where the amount of substitution with wax paper is greater. In sum, observed interchangeability without considering margins can play right into the defendant's hands.*" See Herbert Hovenkamp, "Antitrust Market Definition: The Hypothetical Monopolist and Brown Shoe," Network Law Review, April 4, 2024, available at https://www.networklawreview.org/hovenkamp-market-definition/ (accessed February 3, 2025).

[101] Jullien, B., Pavan, A., & Rysman, M. (2021). Two-sided markets, pricing, and network effects. In Handbook of industrial organization (Vol. 4, No. 1, pp. 485-592), available at https://faculty.wcas.northwestern.edu/apa522/Two-Sided-Market-and-Network-Effects.pdf (accessed February 3, 2025).

efficient suppliers will find it difficult to enter the market. Anticompetitive conduct can cause tipping, thereby insulating a platform from competition even after the conduct has ceased.[102]  I discuss the relevance of tipping to this case in Sections 8.1.2 and 9.5.

85.    Once economists establish that a given market exhibits indirect network effects, control over the price structure (i.e., how much of the fee each side of the market pays) is an additional defining feature of platforms which separates them from conventional vertically related markets.[103]  This control means the platform operator can unilaterally decide how much each side of the platform pays in fees – which in turn requires there to be imperfect cost-pass through from one side of the platform to the other.  In other words, if the platform operator applies a $5 fee to sellers, the economics of multisided transaction platforms will only apply if sellers do not perfectly pass-through that fee to consumers by raising prices $5.

86.    It may not be immediately obvious why control over the price structure is a defining characteristic of multisided platforms, but there is an intuitive explanation.  For indirect network effects to influence the pricing strategy of a platform operator, it must be able to avail itself of those network effects by setting different prices to each side of the platform.  This is sometimes referred to as the internalization of network externalities.[104]  If it cannot set different prices to each side of the platform, then it cannot induce a network effect by setting lower/higher prices to certain sides of the platform.

87.    Once economists establish that a candidate product truly is a multisided platform, (meaning there are indirect network effects and the platform operator can control the

---

[102] "*A robust literature explains how network effects create barriers to entry and render markets prone to tipping.*" See, e.g., Filippo Lancieri & Patricia Morita Sakowski, Competition in Digital Markets: A Review of Expert Reports, 26 Stan. J.L. Bus. & Fin. 65, 75 (2021) (summarizing several recent reports on tipping effects); (explaining impact of network effects on platform competition); Geoffrey Parker, Georgios Petropoulos & Marshall Van Alstyne, Platform Mergers and Antitrust, 30 Indus. & Corp. Change 1307, 1309 (2021) (noting relationship between network effects and tipping); Luigi Zingales et al., Stigler Committee on Digital Platforms, Final Report, Stigler Center for the Study of the Economy & the State, U. Chicago Booth 7-8, 29, 34-41 (2019) ("Stigler Report") (noting the factors that make markets "prone to tipping"); Kenneth A. Bamberger & Orly Lobel, Platform Market Power, 32 Berkeley Tech. L.J. 1051, 1067-71 (2017).

[103] "*But what is a two-sided market, and why does two-sidedness matter? On the former question, the recent literature has been mostly industry specific and has had much of a 'You know a two-sided market when you see it' flavor. 'Getting the two sides on board' is a useful characterization, but it is not restrictive enough. Indeed, if the analysis just stopped there, pretty much any market would be two-sided, since buyers and sellers need to be brought together for markets to exist and gains from trade to be realized. We define a two-sided market as one in which the volume of transactions between end-users depends on the structure and not only on the overall level of the fees charged by the platform. A platform's usage or variable charges impact the two sides' willingness to trade once on the platform and, thereby, their net surpluses from potential interactions; the platforms' membership or fixed charges in turn condition the end-users' presence on the platform. The platforms' fine design of the structure of variable and fixed charges is relevant only if the two sides do not negotiate away the corresponding usage and membership externalities.*" Rochet, J. C., & Tirole, J. (2006). Two-sided markets: a progress report. The RAND journal of economics, 37(3), 645-667, available at https://www.jstor.org/stable/25046265 (accessed February 3, 2025). Jullien, Pavan, & Rysman (2021, p. 547) similarly summarize this as "*a key driver of the differences between one-sided and multi-sided markets (see the discussion in Rochet and Tirole, 2003, 2006): [is] the (imperfect) internalization of network externalities.*"
[104] Jullien, Pavan, & Rysman (2021), p. 547.

FILED UNDER SEAL

price structure), an unsurprising and robust finding of the economic literature is that a profit maximizing platform will always apply larger fees on the side of the platform which is less price-elastic.[105]  One reason one side of the market may be less elastic than another is because it has smaller indirect network effects on the other side.[106] This is because indirect network effects induce further substitution on the opposite side of the platform.  A lack of indirect network effects therefore reduces the total diversion a price increase will cause, all else equal, functionally similar to a smaller elasticity of demand in one-sided markets.

88.    This has important implications for the application of a SSNIP test to a multisided platform.  Economists understand that it is necessary to consider indirect network effects when performing a SSNIP test in multisided settings.    A possible misunderstanding of this insight is that a SSNIP test must be directly applied to both sides of the market.  Because of the price setting incentives described above, such a misunderstanding would consistently define too broad a market by ignoring where a platform can, in reality, profitably extract fees.  In cases where one side of the market pays precisely $0, there is the additional problem that *any* price increase from $0 is an infinite percentage increase, and therefore larger than the 5% to 10% called for in a SSNIP test.[107]

89.    A classic example is a dating platform.  Imagine a dating platform that faces more demand from men than women.  It might allow women to join for free (to encourage participation), while charging a membership fee to men.  If an economist were tasked with evaluating if this dating platform existed in the same market as a brick-and-mortar bar, they would apply a SSNIP test.  A misinformed economist may observe the $0 fee for women on the platform, then test how they respond to price increase.  If such a price increase caused women to substitute to the bar, that alone could be enough to make the price increase unprofitable.  This could then be exacerbated by more men leaving the platform in response to reduced participation by women.

---

[105] "*The most elastic side of the market is used to generate maximum demand by providing it with platform services at the lowest possible price. Full participation of the high-elasticity, low-price side of the market attracts the other side. As this side is less price elastic, the platform is able to extract high prices*." (Bolt, W., & Tieman, A. F. (2008). Heavily skewed pricing in two-sided markets. International Journal of Industrial Organization, 26(5), 1250-1255, available at https://www.sciencedirect.com/science/article/abs/pii/S0167718707001336 (accessed February 3, 2025)).

[106] "*It is known from the earlier literature on one-sided markets that network effects can raise the elasticity of the demand by magnifying the demand response to a change in prices, as consumers that would not react to a price increase alone may react to the induced reduction of interaction benefits*." (Jullien, Pavan, & Rysman (2021, p. 520).

[107] "*However, on the side where the price is zero it is not possible to perform a SSNIP test. Here the issue is not only that the reaction of customers to a price increase is not known, but, more fundamentally, that increasing the price by 5 or 10% has no meaning when the starting price is zero. Any price increase one would consider would be arbitrary*."  See "Market Definition in Multi-Sided Markets – Note by Dr. Lapo Filistrucchi," OECD Competition Committee, January 12, 2018, available at https://one.oecd.org/document/DAF/COMP/WD(2017)27/FINAL/en/pdf (hereinafter, OECD Market Definition in Multi-Sided Markets) (accessed February 3, 2025), ¶98.

FILED UNDER SEAL

90. The economist might then (erroneously) conclude that the dating platform is in the same market as a brick-and-mortar bar – all while ignoring that the platform had, in reality, been able to profitably extract a fee from men (who care more about the participation of women than the membership fee) and consequently do not substitute to the bar in response to a small but significant price increase applied directly to them. As a result, there would also be no reason for women on the platform to substitute either, and thus the SSNIP would induce no profit-reducing volume effect.

91. Indeed, this is an illustration of a common phenomenon in multisided platform, where purchasers "that would not react to a price increase alone may react to the induced reduction of interaction benefits" - i.e., the benefit of interacting with participants on the opposite side of the platform.[108] In other words, one side of the market may be price sensitive and the other side of the market may care more about interacting with those price sensitive participants.[109] In such cases, the hypothetical platform monopolist can exploit this asymmetry to profitably extract fees from the side of the market that is price insensitive (and is concerned primarily with interaction benefits) even if it would find it unprofitable to apply fees to the opposite, price sensitive, side of the market.

92. Again, the importance of the price structure is a definitional feature of multisided platforms that distinguish them from one-sided markets. Leading economists, including a Nobel prize winner, "define a two-sided market as one in which the volume of transactions between end-users depends on the structure and not only on the overall level of the fees charged by the platform."[110] More intuitively put, demand for the platform depends not only on the aggregate fee-level, but how that fee is distributed between participants. Failure to consider the importance of the price structure as opposed to the price level in analyzing multisided platforms would ignore established economic principles and lead to systematically incorrect conclusions.[111] One way to do so is to ignore the actual distribution of fees on a platform and incorrectly apply a SSNIP test directly to the lower fee side of a platform.

93. Because a profit-maximizing platform levies higher fees on the less-elastic side of the market, the ability of a hypothetical monopolist platform operator to profitably apply a SSNIP is determined by the least elastic side of the market. Applying a SSNIP test to

---

[108] Jullien, Pavan, and Rysman, p. 520.

[109] This might occur because the price sensitive side of the market knows that participants on the other side will follow it to alternative platforms. In this example, women on the dating platform may be confident that men will follow them to alternatives, while men may not believe the same. As a result, women may be more willing to substitute in light of a SSNIP than men, and we expect to see higher fees applied to men. Similar phenomenon between card holders and card issuers appear to be at play in this case, causing Apple Pay fees to be levied on card issuers.

[110] Rochet, J. C., & Tirole, J. (2006).

[111] "*While using the standard single-sided SSNIP test or CLA formulas would lead to a too-narrow or too-large definition of the relevant market, adopting a two-sided SSNIP test (or using two-sided CLA formulas) that do not allow the HM to re-optimise the price structure would lead to a too-large definition of a market. In fact, not allowing the price structure to be re-optimised would always overestimate the loss in profits due to the increase in prices, because by definition the optimal adjustment by the hypothetical monopolist will tend to reduce such a loss.*" OECD Market Definition in Multi-Sided Markets, ¶94.

the more elastic side of the market instead would ignore the real-world incentives facing a platform operator, and would risk a false negative result in markets where the operator can profitably increase fees to one, but not both, sides of the platform. The starting point for performing a SSNIP test in a multisided setting is therefore identifying which side directly pays the platform fees.

94. As mentioned at the beginning of this section, market definition is fundamentally a study of competitive constraints. The end goal of that study is typically to understand if a firm has sufficient market power to harm the competition - often by looking at indirect indicators of market power, such as market shares. Economists can also study direct indicators of market power, as I explain in the following section.

## 5.3 General Framework for Identifying and Measuring Market Power

95. Economists define market power as power over price. If a firm can profitably raise prices above cost, economists consider it to have power over price, and therefore market power.[112] It is therefore commonly quantified using the "Lerner Index," which measures a firm's profit margin proportional to its price, given by:

$$Lerner\ index = \frac{P - MC}{P}$$

96. Where $P$ is the firm's price and $MC$ is the firm's marginal cost. The index has a minimum value of 0, which indicates no markup above cost, and asymptotically (when MC is non-zero) converges on a value of 1 as prices become higher with respect to marginal cost. The higher the Lerner Index value, the greater a firm's market power.[113]

97. The greater the Lerner Index, the more inelastic the demand for firm's products. If a firm faces highly inelastic demand for its product, denoted by a Lerner Index approaching 1, that indicates both that purchasers do not reduce consumption as price increases, and that few substitutes are available.

98. In sum, assessing market power may entail an analysis of market shares, market concentration, barriers to entry, supply constraints, prices, and costs. Taking these indicia together, economists can understand and assess the degree of market power

---

[112] "*This power to elevate prices above (and to restrict output below) competitive levels is called market power by economists and by courts as well.*" (Areeda, P. E., Kaplow, L., Edlin, A. S., & Hemphill, C. S. (2021). Antitrust analysis: problems, text, and cases, 7th Edition, p. 527, available at https://www.pbookshop.com/antitrust-analysis-problems-text-and-cases-7th-edition-9781454824992.html (accessed February 3, 2025)).

[113] Lerner, A. P., (1934), The Concept of Monopoly and the Measurement of Monopoly Power, The Review of Economic Studies, 1, issue 3, p. 157-175 available at https://www.jstor.org/stable/2967480 (accessed February 3, 2025).

FILED UNDER SEAL

firms possess, even if any given one of these indicia is not by itself necessarily dispositive of market power.

99. In some instances, the study of market definition and market power may perfectly overlap. With relevance to plaintiffs' allegations, this can occur when the candidate market is an aftermarket.[114]  In the following section, I therefore summarize the economic principals of aftermarkets – and explain how it intersects with the analysis of multisided platforms.

## 5.4  Market Definition and Power in Aftermarkets

100. Aftermarkets may exist when the demand for a secondary product only exists following the initial purchase of a primary product.[115]  This creates a potential distinction between the foremarket for the original primary product and the aftermarket for the secondary product.[116]  These separate markets may have distinct levels of competition.  Many durable goods have potential aftermarkets for complementary products.[117]  Before proceeding, I note that when the candidate market is a single-brand aftermarket, the economic assessment of market definition and market power significantly overlap.  The following discussion reflects this.

101. Upon finding that a candidate aftermarket truly exists, it may be straightforward to show that a firm possesses a perfect 100% monopoly share in that market.  This occurs when there are literally no competitive products available to purchase in the aftermarket - potentially because of the challenged conduct.

102. Whether or not a firm possesses sufficient power to restrict competition in an aftermarket (and therefore whether the aftermarket exists) may then hinge on whether aftermarket conditions in turn change purchasers initial foremarket selection - i.e., does foremarket competition constrain aftermarket power.[118]  If, in response to aftermarket

---

[114] For the avoidance of doubt, failure to identify a cognizable single-brand market does not lead to the inevitable conclusion that the firm in question also lacks power in potential broader markets. It is conceivable that, even if the single-brand aftermarket is rejected, a firm would still possess power in a broader market.

[115] While demand for the secondary product follows from the primary, that demand must still be distinct (meaning not identical demand functions) otherwise the foremarket and aftermarket may be more aptly analyzed as a single product.

[116] The foremarket is sometimes also referred to as the "primary market" see e.g., Shapiro, C. (1994). Aftermarkets and consumer welfare: Making sense of Kodak. Antitrust LJ, 63, 483, available at https://www.jstor.org/stable/pdf/40843290.pdf (hereinafter, Shapiro, C. (1994)) (accessed February 5, 2025).

[117] Borenstein, S., MacKie-Mason, J. K., & Netz, J. S. (1994). Antitrust policy in aftermarkets. Antitrust LJ, 63, 455, available at: https://www.jstor.org/stable/pdf/40843289.pdf (accessed February 5, 2025).

[118] "*In the context of aftermarkets, a key question regarding product market definition is whether the aftermarket constitutes a relevant product market separate from the foremarket. The hypothetical monopolist test can answer this question—if a profit maximizing hypothetical monopolist of an aftermarket (that is not a monopolist in the foremarket) would raise prices by at least a small but significant and non-transitory amount, then foremarket competition is not sufficient to prevent against anticompetitive behavior in the aftermarket; thus it is appropriate to analyze competition in a separate relevant market comprising the aftermarket.*" See "Competition Issues in Aftermarkets – Note from the United States," OECD, available at https://www.ftc.gov/system/files/attachments/us-submissions-oecd-2010-present-other-international-competition-fora/aftermarkets.pdf (accessed February 5, 2025), ¶13.

price increases, purchasers do not substitute in sufficiently large volumes in the foremarket (similar to the general framework for market definition described above in Section 5.1) and consequently do not substitute their aftermarket purchase either - a putative monopolist can extract supracompetitive prices in the aftermarket and antitrust enforcement may be necessary.

103.    In aftermarket cases, there are multiple reasons that purchasers' foremarket decision may be unresponsive to price increases in the aftermarket. I understand the court recognized several of these in *Epic v Apple*. One possibility is that a firm possesses power in both the foremarket and aftermarket.[119] Another is that aftermarket conditions may change after purchasers make their foremarket decision (sometimes referred to as a "bait-and-switch.") This is related to but distinct from the concept of "lock in," where purchasers are unwilling to substitute foremarket products after their first selection (which may also facilitate aftermarket abuse).[120] Additionally, purchasers may not have adequate visibility into aftermarket conditions when making their initial foremarket decision. The latter two are particularly relevant in this case.

104.    One reason purchasers in the foremarket may lack visibility into aftermarket conditions – and consequently be unresponsive to aftermarket prices - is because the aftermarket is multisided. Intuitively, the platform operator can apply fees to the side of the platform that does not participate in the foremarket purchase decision. Unless that non-participant in the foremarket has sufficiently large indirect network effects on the side that does make a foremarket decision, it will be impotent in responding to the monopolist's supracompetitive prices. In other words, multisidedness may combine with aftermarket characteristics to eliminate or reduce the relevance of foremarket competition in identifying monopoly power.

105.    Applied here, an important point of Apple Pay is that it involves not only a foremarket-aftermarket relationship, but the aftermarket is itself multisided. This means that Apple can apply fees in the aftermarket to a side of the platform that plays no role in the foremarket purchasing decision. In other words, Apple is able to charge fees to card issuers who have little or no impact or role in smart phone customers choosing between an iOS device and an Android device. Moreover, the facts of the aftermarket in this case means that iOS users could never experience any price incentive to change their foremarket choice to an Android device. As a result, economic analysis stemming from aftermarkets does not obviously translate to this case, where we see a multisided aftermarket in which fees are exclusively applied on the side of the platform that does not and cannot participate in the foremarket.

---

[119] The examples I give here are not an exhaustive list of possible reasons foremarket selection may be unaffected by aftermarket conditions.
[120] "*There are three key elements to an aftermarket: (1) the consumer purchases several (complementary) components that work together as a "system" to provide value to the customer; (2) these components are purchased at different points in time; and (3) there is some degree of "lock-in" or sunk costs, i.e., at least some of the expenditures on the initial component(s) cannot be recovered if the consumer later switches brand.*" Shapiro, C. (1994) https://www.jstor.org/stable/pdf/40843290.pdf, p. 486.

106.    In the following sections, I apply the economic foundations laid here to analyze the borders of the relevant market and the extent to which Apple has power in that market.

# 6. Tap-and-Pay iOS Mobile Wallets is a Relevant Antitrust Market

107.    I conclude that the relevant market is specific to tap-and-pay iOS mobile wallets by applying a SSNIP test.  Specifically, I study the timeline of entry by candidate competitors and the effect, or lack thereof, they had on Apple Pay's fees and card issuers' choice to comply with Apple's terms.  I observe that:

- In 2014:
  - Google already offers a mobile wallet which both users and card issuers can avail of free of charge.
  - Contactless cards do not meaningfully exist in the U.S.
  - Apple Pay launches, ███████████████████████
  - ███████████████████████████████████████████ ███████████████████████████

- In 2015:
  - Samsung Pay launches, also free of charge to users and card issuers.
  - Google/Samsung join the networks' Digital Enablement programs (see Section 9.4).
  - ███████████████████████████████

- In 2017 through 2018:
  - Contactless card rollout begins.
  - Apple Pay ████████████████████████
  - ███████████████████████████

- In the second half of 2020:
  - PayPal launches a QR code mobile wallet (see Section 6.6).
  - ████████████████████████

- In 2024:
  - Visa has issued more than 500 million contactless cards in the U.S., up from just 15 million in 2017.
  - ████████████████████████

108.  Based on this timeline, ████████████████████████████████████████
████████████████████████████████ indicating it was not competitively
constrained by pre-existing Android mobile wallets at that time.  This continued to be
true in 2015, when Samsung Pay launched, and both it and Google agreed to payment
network commercial frameworks that meant their wallets used the same tokenization
framework as Apple Pay, but they continued not to charge issuer fees.  At this time,
contactless cards were not available in the U.S. and therefore could not have constrained
Apple Pay's initial fee level.  When contactless cards later became available (with no
transaction fees for issuers and coinciding with the first round of contract renewals for
Apple Pay), ████████████████████ nor did issuers avail themselves of the new
product to terminate or renegotiate their contracts.  Finally, when PayPal attempted to
compete at POS with a QR-code wallet in 2021, ████████████████████████████
████████████████████████

109.  Most simply put, both Apple Pay's fees and card issuers' acquiescence to Apple Pay's
terms have been completely unresponsive to the launch of products Apple has
previously argued were competitive constraints.[121]  Given this fact timeline, I reject the
proposition that Android mobile wallets, contactless cards, or QR-code payments are in
the same relevant market as Apple Pay in the U.S. I therefore conclude that the relevant
market is specific to tap-and -pay iOS mobile wallets, where Apple enjoys a 100%
market share.

110.  For the purpose of class-certification specifically, I note that the entire analysis I just
went through and the borders of the relevant market it implies are a question common
to the proposed class which can be answered with class-wide evidence.  By its nature,
market definition asks about aggregate substitution patterns facing a hypothetical
monopolist (see Section 5.1).  Even if these substitution patterns were heterogenous
between members of the Proposed Issuer Class, this would not change the aggregate
substitution facing Apple Pay, and consequently would not affect the borders of the
relevant market.  Moreover, the fact that Apple charges precisely the same fees to all
members of the Proposed Issuer Class (despite having bilateral agreements with every
single one) suggests that the competitive alternatives to Apple Pay, or lack thereof, do
not meaningfully differ between members of the Proposed Issuer Class.

## 6.1  The Geographic Market is Specific to the U.S.

111.  Before proceeding to my analysis of product market definition, I briefly address the
threshold matter of geographic market definition.  U.S. card holders who wish to make
tap-and-pay transactions using their iOS device, and card issuers supporting them in
doing so, can only use mobile wallets that are available on U.S. devices.  Moreover, the
merchants they are transacting with must accept their mode of payment.  This means
that neither U.S. card issuers nor U.S. card holders can substitute to mobile wallets that

---

[121] Defendant Apple Inc.'s Notice of Motion and Motion to Dismiss Plaintiffs' Amended Class Action
Complaint, November 23, 2022, Case No. 4:22-cv-04174-JSW, p. 13.

cannot be downloaded on Apple's U.S. app store because Apple maintains country-specific stores.[122]  It also means that QR payments commonly used overseas (such as WeChat and AliPay) are not constraints on Apple Pay within the U.S. geographic market, given that U.S. merchants do not widely accept such means of payment.[123]

112.    I therefore conclude the relevant market is specific to the U.S.  To the extent Apple and its expert(s) disagree, I note that, for the purpose of class certification, the question of geographic market definition is common to the Proposed Issuer Class, which only comprises U.S. card issuers, and can be answered using class wide evidence and methods.

## 6.2  The Aftermarket for Tap-and-Pay iOS Mobile Wallets Satisfies the *Epic* Factors

113.    Counsel instructs me that the court in *Epic v Apple* identified four elements necessary to define an aftermarket:

- The challenged aftermarket restrictions are not generally known when consumers make their foremarket purchase.

- Significant information costs prevent accurate lifecycle pricing.

- Significant monetary or non-monetary switching costs exist.

- General market-definition principles regarding cross-elasticity of demand do not undermine the proposed aftermarket.

114.    Counsel has also asked me to evaluate these factors from an economic perspective with respect to the candidate aftermarket for tap-and-pay iOS mobile wallets.  From an economic perspective, the enumerated factors from *Epic v. Apple* provide indirect evidence of whether a monopolist in a candidate aftermarket would have sufficient market power to harm competition and raise prices above a competitive level.  As I explain in Section 5.4, this is fundamentally a question of the extent to which foremarket competition constrains an aftermarket monopolist.  This question can also be answered via direct evidence using a properly designed SSNIP test.

115.    As a threshold matter, I note the above considerations would be unnecessary when a firm possesses monopoly power in both the foremarket and aftermarket.  Intuitively, it would not matter if purchasers were aware of aftermarket restrictions and prices if there were also no substitutes available in the foremarket.

116.    Moreover, the *Epic* factors focus on the extent to which purchasers in the aftermarket may change their foremarket decision in response to aftermarket restraints.  In the case

---

[122] "Change your Apple ID country or region," Apple Support, available at https://support.apple.com/en-us/118283 (accessed January 14, 2025).
[123] See, e.g., APL-ACU_00115796, at -815█████████████████████████

of app stores, the subject matter of the *Epic* case, this intends to capture how iOS users respond to restraints affecting their purchase of apps. It is not clear that the same logic applies to tap-and-pay mobile wallets, given iOS users never pay a fee to Apple, and only card issuers (who do not participate in the foremarket ███████████████ ███████████████████ pay anything to Apple.

117.   Fundamentally, Apple Pay does not facilitate sales between iOS users and the fee-paying side of the market, here card issuers. Instead, card issuers pay a fee to facilitate sales between card holders and merchants. Merchants, by Apple's admission, pay no fee to Apple for Apple Pay and therefore could not incorporate Apple Pay's fees into their retail prices to iOS users.[124] This is a fundamental distinction between Apple Pay as a platform and the Apple App Store as a platform (where platform fees could be factored into user-facing app prices).

118.   Most simply put, the fact that there is literally, and by Apple's design, ███████████ ████████████████████████████████████████████████████████████████ is a fundamental distinction between this case and *Epic* which may warrant unique economic consideration. I explain the economic logic behind this in Sections 5.2 and 5.4.

119.   In the following sections, I nonetheless evaluate the economic evidence bearing on the *Epic* factors in the context of this case. In applying these factors, I focus on card holders (iOS owning card holders specifically) because only they, not card issuers, transact in the foremarket by deciding whether to acquire (or to continue to acquire subsequent generations of) an apple device. To any extent the foremarket constrains the aftermarket, it must therefore be via card holders. Before proceeding, I note that whether the candidate aftermarket for tap-and-pay iOS mobile wallets satisfies the factors in *Epic* is a question common to the proposed class which can be answered with class wide evidence.

---

[124] "*Apple admits that it does not charge, and has not charged at any time in the past, Merchants in the United States fees for credit transactions made by any Cardholder using Apple Pay. Apple further admits that it does not charge, and has not charged at any time in the past, Merchants in the United States fees related to Merchants' ability to accept credit payments using Apple Pay.*" Apple's Response to Request for Admission No. 5. See also Apple's Response to Request for Admission No. 6 for the same language regarding debit transactions.

### 6.2.1   The Challenged Aftermarket Restrictions Are not Generally Known When Consumers Make their Foremarket Purchase

120.   Apple ensured that iOS device holders were unaware of at least two prongs of the challenged anticompetitive scheme ████████████████████████████ ████████████████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████

121.   ████████████████████████████████████████████████████
█████████████[125]

122.   Plaintiffs challenge an anticompetitive scheme by Apple that had three prongs, as described in Section 8.  Two of those (the ███████████████ and the Pricing Restraint) were contractual restraints specified in Apple's issuer contracts.  Apple's ████████████████████████████████████████████ therefore ███████ the ███████████ and Pricing Restraints to their card holders.  As a result, card holders could not be generally aware of the aftermarket restrictions, ███████████████████ █████████████

123.   Indeed, until 2024, Google Pay was even available on iOS devices, simply without the NFC access necessary to perform tap-and-pay transactions – because of the challenged conduct.[126]  Similarly, PayPal has offered a mobile wallet on iOS devices, again without NFC access, which I discuss further in Section 6.6.  iOS users may therefore be reasonably unaware of the extent to which these mobile wallets could compete head-to-head with Apple Pay.

124.   Consistent with Apple's ███████████████████, I am not aware of any evidence to suggest that iOS users are broadly aware of the challenged conduct.  Even if iOS users became aware of the challenged aftermarket restrictions following Apple Pay's launch, ████████████████████████████████████████████████

---

[125] See, e.g. APL-ACU_00066713, ████████████████████████████████████████
████████████████████████████████████████████████████ (APL-ACU_06210202, ████████████████████████████ (APL-ACU_00155450); ██████ (APL-ACU_01138013); ███ (APL-ACU_00153579); ████████████████████████████████ (APL-ACU_06140172); ████████████ (APL-ACU_00048947); ██████████ (APL-ACU_00096586).

[126] "*Google Pay, which has been available both on Android and on Apple's rival iOS system, offers peer-to-peer payments and expense tracking tools. The retirement of Google Pay leaves iOS users without an app-based way to use Google Pay, given Google Wallet is not available through Apple's app store*."  "Google Pay Expands Digital Wallet Features for Android and iOS," Payments Dive, available at https://www.paymentsdive.com/news/google-pay-payment-app-android-ios-digital-wallet/708305/ (accessed February 3, 2025).



**Figure 7: Share of U.S. iPhone Users by Number of Years in the iOS Ecosystem as of Q4 2020[127]**

125. Because ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████ and therefore could not have been aware of any aftermarket restrictions associated with Apple Pay when purchasing their first iOS device. As a result, ████████████████████████ did not have an opportunity to consider the challenged aftermarket restraints in their initial foremarket purchase decision.

126. 



127. By the time Apple Pay launched, these iOS users were already locked into the iOS ecosystem and would face significant costs in switching to Android in response to

[127] APL-ACU_00071286, at -318.
[128] APL-ACU_00069301, at -373.
[129] APL-ACU_00069301, at -373.
[130] APL-ACU_00069301, at -320.

Apple's aftermarket restraints. I explain the source of user lock-in (via substantial switching costs) below in Section 6.2.3.

128.    This follows a similar logic to prior cases, such as *Kodak*, that involved a "bait-and-switch" between an initial foremarket purchase and later emergence of aftermarket restraints.[131]  Because of the temporal distinction between the initial foremarket purchase and the later aftermarket restraint, a meaningful number of customers could not use foremarket competition to restrain abuse of monopoly power in the aftermarket.

## 6.2.2  Significant Information Costs Prevent Accurate Lifecycle Pricing

129.    In the same way that Apple contractually ensured that iOS device holders were unaware of the ▮▮▮▮▮ and Pricing Restraints through ▮▮▮▮▮▮▮▮▮▮, ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮



130.    Apple's prohibition on price transparency is ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ ▮▮▮ ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮[135]

131.    Apple further insulates itself from price transparency and the effects of price signaling to card holders ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮[136]

132.    Therefore, even if Apple Pay users were aware of Apple Pay's fees to card issuers, ▮▮▮▮▮▮▮▮▮▮ (the challenged Pricing Restraint).  At a minimum, this means the only way card issuers could pass Apple Pay's fees through to their card holders is and was to cross-subsidize those fees across virtually all their customers.  In this case, no individual iOS user could meaningfully reduce the cost of Apple Pay by switching to Android, as they would still pay the cross-subsidized fee of all other iOS users who remained on iOS – essentially creating a tragedy of the commons among iOS users.  Even if iOS users did seek to reduce cross-subsidized fees by switching to

---

[131] Ryan Sandrock, "Beyond Magnuson-Moss and Kodak: Right to Repair as an Antitrust Issue," California Lawyers Association, Vol. 34, No. 1, Fall 2024, available at https://calawyers.org/publications/antitrust-unfair-competition-law/competition-volume-34-number-1-fall-2024-beyond-magnuson-moss-and-kodak-right-to-repair-as-an-antitrust-issue (accessed February 3, 2025).
[132] CCU-APPLEPAY-0001518, ¶ 10.d.
[133] CCU-APPLEPAY-0001518, ¶ 11.d.
[134] CCU-APPLEPAY-0001518, ¶ 11.c.
[135] CCU-APPLEPAY-0001518, ¶ 11.d.
[136] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Android, they would face substantial, likely insurmountable, information costs in predicting the extent to which other card holders with their same card issuer would use Apple Pay over the lifecycle of their iOS purchase. This would effectively eliminate their ability to accurately incorporate lifecycle pricing into the foremarket purchase decision.

133.    At a maximum, Apple's Pricing Restraint ███████████████████████████ ████████████████████████████████ In which case, it is self-evident that card holders did not and could not accurately predict lifecycle pricing at their initial foremarket purchase.

## 6.2.3  Significant Monetary or Non-Monetary Switching Costs Exist

134.    iOS users looking to switch to Android incur at least four monetary and non-monetary switching costs if they do so:

- **First**, iOS users incur a monetary switching cost of purchasing a new Android device.

- **Second**, they incur the non-monetary cost of learning a new mobile OS.

- **Third**, they incur the monetary cost of replacing apps and content purchased on their iOS device (including their iTunes/Apple Music library).

- **Fourth**, they lose integration with other Apple devices (such as their tablet or smartwatch). This cost could either be monetary (if they also purchase replacement companion devices) or non-monetary (if they accept poor integration as a reduction in quality).

135.    Apple Senior Vice President of Services, Eddy Cue, has acknowledged these switching costs: "[t]he more people use our stores the more likely they are to buy additional Apple products and upgrade to the latest versions. Who's going to buy a Samsung phone if they have apps, movies, etc already purchased? They now need to spend hundreds more to get to where they are today."[137]  A subcommittee of the United States Congress similarly concluded that "Apple's market power is durable due to high switching costs, ecosystem lock-in, and brand loyalty."[138] ███████████████ ████████████████████████████████████ ████████████████████████████████████ ███████████████████████████

---

[137] *Epic Games v. Apple Inc.,* Case No. 20-cv-5640 (N.D. Cal.), Dkt. No. 777-3, p. 25 ¶ 63.
[138] Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary, "Investigation of Competition in Digital Markets" at p.334, available at
https://s3.documentcloud.org/documents/7222833/House-Tech-Antitrust-Report.pdf (hereafter "US Congressional Report") (accessed February 3, 2025).

FILED UNDER SEAL

**Figure 8: Repeat iPhone Owners Stated Reason for Staying in the iOS Ecosystem[139]**



136.   Indeed, locking device owners into the iOS ecosystem was an explicit goal of Apple. In a 2010 email to employees, Steve Jobs announced his goal to "[t]ie all our products together, so we further lock customers into our ecosystem."[140] ████████████ ████████████████████████ ███████████████████████████[141]

137.   ███████████████████████████████████████████████████ ███████████████████████[142] The economic import of such tactics is to limit iOS users willingness to substitute to Android in light of aftermarket restraints once they are already locked into the iOS ecosystem.

138.   Ultimately, whether iOS users are adequately locked into the iOS ecosystem for Apple to profitably abuse power in the candidate aftermarket for tap-and-pay iOS mobile

---

[139] APL-ACU_00069421, at -521.
[140] "Steve Jobs Wanted to Further Lock Customers into Apple's Ecosystem," CNET, available at https://www.cnet.com/tech/tech-industry/steve-jobs-wanted-to-further-lock-customers-into-apples-ecosystem/ (accessed February 5, 2025).
[141] APL-ACU_00090458, at -463.
[142] APL-ACU_00090458, at -463-464.

wallets is a question common to the Proposed Issuer Class which requires no individualized analysis.

### 6.2.4 General Market-Definition Principles Regarding Cross-Elasticity of Demand Do not Undermine the Proposed Aftermarket

139. I explained general market definition principles earlier in Section 5.1, followed by an explanation of how to apply them in the case of a multisided platform in Section 5.2. In the following sections, I conclude that not only do such principles (specifically a SSNIP test) not undermine the aftermarket, they in fact affirmatively support a tap-and-pay iOS mobile wallet aftermarket.

## 6.3 A SSNIP Test Must be Applied to Card Issuers

140. Before applying a SSNIP test to the candidate market for tap-and-pay iOS mobile wallets, I begin by explaining how such a test should be applied given the industry context. I conclude that a SSNIP must, at the first stage, be applied to the fee-paying customers, here card issuers, based on four facts I have previously mentioned:

- **First**, profit-maximizing platforms apply fees on the least elastic side of the market (Section 5.2).

- **Second**, a SSNIP in a multisided setting should consequently reflect where actual platform operators choose to extract fees (Section 5.2).

- **Third**, card issuers, not card holders, pay Apple Pay's fees (Section 4.5.3).

- **Fourth,** ▮▮▮▮▮▮▮▮▮▮▮▮ Pricing Restraints ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Sections 2.2 and 8.3).

141. These facts combined mean the ability of a hypothetical monopolist of tap-and-pay iOS mobile wallets to increase fees above the competitive level depends on how card issuers react to a SSNIP, specifically with respect to their decision to list or delist from the platform.

142. The relevant question for market definition is therefore: Would card issuers find it viable to delist in response to a SSNIP by a hypothetical monopolist of tap-and-pay iOS mobile wallets? Implicit in this question is the extent to which card issuers can affect card holder behavior. More plainly, whether a card holder would also exit the platform should their issuer delist – or instead move purchase volume to an issuer that remained on the platform (i.e., inter-issuer competition).

143. Given the candidate market is an aftermarket where, plaintiffs argue, Apple enjoys a 100% market share – the above question is equivalent to asking if Apple Pay itself was able to profitably deviate prices from the competitive level. This has two useful implications which greatly simplify the role of multisidedness, network effects, and aftermarkets in this case:

48

- **First**, I can directly apply a SSNIP test by studying how Apple Pay's actual fees and issuers' choice to participate (or not) responded to candidate changes in the competitive environment.

- **Second**, if the finder-of-fact agrees that tap-and-pay iOS mobile wallets is a cognizable antitrust market, I have therefore also established that Apple Pay possesses monopoly power within that market.

144. These implications (primarily the first) dispose of the relevance of multisidedness to market definition because such relevance stems from indirect network effects. Indirect network effects occur when substitution on one side (the fee-paying side) of the platform causes further substitution on the other side. When there is no meaningful substitution on the original fee-paying side of the platform then, by definition, there can be no indirect network effects. In such instances, multisidedness would be moot with respect to market definition. Applied here, virtually the entire population of U.S. card issuers signed up to the Apple Pay platform by the start of the Proposed Issuer Class period, and I have seen no evidence that any solvent issuer later delisted (specifically in response to a SSNIP or change in the competitive environment). Consequently, there are not any indirect network effects which would undermine my SSNIP test.

145. In the sections that follow, I therefore employ the staggered entry timeline and distinct fee-levels for Google Pay, Apple Pay, PayPal's QR-code wallet, and contactless cards to show that the candidate market for tap-and-pay iOS mobile wallets satisfies a SSNIP test (which accounts for network effects) and that Apple possesses monopoly power via its Apple Pay product.

## 6.4 Card Issuers Must List on the Apple Pay Platform

146. The factual record shows that ███████████████ ████████████████████████████████████ despite the presence of "free" Android wallets, ███████████████████ ████████████████████. As early as January 2014, several months before Apple Pay's launch, issuing institutions expressed their reluctance to pay Apple's fees. During a board meeting in January 2014, Visa reported that "transaction fees […] [had] not been favorably received" by a group of banks including Bank of America, Chase, and Wells Fargo.[143]

147. ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████

   - ████████████████████████████████ ████████████████████████████████ ████████████████████████████████

---

[143] VisaAffinityCU-00002001 at -004.



148. Contemporary reporting echoed this, stating card issuers "scrambled" to join the Apple Pay platform, concerned that failure to do so would "disadvantage" them relative to card-issuing competitors:

> "Hundreds of financial institutions scrambled to work with Apple Pay, **afraid of being left at a competitive disadvantage**. As a result, big banks and other card issuers agreed to give Apple 0.15% of the value of each credit-card transaction. For bank debit cards, Apple collects a half-cent per purchase, according to people familiar with the service."[147]  [emphasis added]

149. This "disadvantage" existed even though Google and Samsung both offered Android tap-and-pay mobile wallets that relied on the same EMV tokenization standards as Apple Pay by 2015 – while charging no fees to issuers. As a result, the fee premium Apple Pay commands over purported competitors (Google and Samsung) already shows that tap-and-pay iOS mobile wallets satisfies a SSNIP test and is therefore a relevant antitrust product market. This continued to be true when contactless cards later became available in the U.S.

## 6.5  Card Issuers Decision to Continue to Acquiesce to Apple Pay's Terms Was Unaffected by the Entry of Contactless Cards

150. If card issuers could use indirect network effects to constrain Apple Pay,[148]  I would expect to see them avail themselves of those effects when new competitive products entered the market. The U.S. rollout of contactless cards (beginning in 2018, ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) provides an informative case study on this question.

151. Specifically, when Apple Pay first launched (and Apple set its fee level with issuers), contactless cards did not meaningfully exist in the U.S. If, as Apple argued in its motion

---

[144] From APL-ACU_00065608 at -609: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
[145] APL-ACU_00082336 at -340.
[146] APL-ACU_00066111 at -118.
[147] Alistair Barr and Robin Sidel, "Google Loses Key Mobile Payment Fees: Google Misses Out on Apple's Slice of Mobile Transactions," The Wall Street Journal, June 5, 2015, available at https://www.wsj.com/articles/google-loses-key-mobile-payment-feesgoogle-misses-out-on-apples-slice-of-mobile-transactions-1433546638 (hereinafter, WSJ Google Loses Key Mobile Payment Fees) (accessed February 3, 2025).
[148] I.e., move purchase volume to alternatives means of presenting payment credentials via their indirect network effects on card holders.

FILED UNDER SEAL

to dismiss, contactless cards are in the same market as Apple Pay, I would expect to see a reduction either in Apple Pay's fees or in issuers' participation when contactless cards later proliferated in availability – ███████████████████████████████████ ██████████████████████████████ Instead, ████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████ and ████████████████████████████ Card holders had, because of the restraints imposed by Apple, no financial incentive to use contactless cards instead of Apple Pay, and issuers evidently did not find it viable to either renegotiate with Apple or delist from the platform once contactless cards became readily available. These facts are irreconcilable with the notion that Apple Pay and contactless cards exist within the same relevant product market.

152.  Specifically, Apple Pay first launched in October 2014.[149]  However, by 2016, only 3.47% of U.S. cards in circulation were reportedly contactless enabled.[150]  This trend did not change until late 2017, when the U.S. payments industry saw a resurgence of interest in contactless payment cards, driven primarily by Visa and large card issuers such as JPMorgan Chase and Wells Fargo.[151]  In November 2017, Visa launched its Visa Global Transit Solutions which aimed to accelerate contactless payments.[152]  As Visa explained:

> "Contactless payments, also known as Tap to Pay, arrived in the U.S. in 2014 with the launch of mobile wallets, however adoption remained nascent until 2018 when Visa financial institutions began issuing contactless cards in earnest."[153]

---

[149] "Apple Pay Set to Transform Mobile Payments Starting October 20," Apple Newsroom, October 16, 2014, available at https://www.apple.com/newsroom/2014/10/16Apple-Pay-Set-to-Transform-Mobile-Payments-Starting-October-20/ (accessed February 3, 2025).

[150] "Why U.S. Banks Should Make Contactless Cards an Immediate Priority," Kearney Report, available at https://info.kearney.com/24/2185/uploads/why-us-banks-should-make-contactless-cards-an-immediate-priority.pdf (accessed February 3, 2025), p. 3.

[151] Federal Reserve Bank of Philadelphia Discussion Paper, p. 2.

[152] Visa introduced innovative worldwide program to accelerate contactless payments on 13 Nov 2017. I use this date to make the vertical line in Figure 10. See "Visa Expands Contactless Payments with New Initiatives," Visa Newsroom, available at https://usa.visa.com/about-visa/newsroom/press-releases.releaseId.11046.html (accessed February 3, 2025); and see also "Tapping into the Future of Payments," Visa Navigate, archived January 23, 2025, available at https://web.archive.org/web/20250123122634/https://navigate.visa.com/na/spending-insights/tapping-into-the-future-of-payments/ (hereinafter, "Visa Navigate on the Future of Payments") (accessed February 3, 2025).

[153] Visa Navigate on the Future of Payments.

153.    Visa went on to explain that:

> "In 2017, Visa decided to invest in a cross-functional initiative
> to help stimulate the growth of contactless payments in the U.S.
> We believed that the time was right to deliver the improved
> experience of contactless payments to more U.S. consumers and
> that Visa, along with our partnerships, could make contactless
> successful in the U.S. market."[154]

154.    Card issuers like Chase joined the effort by starting to issue contactless cards in
November 2018,[155] followed by Wells Fargo in April 2019.[156]

155.    As a result, between 2017 and 2024, the number of Visa contactless cards increased
from 15 million to over 535 million – a relative increase over 35x – shown below in
Figure 9:[157]

---

[154] Visa Navigate on the Future of Payments.
[155] "Contactless Card in 2021," J.P. Morgan Insights, available at
https://www.jpmorgan.com/insights/payments/payment-trends/contactless-card-in-2021 (accessed February 3,
2025). See also Federal Reserve Bank of Boston report, p. 8.
[156] "Wells Fargo Begins Contactless Credit, Debit Card Rollout," Payments Dive, available at
https://www.paymentsdive.com/ex/mpt/news/wells-fargo-begins-contactless-credit-debit-card-rollout/ (accessed
February 3, 2025).
[157] Visa 2024 Annual Report, p. 8, available at
https://s29.q4cdn.com/385744025/files/doc_downloads/2024/Visa-Fiscal-2024-Annual-Report.pdf (hereinafter,
Visa 2024 Annual Report). See also Tapping into the Future of Payments.

**Figure 9: Number of Contactless Cards Issued by Visa in the U.S., 2019-2024[158]**



The data is reported in Visa's Annual Report based on its fiscal year.

156.    During this time, ████████████████████████████████████████████
████████████████ and I am not aware of any solvent issuer delisting from the Apple
Pay platform. ██████████████████████████████████████████████
███████████████████████████████



157.    That the proliferation of contactless cards in the US had no effect on Apple Pay's fees
        or card issuers choice to agree to Apple's terms is already sufficient to show that

---

[158] Visa's fiscal year reflects 12 months ending at September of the reported year. See Visa 2019 Annual Report, available at https://s1.q4cdn.com/050606653/files/doc_financials/2019/ar/Visa-Inc.-Fiscal-2019-Annual-Report.pdf; Visa 2020 Annual Report, available at https://s1.q4cdn.com/050606653/files/doc_financials/annual/2020/Visa-Inc.-Fiscal-2020-Annual-Report.pdf; Visa 2021 Annual Report, available at https://s1.q4cdn.com/050606653/files/doc_financials/2021/ar/Visa-Inc_-Fiscal-2021-Annual-Report.pdf; Visa 2022 Annual Report, available at https://s1.q4cdn.com/050606653/files/doc_financials/2022/ar/Visa-Inc-Fiscal-2022-Annual-Report.pdf; Visa 2023 Annual Report available at https://s1.q4cdn.com/050606653/files/doc_downloads/2023/12/849d0b35-b550-4d4a-95e3-611146a657f2.pdf; and Visa 2024 Annual Report, available at https://s29.q4cdn.com/385744025/files/doc_downloads/2024/Visa-Fiscal-2024-Annual-Report.pdf.
[159] See APL-ACU_00988146, ████████████████████████████████████
████████████████████████

contactless cards did not competitively constrain Apple Pay (and therefore do not belong in the relevant market). ██████████████████████████████
████████████████████
██████████████████

**Figure 10: Apple Pay's Revenue and Volumes During Contactless Rollout[160]**



158.    It is unsurprising that card issuers were unable to substitute Apple Pay and contactless cards given their functional distinctions.  Fundamentally, a mobile wallet does not replace a customer's physical card, just as a physical wallet does not replace the cards it holds.  Consequently, a SSNIP test instead applied on physical contactless cards could *never* cause profit-reducing diversion to a mobile wallet, because the mobile wallet still relies on the underlying card.  It is simply a means of presenting that card to the merchant.

159.    Apple's public statements reflect this understanding.  For example, Jennifer Bailey, head of Apple Pay, publicly represented that "Our [Apple's] goal [is] to replace the wallet."[161] ████████████████████████████
██████████████████████[162]

---

[160] ████████████████████████              APL-ACU_06174810;████████
                                                              APL-ACU_01148304, see Appendices C.1.1. I consider Nov 2017 as the date of contactless cards rollout in the U.S., consistent with Visa introducing innovative worldwide program to accelerate contactless payments on 13 Nov 2017 (see fn. 152).
[161] "Apple VP Jennifer Bailey: Apple Is Still Thinking About Replacing 'Everything in Your Wallet'," YouTube, December 7, 2016, available at https://www.youtube.com/watch?v=_Rdq6J34ljo (accessed February 3, 2025), 8:10–9:15.
[162] APL-ACU_01158756.

FILED UNDER SEAL

160.    A presentation from ████████████████████████████████████
████████ [163]



161.    ████████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████ [164]

162.    In this sense, mobile wallets are complementary with physical cards, not substitutable. Apple Pay therefore appears to be a complementary value-added layer on top of physical cards, rather than a substitute for them.

## 6.6  Card Issuers Decision to Acquiesce to Apple Pay's Terms was Unaffected by the Entry of QR-code Wallets

163.    In May 2020, PayPal launched a QR-code mobile wallet in the U.S.[165]  If QR-codes are in the relevant market, I would expect the entry of this candidate competitor to have a discernible effect on either Apple Pay's fees or customers' (card issuers') choice to list on the platform.  Instead, PayPal's QR-code wallet ████████████████████████████ ████████████████████████████ – even including Android transactions.

---

[163] APL-ACU_00086030.
[164] APL-ACU_00681586.
[165] "PayPal Rolls Out QR Code Payments for a Touch-Free Way to Buy and Sell In Person," PayPal, May 19, 2020, available at https://newsroom.paypal-corp.com/2020-05-19-PayPal-Rolls-Out-QR-Code-Payments-for-a-Touch-Free-Way-to-Buy-and-Sell-In-Person (hereinafter, "PayPal Rolls Out QR Code Payment") (accessed February 3, 2025).

FILED UNDER SEAL



164.    I am not aware of any Apple Pay customer (i.e., card issuer) who used the launch of PayPal's QR-code wallet to renegotiate with Apple or delist from the Apple Pay platform. In other words, based on the evidence available to me, I observe essentially zero issuer substitution from Apple Pay to PayPal's QR-code wallet.

165.    As I explain in Section 8.1.3, ████████████████████████████████████

████████████████████████████████████████████████████████████████████████ If QR and NFC wallets were in the same market, card issuers should therefore be able to guide card holders to PayPal's QR-wallet. However, despite PayPal being an established brand with card holder trust and an existing customer base for its e-commerce offering, it was unable to break into POS transactions (or divert demand away from Apple Pay) while relying on QR-codes instead of NFC. In my expert opinion, this provides clear evidence that QR-code mobile wallets are outside the relevant market.

166.    Indirect network effects are only relevant to market definition when there is some initial level of substitution by one side of the platform that triggers a feedback loop. In this case, virtually all cards in the U.S. are under contract with Apple Pay, and I have seen no evidence of any issuer in the U.S. ever substituting Apple Pay with another

---

[166] ████████████████████████████████████████████████████████████

████████████████████  ████████████████████████████████████  For Apple Pay volume data, I keep transactions until May 2023 to match the timeframe of PayPal's recorded data. I prorate Apple Pay values to match end of PayPal data on May 22, 2023, keeping 71% (22 days/31 days) of the May 2023 values. I filter for ████████████████████  to compare with PayPal QR instore data. I consider credit, debit, and prepaid cards, as classified in the ████████████  . To avoid duplication in the dataset, I filter for transactions labelled as ████████████████  . See Appendix C.1.2.

FILED UNDER SEAL

product.[167]  As a consequence, there was no initial level of issuer substitution that could trigger an indirect network effect on card holders.  Because of this, I know the SSNIP test I apply in this section accurately accounts for potential network effects.

167.    In summary, the candidate market for tap-and-pay iOS mobile wallet exhibits the factors laid out in *Epic* and satisfies a SSNIP test. 

Pricing Restraint

In addition to these information costs, iOS users who were already in Apple's ecosystem faced substantial switching costs in the form of a new smartphone, repurchasing digital content, and learning a new operating system.  As a result, a SSNIP test shows that Apple was able to profitably raise fees above the pre-established competitive level set by Android tap-and-pay mobile wallets when it first launched Apple Pay.  Apple's ability to extract exceptional fees from card issuers was unaffected by the later proliferation of contactless cards and emergence of QR-code wallets offered by established and trusted brands (namely PayPal).  Based on these facts, I conclude that Android mobile wallets, contactless cards, and QR-code payments are not meaningful competitive constraints on Apple Pay and therefore that the relevant market is that for tap-and-pay iOS mobile wallets.

168.    For current purposes, I note that market definition inquiry and analysis is, by its nature, common to the Proposed Issuer Class.  Defining the borders of the relevant market requires no individualized analysis because it is defined by aggregate substitution patterns facing a hypothetical monopolist.

---

[167] By "substituting," I specifically mean a card issuer delisting from the Apple Pay platform in response to a SSNIP or other change in the competitive environment. Because market definition is solely concerned with identifying competitive substitutes, card issuers delisting due to anything other than substitution, such as a card issuer becoming insolvent or closing retail operations, would not be relevant to any analysis of market definition.

FILED UNDER SEAL

# 7. Through Apple Pay, Apple Possesses Market Power

169.    Having shown that the candidate aftermarket for tap-and-pay iOS mobile wallets satisfies a SSNIP test, I have already provided direct evidence that Apple was able to ███████████████████████████ and therefore has market power.  In this section, I turn to other indicators of market power to affirm my conclusion that Apple Pay possesses monopoly power.

## 7.1  Apple Pay Was (and Is) Essentially ██████████████

170.    As explained in Section 5.3, economists measure market power with reference to profitability, specifically a firm's price-cost margin.  In other words, market power is the extent to which a firm can deviate price from marginal cost.

171.    Apple has ████████████████████████████████████████ ███████████████████████████████████ In response to plaintiffs' Interrogatory No.8 , Apple stated:

██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████
██████ [168]

172.    As a threshold matter, ████████████████████████████ ████████████████████████████████████ ████████████ If Apple Pay's ████████████████████ ████████████████████████████████████ █████████████ █████████████████████████ ████████████████████████████

173.    To further analyze direct evidence of Apple Pay's power, I next consider Apple's █████████████████████████████████.  ████████████████████ ████████████████████████████████████ ██████████ I reserve the right to amend my analysis.

---

[168] Apple's Response to Interrogatory No. 8.

174. Apple ██████████████████████████████████████████
████████████████████ [169]  For example:

- ████████████████████████████████████████████
  ███████████████████████████████ ████████
  ██████████████████████████████████████████
  ██████████████████████████████████████████
  █████████████████████████████████████ ██

- ████████████████████████████████████████████
  ████████████████████████ ██████████████
  ██████████████████████████████████████████
  ██████████████████ ████████████

- ████████████████████████████████████████████
  ████ █████████████████████████████████
  ████ ████████████████████████████████
  ████████████████

175. ████████████████████████████████████████████
████████ . [176]  This suggests Apple Pay has a Lerner Index at (or closely approaching)
1 – indicating near perfect monopoly power (as I explained in Section 5.3). ████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████ Economists do not
typically consider operating costs to be a reasonable measure of marginal costs, because
they include many costs which do not scale with volume. Based on the evidence
available to me at the time of writing, ███████████████████ provides direct
evidence of market power.

176. While there is already clear evidence that Apple Pay ███████████████
██████████████████████████████████████████████
████████████████████████████████ I note that whether or not Apple Pay



---

[169] From APL-ACU_00065952 (at -6071), ████████████████████████████████
████████ From APL-ACU_00066280 (at -356), ████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████
[170] APL-ACU_00711812.
[171] APL-ACU_00711807 at -811.
[172] ████████████████ (APL-ACU_00065952 at -6071), ████████████████████
████████████
[173] APL-ACU_00065952 at -6071.
[174] APL-ACU_00469885 at -999.
[175] ████████████████████ (APL-ACU_00469885 at -999), ██████████████████
████████████████
[176] ████████████████████████████

possesses market power is a question common to the proposed class which can be answered with class wide evidence.

## 7.2 Android Tap-and-Pay Mobile Wallets Do Not Constrain Apple Pay's Market Power – Even if They Are Included in the Relevant Market

177.    In the alternative, I also evaluate if Apple would still possess market power in a broader product market that also includes tap-and-pay wallets on Android devices. I conclude that it would.

178.    Market shares can be measured with respect to users, transaction count, spend amount, or revenue share. Because Apple is the only tap-and-pay mobile wallet (on both iOS and Android) that charges any fees, it enjoyed a durable 100% market share, measured by revenue, for the entirety of the Proposed Issuer Class period – even including Android tap-and-pay mobile wallets.

179.    ███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

[177] ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

FILED UNDER SEAL

180. 

181.   Other public sources ███████████████[180]   reached the same
conclusion.  For example, a 2021 debit issuer study by Pulse found that "Apple Pay



[180] APL-ACU_00681755.

FILED UNDER SEAL

outperformed Samsung Pay and Google Pay in cardholder enrollment, active rate and usage, capturing a 92% share."[181]

182.    In other words, iOS users spend substantially more via mobile wallets than Android users – so much so that Apple Pay has a durable monopoly share of even a broader Android inclusive market.

## 7.3    Apple Pay's Dominance Is not a Result of Superior Product Offering

183.    Apple Pay's dominant share of a broader market cannot be explained by differences between mobile wallets.



184.

185.    Indeed, when Samsung Pay first launched, it had meaningful differentiation from Apple Pay that facilitated broader merchant acceptance.  Samsung Pay supported contactless payments via both NFC and MST ("Magnetic Secure Transmission").  MST enablement in Samsung Pay meant that it could make contactless transactions even

---

[181] "2021 Debit Issuer Study White Paper," Pulse Network, available at
https://content.pulsenetwork.com/dis/2021-debit-issuer-study-white-paper (accessed February 3, 2025).
[182] SEA_SUBP000000121, at -134.

when a payment terminal lacked an NFC chip, by instead using magstripe technology which was the historic industry standard. This in turn allowed broader merchant acceptance before NFC became widely part of payment terminals (as it is today) – leading Dan Ewing (Apple Pay – Strategy & Planning) █████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████

186.    As a result, ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████[183]████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██ ██ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████[185]

187.    ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████ ██

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

---

[183] APL-ACU_00185266.
[184] APL-ACU_00398118.
[185] APL-ACU_00078951.
[186] SEA_SUBP000000239, at -247.

188. ██████████████████

██████████████████████████████████████████████████████████████████████████████████████████████████████████████████

189. ██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████

190.    To further substantiate that spending differences aren't driven by Google or Samsung offering inferior wallets, I look at transaction data for PayPal's QR-based wallet. In late 2020, PayPal launched its QR-code app for making POS purchases. Unlike Apple Pay, PayPal's POS offering was available on both iOS and Android.[187]

191. ██████████████████████████████████████████
██████████████████████████████████████████
██████████████████



192. ██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

---

[187] PayPal Rolls Out QR Code Payment.
[188] ██████████████████████████████████████████
██████████████████████████████████
[189] ██████████████████████████████
██████████████████████████████████

64

FILED UNDER SEAL

███████████████████████████████████████████████████████████████
███████████████.

193.    The fact that spending disparities between iOS and Android users persist even when using precisely the same mobile wallet indicates that hypothetical differentiation between Apple Pay and Android wallets cannot explain Apple's dominant share of a broader, Android inclusive, mobile wallet market.

194.    As a result, even if the finder-of-fact were to conclude that iOS and Android wallets were in the same market, restricting access to iOS users (who account for 93% of transaction value) would nonetheless amount to substantial foreclosure, securing Apple's monopoly power.  I explain this in further detail below in Section 8.4.

195.    In the following section, I further explain why iOS users ████████████████████
████████████████████████ even though Samsung Pay offered a meaningful point of differentiation that should expand mobile wallet usage relative to Apple Pay, all else equal.

## 7.4  iOS Users Account for a Supermajority of Tap-and-Pay Mobile Wallet Spending

196.    iOS users have a variety of demographic characteristics that are associated with greater mobile wallet spending.  Specifically, iOS users are both, on average, younger and have a higher income than Android users.  For example, a 2016 study (later published in 2023) found that:[190]

> "Knowing whether someone owns an iPhone in 2016 allows us to guess correctly whether the person is in the top or bottom income quartile 69 percent of the time.  … Across all years in our data (1992, 2004, and 2016), no individual brand is as predictive of being high-income as owning an Apple iPhone in 2016."[191]

197.    Similarly, a 2019 survey found:

> "iPhone users make an average salary of $53,251 and are more likely to splurge on commodity items than those with Androids.  On the contrary, Android users make an average salary of $37,040, making it a plausible reason as to why they may be drawn to the cheaper prices of Android products.  iPhone users

---

[190] See Bertrand, Marianne, and Emir Kamenica. 2023. "Coming Apart? Cultural Distances in the United States over Time." American Economic Journal: Applied Economics, 15 (4): 100–141 (hereinafter, Bertrand & Kamenica (2023)), available at https://www.aeaweb.org/articles?id=10.1257/app.2021066 (accessed February 5, 2025).
[191] Owning an iPad gave similar results with a 66.9 percent chance, while owning an Android smartphone was in fourth place at 59.5 percent. See Bertrand & Kamenica (2023).

also reported that they usually spend an average of $117 every month on clothes, whereas Android users would spend about only $62 per month. Additionally, iPhone users will shell out $101 on technology and $83 on makeup products. For Android users, their average monthly expenses come out to about $51 for tech-related items and $40 for beauty. They are also self-admittedly more frugal and inclined to frequently seek out deals and discounts."[192]

198.    As a result, another study analyzed 31 million online sessions from 2017 to 2021 to compare spending habits of iPhone and Android users. It found that iPhone users spent 2.85x more per transaction ($32.94) than Android users ($11.54).[193] Overall, though iOS has an overall market share of 55% measured by all smartphone shipments,[194] this reportedly rises to 71% of premium smartphones (those priced above $600).[195] Intuitively, iPhones are, on average, more expensive than Android devices, so they appeal to consumers who have more disposable income. These premium smartphone users appear to be more likely to spend significant sums via a tap-and-pay mobile wallet.

199.    iOS users also have age characteristics that are associated with greater mobile wallet usage. Younger consumers are more likely to adopt mobile wallets, as 78.9% of Generation Z (age under 27) and 66.7% of Millennials (age 28-34) use digital wallets, compared to 43.7% of those over 44 and just 25.7% of those aged 60 and above.[196] iOS users share similar age demographics, as 68% of iOS users are aged 18-29, whereas Android is more widely used among older users, with 55% of those aged 50-64.[197]

---

[192] "iPhone Users Spend $101 Every Month on Tech Purchases, Nearly Double of Android Users, According to a Survey Conducted by Slickdeals," PR Newswire, available at https://www.prnewswire.com/news-releases/iphone-users-spend-101-every-month-on-tech-purchases-nearly-double-of-android-users-according-to-a-survey-conducted-by-slickdeals-300739582.html?c=n (accessed February 3, 2025).

[193] Alan Coleman, "Do iPhone Users Spend More Money Online Than Android Users?," Wolfgang Digital Blog, June 22, 2021, available at https://www.wolfgangdigital.com/blog/battle-of-the-internet-giants-apple-vs-facebook-june-2021/ (accessed February 3, 2025).

[194] CFPB report on Big Tech's Role in Contactless Payments, Figure 4.

[195] "Apple Is the Largest Premium Smartphone Brand, but Its Lead Is Narrowing," TechSpot, January 2, 2024, available at https://www.techspot.com/news/101379-apple-largest-premium-smartphone-brand-but-lead-narrowing.html (accessed February 3, 2025).

[196] "55% of High-Earning Consumers, 79% of Generation Z Use Digital Wallets," PYMNTS, May 2, 2024, available at https://www.pymnts.com/mobile-wallets/2024/55percent-high-earning-consumers-79percent-generation-z-use-digital-wallets/ (accessed February 3, 2025).The age classification for each generation is defined based on "Where Millennials End and Generation Z Begins," Pew Research Center, January 17, 2019, available at https://www.pewresearch.org/short-reads/2019/01/17/where-millennials-end-and-generation-z-begins/ and (accessed February 3, 2025). Millennials in this context refer to the generation excluding Bridge Millennials, see "How to Target Bridge Millennials," PayPal Business Resource Center, available at https://www.paypal.com/us/brc/article/how-to-target-bridge-millennials (accessed February 3, 2025).

[197] "Smartphone OS Share by Age Group in the U.S.," Statista, available at https://www.statista.com/forecasts/911113/smartphone-os-share-by-age-group-in-the-us (accessed February 3, 2025).

200.    Moreover, unlike app store users, mobile wallet users are a subset of all smartphone users – potentially with distinct characteristics.   For example, ███████████████ ████████████████████████████████████████████████████████████████████ [199] ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████

███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████

201.    ███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████

██████████ among Samsung users, consistent with Samsung Pay having a lower user active rate than Apple Pay (as discussed previously in Section 7.2).  In other words, across all Android users, income is, on average, lower and age is, on average, higher than for iOS users.  Therefore, those who are likely to actively use a mobile wallet represent a smaller portion of all Android users, which manifests itself in the lower active rates described above in Section 7.2.

202.    One might similarly ask if the fact that iOS users have the characteristics associated with greater mobile wallet usage is a result of self-selection.  E.g., users with these characteristics purposefully purchase iOS over Android specifically to access Apple Pay.  There are two facts that plainly contradict such a hypothesis:

---

[198] APL-ACU_00069301 at 371.
[199] APL-ACU_00069301 at 374.
[200] SEA_SUBP000000239, at -245.

- **First**, the share of iOS users who purchased their first iOS device before Apple Pay was available indicates the disparate demographics between iOS and Android are unlikely to have emerged as a self-selection response to Apple Pay, see Section 6.2.1.

- **Second**, income disparities between iOS and Android users demonstrably pre-date the release of Apple Pay.[201]  It is therefore implausible to think that such disparities could be caused by Apple Pay.

203.   In short, the fact that iOS (separately from Apple Pay) appeals to smartphones users who are more likely to spend significant sums of money via a tap-and-pay mobile wallet (simply because of their demographic and socioeconomic characteristics) gives Apple power over card issuers.

# 8. The Challenged Conduct Excluded Competitors and Inflated Apple Pay's Fees

204.   Apple's overall scheme to monopolize the market for tap-and-pay iOS mobile wallets had three prongs:

- **First**, monopolizing the market for tap-and-pay iOS mobile wallets by restricting access to the NFC interface.  The "NFC Restraint."

- **Second**, imposing Pricing Restraints[202] on card issuers which ████████████ ████████████████████████████████████████ The "Pricing Restraint."

- **Third**, extracting fees on e-commerce transactions by ████████████████ ████████████████████████████████████

205.   For the purpose of class-certification, the most important fact is that each of these restraints applied equally to every member of the Proposed Issuer Class.  Apple did not give special access to the NFC interface for any members of the Proposed Issuer Class either directly or indirectly.[203]   Similarly, ██████████████████████ was in every contract I've reviewed, as was the Pricing Restraint.

---

[201] For example, a 2014 report found "*The median iPhone app user earns $85,000 per year, which is 40 percent more than the median Android phone user with an annual income of $61,000.*" See "iPhone Users Earn Higher Income, Engage More on Apps than Android Users," Comscore, available at https://www.comscore.com/Insights/Infographics/iPhone-Users-Earn-Higher-Income-Engage-More-on-Apps-than-Android-Users (accessed February 3, 2025).

[202] These could also be referred to as "user incentives."

[203] For the purpose of sending payments. Some members of the Proposed Issuer Class have acquiring activities which could access the NFC interface to operate a merchant-facing solution that received payments. ████████ ████████ – see APL-ACU_00071646 I note this option still did not allow card issuers to circumvent Apple Pay and is therefore not an exception to the NC Restraint at-issue in this case.

FILED UNDER SEAL

206. Whether or not the challenged conduct foreclosed competition is therefore a question common to the Proposed Issuer Class. In this section, I proceed to explain the overall effect of Apple's scheme on its ability to extract fees from members of the Proposed Issuer Class.

# 8.1 Apple Denies NFC Access to Would-be Competitors

## 8.1.1 Apple Only Denies NFC Access to Competitive Threats to Apple Pay

207. The NFC interface can be used for a range of purposes, and Apple only denies access when developers wish to use it for sending payments. Apple's own developer documentation states "Your app can read tags to give users more information about their physical environment and the real-world objects in it. Using Core NFC, you can read Near Field Communication (NFC) tags of types 1 through 5 that contain data in the NFC Data Exchange Format (NDEF). For example, your app might give users information about products they find in a store or exhibits they visit in a museum."[204]

208. I note however that Apple (historically) only denied access to users' NFC interface when another app tried to compete with Apple Pay downstream. This is inconsistent with Apple's assertions relating to security issues. For example, the Australian Competition and Consumer Commission noted that:

> "while Apple has gradually rolled out various aspects of NFC functionality to third-party developers, it continues to reserve some aspects, such as 'tap-and-go' payment functionality for its own Apple Pay app. Apple has stated that it limits this access to protect the security of the iPhone. Similar issues do not appear to exist with Android devices."[205]

209. Indeed, Apple allows merchant (rather than issuer) facing payment solutions that do not threaten Apple Pay's market power access to the NFC interface. In February 2022, Apple announced that Stripe would be able to access an iOS device's NFC interface to allow merchants to receive payments. This would forego merchants' need to connect to any external scanner hardware:

> "Tap to Pay on iPhone will be available for payment platforms and app developers to integrate into their iOS apps and offer as a payment option to their business customers. Stripe will be the

---

[204] "Core NFC," Apple Developer Documentation, available at
https://developer.apple.com/documentation/corenfc (accessed February 3, 2025).
[205] Australian Competition & Consumer Commission (ACCC), "Submission 11 to the Joint Committee on Corporations and Financial Services –Mobile and Digital Wallet," Parliament of Australia, available at
https://www.aph.gov.au/Parliamentary_Business/Committees/Joint/Corporations_and_Financial_Services/Mobileanddigitalwallet/Submissions (accessed February 3, 2025).

FILED UNDER SEAL

first payment platform to offer Tap to Pay on iPhone to their business customers."[206]

210.    When announcing the new integration with Stripe, Apple's vice president of Apple Pay and Apple Wallet claimed that security would not be threatened by opening access, stating:

> "As more and more consumers are tapping to pay with digital wallets and credit cards, **Tap to Pay on iPhone will provide businesses with a secure, private, and easy way to accept contactless payments** and unlock new checkout experiences using the power, security, and convenience of iPhone … In collaboration with payment platforms, app developers, and payment networks, we're making it easier than ever for businesses of all sizes – from solopreneurs to large retailers – to seamlessly accept contactless payments and continue to grow their business."[207] (emphasis added)

211.    Dan Ewing, Apple Pay Director, commented on the press release ████████████████
████████████████████████[208]

212.    Similarly, in June 2022, ████████████████████████████████,[209] Square announced it would offer the same functionality for merchants to receive payments using an iOS device's NFC interface:

> "Using just the Square POS app and an iPhone, sellers will be able to **seamlessly and securely take contactless payments with Tap to Pay on iPhone**. This builds on Square's powerful software which helps sellers drive more business with marketing and loyalty programs; easily track and manage product inventory; and even simplify their cash flow with business banking tools that provide them instant access to their Square sales."[210]

213.    Apps that use the NFC interface to receive payments pose no threat to Apple Pay's fee on sending payments. As a result, Apple allows multiple third-party payment

---

[206] "Apple Unveils Contactless Payments via Tap to Pay on iPhone," Apple Newsroom, February 8, 2022, available at https://www.apple.com/newsroom/2022/02/apple-unveils-contactless-payments-via-tap-to-pay-on-iphone/ (hereinafter, "Apple Unveils Contactless Payments via Tap to Pay on iPhone") (accessed February 3, 2025).
[207] Apple Unveils Contactless Payments via Tap to Pay on iPhone.
[208] APL-ACU_00712448.
[209] APL-ACU_06199177.
[210] "Tap to Pay on iPhone: Early Access Program," Square Press, available at https://squareup.com/us/en/press/tap-to-pay-early-access-program (accessed February 3, 2025).

processors access to the NFC interface, so long as they only use it to receive, not send, payments.

## 8.1.2  Apple's NFC Restraint Excluded Mobile Wallet Competition

214.    The European Commission ("EC") investigation into Apple for its "practices regarding Apple Pay" and Apple's consequent commitments to the EC provide clear evidence that Apple's NFC restraint excluded competitors from the market for tap-and-pay mobile wallets on iOS devices.  Specifically:

- On June 16, 2020, the EC announced it was investigating "Apple's practices regarding Apple Pay and their impact on competition."[211]

- On May 2, 2022, the EC sent a Statement of Objections to Apple, where it "preliminarily found that Apple may have restricted competition, to the benefit of its own solution, Apple Pay."[212]

- On January 19, 2024, Apple sent proposed commitments to the EC.  These would require Apple to open NFC access to competing mobile wallets in the EEA.[213]

- On July 11, 2024, the EC accepted and published an amended and finalized version of Apple's commitments to open NFC access.[214]

215.    Following these commitments, plaintiffs' counsel sent Interrogatory Number 4, requesting Apple list all developers who requested NFC access and whether Apple had approved them.  In response to this, Apple provided the below list I present in Appendix B.  By ███████████████████████████████████████████████████ ███████████████████████████.  Apple provided an updated list of NFC requests at approximately 4:30 PM PST (admitting Google has requested and been granted NFC access) the day this report was due – I have therefore not had opportunity to fully reflect that list in this report.

216.    Importantly,  ████  ██████  ███████  █████████  █████████  ███████  █████ ████████████████████████████████████████████████████████████████████████ ████████████  Each of these is positioned to offer a multi-issuer mobile wallet to compete



[211] "Antitrust: Commission Opens Investigation into Apple's Practices Regarding Apple Pay," European Commission, June 16, 2020, available at https://ec.europa.eu/commission/presscorner/detail/en/ip_20_1075 (accessed February 3, 2025).
[212] "Antitrust: Commission Sends Statement of Objections to Apple on App Store Rules for Mobile Wallets," European Commission, May 2, 2022, available at
https://ec.europa.eu/commission/presscorner/detail/en/ip_22_2764 (accessed February 3, 2025).
[213] "Antitrust Case AT.40452 – Apple Mobile Payments," European Commission Competition, available at https://competition-cases.ec.europa.eu/cases/AT.40452 (hereinafter, EC Case AT.40452 – Apple Mobile Payments) (accessed February 3, 2025).
[214] EC Case AT.40452 – Apple Mobile Payments

FILED UNDER SEAL

with Apple Pay. ███████████████████████████████████████████

███████████████████████████████████████████



215

217.    ███████████████████████████████████████████ 216

This again underscores why the but-for world is most aptly characterized by one in
which the challenged conduct never occurred in the first instance. Had Google received
NFC access ██████████████, it could have competed down Apple Pay's fees,
challenging Apple's now entrenched monopoly power earlier. Economists widely
understand that, once such tipping has occurred, *ex post* intervention may be
insufficient to bring the market to a competitive equilibrium, even if *ex ante*
enforcement would have been effective – as I discuss further in Sections 5.2 and 9.5.

218.    Moreover, on December 9, 2024 Vipps MobilePay reportedly became the first
competitor to go live, offering a tap-and-pay mobile wallet on iOS. At launch, Vipps
signed card issuers including "SpareBank 1, DNB, and over 40 other Norwegian banks,
representing approximately 70% of Norwegian bank customers" and it "currently
works with terminals that accept BankAxept cards, Norway's national payment system,
covering more than 90% of payment terminals in the country."217

219.    While Vipps's first steps into tap-and-pay iOS mobile wallet competition began with a
domestic Norwegian network, Vipps also announced "in a few months, and well before
the summer vacation, the service will also be available for Visa and Mastercard cards,
making it possible to tap to pay with Vipps worldwide."218

220.    These facts lead to the clear conclusion that Apple's NFC Restraint excluded would-be
competitors from the relevant market.219 In other words, but-for the NFC restraint,
many developers would have competed to offer a mobile wallet on iOS devices. In
Section 8.1.3, I explain that Apple ████████████████████████████████

---

215 APL-ACU_00335383-4.

216 ████████████████████████████████████████████
██████████████████████████████████████ APL-ACU_00335382,
at -384.

217 "World's First Apple Pay Alternative for iPhone Launches in Norway," MacRumors, December 9, 2024,
available at https://www.macrumors.com/2024/12/09/vipps-mobilepay-first-iphone-apple-pay-alternative/
(accessed February 3, 2025).

218 "Vipps MobilePay Launches the World's First Alternative to Apple Pay on iPhone," Vipps MobilePay News,
December 9, 2024, available at https://vippsmobilepay.com/en/news/2024/12/09/vippsmobilepay-launches-the-
worlds-first-alternative-to-apple-pay-on-iphone (accessed February 3, 2025).

219 Even if the relevant market were broadened to include Android, it is clear that many non-OEM developers
only find it viable to offer a mobile wallet when it can be launched on both iOS and Android devices. The
evidence necessary to further analyze this question would be common to the proposed class, as is the question
itself.

██████████████████████████████████████████████████████████ .
Other mobile wallet providers, such as Curve, also reported they would "eliminate these fees for banks"[220] saving them "millions," following Apple's commitments to the EC.[221]

221.    It is therefore clear that Apple's NFC Restraint excluded competitors who would at least attempt to offer lower issuer fees.  To the extent Apple raises issues as to any offsetting justification or efficiencies associated with its conduct, these issues can be addressed on a class-wide basis.  In the next Section, I examine one of these excluded competitors, PayPal, in further detail.

### 8.1.3  PayPal Is (and Was) A Credible Competitive Threat to Apple Pay Which Apple Demonstrably Excluded From The Relevant Market

222.    A month after the EC announced Apple's commitment to open NFC access in the EEA, PayPal's CEO, Alex Chriss, disclosed that PayPal was preparing to compete directly with Apple Pay.  During its Q4 2023 earnings call, Chriss commented on the upcoming opportunity to offer NFC POS payment services on iOS, revealing that they would be "working closely on this," given their customers' demand for an "omnichannel and offline solution as well." Chriss went on to note that, once available, PayPal would "be ready to be able to deliver for [their] customers, both online and offline."[222]  Indeed (and as just explained in Section 8.1.2), ████████████████████████████████████████
████████████████████████████████████████████████████████[223]

223.    ████████████████████████████████████████████████████████████
Alex Chriss stated that PayPal is going to "quickly" take advantage of Apple opening up NFC, starting "with one country in Europe, likely this fall, and then continue to expand over time." He also alluded to the possibility of expanding in the US: "if it happens to work in the US as well, we'll do that."[224]  PayPal gaining access to NFC will now allow PayPal to compete more closely with Apple Pay in the EEA, though Apple maintains other challenged conduct which could still inhibit PayPal's ability to effectively compete.  It is also not clear yet whether Apple may take other steps, such

---

[220] "Curve to Launch Its Own Version of Apple Pay," The Paypers, available at https://thepaypers.com/mobile-payments/curve-to-launch-its-own-version-of-apple-pay--1268392 (hereinafter, "Curve to Launch Its Own Version of Apple Pay") (accessed February 3, 2025).

[221] "London Fintech Curve to Launch Apple Pay Rival That Could Save Banks Millions," City A.M., available at https://www.cityam.com/london-fintech-curve-to-launch-apple-pay-rival-that-could-save-banks-millions/ (accessed February 5, 2025). See also "Curve to Launch Its Own Version of Apple Pay:" "*Curve intends to support banks in saving on the costs of transaction fees which they now pay to Apple.*"

[222] "PayPal (PYPL) Q4 2023 Earnings Call Transcript," The Motley Fool, February 7, 2024, available at https://www.fool.com/earnings/call-transcripts/2024/02/07/paypal-pypl-q4-2023-earnings-call-transcript/ (accessed February 5, 2025).

[223] HCE, i.e., 'Host Card Emulation' allows NFC-enabled handsets to share the payment data with contactless payment terminals without using a Secure Element. See Section 4.5.2 for further discussion.

[224] "PayPal Holdings, Inc. (PYPL) Goldman Sachs Communacopia & Technology Conference 2024 (Transcript)," Seeking Alpha, September 9, 2024, available at https://seekingalpha.com/article/4719988-paypal-holdings-inc-pypl-goldman-sachs-communacopia-and-technology-conference-2024-transcript (accessed February 5, 2025).

FILED UNDER SEAL

as the imposition of fees, to hinder competition from PayPal and others granted access to the NFC chip.

224.    PayPal's interest in offering iOS users an NFC tap-and-pay mobile wallet is not new.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████[225]

██████████████████████████████

225.    ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████[226]  To my knowledge, Apple did not provide NFC access to PayPal ███████████████████

226.    PayPal's stated intention to now compete with Apple Pay (which was subsequently corroborated by Apple confirming PayPal had requested NFC access in the EEA) is important because PayPal was well positioned to offer a fee-reducing competitive threat to Apple Pay in the early years of its roll out. ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████

227.    ███████████████████████████████████████████████████████████

██████████████████████████████████[227]██████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████

---

[225] APL-ACU_06253515, at -516.

[226] APL-ACU_06253515.

[227] APL-ACU_00065200 at -204 and at -208.

74

**Figure 17: PayPal** ████████████████████████████**, 2022-2023**[228]



228.  ██████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████

**Figure 18: Apple Pay** ████████████████████████ **2023**[229]

229.  ██████████████████████████████████████
      ██████████████████████████████████████

---

[228] APL-ACU_00065200 at -204.
[229] APL-ACU_00065200 at -208.

75

FILED UNDER SEAL

██████████████████████████████████████████████████
███████████████████████████████████████████ 230

**Figure 19: PayPal** ████████████████████████████████████ **" 2023[231]**



230.   ████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████ █████████████████████
████████████████ █████████████████████████████████
██████████████████████████████ 232

---

[230] APL-ACU_00065200 at -210.
[231] APL-ACU_00065200 at -210.
[232] APL-ACU_00086740.

76

231. ████████████████████████████████████████████████████████████
████████████████████[233]



232.   In short, Apple demonstrably excluded PayPal from offering a tap-and-pay mobile wallet to iOS users through the challenged conduct.  PayPal was well positioned to enter the market and compete on fees owing to its established user base and trusted brand through its pre-existing e-commerce offering.  I discuss further implications of the effect PayPal's competition with Apple Pay would have had on issuer fees in Section 9.4.2.  In the next section, I explain that Apple also extracted fees on e-commerce transactions by only selling Apple Pay ██████████████

## 8.2  Apple Pay is ████████████████████████████

233.   In its bilateral agreements with issuers, Apple defines the terms of use, and associated fees, for its "Payment Platform," ████████████████████████ For example, in Apple's contract with Wells Fargo, the "Apple Payment Platform" █████████████████████ ████████████████████████████████████████████ ██████████████████[234]

234.   Clause 5.1.1 specifies the fees applying to credit and debit transactions made using the Apple Payment Platform.  These terms require ████████████████████ ████████████████████ – and pay the standard fees for the Apple Pay Platform.

---

[233] APL-ACU_00466489 at -491.
[234] APL-ACU_00096586 at -587, █████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████

FILED UNDER SEAL

235.    Only selling Apple Pay as a ███████████████ insulates Apple Pay from competition. Having first ensured (via its NFC Restraint) that no other tap-and-pay iOS mobile wallet can compete at POS, ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ In this sense, the NFC Restraint and the ██████████████████████ worked synergistically to enable Apple to extract supracompetitive prices from card issuers.

236.    Apple's internal documents explicitly recognize the anticompetitive effect of its ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████████[235]

████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

237.    ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████[236]

████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

238.    Apple also recognized that the NFC Restraint and the ████████████████ █████████████████████████████████████:

---

[235] APL-ACU_00920319 – ███████████████████████████████████
[236] APL-ACU_00156958 – ████████████████████████████████████

78



239.    Apple's ▮▮▮▮▮▮▮▮▮▮ therefore enabled it to extract supracompetitive fees on e-commerce transactions and furthered its broader monopolization scheme to achieve ▮▮▮▮▮▮▮ – as Apple explicitly recognized in internal communications.

240.    From a class certification perspective, I note that the ▮▮▮▮▮▮▮▮▮▮ in the issuer contracts I've reviewed applies to every member of the Proposed Issuer Class equally.  Whether such a restraint has the effect of monopolizing a relevant antitrust market is therefore a question common to the proposed class which can be answered with class wide evidence.

## 8.3  Apple Imposes Pricing Restraints on Issuers that Distort Competitive Incentives

241.    In its bilateral contracts with issuers, Apple stipulates a Pricing Restraint ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  For example, Apple's Payment Platform Agreement with Visa specifies that ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for Apple Pay transactions.[237]

242.    This restraint has the effect of eliminating the relevance of card holders' cross-price elasticities in card issuers' decision making.  In other words, card issuers cannot use card holders' responsiveness to price changes to resist Apple's fees.  This in turn narrows the field of effective competition facing Apple, supporting its broader monopolization scheme.

243.    From a class certification perspective, I note that the Pricing Restraint is in every issuer contract I reviewed and therefore applies to every member of the Proposed Issuer Class equally.  Whether such a restraint has the effect of monopolizing a relevant antitrust

---

[237] APL-ACU_00153579 at -681.

market is therefore a question common to the proposed class which can be answered with class wide evidence.

## 8.4 The Challenged Conduct is Also Capable of Harming Competition in an Android Inclusive Market

244.    In Section 7.2, I explained that Apple Pay maintains a virtual monopoly market share in excess of ▮ even in a broader market that includes Android tap-and-pay mobile wallets, such as Google Pay and Samsung Pay.  Here, I explain how the challenged conduct would be capable of foreclosing competition (and protecting Apple Pay's monopoly share) despite would-be competitors ostensibly being able to develop tap-and-pay mobile wallets on Android.

245.    In its decision regarding its antitrust investigation into Apple Pay, the EC stated:

> "access to the NFC Input on both iOS and Android is critical for developing a viable mobile wallet service (multi-homing)."[238]

> "offering an NFC-based payment solution on both Android and iOS (multi-homing) is essential for a significant number of in-store mobile wallet providers, as only reaching both Android and iOS users enables commercial viability."[239]

> "Most wallet developers' objective is to multi-home on both iOS and Android to reach all smartphone users, and it is often not viable not to be present on iOS, which offers significant market potential and revenue opportunities.  Developing separate (and different) solutions for the two operating systems is more costly and often not viable and goes against the consistency of the developer's services and brand.  Consequently, if they cannot also launch a wallet solution on iOS, many developers may not have an interest in developing it only for Android."[240]

246.    The EC went on to state:

> "NFC Input is also indispensable in the plausible broader market for in-store mobile wallets."[241]

247.    In short, the EC concluded (based on submissions from industry participants) that lack of NFC access on iOS could also prevent developers from developing an Android mobile wallet.  This occurs because it is only "commercially viable" to offer *any* mobile

---

[238] EC Decision on Apple Mobile Payments, ¶33.
[239] EC Decision on Apple Mobile Payments, ¶81.
[240] EC Decision on Apple Mobile Payments, ¶90.
[241] EC Decision on Apple Mobile Payments, fn. 89.

FILED UNDER SEAL

wallet if that wallet can be used on iOS in addition to Android.  Discovery in this case has revealed at least two facts which support the EC's conclusion:

- **First**, iOS users constitute a supermajority of mobile wallet spending, even when the exact same wallet is available on both iOS and Android (See Section 7.2).

- **Second**, rather than develop an NFC mobile wallet for Android users and a QR-code mobile wallet for iOS users, PayPal chose the common denominator (QR-codes) for both iOS and Android development.

248.    Indeed, Google also recognized that providing a mobile wallet for both Android and iOS customers was important to ███████████████████████████████████ ████████████████████████████████[242]  Through the challenged conduct, Apple prevented Google from improving the customer experience.

249.    Cutting off access to this key group (iOS device holders) therefore causes substantial foreclosure (and secures Apple's monopoly power) even if Android mobile wallets are in the relevant market.  As a result, the challenged conduct is also capable of harming competition and inflating prices even if Android mobile wallets are part of the relevant market.

250.    Access to the NFC interface is fundamental to processing contactless transactions. Apple did not innovate NFC, but it does control it on iOS devices.[243]  Without NFC access on iOS, mobile wallet providers cannot compete head-to-head with Apple Pay. Nor can they develop OS-agnostic wallets that would benefit Android and iOS consumers alike.  That, in reality, contactless mobile wallets are only offered by Original Equipment Manufacturer (OEMs) (Apple, Google, and Samsung) is therefore a consequence of the challenged conduct.  This is easy to demonstrate by simply observing the multitude of non-OEM NFC requests following Apple's commitment to open NFC access in the EEA (because of antitrust scrutiny) – discussed earlier in Section 8.1.2.

251.    Ultimately, whether Apple's challenged conduct foreclosed competition in a relevant market (regardless of whether that market is Android inclusive or not) is a question common to the Proposed Issuer Class which can be answered with class wide evidence. Each prong of the challenged anticompetitive scheme applied to all members of the Proposed Issuer Class equally.  I next turn to assessing whether harm is also common to the Proposed Issuer Class.

---

[242] APL-ACU_00335383.
[243] See Section 4.5 for a discussion of Apple's role in NFC technology.

FILED UNDER SEAL

# 9. Apple Pay Would Charge No (or the Same Lower) Fees in the But-for World to all Members of the Proposed Issuer Class

252.  My opinions regarding class wide common impact stem from five central observations:

- All members of the Proposed Issuer Class pay precisely the same fees to Apple.

- Tap-and-Pay Android mobile wallets face open competition, and consequently have been free to both card issuers and holders since 2011.

- The networks introduced "digital enablement" policies to reduce barriers to entry and expansion for tap-and-pay mobile wallets. This facilitated competition among Android mobile wallets but could not overcome the anticompetitive effects of Apple's challenged conduct.

- As a result, Apple Pay is the *only* known exception to charge issuer fees because Apple is the only mobile wallet provider with sufficient market power to do so.

- This market power, and consequent ability to extract exceptional fees, stemmed directly from the challenged conduct.

253.  Though discovery is ongoing, the evidence currently available to me indicates that, but-for the challenged conduct, Apple would have faced competition from mobile wallets that charge $0 fees across all members of the Proposed Issuer Class. As a result, harm is common to the Proposed Issuer Class. Indeed, I am not aware of any mobile wallet other than Apple Pay that charges any member of the Proposed Issuer Class any fees.

254.  Even if the but-for fee were not $0, there would still be class wide common impact so long as Apple Pay's fees were lower by any amount. This is because every member of the Proposed Issuer Class paid the same fees per transaction to Apple. If those identical fees were lower by any amount (even if still above $0), every member of the Proposed Issuer Class would therefore benefit from reduced transaction fees to Apple. There is no reason to think Apple would contradict its longstanding policy and instead extract individualized fees in the but-for world.

## 9.1  All Members of the Proposed Issuer Class Are Impacted

255.  All members of the Proposed Issuer Class pay the same fees for Apple Pay. Specifically, in the United States, Apple charges card issuers (members of the Proposed Issuer Class) ▉▉▉▉▉▉▉ of each credit transaction and ▉▉▉▉▉ for each debit transaction to give their card holders access to the Apple Pay platform. In response to plaintiffs' Request for Admission No. 1 (specific to credit fees), Apple stated:

82

FILED UNDER SEAL



256.   In response to plaintiffs' Request for Admission No. 2 (specific to debit fees), Apple
repeated that:



257.   Moreover, that Apple charges all issuers precisely the same fees is no accident. ▇▇



(emphasis added) Indeed, ▇▇▇▇▇▇▇

258.   This note was prepared for a ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

259.   It is therefore uncontested that Apple, by design, charges a perfectly homogenous fee
structure across all members of the Proposed Issuer Class for both credit and debit
transactions, and that it has ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

260.   This disposes of many of the questions economists frequently consider at class
certification.  For example, ▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇  or model a complex counterfactual distribution of prices.  Instead,
only a single but-for fee level will suffice.  This is because to properly evaluate the but-
for world, economists must hold everything except the challenged conduct constant.

261.   So long as the challenged conduct increased Apple Pay's fees during the Proposed
Issuer Class-period by *any* amount, each member of the Proposed Issuer Class paid an
overcharge and was therefore impacted.  If large and small issuers were differently

---

[244] Apple's Response to Request for Admission No.1.
[245] Apple's Response to Request for Admission No.2.
[246] APL-ACU_00228404.
[247] APL-ACU_00193108.

situated with respect to Apple Pay, I would expect that to manifest itself in Apple Pay's fees, yet Apple has admitted it does not.

## 9.2  Yardstick Analysis is a Method Common to the Proposed Issuer Class That Can Estimate Counterfactual Fees

262.    In antitrust cases, economists frequently use either a before-and-after comparison or a yardstick to evaluate damages and impact.[248]  The former compares prices across time, relying on a change in the competitive environment (for example, comparing prices pre-cartel vs during a cartel).  When there is no "clean" time period, economists may turn to yardstick analysis.  This instead relies on a comparator market with similar characteristics and in which the challenged conduct did not occur.

263.    Here, a yardstick analysis is a suitable method to construct the but-for world that is common to the Proposed Issuer Class.  There is no "clean" time period unaffected by the challenged conduct,[249] but there are mobile wallets with tap-and-pay capabilities available outside of iOS that Apple excluded from the relevant market through the challenged conduct.  I can use their fees as a yardstick of what fees on tap-and-pay iOS mobile wallets would look like in the but-for world.

264.    In the sections that follow, I describe several candidate yardsticks and what they indicate members of the Proposed Issuer Class would pay for tap-and-pay iOS mobile wallets but-for the challenged conduct.  All the yardsticks I identify support a $0 fee counterfactual.  Even if they did not, a competitive yardstick would remain a suitable damage methodology that identifies common impact so long as the yardstick indicated fees lower than Apple Pay by any amount.  Most importantly for the purpose of class-certification, I understand that, like Apple, the yardsticks I describe below all charge the same fees, or lack thereof, across all card issuers.

---

[248] McCrary, J., & Rubinfeld, D. L. (2014). Measuring benchmark damages in antitrust litigation. Journal of Econometric Methods, 3(1), 63-74. See p.63: "*The two most common approaches to evaluating damages involve the use of yardsticks and benchmarks. In a typical yardstick approach, one compares prices during the period in which the antitrust violation is believed to have had an effect (the "impact period") to prices in other markets that are deemed to be reasonably comparable to the market at issue.*" See also Hovenkamp, H. J. (2005). Federal antitrust policy: The law of competition and its practice (3rd ed.). Hornbook Series, Thomson/West, 3rd ed. A 'yardstick' approach is also endorsed in the official guidance for courts and practitioners in assessing antitrust damages published by the European Commission. Among the three approaches to quantification it describes are "*Comparator-based approaches," which might among other methods "compar[e] different geographic or product markets, also referred to as the 'yardstick' or 'benchmark' approach*." See "Quantifying Antitrust Damages: Towards Non-Binding Guidance for Courts," Oxera (Study Prepared for the European Commission), December 2009, available at https://web.archive.org/web/20101009141158/http://ec.europa.eu/competition/antitrust/actionsdamages/quantification_study.pdf (accessed February 3, 2025).

[249] I discuss why the period following Apple's commitments to the European Commission is not "clean" in more detail in Section 9.5. In short, economists widely understand that *ex post* enforcement in platforms that have tipped may be insufficient to bring the market to a competitive equilibrium. Moreover, other prongs of the challenged conduct, specifically the ▮▮▮▮▮▮▮▮▮▮ and the Pricing Restraint are still in place in the EEA.

## 9.3 Android Tap-and-Pay Mobile Wallets Are a Competitive Yardstick

265.    To predict the but-for world, fees on tap-and-pay Android mobile wallets are an instructive starting point. Neither Google Pay nor Samsung Pay charge any fees to either issuers or mobile wallet users. Indeed, Apple internally recognized that ████ ████████████████████████████████████████████████  For example:

- ▪ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████[250] (underline in original email)
- ▪ Similarly, Apple internal emails noted ████████████████████ ████████████████████████████████████[251]

266.    Google and Samsung's incentive to provide a mobile wallet free of charge appears to stem in part from the value a tap-and-pay mobile wallet adds to a smartphone/mobile OS. Indeed, ████████████████████████████████. Moreover, Samsung executives have also explicitly stated as such:

> "Samsung executive Injong Rhee told analysts recently that Samsung Pay is being developed to drive sales of the company's high-end smartphones, and not as a major revenue-making opportunity."[252]

267.    The first version of Google Wallet launched in 2011. At the time it charged $0 issuer fees. Google did not restrict NFC access on Android devices. Consequently, a competitor to Google Wallet offered by AT&T, T-Mobile and Verizon launched in 2013 following a successful trial in 2012 – this was originally called ISIS Wallet and later rebranded to Softcard.[253] In 2015, Google acquired intellectual property rights from Softcard and rolled it and Google Wallet into its new Android Wallet – with AT&T, T-Mobile and Verizon announcing their support for Google's tap-and-pay wallet.[254]

268.    In February 2015, Samsung acquired LoopPay and its intellectual property, signaling the imminent launch of its Samsung Pay wallet.[255] Indeed, by September 2015,

---

[250] APL-ACU_00085035.
[251] APL-ACU_00233740, at -741. See also "*Samsung Pay, Apple Pay's key rival, is not charging banks any commission, the bankers say*," Ibid.
[252] WSJ Google Loses Key Mobile Payment Fees.
[253] "Isis Mobile Wallet Goes Live Nationwide, Offers Freebies," CNET, November 14, 2013, available at https://www.cnet.com/tech/mobile/isis-mobile-wallet-goes-live-nationwide-offers-freebies/ (accessed February 3, 2025).
[254] Google Wallet Will Soon Come Pre-Installed on Verizon, AT&T, and T-Mobile Android Phones
[255] "Samsung Buys Startup LoopPay, Moves Toward Mobile Payments," Reuters, February 19, 2015, available at https://www.reuters.com/article/technology/samsung-buys-startup-looppay-moves-toward-mobile-payments-idUSKBN0LM2AY/ (accessed February 3, 2025).

FILED UNDER SEAL

Samsung Pay was available in the US. Samsung Pay's entry and its corresponding $0 issuer fees reflect competition with Google Pay, which also remained priced at $0. However, because Apple had insulated itself from competition, its higher issuer fees remained.

269. Witnessing the beneficial effects of competition, in 2015, the payment networks sought to lower barriers of entry for all mobile wallet providers by offering standardized tokenization services to ensure security and expanding Android mobile wallet coverage to every card issuer in their networks. This approach obviated the need for bilateral negotiations, removing a potential impediment to the entry and expansion of mobile wallets – which in turn increased output of tap-and-pay Android mobile wallets. The networks' efforts to remove barriers to entry, however, did nothing to ameliorate Apple's exclusionary conduct for the reasons discussed above.

270.  Google, still seeking to improve the customer experience, offered Google Pay on iOS until 2024 – just without NFC capabilities. This is consistent with Google's longstanding strategy of offering apps to iOS users that compete with Apple's own offering. For example, iOS users can download both Google Chrome and Google Maps on their iOS device. In fact, following Apple Maps' unsuccessful launch in 2012, Apple CEO Tim Cook issued a public apology, stating he was "extremely sorry" and even recommended iOS device holders use Google Maps instead.[257] In short, Google has a history of competing with Apple apps even on iOS devices – to the benefit of iOS users. ████████████ therefore supports the use of a yardstick damage method.

271. In summary, competition among Android mobile wallets led to $0 fee competitive level for several years before the launch of Apple Pay. When Apple launched as a monopolist on iOS devices, it imposed contractual and other anticompetitive restraints to immunize itself from competition. Apple's conduct demonstrably stymied Google's attempts to compete on iOS devices. The anticompetitive effects of Apple's conduct could not be ameliorated by the networks' efforts to lower barriers to entry and expansion of other mobile wallets.

---

[256] ████████████████████████████████████████ See APL-ACU_00335383.

[257] "Apple's Map Apology Humble, Plugs Other Services 'Good Enough'," ZDNet, September 28, 2012, available at https://www.zdnet.com/article/apples-map-apology-humble-plugs-other-services-good-enough/ (accessed February 3, 2025).

FILED UNDER SEAL

## 9.4 Payment Network Tokenization Frameworks Lowered Barriers to Entry and Expansion, Facilitating Fee Reducing Competition

272.  Google and Samsung wanted to offer their smartphone users a mobile wallet that could make tap-and-pay transactions.  By 2015, mobile wallets began to rely on tokens managed by the payment networks to securely store payment credentials.  These tokenization services are foundational to the wallets Apple, Google, and Samsung currently offer because the purpose of these mobile wallets is solely to store and transmit the tokens which only the networks can create and match to specific card holders.  Without those tokens, the wallets do not function.  The networks' tokenization services therefore became an indispensable input to mobile wallets – to which lack of access would constitute a potentially insurmountable barrier to entry for would-be mobile wallet competitors.

273.  Starting in 2015, Visa and Mastercard created commercial frameworks that facilitated access to their tokenization services, thereby supporting competition among mobile wallet providers while simultaneously expanding mobile wallet access (and consequently output) to all issuers in their networks, while also increasing transaction security:

> "There is one agreement with Visa and the banks can have confidence that there are no pass-through fees," said Visa President Ryan McInerney in an interview.  Banks and payment services can make other deals including fees, such as marketing arrangements, according to a person familiar with the matter.
>
> Visa unveiled its new tokenization service on May 28 the same day that Google announced Android Pay and said it had signed on to Visa's service.  Others will likely follow, because of the combined influence of Visa and MasterCard."[258]

274.  Specifically, in 2015, the networks (Visa and Mastercard) unveiled "digital enablement" "no-cost commercial frameworks" providing access to their "tokenization services" – called Visa Digital Enablement Program (VDEP) and Mastercard Digital Enablement Express (MDEE) respectively.[259]

275.  VDEP is a commercial framework allowing mobile wallet providers ███████████████
          ███████████████████████████████████████████████[260]███████████████
          ████████████████████████████████████████████████████████████

---

[258] WSJ Google Loses Key Mobile Payment Fees.

[259] MDEE appears to be separate from Mastercard Digital Enablement Services (MDES). In other words, the operative word in the MDEE acronym is "Express." ███████████████████████████████ – see APL-ACU_06234037 and APL-ACU_00990137.

[260] APL-ACU_00155696.



276.    Apple internally understood that ████████████████████████████
████████████[263]  Instead, it set default commercial terms between
mobile wallets and issuers which they could depart from by mutual agreement.
However, there would be little need to do so, given both issuers and wallet providers
were evidently happy to do business at the agreed $0 fee level and Mastercard centrally
provided the technical infrastructure to process such transactions.

277.    Through VDEP and MDEE, issuers could therefore access participating mobile wallets
and the tap-and-pay functionality they offer without paying any fees.  In exchange,
wallet providers could receive the networks' tokenization services and coverage across
all participating card issuers.  In this sense, VDEP and MDEE appear to be pro-
competitive agreements that reduced barriers to entry for mobile wallet providers.  By
facilitating competition among mobile wallets, these programs also guaranteed the $0
competitive fee level would be preserved.

### 9.4.1   Unlike Google and Samsung, Apple Did Not Participate in the Networks' Tokenization Frameworks

278.    Apple's internal documents indicate that ██████████████████████████
████████████████████████████.[264,265]



---

[261] APL-ACU_00987451.
[262] APL-ACU_06234037.
[263] See APL-ACU_06226301, at -315: ████████████████████████████████
████████████████████████████████████ Also see APL-ACU_00088978, at -981: ████████
[264] APL-ACU_00987451 at 453.
[265] APL-ACU_00444008 at -009.

FILED UNDER SEAL

279. Similarly, "Android Pay and Samsung Pay [were] among the first digital partners to participate in [MDEE]" – Mastercard's equivalent to VDEP. Both Google and Samsung had signed by the end of 2015.[266]

280. This meant Apple Pay was ████████████████████████████████████████████
████████████████████████████[267,268] Apple also ████████████████████████
████████████████████████████████ as indicated in an email chain where Apple
mentioned ████████████████████████████████████████████████[269]
Ultimately, ████████████████████████████████████████████████████████
████████████.[270]

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

281. Visa offered Apple ████████████████████████████████████████████████
████████████████████████████████████████████████████████████ Apple
similarly ████████████████████████████████████████████████████████████
████████████████████.

282. Visa and Mastercard's Digital Enablement Programs therefore appear to be a mutually beneficial arrangement where Google and Samsung (and, as discussed below in Section 9.4.2, PayPal) provided fee-free wallet access (benefitting Visa and Mastercard's issuer members) in exchange for them receiving the networks' tokenization services (benefitting Google, Samsung, and PayPal by enabling them to offer their users a tokenized mobile wallet). Indeed, Visa explicitly described VDEP as "a **commercial framework** for Visa partners **to access Visa's token services** and other digital capabilities in the United States."[271]  (emphasis added)

283. That Google Pay and Samsung Pay are nominally "free" therefore fails to fully capture the benefits they receive from their contracts with the networks. They are in fact recipients of the tokenization services which underpin and secure mobile wallet transactions – just as is Apple. In other words, Google and Samsung "sell" access to their mobile wallet in exchange for the payment networks' tokenization services. The primary distinction is that Apple faces no competition on iOS and consequently extracts

---

[266] "Mastercard's Express Lane to Secure Digital Commerce," PYMNTS, available at https://www.pymnts.com/news/2015/mastercards-express-lane-to-secure-digital-commerce/ (accessed February 3, 2025).
[267] APL-ACU_00927172 at -173.
[268] APL-ACU_00156958.
[269] APL-ACU_00357912 at -913.
[270] APL-ACU_00116421 at -423.
[271] "PayPal and Visa Enter New Partnership," Visa, available at https://www.visa.ie/visa-everywhere/innovation/paypal-and-visa-enter-new-partnership.html (hereinafter, "PayPal and Visa Enter New Partnership") (accessed February 3, 2025).

FILED UNDER SEAL

a fee from card issuers *in addition* to receiving Visa and Mastercard's tokenization services.

284. Most simply put – both smartphone producers and card issuers wanted to offer their customers a tap-and-pay mobile wallet.  To do so, smartphone producers needed tokenization services from the payment networks, and card issuers need to provision their cards on mobile wallets.  The networks were able to reduce barriers to entry and facilitate competition among mobile wallets on Android devices through their tokenization frameworks – demonstrably facilitating the entry of Samsung Pay and the expansion of Android Pay.  This put Google and Samsung in competition with each other, preserving the $0 competitive fee level on Android that had prevailed since 2011.  However, the networks could not reduce the insurmountable barrier to entry that Apple erected on iOS – lack of NFC access.  Apple Pay was consequently the only tap-and-pay mobile wallet that was fully insulated from price competition, and therefore extracted exceptional fees that no other tap-and-pay mobile wallet provider had sufficient power to achieve.

285. Therefore, but-for the challenged conduct, Apple, just like Google and Samsung, would have faced competitive pressure to charge a $0 fee level to *all* card issuers on both POS and e-commerce.  Would-be competitors who Apple excluded from the market availed themselves of the networks' tokenization frameworks to expand mobile wallet acceptance on Android devices before the start of the putative class-period.  I discuss a notable example, PayPal, in the following section.

## 9.4.2  Like Google and Samsung, PayPal Also Participated in the Networks' Tokenization Frameworks

286. Recall from Section 8.1.3 that:

- **First**, ███████████████████████████████ and publicly announced its intention to compete with Apple Pay following Apple's commitments to the EC.

- **Second**, Apple internally recognized ████████████████████ ████████████████████████████████████ ████████

287. Taking these facts together, I conclude that PayPal would be a credible competitive threat to Apple Pay but-for the challenged conduct.  In this section, I explain why such competition from PayPal would likely reduce Apple Pay's own fees.

288. At least as early as July 2016, PayPal "announced plans to join the Visa Digital Enablement Program (VDEP) and to enable NFC mobile payments to PayPal mobile

wallet users across US."[272]  I note this precedes the start of proposed class-period.

289.    Similarly, in an undated press release, Visa stated:

> "PayPal will join the Visa Digital Enablement Program (VDEP) to expand point-of-sale acceptance: **PayPal will join VDEP, a commercial framework for Visa partners to access Visa's token services and other digital capabilities in the United States**.  This will enhance transaction security and **expand acceptance for PayPal's digital wallet to all physical retail locations** where Visa contactless transactions are enabled. Consistent with VDEP, issuers will be able to choose whether to participate **and retailers can expect to pay fees that are consistent with other contactless transactions they accept today**."[273]  (emphasis added)

290.    Apple also ███████████████████████████████████
████"[274]



291.    PayPal's participation in VDEP means, like Google and Samsung, it agreed not to charge issuer fees in exchange for Visa's tokenization services.  In its announcement that PayPal would join VDEP, Visa explained:

> "Further, the arrangement is designed to carry significant benefits for issuing financial institutions, acquirers, and merchants.  **For issuing institutions, these include** a better customer experience, more spending volume on their credit and debit cards, **lower operational costs and improved security**. Merchants will also benefit from the improved customer experience, efficiency and security, which together will help drive increased sales."[275]  (emphasis added)

292.    Based on PayPal agreeing to a "commercial framework" with the payment networks

---

[272] "PayPal to Join VDEP and Unveil NFC Mobile Payments in US," The Paypers, July 26, 2016, available at https://thepaypers.com/mobile-payments/paypal-to-join-vdep-and-unveil-nfc-mobile-payments-in-us--765502 (accessed February 3, 2025).
[273] PayPal and Visa Enter New Partnership.
[274] APL-ACU_00444008.
[275] PayPal and Visa Enter New Partnership.

FILED UNDER SEAL

where it would receive their tokenization services in exchange for not charging issuer fees, I anticipate that any tap-and-pay iOS mobile wallet PayPal offers (or would have offered absent the challenged conduct) would not charge any fee to any member of the Proposed Issuer Class in the but-for world.  If, true to this prediction, PayPal launched on iOS at a $0 fee to issuers, this would place Apple under pressure to similarly reduce Apple Pay's fees, or risk card issuers delisting from Apple Pay and instead directing card holders to use PayPal's new tap-and-pay iOS mobile wallet.  This further supports my broader and more fundamental conclusion that Apple would have faced credible competition from mobile wallets that charged $0 fees to all members of the Proposed Issuer Class.

## 9.5  Apple Pay Fees After Opening NFC Access are not a Reliable Indicator of the But-for World

293.  Any Apple Pay fees that persist following Apple's decision to open NFC access are not a reliable measure of the fees that would have existed absent Apple's alleged anticompetitive conduct.  There are at least three reasons for this:

- **First**, the but-for world is one in which the challenged conduct never occurred in the first instance.  This is particularly important in multisided platforms, whose network effects can lead to tipping.  Published literature recognizes that, once the market has tipped in the incumbent's favor, ceasing the exclusionary conduct which originally caused it to tip may be insufficient to bring the market to a competitive equilibrium.[276]

- **Second**, plaintiffs in this case challenge multiple prongs of conduct, of which the NFC restriction is just one.  Apple's commitments to the EC do not require it to remove either the ███████████ or the Pricing Restraint.  These ███████████ may therefore continue to inflate Apple Pay fees even after opening NFC access.

- **Third,** ███████████████████████████.  The first competitor to Apple Pay only launched in December 2024 with a domestic payment network in Norway and interoperability with Visa and Mastercard to come in 2025.  As a result, there has been insufficient time for both competitive entry and contract renewal to occur and reduce Apple Pay's fees, so it would be premature to reach any conclusions about how those fees responded to Apple opening the NFC interface.

---

[276] "*To address the competitive concerns from platform M&A, we need to go beyond traditional approaches such as ex post regulatory intervention. An ex post antitrust approach alone is too narrow and too slow for dynamic markers, while in many cases the harm cannot be undone. The combination of economic forces described above can lead to market tipping behavior whose opportunity losses cannot be recovered ex post.*" Geoffrey Parker, Georgios Petropoulos & Marshall Van Alstyne, Platform Mergers and Antitrust, 30 Indus. & Corp. Change 1307, 1309 (2021), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3763513 (accessed February 3, 2025).

FILED UNDER SEAL

294.    Moreover, points one and two above may interact in allowing Apple to continue setting fees at the monopoly level.  For example, because of Apple Pay's now entrenched market position, issuers may not find it viable to delist from the platform, contact their cardholders, and ask them to substitute to another mobile wallet.  Yet, with the Pricing Restraint in place, that is their only option to incentivize cardholders to use a lower-fee platform.  In the but-for world where the NFC restriction never occurred, issuers would likely have been better able, in their original negotiations with Apple, to credibly threaten not to list on the platform in the first place unless Apple agreed to reduce its fees.

295.    Markets in which Apple has only recently opened NFC access, while continuing other courses of challenged conduct, are therefore not fully clean yardsticks of a but-for world in which Apple never engaged in any of the challenged conduct.

FILED UNDER SEAL

## 9.6  Assessment of Aggregate Class Wide Damages

296. ███████████████████████████████████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████



297. ███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

---

[277] Should subsequent disclosure/analysis indicate a greater than $0 counterfactual transaction fee, I may update my final conclusions on but-for fees in a merits report. The purpose of my present analysis is to demonstrate the applicability of class wide methods.

[278] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

FILED UNDER SEAL

██████████████████████████████████████████████
████████████████████████████

I declare under penalty of perjury that the foregoing is true and correct.

February 7, 2025

Dr. Christopher A. Vellturo

FILED UNDER SEAL

# Appendices

## A.    Payment Industry Participants

### A.1.    Key Players in the Payment Industry

298.    The payment industry comprises a web of parties, technologies and processes that interact to facilitate transactions between card holders and businesses.[279]  The key participants include:

- **The card holder** – the consumer that initiates payment for a good or service.

- **The merchant** – the business that accepts the payment in exchange for selling the good or service.

- **The card issuer ("issuer")** – the financial institution (a bank, credit union, or three-party network) that issues the credit or debit card to the customer. The issuer determines whether to authorize the transaction (based on factors such as available credit) and if approved, releases the funds for the payment of the good or service to the acquiring bank.

- **Acquiring bank ("acquirer")** – the merchant's bank.  The acquirer is the financial institution that enables the merchant to accept card payments.[280]  It facilitates receipt of the payment into the merchant's account, thereby settling the transaction.

- **The card network ("network")** – facilitates the transfer of funds by connecting the merchant to the issuer and providing the infrastructure for processing the payment.[281]  The major networks in the United States are Visa, Mastercard, American Express, and Discover.  Visa and Mastercard operate solely as networks and work with other financial institutions which issue cards to card holders.  In contrast, American Express and Discover act as both the network and the issuer.  As such, a network can either be a four-party network (where there is an issuer, an acquirer, a card holder, and a merchant), or a three-party network (where the card network also acts as the issuer).[282]  In a four-party network, the acquirer sits between the merchant and the card network, directing the transaction from the merchant to the network for authorization, and ultimately routing the payment to the merchant.[283]

---

[279] Stripe – the payment industry ecosystem explained.
[280] "Visa Payment Options: About Visa," YouTube, August 14, 2019, available at https://www.youtube.com/watch?v=9Q3rFNoBi5g (accessed February 3, 2025).
[281] "How Do Credit Card Networks Work," Stripe, available at https://stripe.com/in/resources/more/how-do-credit-card-networks-work (accessed February 3, 2025). See also CFPB report, pp. 27-28.
[282] CRS report.
[283] CFPB report, pp. 27-28.

299.    In many cases, a payment processor is also involved in the transaction.[284]  The payment processor may provide infrastructure for the transaction (such as a physical card reader or an online payment gateway).[285]  It also manages technical aspects of the transaction on behalf of the merchant, which can include verifying payment details, checking for fraud, and ensuring compliance with relevant regulations.[286]  Examples of payment processors include PayPal and Square.[287]

## A.2.    Fees in Standard Card Payments

### A.2.1.    Merchant Discount Rate

300.    When a card holder uses a debit or credit card to make a purchase, the merchant pays a "merchant discount rate" ("MDR") to their bank, called the "acquirer," which is typically around 1% to 3% of the total transaction value.[288]  The acquirer and merchant negotiate the MDR, which is comprised of (1) interchange fees, (2) network fees,[289] and (3) acquirer fees, which go to the (1) card issuer, (2) payment network, and (3) acquirer respectively.[290]  The acquirer distributes the interchange and network fees, and then retains the acquirer fee for itself.[291]  In a four-party network, a merchant that accepts cards badged by Visa or Mastercard enters into a contract with an acquirer for payment processing services.  This contract specifies the fees for processing a transaction.[292]

### A.2.2.    Multilateral Interchange Fees

301.    Default Multilateral Interchange Fees (sometimes abbreviated to "MIF"), which comprise the majority of the MDR, are determined by the payment networks in "interchange fee schedules" which are typically updated twice a year.[293]  They are called "multilateral" in reference to the payment networks setting MIFs on behalf of all participating issuers, rather than each issuer engaging in bilateral negotiations with acquiring banks.  They are called "default" because the networks set default rates which

---

[284] The Promise and Perils of Digital Wallets, fn. 14: "*Acquirers will frequently outsource many of their functions to third-party payment processors and independent service organizations*."
[285] CRS report.
[286] "Payment Processor vs. Payment Gateway," Stripe, available at https://stripe.com/in/resources/more/payment-processor-vs-payment-gateway (accessed February 3, 2025).
[287] PayPal offers both payment processing and digital wallet services.
[288] CRS report. See also "Credit Card Swipe Fees and Routing Restrictions," Congressional Research Service, October 8, 2024, available at https://crsreports.congress.gov/product/pdf/R/R48216 (hereinafter, 2024 CRS report) (accessed February 3, 2025), p. 8.
[289] Network fees are also sometimes referred to as "assessment fees" (see, e.g., United States of America et. al v. American Express Co. et al, *Complaint for equitable relief for violation of Section 1 of the Sherman Act*, Case No. 10-cv-04496 filed October 4, 2010 (E.D.N.Y.), p. 6. For purposes of this report, we use the term "network fees" to refer to the portion of the MDR that the card network receives (see, e.g. Electronic Payments Coalition report, p. 1).
[290] The Promise and Perils of Digital Wallets, p. 313.
[291] Electronic Payments Coalition report, p. 1. See also CFPB report, p. 28, fn. 53.
[292] CFPB report, pp. 27-28.
[293] CRS report; CFPB report p. 28.

FILED UNDER SEAL

issuer/merchants may bilaterally agree to depart from.  MIFs are usually a percentage of the transaction, plus a fixed amount (for example, 1.60% plus $0.10).[294]  The payment networks set the default level of MIFs to "attract issuing banks to their networks."[295]  The issuing institutions do not have direct control over the default fees.[296]

302.    MIFs are paid by merchants via their acquirer to the issuer and vary depending on the type of transaction, the size of the retailer, and the type of debit or credit card used.[297]  The issuer then pays its own network fee to the card network.[298]

303.    Debit card fees are governed by Regulation II (Debit Card Interchange Fees and Routing).  The regulation, which was implemented by the Durbin Amendment to the Dodd Frank Act in 2011, caps interchange fees for PIN debit card transactions at 0.05%, plus $0.21 per transaction for large issuing institutions.[299]

### A.2.3.    Network Fee

304.    The card network receives a portion of the MDR for facilitating the transaction and providing services such as fraud detection.  Network fees are typically around 0.1% to 0.2% of a transaction.[300]

### A.2.4.    Acquirer Fee

305.    The acquirer retains the balance of the MDR after paying network and interchange fees, which is typically around 0.2% to 0.3% of the transaction.[301]

### A.2.5.    Processing Fees

306.    If a payment processor is involved in the transaction, they will also charge a processing fee.  Processing fees are typically negotiated between the merchant and the payment

---

[294] In 2019, the average interchange rate for credit cards in the U.S. was 1.60% (weighted average as a percentage of purchase volume). See Electronic Payments Coalition report, p. 3. See also "Merchant Rates 2024-2025," Mastercard, available at https://www.mastercard.us/content/dam/public/mastercardcom/na/us/en/documents/merchant-rates-2024-2025.pdf (accessed February 3, 2025).
[295] CRS report.
[296] Electronic Payments Coalition report, p. 2.
[297] CFPB report, p. 28.
[298] "Who Pays for Generous Credit Card Rewards?" Kellogg School of Management, available at https://insight.kellogg.northwestern.edu/article/who-pays-generous-credit-card-rewards (accessed February 3, 2025).
[299] Large banks are financial institutions with more than $10 billion in assets. See CRS report. See also Zhu Wang, "Debit Card Interchange Fee Regulation: Some Assessments and Considerations," Federal Reserve Bank of Richmond Economic Quarterly, Vol. 98, No. 3, (Q3 2012), pp. 159-183, available at https://www.richmondfed.org/~/media/richmondfedorg/publications/research/economic_quarterly/2012/q3/pdf/wang.pdf (accessed February 3, 2025), pp. 162, 165.
[300] CRS report; CFPB report p. 28. See also 2024 CRS report, p. 10.
[301] Electronic Payments Coalition Report, p. 1.

FILED UNDER SEAL

processor.  PayPal and Square charge processing fees ranging from 2.6% to 2.9% of the transaction, plus a fixed fee of $0.10 to $0.30 per transaction.[302]

## A.3. Tokenization Process

307.    To use Apple Pay, an iPhone user first needs to sign up by opening the "Wallet" app on their iPhone and adding their credit or debit card information.  Apple Pay sends the card holder's Primary Account Number (the number printed on a debit/credit card, or "PAN") to the issuer,[303] which requests a payment token from a Token Service Provider (TSP), which is usually the card network.[304]  The card network – typically Visa or Mastercard – verifies the card holder's PAN.  It then creates an encrypted payment token called a Device Primary Account Number ("DPAN").  The DPAN is unique to each device, meaning that if a card holder adds the same card details to their phone and watch, each one will have a different DPAN.[305]  The card network returns the DPAN to the issuer, which in turn forwards this to Apple Pay.  Apple Pay saves the DPAN on the iPhone's Secure Element ("SE").[306]  The card holder's real card details are never stored on the SE, only the proprietary token (DPAN) created by the card network.

308.    The network maintains a secure "token vault," which records the match between the original PAN and the new random token value (DPAN).[307]  If a thief were to intercept the tokenized card number, they would be unable to use it to make any payments.  The purpose of tokenization is therefore to secure card holder data during the transaction.[308]  To make payment in store using Apple Pay, a user unlocks their phone (e.g., with Face ID), which allows Apple Pay to access the DPAN stored on the SE.  When the user taps their phone at the merchant's POS, the SE generates a dynamic cryptogram for the particular transaction.[309]  The SE sends this, together with the DPAN, to the POS system

---

[302] CRS report.

[303] The issuer must be partnered with Apple Pay for the card to be added. For a list of Apple Pay participating banks in the United States, see Apple Pay Participating Banks.

[304] See "Adapting to Mobile Wallets: The Consumer Experience," p. 12, fn. 37: "*Currently, only the card networks can serve as Token Service Providers (TSPs) for EMV payment tokens.*"  See also "Industry Perspectives on the Evolution of EMV Payment Tokenization," Federal Reserve Bank of Boston, revised May 6, 2019, p. 5: "*When EMVCo published the first tokenization specification v1.0, the only TSPs in the U.S. were the major card networks (Visa, Mastercard, American Express, and Discover), which allowed for a tightly controlled and secure process;*" p. 8: "*Only a few specialized companies (e.g., core processors and digital security companies) may be able to meet the threshold to become certified TSPs in the U.S.*" Available at https://www.bostonfed.org/-/media/Documents/PaymentStrategies/evolution-of-payment-tokenization.pdf (hereinafter, "Federal Reserve Bank of Boston on EMV Payment Tokenization") (accessed February 4, 2025).

[305] "Tokenization: A Deep Dive," Visa Commercial Solutions, available at https://web.archive.org/web/20240914005422/https://visa-commercial-solutions.visa.com/knowledge-hub/tokenization-a-deep-dive (accessed January 14, 2025).

[306] See Section {4.5.2}..

[307] The Promise and Perils of Digital Wallets, p. 328.

[308] "Payment Tokenization," Checkout.com, available at https://www.checkout.com/blog/payment-tokenization (accessed January 14, 2025).

[309] A dynamic cryptogram is a layer of security that is created for each transaction. It combines the DPAN and data pertaining to the transaction, such as the transaction amount. See Adapting to Mobile Wallets: The Consumer Experience, p. 4, fn. 14.

FILED UNDER SEAL

via the iPhone's NFC antenna.[310]  The POS routes the DPAN and dynamic cryptogram to the acquirer, which in turn relays this information to the card network (usually Visa or Mastercard).  The card network verifies and decrypts the DPAN to obtain the card holder's actual PAN.  The DPAN can only be decrypted by the card network, and not by Apple.[311]  The PAN, together with the payment information, is passed to the issuing institution which either approves or declines the transaction.[312]

---

[310] Adapting to Mobile Wallets: The Consumer Experience, p. 4.
[311] "Countries and Regions That Support Apple Pay," Apple Support, available at https://support.apple.com/en-gb/101554 (hereinafter, "Countries and Regions That Support Apple Pay") (accessed January 14, 2025).
[312] Countries and Regions That Support Apple Pay.

FILED UNDER SEAL

## B.    EEA NFC Requests

**Table 1: Apple's Response to Interrogatory No. 4 – NFC Requests in the EEA Post Commitments to the European Commission**



FILED UNDER SEAL



FILED UNDER SEAL



## C.    **Summary of Datasets Relied Upon**



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL





FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL





FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL





FILED UNDER SEAL





FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL





FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL





FILED UNDER SEAL





FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL



FILED UNDER SEAL

# D.    Materials Cited

## D.1.    Academic Articles

| |
|---|
| Herbert Hovenkamp, "Antitrust Market Definition: The Hypothetical Monopolist and Brown Shoe," Network Law Review, April 4, 2024, available at https://www.networklawreview.org/hovenkamp-market-definition/ (accessed February 3, 2025). |
| Jullien, B., Pavan, A., & Rysman, M. (2021). Two-sided markets, pricing, and network effects. In Handbook of industrial organization (Vol. 4, No. 1, pp. 485-592), available at https://faculty.wcas.northwestern.edu/apa522/Two-Sided-Market-and-Network-Effects.pdf (accessed February 3, 2025). |
| Adam J. Levitin, "Pandora's Digital Box: The Promise and Perils of Digital Wallets," University of Pennsylvania Law Review, Vol. 166, No. 2, January 2018, pp. 305-376, available at https://web.archive.org/web/20190428193040/https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=9607&context=penn_law_review (accessed January 14, 2025). |
| Areeda, P. E., Kaplow, L., Edlin, A. S., & Hemphill, C. S. (2021). Antitrust analysis: problems, text, and cases, 7th Edition, available at https://www.pbookshop.com/antitrust-analysis-problems-text-and-cases-7th-edition-9781454824992.html (accessed February 3, 2025). |
| Bertrand, Marianne, and Emir Kamenica. 2023. "Coming Apart? Cultural Distances in the United States over Time." American Economic Journal: Applied Economics, 15 (4): 100–141, available at https://www.aeaweb.org/articles?id=10.1257/app.20210663 (accessed February 5, 2025). |
| Bolt, W., & Tieman, A. F. (2008). Heavily skewed pricing in two-sided markets. International Journal of Industrial Organization, 26(5), 1250-1255, available at https://www.sciencedirect.com/science/article/abs/pii/S0167718707001336 (accessed February 3, 2025). |
| Borenstein, S., MacKie-Mason, J. K., & Netz, J. S. (1994). Antitrust policy in aftermarkets. Antitrust LJ, 63, 455, available at: https://www.jstor.org/stable/pdf/40843289.pdf (accessed February 5, 2025). |
| Filippo Lancieri & Patricia Morita Sakowski, Competition in Digital Markets: A Review of Expert Reports, 26 Stan. J.L. Bus. & Fin. 65, 75 (2021), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3681322 (accessed February 3, 2025). |
| Geoffrey Parker, Georgios Petropoulos & Marshall Van Alstyne, Platform Mergers and Antitrust, 30 Indus. & Corp. Change 1307, 1309 (2021), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3763513  (accessed February 3, 2025). |

Geoffrey Parker, Georgios Petropoulos & Marshall Van Alstyne, Platform Mergers and Antitrust, 30 Indus. & Corp. Change 1307, 1309 (2021), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3763513 (accessed February 3, 2025).

Hendry M. "What is NFC? In: Near Field Communications Technology and Applications," Cambridge University Press, available at https://www.cambridge.org/core/books/abs/near-field-communications-technology-and-applications/what-is-nfc/D7FBAAD86442DA5362711674061F3078 (accessed January 29, 2025).

Kenneth A. Bamberger & Orly Lobel, Platform Market Power, 32 Berkeley Tech. L.J. 1051, 1067-71 (2017), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3074717 (accessed February 3, 2025).

Lerner, A. P., (1934), The Concept of Monopoly and the Measurement of Monopoly Power, The Review of Economic Studies, 1, issue 3, p. 157-175 available at https://www.jstor.org/stable/2967480 (accessed February 3, 2025).

Luigi Zingales et al., Stigler Committee on Digital Platforms, Final Report, Stigler Center for the Study of the Economy & the State, U. Chicago Booth 7-8, 29, 34-41 (2019), available at https://www.chicagobooth.edu/-/media/research/stigler/pdfs/digital-platforms---committee-report---stigler-center (accessed February 3, 2025).

Rochet, J. C., & Tirole, J. (2006). Two-sided markets: a progress report. The RAND journal of economics, 37(3), 645-667, available at https://www.jstor.org/stable/25046265 (accessed February 3, 2025).

Shapiro, C. (1994). Aftermarkets and consumer welfare: Making sense of Kodak. Antitrust LJ, 63, 483, available at https://www.jstor.org/stable/40843290  (accessed February 5, 2025).

Tom Akana and Wei Ke, Ph.D., "Contactless Payment Cards: Trends and Barriers to Consumer Adoption in the U.S.," Federal Reserve Bank of Philadelphia Discussion Paper, May 2020, p. 3, available at https://www.philadelphiafed.org/-/media/frbp/assets/consumer-finance/discussion-papers/dp20-03.pdf (accessed January 14,

Zhu Wang, "Debit Card Interchange Fee Regulation: Some Assessments and Considerations," Federal Reserve Bank of Richmond Economic Quarterly, Vol. 98, No. 3, (Q3 2012), pp. 159-183, available at https://www.richmondfed.org/~/media/richmondfedorg/publications/research/economic_quarterly/2012/q3/pdf/wang.pdf (accessed February 3, 2025).

FILED UNDER SEAL

## D.2.    Public Documents

| |
|---|
| "About Google Pay," Google Pay Help, available at https://support.google.com/googlepay/answer/14555219?hl=en (accessed January 14, 2025). |
| "American Express Expands Availability of New Contactless Payment Product," SecureIDNews, July 16, 2003, available at https://www.secureidnews.com/news-item/american-express-expands-availability-of-new-contactless-payment-product/ (accessed January 14, 2025). |
| "Antitrust Case AT.40452 – Apple Mobile Payments," European Commission Competition, available at https://competition-cases.ec.europa.eu/cases/AT.40452 (accessed February 3, 2025). |
| "Antitrust: Commission Opens Investigation into Apple's Practices Regarding Apple Pay," European Commission, June 16, 2020, available at https://ec.europa.eu/commission/presscorner/detail/en/ip_20_1075 (accessed February 3, 2025). |
| "Antitrust: Commission Sends Statement of Objections to Apple on App Store Rules for Mobile Wallets," European Commission, May 2, 2022, available at https://ec.europa.eu/commission/presscorner/detail/en/ip_22_2764 (accessed February 3, 2025). |
| "Chase Announces New Contactless Visa Credit Cards," Crowdfund Insider, November 14, 2018, available at https://www.crowdfundinsider.com/2018/11/141318-chase-announces-new-contactless-visa-credit-cards/ (accessed January 14, 2025). |
| "Commission accepts commitments by Apple opening access to 'tap and go' technology on iPhones," European Commission, July 11, 2024, available at https://ec.europa.eu/commission/presscorner/detail/en/ip_24_3706  (accessed January 29, 2025). |
| "Contactless Cards: The Future of Payments," CNN Money, February 2, 2004, available at https://web.archive.org/web/20130408085233/https://money.cnn.com/2004/02/02/news/companies/contactless_cards/ (hereinafter, "CNN Money on Contactless Cards") (accessed January 14, 2025). |
| "Contactless Payments in a 'blink'," SecureIDNews, March 23, 2005, available at https://www.secureidnews.com/news-item/contactless-payments-in-a-blink/ (accessed January 14, 2025). |
| "Countries and Regions That Support Apple Pay," Apple Support, available at https://support.apple.com/en-gb/101554 (accessed January 14, 2025). |
| "Credit Card Swipe Fees and Routing Restrictions," Congressional Research Service, October 8, 2024, available at https://crsreports.congress.gov/product/pdf/R/R48216 (hereinafter, 2024 CRS report) (accessed February 3, 2025), p. 8. |
| "Curve to Launch Its Own Version of Apple Pay," The Paypers, available at https://thepaypers.com/mobile-payments/curve-to-launch-its-own-version-of-apple-pay--1268392 (hereinafter, "Curve to Launch Its Own Version of Apple Pay") (accessed February 3, 2025). |
| Defendant Apple Inc.'s Notice of Motion and Motion to Dismiss Plaintiffs' Amended Class Action Complaint, November 23, 2022, Case No. 4:22-cv-04174-JSW |

FILED UNDER SEAL

| |
|---|
| "Digital Wallet Statistics," Capital One Shopping, available at https://capitaloneshopping.com/research/digital-wallet-statistics (accessed January 14, 2025). |
| "Digital Wallets in Visa's Ecosystem," Visa, October 2024, available at https://usa.visa.com/content/dam/VCOM/global/support-legal/documents/digital-wallet-guide-october-2024.pdf (accessed February 3, 2025). |
| "Electronic Payments Coalition report," available at https://www.electronicpaymentscoalition.org/wp-content/uploads/2020/07/July-2020-Overview-of-Interchange.pdf (accessed January 14, 2025). |
| "Google Pay Expands Digital Wallet Features for Android and iOS," Payments Dive, available at https://www.paymentsdive.com/news/google-pay-payment-app-android-ios-digital-wallet/708305/ (accessed February 3, 2025). |
| "Google Wallet Makes Its Debut," The New York Times, September 19, 2011, available at https://archive.nytimes.com/bits.blogs.nytimes.com/2011/09/19/google-wallet-makes-its-debut/ (accessed February 4, 2025). |
| "Google Wallet Will Soon Come Pre-Installed on Verizon, AT&T, and T-Mobile Android Phones," The Verge, February 23, 2015, available at https://www.theverge.com/2015/2/23/8091407/google-wallet-softcard-partnership (accessed February 3, 2025) |
| "How Do Credit Card Networks Work," Stripe, available at https://stripe.com/in/resources/more/how-do-credit-card-networks-work (accessed February 3, 2025). |
| "Market Definition: Use and Abuse," U.S. Department of Justice Antitrust Division, available at https://www.justice.gov/atr/operationalizing-hypothetical-monopolist-test (accessed February 5, 2025). |
| "New MasterCard PayPass Utilizes Contactless Card Payment Technology," SecureIDNews, available at https://www.secureidnews.com/news-item/new-mastercard-paypass-utilizes-contactless-card-payment-technology/ (accessed January 14, 2025). |
| "NFC Forum Announces First Five Specifications," NFC Forum, available at https://web.archive.org/web/20110628203003/http://www.nfc-forum.org/news/pr/view?item_key=d8968a33b4812e2509e5b74247d1366dc8ef91d8 (accessed January 14, 2025). |
| "Operationalizing the Hypothetical Monopolist Test," U.S. Department of Justice, available at https://www.justice.gov/atr/operationalizing-hypothetical-monopolist-test (hereinafter, Operationalizing the Hypothetical Monopolist Test) (accessed February 4, 2025). |
| "Payment Trends 2023: Mobile Wallets Are Becoming Universal," Visa, 2023, available at https://corporate.visa.com/content/dam/VCOM/regional/na/us/services/documents/vca-mobile-wallets-are-becoming-universal.pdf (accessed January 14, 2025). |
| "Samsung Announces Launch Dates for Groundbreaking Mobile Payment Service Samsung Pay," Samsung Newsroom, available at https://news.samsung.com/global/samsung-announces-launch-dates-for-groundbreaking-mobile-payment-service-samsung-pay (accessed January 14, 2025). |
| "Samsung Buys Startup LoopPay, Moves Toward Mobile Payments," Reuters, February 19, 2015, available at https://www.reuters.com/article/technology/samsung-buys-startup- |

FILED UNDER SEAL

looppay-moves-toward-mobile-payments-idUSKBN0LM2AY/ (accessed February 3, 2025).

"Tap to Pay: Will Contactless Cards Pave the Way for NFC Mobile Payments in the U.S.?," Federal Reserve Bank of Boston, April 22, 2019, available at https://www.bostonfed.org/publications/payment-strategies/tap-to-pay-will-contactless-cards-pave-the-way-for-nfc-mobile-payments-in-the-us.aspx (accessed January 14, 2025).

"The FCA and PSR Publish a Joint Call for Information on Digital Wallets," Bird & Bird, 2024, available at https://www.twobirds.com/en/insights/2024/uk/the-fca-and-psr-publish-a-joint-call-for-information-on-digital-wallets (accessed January 14, 2025).

"The History of RFID Technology," RFID Journal, available at https://www.rfidjournal.com/expert-views/the-history-of-rfid-technology/76202/ (accessed January 14, 2025).

"Tokenization: A Deep Dive," Visa Commercial Solutions, available at https://web.archive.org/web/20240914005422/https://visa-commercial-solutions.visa.com/knowledge-hub/tokenization-a-deep-dive (accessed January 14, 2025).

"Vipps MobilePay Launches the World's First Alternative to Apple Pay on iPhone," Vipps MobilePay News, December 9, 2024, available at https://vippsmobilepay.com/en/news/2024/12/09/vippsmobilepay-launches-the-worlds-first-alternative-to-apple-pay-on-iphone (accessed February 3, 2025).

"Visa and Google Sign Licensing Deal to Boost Mobile Payment Adoption," Visa Newsroom, available at https://usa.visa.com/about-visa/newsroom/press-releases.releaseId.8936.html (accessed February 3, 2025).

"Visa Expands Contactless Payments with New Initiatives," Visa Newsroom, available at https://usa.visa.com/about-visa/newsroom/press-releases.releaseId.11046.html (accessed February 3, 2025)

"Visa Expands Global Footprint with Contactless Payments," Visa, November 14, 2018, available at https://usa.visa.com/about-visa/newsroom/press-releases.releaseId.15971.html (accessed January 14, 2025).

"Visa Payment Options: About Visa," YouTube, August 14, 2019, available at https://www.youtube.com/watch?v=9Q3rFNoBi5g (accessed February 3, 2025).

"Wells Fargo Accelerates Customer Checkout Experience with New Tap-to-Pay Contactless Cards," Business Wire, April 2, 2019, available at https://www.businesswire.com/news/home/20190402005214/en/Wells-Fargo-Accelerates-Customer-Checkout-Experience-with-New-Tap-to-Pay-Contactless-Cards (accessed January 14, 2025).

"Wells Fargo Pilots, Visa Formally Launches Mobile Contactless Payments," BankTech, available at https://web.archive.org/web/20240616164002/https://www.banktech.com/payments/wells-fargo-pilots-visa-formally-launches-mobile-contactless-payments/d/d-id/1294365.html (accessed January 14, 2025).

"What is a Digital Wallet," Checkout.com, available at https://www.checkout.com/blog/what-is-a-digital-wallet (accessed January 14, 2025).

FILED UNDER SEAL

"What is a Staged Digital Wallet?," GoCardless, available at
https://gocardless.com/guides/posts/what-is-a-staged-digital-wallet/ (accessed January 14,
2025).

"What is Host Card Emulation (HCE)?," Thales Group, available at
https://cpl.thalesgroup.com/faq/hardware-security-modules/what-host-card-emulation-hce
(accessed January 14, 2025).

"What Is NFC Technology?," Square, available at https://squareup.com/us/en/the-bottom-
line/managing-your-finances/nfc (hereinafter, "What Is NFC Technology? – Square")
(accessed January 14, 2025).

"Who Pays for Generous Credit Card Rewards?" Kellogg School of Management,
available at https://insight.kellogg.northwestern.edu/article/who-pays-generous-credit-card-
rewards (accessed February 3, 2025).

The Four Corner Model for Card Payments, Paiementor, December 15, 2017, available at
https://www.paiementor.com/the-four-corner-model-for-card-payments/ (accessed January
29, 2025).

The Three Corner Model in Card Payments, Paiementor, December 26, 2017, available at
https://www.paiementor.com/the-three-corner-model-in-card-payments/ (accessed January
29, 2025).

Visa 2021 Annual Reports, available at
https://s1.q4cdn.com/050606653/files/doc_financials/2021/ar/Visa-Inc_-Fiscal-2021-
Annual-Report.pdf (accessed February 3, 2025).

"Apple Pay Security," Apple, available at https://learn.applepay.apple/security-us (accessed
January 14, 2025).

"Apple Platform Security Overview," Apple Support, available at
https://support.apple.com/en-euro/guide/security/secc1f57e189/web (accessed January 14,
2025).

"Apple Platform Security: Payment Tokenization," Apple Support, available at
https://support.apple.com/en-gb/guide/security/seccb53a35f0/web (accessed January 14,
2025).

"Competition Issues in Aftermarkets – Note from the United States," OECD, available at
https://www.ftc.gov/system/files/attachments/us-submissions-oecd-2010-present-other-
international-competition-fora/aftermarkets.pdf (accessed February 5, 2025).

"New Visa PayWave Issuers and Merchants Sign Up for Faster, More Convenient
Payments," Secure Technology Alliance, September 20, 2007, available at
https://www.securetechalliance.org/new-visa-paywave-issuers-and-merchants-sign-up-for-
faster-more-convenient-payments/ (accessed February 3, 2025).

"Steve Jobs Wanted to Further Lock Customers into Apple's Ecosystem," CNET, available
at https://www.cnet.com/tech/tech-industry/steve-jobs-wanted-to-further-lock-customers-
into-apples-ecosystem/ (accessed February 5, 2025).

"2021 Debit Issuer Study White Paper," Pulse Network, available at
https://content.pulsenetwork.com/dis/2021-debit-issuer-study-white-paper (accessed
February 3, 2025).

"55% of High-Earning Consumers, 79% of Generation Z Use Digital Wallets," PYMNTS,
May 2, 2024, available at https://www.pymnts.com/mobile-wallets/2024/55percent-high-
earning-consumers-79percent-generation-z-use-digital-wallets/ (accessed February 3,
2025).

FILED UNDER SEAL

| |
|---|
| "Adapting to Mobile Wallets: The Consumer Experience," Federal Reserve Bank of Boston, June 16, 2017, available at https://www.bostonfed.org/publications/payment-strategies/choosing-a-mobile-wallet-the-consumer-perspective.aspx (accessed January 14, 2025). |
| "Amazon Pay: An In-Depth Guide," Stripe, available at https://stripe.com/gb/resources/more/amazon-pay-an-in-depth-guide (accessed January 14, 2025). |
| "Apple Announces Apple Pay," Apple Newsroom, September 9, 2014, available at https://www.apple.com/newsroom/2014/09/09Apple-Announces-Apple-Pay/ (accessed January 14, 2025). |
| "Apple Is the Largest Premium Smartphone Brand, but Its Lead Is Narrowing," TechSpot, January 2, 2024, available at https://www.techspot.com/news/101379-apple-largest-premium-smartphone-brand-but-lead-narrowing.html (accessed February 3, 2025). |
| "Apple Pay Participating Banks," Apple Support, available at https://support.apple.com/en-us/HT204916 (hereinafter, "Apple Pay Participating Banks") (accessed January 14, 2025). |
| "Apple Pay Set to Transform Mobile Payments Starting October 20," Apple Newsroom, October 16, 2014, available at https://www.apple.com/newsroom/2014/10/16Apple-Pay-Set-to-Transform-Mobile-Payments-Starting-October-20/ (accessed February 3, 2025). |
| "Apple Pay vs. Samsung Pay vs. Android Pay," Worldpay, available at https://www.worldpay.com/en/insights/article/apple-pay-vs-samsung-pay-vs-android-pay (accessed January 14, 2025). |
| "Apple Unveils Contactless Payments via Tap to Pay on iPhone," Apple Newsroom, February 8, 2022, available at https://www.apple.com/newsroom/2022/02/apple-unveils-contactless-payments-via-tap-to-pay-on-iphone/ (accessed February 3, 2025). |
| "Apple VP Jennifer Bailey: Apple Is Still Thinking About Replacing 'Everything in Your Wallet'," YouTube, December 7, 2016, available at https://www.youtube.com/watch?v=_Rdq6J34ljo (accessed February 3, 2025), 8:10–9:15. |
| "Apple's Map Apology Humble, Plugs Other Services 'Good Enough'," ZDNet, September 28, 2012, available at https://www.zdnet.com/article/apples-map-apology-humble-plugs-other-services-good-enough/ (accessed February 3, 2025). |
| "Beyond Magnuson-Moss and Kodak: Right to Repair as an Antitrust Issue," California Lawyers Association, Vol. 34, No. 1, Fall 2024, available at https://calawyers.org/publications/antitrust-unfair-competition-law/competition-volume-34-number-1-fall-2024-beyond-magnuson-moss-and-kodak-right-to-repair-as-an-antitrust-issue (accessed February 3, 2025). |
| "Big Tech's Role in Contactless Payments: Analysis of Mobile Device Operating Systems and Tap-to-Pay Practices," CFPB, September 7, 2023, available at https://www.consumerfinance.gov/data-research/research-reports/big-techs-role-in-contactless-payments-analysis-of-mobile-device-operating-systems-and-tap-to-pay-practices/full-report/  (accessed January 14, 2025). |
| "Change your Apple ID country or region," Apple Support, available at https://support.apple.com/en-us/11828 (accessed January 14, 2025). |
| "Contactless Card in 2021," J.P. Morgan Insights, available at https://www.jpmorgan.com/insights/payments/payment-trends/contactless-card-in-2021 (accessed February 3, 2025) |

FILED UNDER SEAL

| |
|---|
| "Core NFC," Apple Developer Documentation, available at https://developer.apple.com/documentation/corenfc (accessed February 3, 2025). |
| "Digital Wallet Tokenization," Checkout.com, available at https://www.checkout.com/blog/digital-wallet-tokenization (accessed January 14, 2025). |
| "Digital Wallet vs. Mobile Wallet: What's the Difference?," Capital One, August 15, 2024, available at https://www.capitalone.com/learn-grow/money-management/digital-wallet-vs-mobile-wallet/ (accessed January 14, 2025). |
| "Do iPhone Users Spend More Money Online Than Android Users?," Wolfgang Digital Blog, June 22, 2021, available at https://www.wolfgangdigital.com/blog/battle-of-the-internet-giants-apple-vs-facebook-june-2021/ (accessed February 3, 2025). |
| "Evolution of Touch-free," Mastercard, available at https://www.mastercard.com/content/dam/public/mastercardcom/gateway/payment-solutions/other/digital-disruption.pdf (accessed January 14, 2025). |
| "FeliCa and NFC Technology," Sony, available at https://www.sony.net/Products/felica/NFC/ (accessed January 14, 2025) |
| "Hotel Key Cards," SiteMinder, available at https://www.siteminder.com/r/hotel-key-card/ (accessed February 4, 2025). |
| "How QR Codes Work – PayPal," available at https://www.paypal.com/us/brc/article/how-do-qr-codes-work (accessed January 14, 2025). |
| "How to Target Bridge Millennials," PayPal Business Resource Center, available at https://www.paypal.com/us/brc/article/how-to-target-bridge-millennials (accessed February 3, 2025). |
| "Industry Perspectives on the Evolution of EMV Payment Tokenization," Federal Reserve Bank of Boston, revised May 6, 2019, available at https://www.bostonfed.org/-/media/Documents/PaymentStrategies/evolution-of-payment-tokenization.pdf (accessed February 4, 2025). |
| "iPhone Users Earn Higher Income, Engage More on Apps than Android Users," Comscore, available at https://www.comscore.com/Insights/Infographics/iPhone-Users-Earn-Higher-Income-Engage-More-on-Apps-than-Android-Users (accessed February 3, 2025). |
| "iPhone Users Spend $101 Every Month on Tech Purchases, Nearly Double of Android Users, According to a Survey Conducted by Slickdeals," PR Newswire, available at https://www.prnewswire.com/news-releases/iphone-users-spend-101-every-month-on-tech-purchases-nearly-double-of-android-users-according-to-a-survey-conducted-by-slickdeals-300739582.html?c=n (accessed February 3, 2025). |
| "Isis Mobile Wallet Goes Live Nationwide, Offers Freebies," CNET, November 14, 2013, available at https://www.cnet.com/tech/mobile/isis-mobile-wallet-goes-live-nationwide-offers-freebies/ (accessed February 3, 2025). |
| "London Fintech Curve to Launch Apple Pay Rival That Could Save Banks Millions," City A.M., available at https://www.cityam.com/london-fintech-curve-to-launch-apple-pay-rival-that-could-save-banks-millions/ (accessed February 3, 2025). |
| "Market Definition in Multi-Sided Markets – Note by Dr. Lapo Filistrucchi," OECD Competition Committee, January 12, 2018, available at https://one.oecd.org/document/DAF/COMP/WD(2017)27/FINAL/en/pdf (accessed February 3, 2025). |

FILED UNDER SEAL

| |
|---|
| "Mastercard's Express Lane to Secure Digital Commerce," PYMNTS, available at https://www.pymnts.com/news/2015/mastercards-express-lane-to-secure-digital-commerce/ (accessed February 3, 2025). |
| "MBNA America Bank Launches Contactless Credit Cards in Atlanta," MerchantService.com, October 17, 2005, available at https://www.merchantservice.com/mbna-america-bank-launches-contactless-credit-cards-in-atlanta/ (accessed January 14, 2025). |
| "Merchant Discount, Interchange, and Other Transaction Fees in the Retail Electronic Payment System," Congressional Research Service, August 6, 2021, available at https://crsreports.congress.gov/product/pdf/IF/IF11893/1 (accessed January 14, 2025). |
| "Merchant Rates 2024-2025," Mastercard, available at https://www.mastercard.us/content/dam/public/mastercardcom/na/us/en/documents/merchant-rates-2024-2025.pdf (accessed February 3, 2025). |
| "Mobile Phones and the Evolution of NFC," NXP, available at https://www.nxp.com/company/about-nxp/smarter-world-blog/BL-MOBILE-PHONES-EVOLUTION-OF-NFC (accessed January 14, 2025). |
| "Near Field Communication (NFC) Technology and Measurements White Paper," Rhode & Schwarz, June 2011, p. 3, available at https://cdn.rohde-schwarz.com/pws/dl_downloads/dl_application/application_notes/1ma182/1MA182_5E_NFC_WHITE_PAPER.pdf  (accessed January 14, 2025). |
| "Open NFC Platform," Apple, available at https://www.apple.com/uk/legal/privacy/data/en/open-nfc-platform (accessed February 3, 2025). |
| "Payment Processor vs. Payment Gateway," Stripe, available at https://stripe.com/in/resources/more/payment-processor-vs-payment-gateway (accessed February 3, 2025). |
| "Payment Tokenization 101," Stripe, available at https://stripe.com/ie/resources/more/payment-tokenization-101 (accessed February 3, 2025). |
| "Payment Tokenization," Checkout.com, available at https://www.checkout.com/blog/payment-tokenization  (accessed January 14, 2025). |
| "PayPal (PYPL) Q4 2023 Earnings Call Transcript," The Motley Fool, February 7, 2024, available at https://www.fool.com/earnings/call-transcripts/2024/02/07/paypal-pypl-q4-2023-earnings-call-transcript/ (accessed February 5, 2025). |
| "PayPal and Visa Enter New Partnership," Visa, available at https://www.visa.ie/visa-everywhere/innovation/paypal-and-visa-enter-new-partnership.html (accessed February 3, 2025). |
| "PayPal CEO sets out vision for 'PayPal everywhere' with NFC," NFCW, September 10, 2024, available at https://www.nfcw.com/2024/09/10/388838/paypal-ceo-sets-out-vision-for-paypal-everywhere-with-nfc/ (accessed January 14, 2025). |
| "PayPal Holdings, Inc. (PYPL) Goldman Sachs Communacopia & Technology Conference 2024 (Transcript)," Seeking Alpha, September 9, 2024, available at https://seekingalpha.com/article/4719988-paypal-holdings-inc-pypl-goldman-sachs-communacopia-and-technology-conference-2024-transcript (accessed February 5, 2025). |

FILED UNDER SEAL

"PayPal Rolls Out QR Code Payments for a Touch Free Way to Buy and Sell In-Person," PayPal, May 19, 2020, available at https://newsroom.paypal-corp.com/2020-05-19-PayPal-Rolls-Out-QR-Code-Payments-for-a-Touch-Free-Way-to-Buy-and-Sell-In-Person (accessed February 5, 2025).

"PayPal Rolls Out QR Code Payments for a Touch-Free Way to Buy and Sell In Person," PayPal, May 19, 2020, available at https://newsroom.paypal-corp.com/2020-05-19-PayPal-Rolls-Out-QR-Code-Payments-for-a-Touch-Free-Way-to-Buy-and-Sell-In-Person (accessed February 3, 2025).

"PayPal to Join VDEP and Unveil NFC Mobile Payments in US," The Paypers, July 26, 2016, available at https://thepaypers.com/mobile-payments/paypal-to-join-vdep-and-unveil-nfc-mobile-payments-in-us--765502 (accessed February 3, 2025).

"QR Code Payments," Stripe, available at https://stripe.com/gb/resources/more/qr-code-payments (accessed January 14, 2025).

"Quantifying Antitrust Damages: Towards Non-Binding Guidance for Courts," Oxera (Study Prepared for the European Commission), December 2009, available at https://web.archive.org/web/20101009141158/http://ec.europa.eu/competition/antitrust/actionsdamages/quantification_study.pdf (accessed February 3, 2025).

"Smartphone OS Share by Age Group in the U.S.," Statista, available at https://www.statista.com/forecasts/911113/smartphone-os-share-by-age-group-in-the-us (accessed February 3, 2025).

"Standards," ISO, available at https://www.iso.org/standards.html (accessed January 14, 2025).

"Tap to Pay on iPhone: Early Access Program," Square Press, available at https://squareup.com/us/en/press/tap-to-pay-early-access-program (accessed February 3, 2025).

"Tapping into the Future of Payments," Visa Navigate, archived January 23, 2025, available at https://web.archive.org/web/20250123122634/https://navigate.visa.com/na/spending-insights/tapping-into-the-future-of-payments/ (hereinafter, "Visa Navigate on the Future of Payments") (accessed February 3, 2025).

"The Consumer Credit Card Market," Consumer Financial Protection Bureau, October 2023, available at https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-report_2023.pdf?mod=article_inline,  (accessed February 3, 2025), p. 167.

"The History of Google Pay," Dintero, available at https://www.dintero.com/newsroom/blog/the-history-of-google-pay (accessed January 14, 2025).

"The Payment Industry Ecosystem Explained," Stripe, available at https://stripe.com/gb/resources/more/the-payment-industry-ecosystem-explained (accessed January 14, 2025).

"U.S. Citi Tests Tapping Subway Fares in NYC," NFC Times, available at https://www.nfctimes.com/project/us-citi-tests-tapping-subway-fares-nyc (accessed February 4, 2025).

"Visa Digital Enablement Program," Nilson Report, available at https://nilsonreport.com/articles/visa-digital-enablement-program/ (accessed February 3, 2025).

FILED UNDER SEAL

"Visa Launches Visa Wave for Contactless Card Payments," Secure Technology Alliance, April 27, 2004, available at https://www.securetechalliance.org/visa-launches-visa-wave-for-contactless-card-payments/ (accessed January 14, 2025).

"Wells Fargo Begins Contactless Credit, Debit Card Rollout," Payments Dive, available at https://www.paymentsdive.com/ex/mpt/news/wells-fargo-begins-contactless-credit-debit-card-rollout/ (accessed February 3, 2025).

"Wells Fargo, Visa Launch Mobile Payment Pilot," Secure Technology Alliance, June 27, 2007, available at https://www.securetechalliance.org/wells-fargo-visa-launch-mobile-payment-pilot/ (accessed February 3, 2025).

"What NFC Does," NFC Forum, available at https://nfc-forum.org/learn/what-nfc-does/ (accessed January 14, 2025).

"Where Millennials End and Generation Z Begins," Pew Research Center, January 17, 2019, available at https://www.pewresearch.org/short-reads/2019/01/17/where-millennials-end-and-generation-z-begins/ (accessed February 3, 2025)

"Why U.S. Banks Should Make Contactless Cards an Immediate Priority," Kearney Report, available at https://info.kearney.com/24/2185/uploads/why-us-banks-should-make-contactless-cards-an-immediate-priority.pdf (accessed February 3, 2025).

"World's First Apple Pay Alternative for iPhone Launches in Norway," MacRumors, December 9, 2024, available at https://www.macrumors.com/2024/12/09/vipps-mobilepay-first-iphone-apple-pay-alternative/ (accessed February 3, 2025).

Alistair Barr and Robin Sidel, "Google Loses Key Mobile Payment Fees: Google Misses Out on Apple's Slice of Mobile Transactions," The Wall Street Journal, June 5, 2015, available at https://www.wsj.com/articles/google-loses-key-mobile-payment-feesgoogle-misses-out-on-apples-slice-of-mobile-transactions-1433546638 (accessed February 3, 2025).

Australian Competition & Consumer Commission (ACCC), "Submission 11 to the Joint Committee on Corporations and Financial Services –Mobile and Digital Wallet," Parliament of Australia, available at https://www.aph.gov.au/Parliamentary_Business/Committees/Joint/Corporations_and_Financial_Services/Mobileanddigitalwallet/Submissions (accessed February 3, 2025).

Business Guide to Mobile Wallets, Worldpay, available at https://www.worldpay.com/en/insights/articles/business-guide-to-mobile-wallets (accessed January 14, 2025).

Global Payments Report Worldpay, available at https://worldpay.globalpaymentsreport.com/en#download-report (accessed January 14, 2025).

History of NFC, NFC Near Field Communication, available at https://nfcnearfieldcommunication.org/history.html (accessed January 14, 2025).

Mary Catherine O'Connor, "Chase Offers Contactless Cards in a Blink," RFID Journal, available at https://www.rfidjournal.com/news/chase-offers-contactless-cards-in-a-blink/79149/ (accessed January 14, 2025).

Ron Amadeo, "How Mobile Payments Really Work," Ars Technica, October 29, 2014, available at https://arstechnica.com/gadgets/2014/10/how-mobile-payments-really-work/ (accessed February 3, 2025).

FILED UNDER SEAL

| |
|---|
| See "Nokia's NFC Phone History," Windows Blog, available at https://blogs.windows.com/devices/2012/04/11/nokias-nfc-phone-history/ (accessed February 4, 2025). |
| Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary, "Investigation of Competition in Digital Markets" at p.334, available at https://s3.documentcloud.org/documents/7222833/House-Tech-Antitrust-Report.pdf (hereafter "US Congressional Report") (accessed February 3, 2025). |
| Visa 2019 Annual Report, available at https://s1.q4cdn.com/050606653/files/doc_financials/2019/ar/Visa-Inc.-Fiscal-2019-Annual-Report.pdf (accessed February 3, 2025). |
| Visa 2022 Annual Report, available at https://s1.q4cdn.com/050606653/files/doc_financials/2022/ar/Visa-Inc-Fiscal-2022-Annual-Report.pdf (accessed February 3, 2025). |
| Visa 2023 Annual Report available at https://s1.q4cdn.com/050606653/files/doc_downloads/2023/12/849d0b35-b550-4d4a-95e3-611146a657f2.pdf (accessed February 3, 2025). |
| Visa 2024 Annual Report, p. 8, available at https://s29.q4cdn.com/385744025/files/doc_downloads/2024/Visa-Fiscal-2024-Annual-Report.pdf |

FILED UNDER SEAL

## D.3.   Bates Documents

| |
|---|
| APL-ACU_00398118 |
| APL-ACU_00048947 |
| APL-ACU_00065200 |
| APL-ACU_00065608 |
| APL-ACU_00065952 |
| APL-ACU_00065952 |
| APL-ACU_00066111 |
| APL-ACU_00066280 |
| APL-ACU_00066713 |
| APL-ACU_00069301 |
| APL-ACU_00069421 |
| APL-ACU_00071286 |
| APL-ACU_00071646 |
| APL-ACU_00078951 |
| APL-ACU_00082336 |
| APL-ACU_00085035 |
| APL-ACU_00086030 |
| APL-ACU_00086740 |
| APL-ACU_00088978 |
| APL-ACU_00090458 |
| APL-ACU_00096586 |
| APL-ACU_00115796 |
| APL-ACU_00116421 |
| APL-ACU_00153579 |
| APL-ACU_00155450 |
| APL-ACU_00155696 |
| APL-ACU_00156958 |
| APL-ACU_00185266 |
| APL-ACU_00193108 |
| APL-ACU_00228404 |
| APL-ACU_00233740 |
| APL-ACU_00238804 |
| APL-ACU_00335383 |
| APL-ACU_00335383 |
| APL-ACU_00335382 |
| APL-ACU_00357912 |
| APL-ACU_00404483 |
| APL-ACU_00444008 |
| APL-ACU_00466489 |
| APL-ACU_00467618 |
| APL-ACU_00469885 |

FILED UNDER SEAL

| |
|---|
| APL-ACU_00681586 |
| APL-ACU_00681755 |
| APL-ACU_00689881 |
| APL-ACU_00711807 |
| APL-ACU_00711812 |
| APL-ACU_00712448 |
| APL-ACU_00920319 |
| APL-ACU_00927172 |
| APL-ACU_00987451 |
| APL-ACU_00988146 |
| APL-ACU_00990137 |
| APL-ACU_01084939 |
| APL-ACU_01138013 |
| APL-ACU_01158756 |
| APL-ACU_06140172 |
| APL-ACU_06174810 |
| APL-ACU_06199177 |
| APL-ACU_06226301 |
| APL-ACU_06234037 |
| APL-ACU_06253515 |
| CCU-APPLEPAY-0001518 |
| CCU-APPLEPAY-0001519 |
| CCU-APPLEPAY-0001520 |
| CCU-APPLEPAY-0001521 |
| CCU-APPLEPAY-0001522 |
| PAYPAL000001 |
| SEA_SUBP000000121 |
| SEA_SUBP000000239 |
| VisaAffinityCU-00002001 |

FILED UNDER SEAL

### D.4.    Requests For Admission & Interrogatories

| |
|---|
| Apple's Response to Request for Admission No.1. |
| Apple's Response to Request for Admission No.2. |
| Apple's Response to Request for Admission No. 5. |
| Apple's Response to Interrogatory No. 4. |
| Apple's Response to Interrogatory No. 8. |

FILED UNDER SEAL

### D.5.  Cases

| |
|---|
| Pulse Network v. Visa, No. 18-20669 (5th Cir. 2022), filed April 5, 2022 (hereinafter, "Pulse v. Visa Appeal"), pp. 2-4. |
| United States of America v. Visa, Inc., Complaint, No. 24-07214 (S.D.N.Y.), filed 24 September, 2024. |
| Antitrust Case AT.40452 – Apple Mobile Payments, "Commitments Decision (Art. 9) of 11.07.2024," European Commission, July 11, 2024, available at https://ec.europa.eu/competition/antitrust/cases1/202441/AT_40452_10269725_10183_3.pdf (accessed February 3, 2025). |
| Epic Games v. Apple Inc., Case No. 20-cv-5640 (N.D. Cal.), Dkt. No. 777-3, p. 25 ¶ 63. |
| United States of America et. al v. American Express Co. et al, Complaint for equitable relief for violation of Section 1 of the Sherman Act, Case No. 10-cv-04496 filed October 4, 2010 (E.D.N.Y.) |

FILED UNDER SEAL

## E. Curriculum Vitae



# CHRISTOPHER A. VELLTURO
## President

Over the course of his career, Dr. Vellturo has performed a wide variety of economic and econometric analyses and provided expert testimony in the context of mergers and acquisitions, antitrust litigation, intellectual property litigation and numerous other matters spanning a broad array of industries. Dr. Vellturo has testified on economics-related matters in numerous U.S. District Courts, as well as at the Canadian Competition Bureau, and before arbitral tribunals acting under the rules of arbitration of the American Arbitration Association. He has appeared before the U.S. Department of Justice, the Federal Trade Commission, various states' Attorneys General offices, the Federal Reserve Bank Board of Governors, and numerous other regulatory agencies on merger-related issues and other antitrust matters. Dr. Vellturo has also made appearances at hearings before the European Commission, and other antitrust enforcement agencies around the world. To date, he has performed economic analyses in over one hundred merger matters, in excess of seventy antitrust actions and well over one hundred intellectual property actions.

Dr. Vellturo has taught graduate-level economics at Boston University's School of Management.

Prior to forming Quantitative Economic Solutions, LLC (QES), Dr. Vellturo was a Principal at Analysis Group/Economics (AG/E) and a Senior Vice President and member of the Board of Directors at National Economic Research Associates (NERA).

Dr. Vellturo has published on a variety of topics, including merger and acquisition-related efficiencies, price discrimination, differentiated product analysis and market definition. His research has appeared in leading academic journals, including *Antitrust*, the *Antitrust Law Journal*, and the *Journal of Economics and Management Strategy*. Dr. Vellturo is a recipient of the Bradley Fellowship in Public Economics and has served as a referee for *American Economic Review* and *Rand Journal of Economics*.

A Ph.D. graduate in Economics from the Massachusetts Institute of Technology, Dr. Vellturo also holds a Sc.B. in Applied Mathematics and Economics from Brown University, where he graduated *magna cum laude* and *Phi Beta Kappa*.

## EDUCATION

1989          Ph.D. in Economics, Massachusetts Institute of Technology
              *Primary Fields:* Econometrics, Industrial Organization
              *Secondary Fields:* Public Finance, Game Theory, Law and Economics


1983          Sc.B. in Applied Mathematics and Economics (*magna cum laude*), Brown University


## PROFESSIONAL EXPERIENCE

2002-Present  **Quantitative Economic Solutions, LLC**
              *President/Manager* – Direct research on microeconomic issues in litigation and non-litigation matters. Areas of particular focus include: antitrust, regulation, and damages assessment in intellectual property and contract matters.

2008-2015     **Boston University, School of Management**
              *Instructor* – Department of Finance & Economics

2000-2002     **Analysis Group/Economics**
              *Principal* - Direct research and provide expert testimony on a variety of microeconomic issues with particular emphasis on antitrust, intellectual property, and mergers and acquisitions. Expert reports and testimony presented in U.S. District Court. Presented antitrust economic analyses to Federal Trade Commission, U.S. Department of Justice, Federal Reserve Bank Board of Governors and the European Commission.

1996-2000     **National Economic Research Associates, Inc.**
              *Senior Vice President* (1999-2000)
              *Vice President* (1996-1999)

1991-1996     **Cambridge Economics, Inc.**
              *Director* - Directed research and provided expert testimony on a variety of microeconomic issues with particular emphasis on antitrust, intellectual property, and mergers and acquisitions. Prior expert testimony provided in U.S. District Court and before the American Arbitration Association. Presented antitrust economic analyses to U.S. Department of Justice, Federal Trade Commission (Antitrust Division), state Attorneys General offices, and the Federal Reserve Bank Board of Governors.

1989-1991     **National Economic Research Associates, Inc.**
              *Senior Consultant* - Directed and performed research relating to issues of antitrust, intellectual property, mergers and regulation.

1987          **Department of Economics, M.I.T.**
              *Teaching Assistant* - Undergraduate econometrics.

| 1985-1989 | **Dean Ann F. Friedlaender, M.I.T.** |
|---|---|
| | *Research Associate* - Participated in research relating to transportation pricing and capital allocation responses to regulatory changes. |

| 1983-1985 | **National Economic Research Associates, Inc.** |
|---|---|
| | *Research Associate* - Conducted research on a wide variety of issues including antitrust, railroad rate setting, optimal landfill pricing, and PCB and asbestos abatement strategies. |

## AWARDS AND PROFESSIONAL ACTIVITIES

| 1987-1989 | Recipient, Bradley Fellowship in Public Economics |
|---|---|
| 1986 | M.I.T. Departmental Fellowship |
| 1983 | Phi Beta Kappa, Brown University |
| 1983 | Sigma Xi, Brown University |
| Present | Journal Referee for *American Economic Review* and *Rand Journal of Economics* |
| Present | Member, American Economic Association |
| Present | Member, American Bar Association |

**TESTIFYING HISTORY (PAST TEN YEARS)**

- *Novartis Pharmaceuticals Corporation, Plaintiff-Appellant v. Nanjing Noratech Pharmaceutical Co., ltd., Defendant-Appellee*
  Court of Appeals for the Federal Circuit Case 23-2317 (Appeal from the United States District Court for the District of Delaware, Nos. 1:20-md-02930-RGA, 1:23-cv-00401-RGA, Judge Richard G. Andrews)

- *Amyndas Pharmaceuticals Single Member P.C. and Amyndas Pharmaceuticals, LLC., v. Alexion Pharmaceuticals, Inc. and Zealand Pharma U.S., Inc.,*
  District of Massachusets, C.A. No. 1:20-cv-12254-LTS-JCB

- *Insulet Corp. v. EoFlow Co. Ltd., et al.*
  District of Massachusetts, C.A. No. 1:23-cv-11780

- *Aragon Pharmaceuticals, Inc., Janssen Biotech, Inc., and Sloan-Kettering Institute for Cancer Research v. Zydus Worldwide DMCC, Zydus Pharmaceuticals (USA) Inc., and Zydus Lifesciences Limited*
  United States District Court for the District of New Jersey, C.A. No. 2:22-CV-02964 (SRC)(LDW) Consolidated
  *Aragon Pharmaceuticals, Inc., Janssen Biotech, Inc., and the Regents of the University of California v. Zydus Worldwide DMCC, Zydus Pharmaceuticals (USA) Inc., and Zydus Lifesciences Limited*
  United States District Court for the District of New Jersey, C.A. No. 2:23-CV-01685 (SRC)(LDW)
  *Aragon Pharmaceuticals, Inc., Janssen Biotech, Inc., the Regents of the University of California, and Sloan-Kettering Institute for Cancer Research v. Sandoz Inc.*
  United States District Court for the District of New Jersey, C.A. No. 2:22-cv-03044 (SRC)(LDW)
  *Aragon Pharmaceuticals, Inc., Janssen Biotech, Inc., the Regents of the University of California, and Sloan-Kettering Institute for Cancer Research v. Hetero Labs Limited Unit V, and Hetero USA, Inc.*
  United States District Court for the District of New Jersey, C.A. No. 2:22-cv-03212 (SRC)(LDW)

- In Re: Ozempic (Semaglutide) Patent Litigation MDL No. 22-MD-3083 (CFC)
  *Novo Nordisk Inc. and Novo Nordisk A/S v. Rio Biopharmaceuticals Inc., et al.*
  United States District Court for the District of Delaware, C.A. No. 22-cv-294 (CFC) Consolidated
  *Novo Nordisk Inc. and Novo Nordisk A/S v. Mylan Pharmaceuticals Inc.*
  United States District Court for the District of Delaware, C.A. No. 22-1040 (CFC)

- *Insulet Corporation v. EOFlow Co., LTD.; EOFlow, Inc.; Nephria Bio, Inc.; Jesse J. Kim (A/K/A Jae Jin Kim); Luis J. Malave; Steven DiIanni; and Ian G. Welsford*
  United States District Court for the District of Massachusetts, C.A. No. 1:23-cv-11780-FDS

- *Mylan Pharmaceuticals, Inc. v. Novo Nordisk A/S*
  United States Patent and Trademark Office before the Patent Trial and Appeal Board, Case IPR2023-00724

- *Novo Nordisk Inc. and Novo Nordisk A/S v. Orbicular Pharmaceutical Technologies PVT. LTD., et al.*
  United States District Court for the District of Delaware, C.A. No. 1:22-cv-00856-CFC

- *Novartis Pharmaceuticals Corporation and Astex Therapeutics Ltd. v. MSN Pharmaceuticals, Inc. and MSN Laboratories PVT Ltd.*
  United States District Court for the District of Delaware, C.A. No. 21-870 (GBW)

- *Astellas Pharma Inc., et al. v. Lupin ltd., et al.*
  United States District Court for the District of Delaware, C.A. No. 23-819-GBW-CJB

- *Amgen Inc. and Amgen Manufacturing, Limited v. Sandoz Inc.*
  United States District Court for the District of New Jersey, C.A. No. 1:23-cv-02406-CPO-EAP

- *Genzyme Corporation and Aventis Inc. v. Novartis Gene Therapies, Inc., and Novartis Pharmaceuticals Corporation*
  United States District Court for the District of Delaware, C.A. No. 21-1736 (RGA)

- *Novartis Pharmaceuticals Corporation v. Lupin Inc.*
  United States District Court for the District of Delaware, C.A. No. 21-1105-MN
  *Novartis Pharmaceuticals Corporation and Dana-Farber Cancer Institute, Inc. v. Dr. Reddy's Laboratories, Inc. and Dr. Reddy's Laboratories, Ltd.*
  United States District Court for the District of Delaware, C.A. No. 21-1106-MN
  *Novartis Pharmaceuticals Corporation and Dana-Farber Cancer Institute, Inc. v. Lotus Pharmaceutical Co., Ltd., Teva Pharmaceuticals Development, Inc.*
  United States District Court for the District of Delaware, C.A. No. 21-1107-MN

- *Plastipak Packaging, Inc. v. Nestle Waters North America, Inc., Operating as BlueTriton Brands, Inc.*
  United States District Court for the Eastern District of Virginia, C.A. No. 1:20-cv-1288

- *Speyside Medical, LLC v. Medtronic CoreValve LLC, and Medtronic, Inc.*
  United States District Court for the District of Delaware, C.A. No. 20-361-LPS

- *PRCM Advisers LLC, Pine River Capital Management L.P., and Pine River Domestic Management L.P. v. Two Harbors Investment Corp.*
  United States District Court for the Southern District of New York, C.A. No. 1:20-cv-05649-LAK

- *Nevro Corp. v. Mayo Foundation for Medical Education and Research; and Venturi Group, LLC (Now Flathead Partners, LLC)*
  American Arbitration Association, Case No. 01-22-0002-8455

- *Microspherix LLC v. Merck Sharp & Dohme Corp., Merck Sharp & Dohme B.V., Organon USA, Inc., and Organon USA, LLC*
  United States District Court for the District of New Jersey Camden Vicinage, C.A. No. 2:17-cv-03984-RMB-JBC

- *Novo Nordisk Inc. and Novo Nordisk A/S v. Teva Pharmaceuticals, Inc. (F/K/A Teva Pharmaceuticals Development, Inc.) and Teva Pharmaceuticals USA, Inc.*
  United States District Court for the District of Delaware, C.A. No. 21-1782 (CFC)

- *Alacritech, Inc., v. Tier 3, et al.* (2:16-cv-00693-RWS-RSP (Lead Case)), *Wistron Corporation, et al.* (2:16-cv-00692-RWS -RSP*), Dell Inc.* (2:16-cv-00695-RWS-RSP), Defendants, and *Intel Corporation, Cavium, Inc.*, Intervenors
  United States District Court for the Eastern District of Texas Marshall Division

- *Plastipak Packaging, Inc. v. CG Roxane, LLC*
  United States District Court for the Southern District of Texas, Civil Action No. 4:20-cv-00356

- *Colibri Heart Valve LLC v. Medtronic CoreValve LLC*
  United States District Court for the District of California Southern Division, C.A. No. 8:20-cv-00847 (DOC) (JDE)

- *Harry Ploss, et al. v. Kraft Foods Group, Inc. and Mondelez Global LLC*
  United States District Court for the Northern District of Illinois Eastern Division, Case No. 15-cv-2937

- *Indivior Inc., Indivior UK Limited, and Aquestive Therapeutics, Inc. v. Alvogen Pine Brook LLC*
  United States District Court for the District of New Jersey, C.A. No. 17-cv-07106 (KM) (CLW)

- *Astellas Pharma Inc., Astellas Ireland Co., LTD., and Astellas Pharma Global Development, Inc. v. Sandoz Inc., et al.*
  United States District Court for the District of Delaware, C.A. No. 20-CV-01589

- *Teva Pharmaceuticals International GmbH v. Eli Lilly and Company*
  United States District Court for the District of Massachusetts, C.A. No. 1:18-cv-12029-ADB

- *Novartis Pharmaceuticals Corporation v. Mylan Pharmaceuticals, Inc.*
  United States District Court for the District of Delaware, C.A. No. 1:19-cv-1118-LPS

- *Novartis Pharmaceuticals Corporation v. Accord Healthcare, Inc., et al.*
  United States District Court for the District of Delaware, C.A. No. 1:18-cv-1043-KAJ

- *United Services Automobile Association v. PNC Bank, N.A.*
  United States District Court for the Eastern District of Texas Marshall Division, Case No. 2:21-cv-0246-JRG

- *Advantest America, Inc.; and Advantest Test Solutions, Inc. v. Samer Kabbani; Lattice Innovation, Inc.; AEM Holdings LTD; and Wavem US Inc.*
  Before the JAMS Arbitration Panel, Reference No: 1200057839

- *Boston Scientific Corp. and Boston Scientific Neuromodulation Corp. v. Nevro Corp.*
  United States District Court for the District of Delaware, C.A. No. 16-1163 (CFC)

- *Astellas US LLC; Astellas Pharma US, Inc.; and Gilead Sciences Inc. v. Hospira, Inc.*
  United States District Court for the District of Delaware, C.A. No. 18-1675-CFC-CJB (Consolidated)

- *United Services Automobile Association v. <u>PNC Bank, N.A.</u>*
  United States District Court for the Eastern District of Texas Marshall Division, Case No. 2:21-CV-0246-JRG
  *United Services Automobile Association v. <u>PNC Bank, N.A.</u>*
  United States District Court for the Eastern District of Texas Marshall Division, Case No. 2:20-cv-00319-JRG

- *Anthony Colucci, Vanessa Lorraine Skipper, Individually and on Behalf of Those Similarly Situated v. <u>Health First, Inc.</u>*
  United States District Court for the Middle District of Florida, C.A. No. 6:21-cv-00681-RBD-GJK

- *<u>Genentech, Inc. and Intermune, Inc.</u> v. Sandoz, Inc. and Lek Pharmaceuticals*
  United States District Court for the District of Delaware, Case No. 19-78 (RGA)

- *I-Mab v. <u>Tracon Pharmaceuticals, Inc.</u>*
  ICC Case No. 25372/MK

- *<u>Novo Nordisk Inc. and Novo Nordisk A/S</u> v. Sandoz In*c.
  United States District Court for the District of Delaware, C.A. No. 20-00747-CFC

- *<u>Indivior Inc. and Indivior UK Limited</u> v. Dr. Reddy's Laboratories S.A. and Dr. Reddy's Laboratories, Inc.*
  United States District Court for the District of New Jersey, Civil Action No. 17-07111-KM-CLW

- *<u>Amgen Inc.</u> et al. v. Sandoz Inc., et al.*
  United States District Court for the District of New Jersey, Civil Action No. 18-11026 (MAS)(DEA)

- *<u>Plastipak Packaging, Inc.</u> v. Premium Waters Inc.*
  United States District Court for the Western District of Wisconsin (Madison), Civil Action No. 3:20-cv-00098

- *<u>Boehringer Ingelheim Pharmaceuticals Inc., et al.</u> v. Mankind Pharma LTD., et al.*
  United States District Court for the District of Delaware, CA. No. 1:18-cv-01689-CFC (Consolidated)

- *<u>AMO Development, LLC, AMO Manufacturing USA, LLC and AMO Sales and Service, Inc.</u> v. Alcon LenSx, Inc., Alcon Vision, LLC, Alcon Laboratories, Inc. and Alcon Research, LLC.; Alcon Inc., Alcon LenSx, Inc., Alcon Research, LLC, and Alcon Vision, LLC. v. <u>AMO Development, LLC, AMO Manufacturing USA, LLC, AMO Sales and Service, Inc., and Johnson and Johnson Surgical Vision, Inc.</u>*
  United States District Court for the District of Delaware, C.A. No. 20-842 (CFC)

- *<u>Novo Nordisk Inc. and Novo Nordisk A/S</u> v. Mylan Institutional LLC*
  United States District Court for the District of Delaware, C.A. No. 19-01551-CFC

- *The Trustees of the University of Pennsylvania v. <u>Eli Lilly and Company</u>, ImClone LLC, and Bristol-Myers Squibb Company*
  United States District Court for the Eastern District of Pennsylvania, Case No. 2:15-cv-06133-PD

- *In the Matter of an Arbitration Under the CPR Non-Administered Arbitration Rules Between <u>Ford Motor Company</u>, on behalf of itself, its wholly and majority-owned subsidiaries, v. Ibiden Company, LTD., and all its direct and indirect subsidiaries.*

- *<u>H. Lundbeck A/S; Takeda Pharmaceutical Company LTD.; Takeda Pharmaceuticals U.S.A., Inc; Takeda Pharmaceuticals International AG; and Takeda Pharmaceuticals America, Inc.</u> v. Apotex, Inc., et al.*
  United States District Court for the District of Delaware, C.A. No. 18-88 (LPS) (Consolidated)

- *ViiV Healthcare Company, Shionogi & Co., Ltd. and ViiV Healthcare UK (No. 3) Limited v. <u>Gilead Sciences, Inc.</u>*
  United States District Court for the District of Delaware, C.A. No. 18-224-CFC-CJB

- *Ferring B.V., Ferring International Center S.A., and Ferring Pharmaceuticals, Inc. v. <u>Serenity Pharmaceuticals, LLC and Reprise Biopharmaceuticals, LLC</u>*
  United States District Court for the Southern District of New York, Case No. 17-cv-9922 (RWS) ECF CASE

- *OJ Commerce LLC; and Naomi Home, Inc. v. <u>KidKraft, LP;</u> and MidOcean Partners, LP.*
  United States District Court for the Southern District of Florida, Case No. 19-CV-60341-CIV-Cooke/Hunt

- *<u>SAS Institute Inc.</u> v. World Programming Limited; Luminex Software, Inc.; Yum! Brands, Inc.; Pizza Hut, Inc.; and Shaw Industries Group, Inc.*
  United States District Court for the Eastern District of Texas Marshall Division, Civil Action No. 2:18-CV-00295-JRG

- *<u>Pfizer Inc.</u>, et al. v. Zydus Pharmaceuticals (USA), et al.*
  United States District Court for the District of Delaware, C.A. No. 17-158 (LPS)

- *<u>Abbott Cardiovascular Systems, Inc., and Evalve, Inc.</u> v. Edwards Lifesciences, LLC, and Edwards Lifesciences, Corp.*
  United States District Court for the District of Delaware, Case No. 1:19-cv-00149-MN

- *Declaration Prepared for CaptionCall, LLC*
  Before the Federal Communications Commission, Washington, D.C. 20554, Docket No. 13-24

- *<u>3M Company & 3M Innovative Properties Company</u> v. Kerr Corporation*
  United States District Court for the District of Delaware, C.A. No. 17-01730-LPS-CJB

- *<u>CardioNet LLC, and Braemar Manufacturing, LLC</u> v. InfoBionic, Inc.*
  United States District Court for the District of Massachusetts, Civil Action No. 1:15-cv-11803-IT

- *<u>Novartis Pharmaceuticals Corporation</u> v. Accord Healthcare, Inc., et al.*
  United States District Court for the District of Delaware, C.A. No. 18-1043-LPS

- *Array Technologies, Inc. v. Colin Mitchell, <u>NEXTracker, Marco Garcia, Daniel S. Shugar, Scott Graybeal, and Flextronics International U.S.A., Inc.</u>*
  United States District Court for the District of New Mexico, Civil Action No. 1:17-cv-00087-JAP-LF

- *In the matter of the arbitration between Intellia Therapeutics, Inc. and <u>Caribou Biosciences, Inc.</u>*
  Before the JAMS Arbitration Panel, Reference No.: 1425027888

- *<u>Astellas Pharma Inc., Astellas Ireland Co., Ltd., and Astellas Pharma Global Development, Inc.</u> v. Actavis Elizabeth LLC, et al.*
  United States District Court for the District of Delaware, C.A. No. 1:16-905 (JFB0 (CJB) (Consolidated)

- *<u>Orexo AB and Orexo US, Inc.</u> v. Actavis Elizabeth, LLC, Actavis Pharma, Inc., Teva Pharmaceuticals USA, Inc., and Teva Pharmaceuticals Industries, Ltd.*
  United States District Court for the District of Delaware, C.A. No. 17-205-CFC

- *Adocia S.A. v. <u>Eli Lilly and Company</u>*
  The American Arbitration Association, AAA Case No. 01-17-0005-2264

- *<u>RELX Inc.</u> v. Informatica Corp.*
  United States District Court for the Southern District of New York, Case No. 16-cv-9718

- *BTG International Limited, et al., v. Amneal Pharmaceuticals LLC, et al.*
  United States District Court for the District of New Jersey, Civil Action No. 2:15-cv-05909-KM-JBC
  *BTG International Limited, et al., v. Amerigen Pharmaceuticals, Inc., et al.*
  United States District Court for the District of New Jersey, Civil Action No. 2:16-cv-02449-KM-JBC
  *BTG International Limited, et al., v. Teva Pharmaceuticals USA, Inc.*
  United States District Court for the District of New Jersey, Civil Action No. 2:17-cv-06435-KM-JBC

- *<u>Novo Nordisk Inc. and Novo Nordisk A/S</u> v. Teva Pharmaceuticals USA, Inc.*
  United States District Court for the District of Delaware, C.A. No. 1:17-cv-00227

- *Zimmer Surgical, Inc. and Dornoch Medical Systems, Inc. v. <u>Stryker Corporation and Stryker Sales Corporation</u>; <u>Stryker Corporation and Stryker Sales Corporation</u> v. Zimmer Surgical, Inc., Zimmer, Inc. and Dornoch Medical Systems, Inc.*
  United States District Court for the District of Delaware, C.A. No. 16-679-RGA

- *<u>Immunex Corporation, Amgen Manufacturing, Limited</u> and Hoffman La-Roche Inc. v. Sandoz Inc., Sandoz International GMBH and Sandoz GMBH*
  United States District Court for the District of New Jersey, Civil Action No. 2:16-cv-01118

- *<u>Desktop Metal, Inc.</u> v. Markforged, Inc. and Matiu Parangi*
  United States District Court for the District of Massachusetts, Civil Action No. 1:18-cv-10524-WGY

- *MorphoSys AG v. Janssen Biotech, Inc., Genmab US Inc., and Genmab A/S*
  United States District Court for the District of Delaware, C.A. No. 16-221 (LPS)(CJB)

- *Nevro Corp. v. Boston Scientific Corporation*
  United States Patent and Trademark Office, Case Nos. IPR2017-01812, U.S. Patent No. 6,895,280 B2

- *Plastipak Packaging, Inc. v. Niagara Bottling, LLC*
  United States District Court for the Eastern District of Virginia, Case 1:17-cv-01463-AJT-MSN

- *Crane Security Technologies, Inc., Visual Physics, LLC. v. Rolling Optics AB*
  US District Court for the District of Massachusetts, C.A. No. 14-cv-12428-LTS

- *BASF Agro B.V., Arnheim (NL), Wadenswil Branch and Bayer S.A.S. v. Makhteshim Agan of North America, Inc., and Control Solutions, Inc.*
  United States District Court for the Middle District of North Carolina. Civil Action No. 1:10-cv-00267-WO-LPA

- *Roche Diagnostics GmbH and Roche Molecular Systems, Inc. v. Enzo Biochem, Inc. and Enzo Life Sciences, Inc.*
  United States District Court for the Southern District of New York, Case No. 04 CV 4046 (RJS)

- *Bayer Intellectual Property GMBH, Bayer Pharma AG, and Janssen Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, Aurobindo Pharma USA, Inc., Breckenridge Pharmaceutical, Inc., Invagen Pharmaceuticals, Inc., Micro Labs Ltd., Micro Labs USA Inc., Mylan Pharmaceuticals Inc., Prinston Pharmaceutical Inc., Sigmapharm Laboratories, LLC, Torrent Pharmaceuticals, Limited, and Torrent Pharma Inc.*
  United States District Court for the District of Delaware, C.A. No. 15-902-RGA
  Consolidated

- *AstraZeneca LP and AstraZeneca AB v. Breath Limited; AstraZeneca LP and AstraZeneca AB v. Apotex, Inc. and Apotex Corp.; AstraZeneca LP and AstraZeneca AB v. Sandoz, Inc.; AstraZeneca LP and AstraZeneca AB v. Watson Laboratories, Inc.*
  United States District Court for the District of New Jersey, Consolidated Civil Action No. 08 CV 1512 (RMB)(AMD)

- *In re: Biogen '755 Patent Litigation*
  *Retained by Pfizer/Serono*
  United States District Court for the District of New Jersey, Civil Action No. 10-cv-02734(CCC) (JBC)

- *Alacritech, Inc., v. Tier 3, et al., Wistron Corporation, et al., Dell Inc.*
  United States District Court for the Eastern District of Texas, Marshall Division, Case No. 2:16-cv-00693-JRG-RSP

- *Neopharm LTD., Promedico LTD., and Neopharm (Isreal) 1996 LTD. v. Wyeth-Ayerst International, LLC F/K/A, Wyeth Ayerst International Inc.*
  United States District Court for the Southern District of New York, Case No. 1:14-cv-08192-SHS

- _DexCom, Inc._ v. _AgaMatrix, Inc._
  United States District Court for the Central District of California, Civil Action No. 1:16-cv-05947-SJO-AS

- _Development Specialists, Inc., Solely in its capacity as assignee for the benefit of creditors of Idun Pharmaceuticals, Inc. v. AbbVie Inc._

- _Koninklijke Philips Electronics, N.V. and Philips Electronics North America Corporation v. ZOLL Medical Corporation_
  United States District Court for the District of Massachusetts, Civil Action Nos. 1:10-cv-11041-NMG, 1:12-cv-12255-NMG

- _Knowles Electronics, LLC_ v. _AAC Technologies Holdings Inc. and American Audio Component, Inc._
  United States District Court for the Northern District of Illinois, Case No. 1:16-cv-3527

- _Safe Gaming System, Inc._ v. _Atlantic Lottery Corporation, Nova Scotia Gaming Corporation and Tech Link International Entertainment Limited._
  Court File No. T-1043-12

- _Dyson, Inc. and Dyson Technology Limited_ v. _SharkNinja Operating LLC and SharkNinja Sales Company_
  United States District Court for the Northern District of Illinois, Case No. 14-CV-779

- _Erfindergemeinschaft UroPep GbR_ v. _Eli Lilly and Company, and Brookshire Brothers, Inc._
  United States District Court for the Eastern District of Texas Marshall Division, Case No. 2:15-cv-01202

- _Wockhardt Bio AG v. Janssen Oncology, Inc._
  In The United States Patent and Trademark Office, Case No. IPR2016-01582 U.S. Patent No. 8,822,438 B2

- _BioMarin Pharmaceutical Inc. and Merck & CIE v. Par Pharmaceutical, Inc._
  United States District Court for the District of New Jersey, Civil Action No. 14-7203 (MAS)(TJB)

- _ViaTech Technologies, Inc. v. Microsoft Corporation_
  United States District Court for the District of Delaware, C.A. No. 1:14-1226-RGA

- _Arthrex Inc._ v. _Smith & Nephew, Inc. and Arthrocare Corp_
  United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:15-cv-1047-RSP
  _Arthrex Inc._ v. _Smith & Nephew, Inc. and Arthrocare Corp_
  United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:15-cv-1756-RSP

- _UCB, Inc., UCB Pharma GMBH, Research Corporation Technologies, Inc., and Harris FRC Corporation_ v. _Accord Healthcare, Inc. and Intas Pharmaceuticals LTD._
  United States District Court for the District of Delaware, C.A. No. 1:13-cv-1206-LPS (consolidated)

- *Bristol-Myers Squibb Co., E.R. Squibb & Sons LLC., ONO Pharmaceutical Co., Ltd., and Tasuku Honjo v. Merck & Co., Inc. and Merck Sharp & Dohme Corp.*
  United States District Court for the District of Delaware, Civil Action No. 14-1131-GMS
  *Bristol-Myers Squibb Co., E.R. Squibb & Sons LLC., ONO Pharmaceutical Co., Ltd., and Tasuku Honjo v. Merck & Co., Inc. and Merck Sharp & Dohme Corp.*
  United States District Court for the District of Delaware, Civil Action No. 14-560-GMS
  *Bristol-Myers Squibb Co., E.R. Squibb & Sons LLC., ONO Pharmaceutical Co., Ltd., and Tasuku Honjo v. Merck & Co., Inc. and Merck Sharp & Dohme Corp.*
  United States District Court for the District of Delaware, Civil Action No. 15-572-GMS

- *Actavis Laboratories UT, Inc. v. UCB, INC.*
  United States District Court for the Eastern District of Texas, Marshall Division, Case No. 2:15-CV-1001-JRG-RSP

- *Koninklijke Phillips N.V. and Philips Electronics North America Corporation v. ZOLL Medical Corporation*
  United States District Court for the District of Western Pennsylvania, Consolidated Civil Action No. 2:12-cv-01369-NBF

- *Enzo Life Sciences, Inc. v. Roche Molecular Systems, Inc. et al.*
  United States District Court for the district of Delaware, Case No. 12 Civ. 106

- *Enzo Life Sciences, Inc. v. Becton, Dickinson and Company, Becton Dickinson Diagnostics, Inc., and Geneohm Sciences, Inc.*
  United States District Court for the District of Delaware, Consolidated Civil Action No. 12-275-LPS

- *Merck Sharp & Dohme Corp. v. Hospira Inc.*
  United States District Court for the District of Delaware, Civil Action No. 14-915-RGA

- *Gilead Sciences, Inc., Gilead Pharmasset LLC, and Gilead Sciences Limited v. AbbVie Inc., and AbbVie Ireland Unlimited Company*
  United States District Court for the District of Delaware, Consolidated Civil Action No. 13-2034-GMS

- *MSC. Software Corporation v. Altair Engineering, Inc. et al.*
  United States District Court for the Eastern District of Michigan Southern Division, Case No. 2:07-cv-12807

- *SAS Institute, Inc. v. World Programming Limited*
  United States District Court for the District of North Carolina, Civil Action No. 5:10-cv-00025-FL (E.D.N.C.)

- *Novartis Pharmaceuticals Corporation, Novartis Corporation, and Novartis AG v. Wockhardt USA LLC, and Wockhardt Limited*
  United States District Court for the District of New Jersey, Civil Action No. 2:12-cv-03967-SDW-MCA

- *Ronald A. Katz Technology Licensing L.P. v. FedEx Corporation, Federal Express Corporation, FedEx Corporate Services, Inc., and FedEx Customer Information Services, Inc.*
  United States District Court for the Western District of Tennessee, Case No. 2:15-cv-02329-JPM-tmp

- *Janssen Pharmaceuticals, Inc., et al. v. Actavis Elizabeth LLC,* et al.
  United States District Court for the District of New Jersey, Civil Action No. 2:13-cv-04507-CCC-MF

- *Unimed Pharmaceuticals, LLC, Besins Healthcare Inc., and Besins Healthcare Luxembourg Sarl v. Perrigo Company, and Perrigo Israel Pharmaceuticals LTD.*
  United States District Court for the District of Delaware, Consolidated Civil Action No. 13-236 (RGA)

- *L'Oreal S.A. and L'Oreal USA, Inc. v. Merck and Co., Inc., Merck Sharp & Dohme Corp. and MSD Consumer Care, Inc.*
  United States District Court for the District of Delaware, Civil Action No. 12-99-GMS

- *Aetna Inc. v. Blue Cross Blue Shield of Michigan*
  United States District Court for the Eastern District of Michigan, Civil Action No. 2:11-cv-15346-BAF-RSW

- *Medac Pharma, Inc. and Medac Gesellschaft für klinische Spezialpräparate mbH v. Antares Pharma, Inc., Leo Pharma A/S and Leo Pharma Inc.*
  United States District Court for the District of New Jersey, Civil Action No. 1:14-cv-01498-JBS-KMW

- *Bayer Pharma AG, Bayer Intellectual Property GMBH and Bayer Healthcare Pharmaceuticals, Inc. v. Watson Laboratories, Inc.*
  United States District Court for the District of Delaware, Civil Action No. 12-1726 (LPS)(CBJ)

- *Pfizer Inc., Wyeth LLC, Wyeth Pharmaceuticals Inc. and PF Prism C.V. v. Apotex Inc., et al.*
  United States District Court for the District of Delaware, Civil Action No. 12-808-SLR.

- In Re: *Apple Inc. v. Samsung Electronics Co., Ltd. et al.*
  United States District Court for the Northern District of California, Case No. 12-CV-00630-LHK

- *Dainippon Sumitomo Pharma Co., Ltd. v. Merck Sharp & Dohme Corp., Merck & Co., Inc., and Essex Chemie AG*
  International Chamber of Commerce, International Court of Arbitration, No.: 17953/VR

## PUBLICATIONS AND PRESENTATIONS

"Trade Secrets Damages: Dangerous Waters." Presented at the Practicing Law Institute (PLI) Conference, Trade Secrets 2017: What every Lawyer Should Know, October 27th, 2017.

"Mock Trial: *Carnival Comics, Inc. v. DigiCom, LLP, et al.*" Presented at the 61st Annual Spring Meeting of the ABA Section of Antitrust Law, Washington, DC, April 11, 2013.

"Understanding How the Patent Cliff Will Re-Define the Endgame." Presented at the 12th Annual Maximizing Pharmaceutical Patent Life Cycles Conference, New York, NY, October 4, 2011.

"Differentiated Products" in *Issues in Competition Law and Policy, Volume I*, ed. D. Wayne Collins, Section of Antitrust Law of the American Bar Association, 2008.

"When Fraud on the Patent Office Violates Section 2: A Mock Trial." Presented at the 52nd Annual Spring Meeting of the ABA Section of Antitrust Law, Washington, DC, April 1, 2004.

"What Drives Consolidation?" Presented at the 28th Semiannual Members Meeting MIT/CRE, Cambridge, MA, May 14, 1998.

"Proving Unilateral Effects and Efficiencies in Merger Cases:  A Demonstration." Presented at the 46th Annual Spring Meeting of the ABA Section of Antitrust Law, Washington, DC, April 1, 1998.

"Creating An Effective Diversion:  Evaluating Mergers With Differentiated Products," *Antitrust*, Spring 1997.

"Economic Battles in the Antitrust Wars:  Network Industries and Their Relevance to Antitrust in the Computer Industry."  Presented at the Washington State Bar Association's Thirteenth Annual Antitrust, Consumer Protection and Unfair Business Practices Conference, November 8, 1996.

"Differentiated Products:  New Tools for New Methods."  Presented at NERA's Seventeenth Annual Antitrust & Trade Regulation Seminar, Santa Fe, NM, July 5, 1996.

"Market Definition Under Price Discrimination" (with J. A. Hausman and G. K. Leonard), Antitrust Law Journal, Vol. 64, No. 2 (Winter 1996).

"Learning-by-Doing in the Context of Antitrust Analysis" (with J. Hausman), April 1995.

"An Economic Analysis of ATM Surcharging," prepared for Southeast Switch Inc., October 5, 1995.

"Cost Effects of Mergers and Deregulation in the U.S. Rail Industry" (with Berndt, *et al.*), Productivity Issues in Services at the Micro Level, ed. Zvi Griliches and Jacques Mairesse, Kluwer Academic Publishers, 1993.

"Cost Effects of Mergers and Deregulation in the U.S. Rail Industry" (with Berndt, *et al.*), Journal of Productivity Analysis, 4, 127-144, 1993.

"Rail Costs and Capital Adjustments in a Quasi-Regulated Environment" (with Friedlaender, *et al.*), Journal of Transport Economics and Policy, 131-152, May 1993.

"Deregulation, Mergers and Cost Savings in Class I U.S. Railroads, 1974-1986" (with Berndt, *et al.*), Journal of Economics and Management Strategy, Vol. 1, No. 2, 1992.

"Observations on Pre-Trial Bargaining Models," MIT Mimeo, September 1989.

"The Deregulation of the U.S. Rail Industry: Efficiency and Equity in Attaining Rail Viability," Ph.D. Dissertation, Department of Economics, MIT, 1989.

"Achieving Cost Efficiency Through Merger: Evidence from the U.S. Rail Industry," Presented at the American Economic Association Symposium on Mergers and Acquisitions, New York, December 29, 1988.